————————

No. 16-1818

————————

## United States Court of Appeals for the Federal Circuit

————————

## Think Computer Corporation,

Appellant,

v.

## Square, Inc.,

Appellee.

————————

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board
No. CBM2014-00159
Patent 8,396,808

————————

## Appellant's Corrected Opening Brief

————————

RABICOFF LAW LLC
Isaac Rabicoff
73 W Monroe St
Chicago, IL 60603
(773) 669-4590

## CERTIFICATE OF INTEREST

### UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

*Think Computer Corporation v. Square, Inc.*

No. 16-1818

Counsel for the appellant certifies the following:

1. The full name of every party or amicus represented by me is:

   Think Computer Corporation.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:

   None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   See Attachment A.

Dated: <u>September 13, 2016</u>       <u>/s/ Isaac Rabicoff</u>
                                       Isaac Rabicoff

## ATTACHMENT A TO CERTIFICATE OF INTEREST

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Isaac Rabicoff
RABICOFF LAW LLC
73 W Monroe St
Chicago, IL 60603
(773) 669-4590

Michael Aschenbrener
Brian Noack
Robert Paladino
Aschenbrener Law P.C.
815 West Van Buren Street, Suite 415
Chicago, IL 60607
(312) 462-4922

# TABLE OF CONTENTS

Table of Authorities.................................................................6

Jurisdictional Statement.......................................................8

Statement of the Issues.........................................................8

Statement of the Case............................................................9

    A. The '808 patent and the technology..............................9

        1. The patent and instituted claims............................9

        2. The problem to be solved.......................................10

    B. The prosecution history of the '808 patent................13

    C. Square's challenge to the patent and the Board's decision......15

    D. Summary of the claim terms in dispute.....................17

Summary of Argument.........................................................19

Argument................................................................................21

I.     The Board erred in holding the instituted claims obvious because it failed to follow the claims' plain language and to consider the patents' prosecution history, which disavowed user selection......21

    A. The prosecution history demonstrated the applicant's disavowal of user selection of account roles.................22

    B. The Board failed to consider whether the applicant disavowed user selection in the prosecution history.......................24

        1. The Board claimed to find no clear and unmistakable disclaimer.................................................................24

        2. The Board erroneously believed that prosecution history disavowal was not previously argued...................26

II.    This Court should reverse the Board's determination of obviousness.................................................................28

    A. The Board's misconstruing of the claims to include user selection of account roles led it to conclude that Dalzell discloses the bi-directional account element................29

    B. The Board never found that Dalzell teaches a single user account that flexibly functions as a merchant or purchaser account during each transaction, as required by the claims.......................30

Conclusion.............................................................................34

Addendum
Final Written Decision (November 27, 2015).....................Appx1
Decision on Request for Rehearing (February 9, 2016).......Appx40
United States Patent No. 8,396,808...............................Appx53
Certificate of Filing and Service
Certificate of Compliance

# TABLE OF AUTHORITIES

## Cases

*CSS Fitness, Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002).........................................................28

*Eleckta Instrument S.A. v. O.U.R. Sci. Int'l Inc.,*
    214 F.3d 1302 (Fed. Cir. 2000).........................................................23

*In re Oelrich,*
    666 F.2d 578 (CCPA 1981)..........................................................31, 32

*In Re Rijckaert,*
    9 F.3d 1531 (Fed. Cir. 1993)............................................................31

*In Re Sang-Su Lee,*
    277 F.3d 1338 (Fed. Cir. 2002)...................................................29, 34

*Nike, Inc. v. Adidas AG,*
    812 F.3d 1326 (Fed. Cir. 2016).............................................28, 29, 34

*Omega Eng'g, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003).........................................................26

*Schindler Elevator Corp. v. Otis Elevator Co.,*
    593 F.3d 1275 (Fed. Cir. 2010).........................................................26

*SightSound Techs., LLC v. Apple Inc.,*
    809 F.3d 1307 (Fed. Cir. 2015).........................................................22

*SmithKline Diagnostic, Inc. v. Helena Labs. Corp.,*
    859 F.2d 878 (Fed. Cir. 1988)...........................................................34

*Standard Oil Co. v. Am. Cyanamid Co.,*
    774 F.2d 448 (Fed. Cir. 1985)...........................................................24

*Straight Path IP Group, Inc. v. Sipnet EU S.R.O.,*
    806 F.3d 1356 (Fed. Cir. 2015).......................................................22

*Trivascular, Inc. v. Samuels,*
    812 F.3d 1056 (Fed. Cir. 2016).......................................................23

## Statutes

28 U.S.C. § 1295(a)(4)(A)...................................................................8
35 U.S.C. § 6.......................................................................................8
35 U.S.C. § 103(a)............................................................................15
35 U.S.C. § 141(c)..............................................................................8
35 U.S.C. § 329...................................................................................8

## Rules

Fed. Cir. R. 47.5(a)............................................................................8
Fed. Cir. R. 47.5(b)............................................................................8

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5(a), appellant Think Computer Corporation ("Think") certifies that no other appeal from the same proceeding in the Patent Trial and Appeal Board (the "Board") is or was previously before this Court or any other appellate court.

Pursuant to Fed. Cir. R. 47.5(b), the Court's decision in this appeal may affect the following judicial and administrative matters: *Think Computer Corporation v. Square, Inc.*, No. 5:14-cv-01374 (N.D. Cal.).

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under 35 U.S.C. § 6 over the petition of appellee Square, Inc. ("Square") for Covered Business Method ("CBM") review of a United States patent owned by Think. The Board issued its final written decision on November 27, 2015. Appx1. The Board denied Think's request for rehearing on February 9, 2016. Appx51. Think timely filed its notice of appeal on April 7, 2016. *Square, Inc. v. Think Computer Corporation*, CBM2014-00159; Appx2572.

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35

U.S.C. §§ 141(c) and 329.

## STATEMENT OF THE ISSUES

1.    Each of the instituted claims recites a method of an electronic payment system that assigns account roles that are "adapted to selectively function" as either a merchant or purchaser "during any particular transaction." As shown by the prosecution history, the applicant disavowed user selection of account roles. And yet the Board construed these claim elements to include user selection, refusing to consider the prosecution history. Did the Board err as a matter of law in construing the claims to include user selection of account roles?

2.    The Board determined that the prior art teaches an online marketplace where a user *could* add a seller "feature" to an existing buyer's fixed-role account. But the Board never held that such a marketplace teaches flexible account roles within a single user account, as required by the instituted claims. Did the Board err as a matter of law in rendering the instituted claims obvious?

## STATEMENT OF THE CASE

### A.    The '808 patent and the technology

#### 1.    *The patent and instituted claims*

This appeal concerns United States Patent No. 8,396,808 (the "'808 patent"), owned, developed, and practiced by Think. It claims the benefit of United States Provisional Application No. 61/230,387, filed July 31, 2009. Appx63 at 1:8-12. The '808 patent contains 22 method claims directed to an electronic payment system that flexibly adapts to function in a merchant or purchaser role during any transaction—a fundamental difference from the way that traditional merchant terminals and plastic payment cards work, which each have fixed roles. *See e.g.,* Appx64 at 3:17-23; Appx67 at 9:60-64.

At issue are claims 1-7, 9-11, 13-17, and 20-22 ("instituted claims").

#### 2.    *The problem to be solved*

Electronic payment transactions are now ubiquitous in everyday life. Appx63 at 1:23-24. Banks dominate this field through the use of fixed-role products with associated fixed-role financial accounts:

physical processing terminals (for merchants) and plastic cards (for purchasers). Appx63 at 1:29-40. For these antiquated financial products, they charge substantial transaction and hardware fees. Appx63 at 1:23-35. With little alternative, businesses must absorb these significant transaction costs. *Id*. Despite the considerable service cost, these offerings also provide limited security at the time of sale, which has led to an epidemic of identity theft (only slightly mitigated by chip-based cards, as they can still easily be stolen and misused), and limited reporting information for each purchase, which drastically increases the cost of bookkeeping for businesses nationwide. Appx63 at 1:37-44.

The '808 patent addresses these problems. It provides a method for a payment system that, among other things, is capable of adaptively functioning in either a merchant or purchaser role for any particular transaction, without requiring a duplicate account for the opposite role. S*ee e.g.,* Appx67 at 9:59-64. This single account structure enables simplified bookkeeping by eliminating redundant database records. Appx64 at 3:29-32.

All independent claims contain substantially the same element as

the following:

> assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;

Appx67 at 9:59-64 ("bi-directional account element").



Figure 1

Figure 1, above, shows a flow chart of a payment system with features common to all payments systems disclosed by the patent. Appx54. New

Transaction S110 illustrates how the payment system selectively adapts a purchaser role to Consumer F and a merchant role to Business A. *Id.* Item Selection S120 shows how Consumer F is able to select from an item from a product catalog, which is stored in Payment System 100. *Id.* Thus, Figure 1 provides a compact visual representation of bi-directional accounts in action.

The Specification clearly sets forth the meaning of the bi-directional accounts common to all claims:

> an account may selectively function as either a merchant or a purchaser during any particular transaction…[i]n other words, *within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts.*

Appx64 at 3:17-22 (emphasis added).

## B.    The prosecution history of the '808 patent

The prosecution history is critical because the applicant specifically disavowed user selection of a buying or selling account for any particular transaction. Appx1676-1677. This disavowal came in the applicant's last response to an office action, immediately before allowance and was a reason for the allowance. *See* Appx1596.

In the last office action before allowance, the Examiner rejected as

obvious independent claims 1, 19, 20, 21, and 22. Appx460. The

Examiner alleged that Wong et al. disclosed the bi-directional account

element because

> the user *could*, after the registration phase, sign up as a
> merchant, and then the account assigned to the user *could
> be* associated with a merchant account, and then the
> merchant *could* register as a user and the merchant's first
> account *could be* transformed into a user account.

Appx463 (emphasis added). The Examiner also alleged that

> [Zhang] teaches that an account can at times be selectively
> designated as a buying account and at other times
> selectively designated as a selling account (see e.g. Table 4).
> [Zhang] allows users to selectively decide if they want to be
> the buyer, and if so, their account is marked as a buyer (or
> potential buyer if only in the bidding stage); and if they want
> to be the seller in the case where the user wants their
> account designated as the seller (or merchant) account.

*Id.*

In response, the applicant *expressly disavowed* user selection of

merchant or purchase roles within the meaning of the bi-directional

account element:

> At most, [the prior art] discloses that a *person* can assume
> these different roles, however, this does not teach that an
> *account within a payment system* is adapted to selectively
> function as either a merchant account or purchaser account
> during any particular transaction, as in Applicant's claim 1.

– 14 –

Appx1677 (emphasis in original).

The Examiner accepted the applicant's narrowed construction of the bi-directional account element, responding with a Notice of Allowance for all claims. Appx1596.

## C.   Square's challenge to the patent and the Board's decision

In 2014, Think sued Square for infringement of the '808 patent in the Northern District of California. Appx1283. In response, later that year, Square filed a petition for Covered Business Method ("CBM") review of the '808 patent by the Board. Appx81. In July of 2015, Square filed another petition for CBM review. Both CBM review petitions sought to invalidate method claims 1-11, 13-17, and 19-22. *Id.* All of those claims recite bi-directional account elements. The Board only granted the first petition, instituting CBM review of claims 1-7, 9-11,13-17, and 20-22. Appx1706-1707.

On November 27, 2015, the Board entered a Final Written Decision that invalidated claims 1-7, 9-11, 13-17, and 20-22 as obvious under 35 U.S.C. § 103(a). Appx1. The Board relied exclusively on a

combination of Bemmel and Dalzell. *See* Appx826; Appx849.

Surprisingly, the Board construed the bi-directional account element differently than *both* parties. The Board concluded that this limitation permitted user selection of merchant or purchaser account roles. Appx14. Even the Petitioner, citing the prosecution history, recognized that user selection of account roles was disavowed by the applicant, observing that the

> distinguishing feature of the claimed invention is that a *user account* (rather than a *human person*) can assume or function as either role.

Appx96.

By reading in user selection, the Board then found that Dalzell disclosed the bi-directional account element because

> a buyer, from a particular account, can add a seller feature to that particular account, without the need to create a whole new account.

Appx29. The Board arrived at this construction without regard for the prosecution history, specification, or the parties' agreed-upon construction.

Think moved for rehearing. *See* Appx2552. In its Decision on

Request for Rehearing, the Board—addressing only a different issue—found that simultaneous merchant and purchaser account functionality was not required for the *same* transaction:

> We find that "[a]ny particular transaction" means any specific transaction, and is not necessarily limited to all transactions going forward, and find further that, logically, an account need only function in "merchant mode" or "purchaser mode" for that particular transaction; otherwise the account would be in the awkward position of performing a transaction with itself.

Appx47. So the Board acknowledged that a single user account can flexibly adapt to a merchant role and purchaser role for "any specific transaction." *Id.*

Nowhere did the Board address Think's key contention that user selection of account roles is *not permitted* by the claims. *See* Appx2558-2560. It never addressed the prosecution history cited by Think that clearly disavowed user selection. *See* Appx2558. Even so, the Board claimed to have considered Think's citations to the prosecution history. Appx47-48. Its analysis does not support this.

Think appealed to this Court from the Board's Final Written Decision and Motion on Rehearing.

**D.    Summary of the claim terms in dispute**

Claim 1 of the '808 patent reads in relevant part:

> A method for transferring an electronic payment between a
> purchaser and a merchant comprising:
> **assigning a role** of a merchant account to a first account
> and a role of a purchaser account to a second account within
> a payment system wherein the first account and the second
> account are **adapted to selectively function** as either a
> merchant account or a purchaser account **during any
> particular transaction**;

Appx67 (emphasis added). The remaining instituted claims have

virtually identical bi-directional account elements.

The following tables summarize the competing claim constructions

for key claim terms.

| "assigning a role" | | |
| --- | --- | --- |
| **Claim Term** | **Think's Construction** | **Board's Construction** |
| "**assigning a role** of a merchant account to a first account and a role of a purchaser account to a second account within a payment system" | A payment system—not a user—designates a role of merchant account to a first account and a role of a purchaser account to a second account within the payment system | A user may optionally register two separate merchant and purchaser user accounts, which may or may not also be associated with separate fixed-role financial accounts, and the user may assume the role of purchaser or merchant when appropriate (Appx13-14; Appx47-48) |

| "adapted to selectively function" and "during any particular transaction" | | |
| --- | --- | --- |
| **Claim Term** | **Think's Construction** | **Board's Construction** |
| "wherein the first account and the second account are **adapted to selectively function** as either a merchant account or a purchaser account **during any particular transaction**" | A payment system—not a user—*must* be capable of designating to each user account either a merchant role or a purchaser role for each and every transaction | "a particular account need not function simultaneously as both a merchant account and a purchaser account; a user is permitted expressly to select which account mode is desired at the appropriate point in time" (Appx14) |

### SUMMARY OF ARGUMENT

The Board erred in construing several elements of the instituted claims, leading it to improperly conclude that the claims were obvious.

– 19 –

To begin, the Board refused to consider the applicant's express disavowal of user selection of account roles within a payment system in the prosecution history. Even Square recognized, in its petition, that such user selection had been disavowed in the prosecution history.

The Board's misconstruction of the instituted claims to permit user selection led it to incorrectly conclude that this limitation (the "bi-directional account element," *see infra* p. 5) was taught by Dalzell. Dalzell was the only prior art submitted by Square as a reference for the bi-directional account element.

But the Board found that Dalzell *only* discloses user selection of account roles: a user could "expressly select" account roles when appropriate. The Board, therefore, erred as a matter of law when it concluded that Dalzell taught the bi-directional account element when it could only teach precisely what the applicant disavowed in the prosecution history.

The Board also made no finding that Dalzell disclosed a related necessarily limitation of the claims: a single user account that flexibly functions as a merchant or purchaser account during each transaction.

Instead, the Board determined that Dalzell taught that a user *could*

add a seller "feature" to an existing buyer's account. And the Board

merely found it *possible* that a user could add a seller feature to a

buyer's account, not that Dalzell actually teaches that limitation. But

even if such a buyer account with user-added seller capabilities were

disclosed, this disclosure is not a payment system that flexibly adapts

account roles for each transaction, as required by the claims.

The Board erred by misconstruing the claims and rendering them

obvious. This Court should reverse the Board's construction of the

claims' terms and its determination of obviousness.

## ARGUMENT

## I.     The Board erred in holding the instituted claims obvious because it failed to follow the claims' plain language and to consider the patents' prosecution history, which disavowed user selection.

The Board erred as a matter of law by construing the claims' bi-

directional account elements to include user selection of account roles.

This reading is at odds with the plain language of the patent's claims

and its prosecution history.

This Court reviews de novo "the Board's ultimate claim

constructions." *Prolitec, Inc. v. Scentair Techs., Inc.,* 807 F.3d 1353, 1358 (Fed. Cir. 2015). Obviousness is a "question of law based on underlying factual findings." *SightSound Techs., LLC v. Apple Inc.,* 809 F.3d 1307, 1318 (Fed. Cir. 2015). Those underlying factual findings by the Board are reviewed "for substantial evidence and its legal conclusions *de novo.*" *Id.*

> ### A.    The prosecution history demonstrated the applicant's disavowal of user selection of account roles.

The Board erred in failing to consider the prosecution history of the patent, where the applicant intentionally limited the scope of the claims by excluding user selection of account roles. This disavowal impacts the construction of several claim terms.

This Court has made clear that in trial proceedings before the Board, "the prosecution history...is to be consulted even in determining a claim's broadest reasonable interpretation." *Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1362 (Fed. Cir. 2015). Even more recently, this Court further opined that "[u]nder a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and

prosecution history." *Trivascular, Inc. v. Samuels,* 812 F.3d 1056, 1062 (Fed. Cir. 2016) (citing *Straight Path*).

The Board erred when it construed the claims' bi-directional account elements to reach user selection of account roles, because the prosecution history shows that the applicant intentionally excluded and clearly disavowed this user selection. This Court made clear that "[c]laims that have been narrowed in order to obtain issuance over the prior art cannot be later interpreted to cover that which was previously disclaimed during prosecution." *Eleckta Instrument S.A. v. O.U.R. Sci. Int'l Inc.,* 214 F.3d 1302, 1308 (Fed. Cir. 2000).

The examiner had rejected the original claims by reading user selection into them, until the applicant clearly disavowed user selection of account roles. *See supra* pp. 6-7. Even Square acknowledged, in its petition, that the applicant disavowed selection of account roles by a human: "a user account (rather than a human person) can assume or function as either role." Appx96. Based on this express narrowing of the claims, the examiner responded with a notice of allowance. *See supra* pp. 6-7; *see also* Appx849.

The Board construed the bi-directional account element to include what the applicant intentionally disavowed. This Court has prohibited such construction, holding that the prosecution history limits the interpretation of the claims "so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.,* 774 F.2d 448, 452 (Fed. Cir. 1985). The Board's construction should be reversed.

## B. The Board failed to consider whether the applicant disavowed user selection in the prosecution history.

The Board denied rehearing, ruling that it did not need to consider the prosecution history for two reasons. None of its reasons excuse the Board from ignoring the prosecution history when construing the claims.

### 1. *The Board claimed to find no clear and unmistakable disclaimer.*

The Board declined to consider the prosecution history for allegedly not "ris[ing] to the level of a clear and unmistakable disclaimer with respect to the meaning of the claim terms." Appx48. But

the Board never addressed the central issue: that the prosecution history cited by Think demonstrated an unmistakable disclaimer of user selection of account roles. *See* Appx2558; *see also supra* p. 7.

The Board's analysis of the cited prosecution history never touches the issue of user selection:

> Patent Owner's discussion of the prosecution history on pages 4 and 5 of the Request for Rehearing do not amount to Patent Owner providing an explicit definition of "selectively function," "during any particular transition," or any other claim term as meaning "simultaneously"; nor do Patent Owner's statements rise to the level of a clear and unmistakable disclaimer with respect to the meaning of the claim terms.

Appx47-48. So the Board did address an unrelated issue: whether the claim terms require *simultaneous* merchant and purchaser account functionality during the *same* transaction. *Id; supra* p. 16. But it provided no analysis or authority to explain why it ignored the prosecution history's unmistakable disavowal of user selection of account roles.

Consequently, the Board continued to ignore the prosecution history disavowal, and never corrected its construction from the Final Written Decision that "a user is permitted expressly to select which

account mode is desired at the appropriate point in time." Appx14.

By adding "a new claim limitation" that "clearly narrows the scope of a claim," *Schindler Elevator Corp. v. Otis Elevator Co.,* 593 F.3d 1275, 1285 (Fed. Cir. 2010), the applicant intentionally surrendered user selection of account roles from the scope of the claims in order to obtain allowance. *See Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1324 (Fed. Cir. 2003) (a prosecution history disclaimer applies where the applicant, whether by amendment or argument, disavows "a certain meaning to obtain his patent"). Since user selection of account roles had to be excluded for the examiner to allow the claims—and the claims were allowed in the following office action—this exclusion must be considered a prosecution history disclaimer.

> 2.    *The Board erroneously believed that prosecution history disavowal was not previously argued.*

The Board purported to have considered the prosecution history cited by Think, Appx47-48, and even granted rehearing in part:

> insofar as we have addressed above the assertions set forth in Patent Owner's Request for Rehearing (Paper 51), the Request is granted.

Appx51.

And yet the Board also refused to alter its claim construction in light of the prosecution history since Think had allegedly raised a new argument in its Motion for Rehearing:

> if we were to now make a construction in favor of Patent Owner based on assertions concerning which Petitioner did not have a chance to respond, such a determination would be fundamentally unfair to Petitioner, and thus cannot be allowed.

Appx43.

Think did not raise a new argument for two reasons. First, Think raised the issue of prosecution history disavowal on several occasions during the proceeding. For example, in its principal response brief, Think specifically pointed out that the applicant overcame the examiner's rejections when it convinced the examiner that prior art only disclosed "the limited concept that users could assume the role of seller or buyer." Appx1808-1809.

Second, from the very beginning, Square acknowledged that user selection was disavowed in prosecution. *See supra* p. 16. In fact, Square even cited the same passage from the prosecution history, Appx96, that Think cited in its Motion for Rehearing, Appx2558, clearly

demonstrating disavowal.

So the Board both refused to revisit claim construction on procedural grounds, and ultimately purported to address those arguments on their merits (for example, whether the prosecution history contained a "clear and unmistakable disclaimer", Appx47-48) by granting rehearing in part. In any event, this Court should review the Board's analysis for error and not accept its refusal to consider the prosecution history on procedural grounds.

Think is also free to present "new or additional arguments in support of the scope of its claim construction on appeal," so long as the scope remains the same as argued below. *CSS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1371 (Fed. Cir. 2002). Think's position on the prosecution history disavowal of user selection has never changed, Square acknowledged this construction from the beginning, and so this Court should consider it on its merits.

## II.    This Court should reverse the Board's determination of obviousness.

The Board must make all factual findings necessary to making an obviousness determination. *See Nike, Inc. v. Adidas AG*, 812 F.3d 1326,

1345 (Fed. Cir. 2016); *see also In Re Sang-Su Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002). This Court reversed the Board for analysis that "lacks critical fact-findings needed for any obviousness determination." *Nike*, 812 F.3d at 1345. When the Board fails to make necessary factually findings, this Court is "unable to engage in such factfinding." *Id.*

Also, given the Board's interpretation of the prior art, the proper claim construction of the '808 patent cannot support its determination of obviousness under Dalzell. Square only cites Dalzell in its Petition and throughout the trial proceedings as reading on the bi-directional account element. *See e.g.,* Appx109-110.

## A.    The Board's misconstruing of the claims to include user selection of account roles led it to conclude that Dalzell discloses the bi-directional account element.

In its Final Written Decision, the Board determined as a matter of law that Dalzell discloses the bi-directional account element, but it expressly takes for granted that the claims permit user selection of account roles:

> we find that a more logical reading of paragraph 59 of Dalzell is that *a buyer, from a particular account, can add a seller feature to that particular account, without the need to create a whole new account.*

– 29 –

Appx29 (emphasis added). The Board concluded that Dalzell teaches that a buyer could "add a seller feature to [a] particular account", *id.*, and, necessarily, *only* the user could select between a merchant or purchaser role for any particular transaction ("a user is permitted expressly to select which account mode is desired at the appropriate point in time," Appx14).

The Board found that Square's expert testimony supported its factual finding that Dalzell only discloses user selection of account roles. *Id.* The Board made no finding that Dalzell discloses a *payment system* that flexibly selects account roles, nor did Square submit any prior art that taught this bi-directional account element under the *proper* claim construction.

**B. The Board never found that Dalzell teaches a single user account that flexibly functions as a merchant or purchaser account during each transaction, as required by the claims.**

The Board made no finding that Dalzell discloses a single user account with flexible account roles that could read on the bi-directional account element. Its only relevant finding falls short:

– 30 –

paragraph 59 of Dalzell…[teaches] that a buyer, from a particular account, *can* add a seller feature to that particular account, without the need to create a whole new account.

Appx29 (emphasis added).

That Dalzell *can* be made to operate in a particular way, does not mean that it discloses doing so. The fact that a certain characteristic may be present in the prior art does not establish whether the prior art teaches it. *See In Re Rijckaert,* 9 F.3d 1531, 1533 (Fed. Cir. 1993). In *Rijckaert*, this Court reversed the Board's obviousness determination. *Id.* This Court further noted that an "optimal condition" is not disclosed by prior art when it does not disclose "the means to achieve this optimal condition…explicitly or implicitly." *Id.* This Court concluded that "[t]he mere fact that a certain thing may result from a given set of circumstances is not sufficient" to establish its disclosure in the prior art. *Id.*, citing *In re Oelrich*, 666 F.2d 578, 581-82 (CCPA 1981) (the court made clear that an implicit teaching cannot "be established by probabilities or possibilities.").

Likewise, here the Board only found that the marketplace disclosed by Dalzell *could* allow a user to add a seller "feature" to her

existing buyer account. Appx29. But nowhere does the Board explain how it discloses the *means* by which a user could carry this out. Nor could a user-enabled seller "feature" by itself constitute a single user account with flexible account roles during each transaction, as required by the bi-directional account element. Buying and selling accounts have fundamentally different infrastructural requirements; an account that flexibly selects those roles is precisely the problem solved by the '808 patent and entirely unaddressed by Dalzell. *See supra* pp. 9-10.

In fact, paragraph 59 of Dalzell contains no explanation of how a user would set up such an account within the disclosed marketplace. Appx874 at [0059]. The Board merely found that it is *possible* ("a buyer…*can* add a seller feature," Appx29) that a user could concoct such an account setup given the general capabilities of Dalzell's marketplace. *See In re Oelrich*, 666 F.2d at 581-82. And even if Dalzell teaches a buyer account that includes a seller feature by default—which it clearly does not—this does not teach a payment system that flexibly adapts account roles for each transaction, a necessary limitation of the claims.

The Board's interpretation of paragraph 59 is also entirely

unsupported by any reasonable reading of that section: it makes no mention of a single account with combined buyer and seller functionality. It only discusses a user's *separate* registration of a seller account:

> As is conventional, users of the marketplace system can register online as marketplace sellers and thereafter create marketplace listings. As part of seller registration and/or as marketplace listings are created, the system may allow the user/seller to specify shipping and other policies to be published to buyers, and specify a bank account into which proceeds from sales are to be deposited by the system or its operator.

Appx874 at [0059]. The Board insists that "such a finding is supported by extensive analysis and testimony by [Square's expert], with explicit citations to Dalzell." And yet, the expert never cites paragraph 59 in his analysis. This is because paragraph 59 reveals that Dalzell cannot teach flexible account roles within a single user account when a user only has the option to register a separate seller account. *See* Appx874 at [0059].

The Board, consequently, failed to make all necessary factual findings to show that the prior art disclosed the bi-directional account element, and thereby erred as a matter of law in rendering the

instituted claims obvious. *See Nike*, 812 F.3d at 1345; *see also In Re Sang-Su Lee*, 277 F.3d at 1344. Dalzell does not disclose the bi-directional account element as properly construed. Square chose not to submit any secondary references into the record that could possibly teach this element.

Under these circumstances, this Court should reverse the Board's determination of obviousness of the instituted claims. *See SmithKline Diagnostic, Inc. v. Helena Labs. Corp.,* 859 F.2d 878, 886 & n.4 (Fed. Cir. 1988) (reversing obviousness after determining that underlying claim construction was clearly erroneous).

## CONCLUSION

This Court should reverse the Board's Final Written Decision canceling claims 1-7, 9-11, 13-17, and 20-22 of the '808 patent on the grounds of obviousness.

Respectfully submitted,

/s/ Isaac Rabicoff
RABICOFF LAW LLC
73 W Monroe St
Chicago, IL 60603
(773) 669-4590

Addendum

# ADDENDUM
## TABLE OF CONTENTS

Final Written Decision (November 27, 2015)............................Appx1
Decision on Request for Rehearing (February 9, 2016)..............Appx40
United States Patent No. 8,396,808.....................................Appx53
Certificate of Filing and Service
Certificate of Compliance

Trials@uspto.gov                                      Paper No. 47
571-272-7822                          Entered:  November 27, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SQUARE, INC.,
Petitioner,

v.

THINK COMPUTER CORPORATION,
Patent Owner.
_____

Case CBM2014-00159
Patent No. 8,396,808 B2
_____

Before TONI R. SCHEINER, MICHAEL W. KIM, and
BART A. GERSTENBLITH, *Administrative Patent Judges.*

KIM, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 328(a) and 37 C.F.R. § 42.73*

## I.    INTRODUCTION

Square, Inc. ("Petitioner") filed a Petition (Paper 3, "Pet.") requesting
institution of a covered business method patent review of claims 1–11, 13–
17, and 19–22 of U.S. Patent No. 8,396,808 B2 ("the '808 patent").  Think

CBM2014-00159
Patent 8,396,808 B2

Computer Corporation ("Patent Owner") filed a Preliminary Response
(Paper 7, "Prelim. Resp.").  On December 29, 2014, we instituted a covered
business method patent review of claims 1–8, 10, 11, 13–17, and 20–22 on
certain grounds of unpatentability alleged in the Petition.  Paper 9 ("Dec.").
After institution of trial, Patent Owner filed a Patent Owner Response
(Paper 21, "PO Resp.") and Petitioner filed a Reply (Paper 30, "Reply").
Patent Owner also filed a Motion to Amend (Paper 20, "PO Motion"), to
which Petitioner filed an Opposition (Paper 29, "Pet. Opp."), and Patent
Owner filed a Reply (Paper 32, "PO Reply").  Petitioner further filed a
Motion to Exclude (Paper 37, "Mot. Exc."), to which Patent Owner filed an
Opposition (Paper 40, "PO Opp."), and Petitioner filed a Reply (Paper 43,
"Pet. Reply").  An oral hearing was held on September 10, 2015.  Paper 46
("Tr.").

   The Board has jurisdiction under 35 U.S.C. § 6(c).  In this Final
Written Decision, issued pursuant to 35 U.S.C. § 328(a) and 37 C.F.R.
§ 42.73, we determine that Petitioner has shown by a preponderance of the
evidence that all claims for which trial was instituted, claims 1–7, 9–11, 13–
17, and 20–22, are *unpatentable*.  Furthermore, Patent Owner's Motion to
Amend is *denied*.  Additionally, Petitioner's Motion to Exclude is *denied*.

II.    DISCUSSION

   A.    *The '808 Patent*

   The '808 patent is directed to an electronic payment system in which a
participant may act as either purchaser or merchant depending on whether
the participant's account is assigned either the purchaser or merchant role.
Ex. 1001, 3:17–20.

CBM2014-00159
Patent 8,396,808 B2

Claim 1 is illustrative of the challenged subject matter and is reproduced below.

> 1. A method for transferring an electronic payment between a purchaser and a merchant comprising:
>
> assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;
>
> adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;
>
> obtaining a user ID token of the purchaser from a merchant terminal, the merchant terminal being at a merchant location and the merchant location being different from the payment system;
>
> communicating identity confirmation information associated with the user ID token to the merchant terminal; and
>
> transferring funds for a purchase price total from the purchaser account to the merchant account.

### B.    Instituted Grounds of Unpatentability

The Board instituted trial for claims 1–11, 13–17, and 19–22 on the following grounds of unpatentability, all of which are on the basis of obviousness under 35 U.S.C. § 103(a):

| References | Claim(s) Challenged |
|---|---|
| Bemmel[1] and Dalzell[2] | 1–3, 5–7, 17, and 20–22 |

---

[1] U.S. Pat. App. Pub. No. 2008/0046366 A1, pub. Feb. 21, 2008 (Ex. 1005).

[2] U.S. Pat. App. Pub. No. 2003/0204447 A1, pub. Oct. 30, 2003 (Ex. 1006).

CBM2014-00159
Patent 8,396,808 B2

| References | Claim(s) Challenged |
|---|---|
| Bemmel, Dalzell, and Carlson[3] | 4 |
| Bemmel, Dalzell, and Tripp[4] | 9, 10, and 13–15 |
| Bemmel, Dalzell, and Elston[5] | 11 |
| Bemmel, Dalzell, and Deschryver[6] | 16 |

Petitioner also relies upon Declarations of Norman M. Sadeh-Koniecpol, Ph.D. in support of its challenges.  Exs. 1002, 1021.

### C.    Standing

We determined, in the Decision on Institution, that the '808 patent is a covered business method patent, as defined in § 18(a)(1)(E) of the America Invents Act and 37 C.F.R. § 42.301, because at least one claim of the '808 patent is directed to a covered business method.  Dec. 5–9.  Patent Owner does not dispute our previous analysis in its Patent Owner Response.  Thus, after considering the record again, we reaffirm our determination in the Decision on Institution and conclude that the '808 patent is eligible for a covered business method patent review.

### D.    Claim Construction

In a covered business method patent review, claim terms in an unexpired patent are interpreted according to their broadest reasonable

---

[3] U.S. Pat. App. Pub. No. 2007/0185785 A1, pub. Aug. 9, 2007 (Ex. 1008).
[4] U.S. Pat. App. Pub. No. 2006/0143087 A1, pub. June 29, 2006 (Ex. 1009).
[5] U.S. Pat. App. Pub. No. 2002/0143655 A1, pub. Oct. 3, 2002 (Ex. 1013).
[6] PCT Pub. No. WO 2007/008686 A2, pub. Jan. 18, 2007 (Ex. 1010).

CBM2014-00159
Patent 8,396,808 B2

construction in light of the Specification of the patent in which they appear. 37 C.F.R. § 42.300(b); *see also In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278–80 (Fed. Cir. 2015) ("Congress implicitly approved the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation."); *accord Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1328 (Fed. Cir. 2015) ("though the rules governing IPR matters at issue in *Cuozzo* will not necessarily govern all PGR/CBM matters, we see no basis for distinguishing between the two proceedings for purposes of the PTAB's use of BRI in claim construction here"). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). We must be careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993). We construe the terms below in accordance with these principles.

> 1. *Whether a Proper Construction of "Purchase List," "Product Catalog," or "Transaction Record" Requires "Line Item Data"*

Petitioner proposes constructions for several claim terms, including "transaction record." Pet. 12–18. Patent Owner asserts that Petitioner's constructions of "purchase list," "product catalog," and "transaction record," or their application to the prior art, are unreasonably broad for omitting the

CBM2014-00159
Patent 8,396,808 B2

material limitation of "line item data."  PO Resp. 4–9, 13 (citing Exs. 1001, 2005, 2021, 2022, 2023).[7]  After considering both Petitioner and Patent Owner's positions, as well as all supporting evidence, we are unpersuaded that a proper construction of "purchase list," "product catalog," or "transaction record" requires "line item data."

> Patent Owner asserts the following:

> > But a POSITA certainly would have understood that a purchase list, product catalog, and transaction record necessarily would include line item data because the term "line item data" had been in use in the field for years, if not decades.

PO Resp. 6.  Patent Owner then goes on to cite several Exhibits showing that the term "line item data" was known for years prior to July 2009.

PO Resp. 6–7 (citing Exs. 2021, 2022, 2023, QuickBooks, Duncan).  Patent Owner's assertions are misplaced.  We are persuaded, and thus find, that the term "line item data" was known prior to July 2009.  We are unclear, however, as to the connection between this finding and Patent Owner's position that the claim terms "purchase list," "product catalog," and "transaction record" require "line item data."  To use an analogy, Patent Owner is asserting that a claim term "fruit" requires "apples" because "apples" were known.  Certainly no one would dispute that "apples" are known, and that "apples" are a "fruit."  The fact that apples are known,

---

[7] Patent Owner also cites to excerpts from the following two books: *QuickBooks 2006: The Official Guide for Premier Edition Users*, published by McGraw-Hill/Osborne, ISBN 978-0-07226-274-2 ("QuickBooks"); *The Career Programmer: Guerilla Tactics for an Imperfect World* by Christopher Duncan, ISBN 978-1-59059-624-1 ("Duncan").  These books, however, do not appear to have been submitted as exhibits in this proceeding.  Accordingly, we have not considered them.

CBM2014-00159
Patent 8,396,808 B2

however, does not prevent other fruits, such as oranges or pears, from also meeting the claim term "fruit."  Similarly, while we agree that the claim terms "purchase list," "product catalog," and "transaction record" encompass "line item data," we are unpersuaded that information other than "line item data" cannot also meet "purchase list," "product catalog," and "transaction record."

Patent Owner asserts further that its position is supported by the Specification, which discloses that "purchase list," "product catalog," and "transaction record" include "line item data."  PO Resp. 7–9 (citing Exs. 1001, 2005).  We are persuaded, and thus find, that the Specification, discloses that "purchase list," "product catalog," and "transaction record" *may* include "line item data."  We are unpersuaded, however, that a proper construction of "purchase list," "product catalog," and "transaction record" **requires** "line item data."  Part of our analysis is similar to that set forth above with respect to the Exhibits, and thus, need not be repeated here. Among other reasons informing our analysis, the Specification does not set forth any explicit definitions for "purchase list," "product catalog," or "transaction record" that require "line item data," for example, in a glossary or in any other manner that could be considered reasonably clear, deliberate, and precise.  *See In re Paulsen*, 30 F.3d at 1480.  At best, the Specification discloses that, in certain embodiments, "purchase list," "product catalog," and "transaction record" *may* include "line item data," but the Specification does not indicate that those embodiments are limiting.  *See In re Van Geuns*, 988 F.2d at 1184.

Patent Owner further asserts that the term "line item data" may itself include certain additional information, citing the prosecution history of the

CBM2014-00159
Patent 8,396,808 B2

'808 patent.  PO Resp. 9 (citing Ex. 2005).  Patent Owner's assertion is not persuasive, as we have determined that the proper constructions of the claim terms "purchase list," "product catalog," and "transaction record" do not require "line item data.

>    2.    *"Line Item Data" and "Line Item Transaction Data"*

In its Patent Owner Response and Motion to Amend, Patent Owner sets forth several constructions for "line item data" and "line item transaction data."  PO Resp. 9; Motion 10.[8]  As an initial matter, we are unclear as to the exact delineation between the two terms, as the two terms are often used interchangeably by Patent Owner.  *See, e.g.*, PO Resp. 9 ("the limitation 'line item data' or 'line item transaction data' 'necessarily forms part of elements recited in the claims'"); Ex. 1001, 8:6–13 ("[A]s one of the main benefits of having merchant product catalogs integrated into the payment system, *line item transaction data* can be communicated.  The *line item data* is additionally stored as part of the transaction record of the accounts . . . ." (emphasis added)).  The two terms are different, however, in that one recites "transaction" while one does not.  As every word in a claim limitation is usually presumed to have meaning, we construe "line item transaction data" as a "line item data" related to a transaction, although as a practical matter, we see little substantive difference between the two terms.  Nevertheless, with that clarification of "line item transaction data," we need only focus our analysis on "line item data."

---

[8] Although none of the claims currently recites or requires "line item data" or "line item transaction data," we determine that a formal construction of those terms at this juncture would best assist us in properly evaluating both the instituted grounds of unpatentability and the Motion to Amend.

CBM2014-00159
Patent 8,396,808 B2

Patent Owner sets forth two separate constructions for "line item data."  In the Patent Owner Response, Patent Owner asserts that "line item data" is "itemized data pertaining to products and services that is derived from the 'product catalog' and stored in the 'purchase list' and 'transaction record.'"  PO Resp. 9.  For support, Patent Owner cites the same Exhibits set forth above in our analysis of "purchase list," "product catalog," and "transaction record."  In the Motion to Amend, Patent Owner asserts that "line item data" is "the information given on each line of an invoice used to communicate the quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping, or any other fees that arrive at the total sum for the transaction."  Motion 10 (citing Ex. 2021); *see also* PO Reply 4 ("line item transaction data 'may include quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping or other fees'").  Petitioner asserts that Patent Owner's proposed constructions are inconsistent and overly narrow, and asserts that a proper construction of "line item data" is "one or more attributes used in relation to individual products involved in a purchase or sale."  Pet. Opp. 4–9 (citing Exs. 1001, 1020, 2005, 2021).

As an initial matter, we note that Patent Owner's proposed construction set forth in its Motion to Amend is not a claim construction, but a list of items that may be included under a proper construction of "line item data."  As an analogy, we would not say a definition of "fruit" is "apples, oranges, and pears."  Certainly, all those items are fruit, but a proper definition of "fruit" would express the boundaries from which one of ordinary skill could determine that apples, oranges, and pears are indeed fruit.  For example, Random House provides such a definition of "fruit" as

CBM2014-00159
Patent 8,396,808 B2

"any product of plant growth useful to humans or animals." *Dictionary.com Unabridged*, Random House, Inc.,

http://dictionary.reference.com/browse/fruit (accessed: Nov. 24, 2015).

To that end, the Patent Owner Response does set forth what could be more properly considered a claim construction. PO Resp. 9. And indeed, when considered in conjunction with Petitioner's proposed construction, the two constructions are similar. As noted by both Patent Owner and Petitioner, the Specification only mentions "line item data," or similar wording, as follows:

> Additionally, as one of the main benefits of having merchant product catalogs integrated into the payment system, *line item transaction data* can be communicated. The *line item data* is additionally stored as part of the transaction record of the accounts. This itemized information can be very useful, such as in one application where tax forms are automatically completed by aggregating each category of *line item transaction data* as appropriate.

Ex. 1001, 8:6–13. From the aforementioned portion of the Specification, we determine that the key to a proper construction of "line item data" is that it is information that is *itemized* and capable of *categorization*. In other words, "line item data" is an itemized part of a larger whole, more specifically, but not limited to, product catalogs, purchase lists, and transactions records, i.e., at a most granular level, individual products involved in a purchase or sale, as advocated by Petitioner. This focus on itemization and categorization of products is supported by other portions of the Specification cited by the parties, for example, column 2, lines 15–17, which recites that "[t]he integration of the payment system and *product* catalog functions to enable recording and tracking transactions with *itemized* detail" (emphases added). *See also* Ex. 1001, 5:51–55 ("the method may additionally store purchase

CBM2014-00159
Patent 8,396,808 B2

list information as a transaction record for the merchant account and/or the purchaser account, which functions to form an *itemized* purchase history" (emphasis added)); 4:4–6 ("[t]he *product* catalog preferably includes a listing of *product* descriptions and prices for each *product* contained within the *product* catalog" (emphases added)); 4:6–13 ("[a]dditional information may be included for a *product* such as *categories* for tax purposes and other purposes, *product*-related IDs for each distributor of the *product* (e.g., Stock-Keeping Unit or 'SKU'), images or media files related to the *product*, inventory related information (the number of *items* on hand, on order, etc. at each warehouse location), or any other suitable product-related data" (emphases added)); 4:13–16 ("[t]he *product* catalog may be a database accessed by outside applications, but may additionally or alternatively include a hosted web-based store through which *products* can be added to a shopping cart (i.e., a purchase list)" (emphases added)).

Accordingly, we construe "line item data" as "itemized information from a larger group of information, related to individual products involved in a purchase or sale, that is capable of categorization," where non-limiting examples of "line item data" may include one or more of "quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping or other fees."

> 3.    *"Wherein the First Account and the Second Account Are Adapted to Selectively Function as Either a Merchant or a Purchaser Account During Any Particular Transaction"*

Patent Owner asserts that Dalzell does not disclose or render obvious "bidirectional accounts." PO Reply 4–5. There is no term "bidirectional accounts" set forth in the claims, but both parties use this term in their arguments. *See, e.g.*, PO Reply 4–5; Pet. 2–3. We presume that the parties

CBM2014-00159
Patent 8,396,808 B2

are referring to the following limitation of independent claim 1: "wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser account during any particular transaction." Independent claims 20, 21, and 22 each recite a similar claim limitation. The only mention of "bi-directional" in the Specification is as follows, and is consistent with the aforementioned presumption: "In other words, within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts." Ex. 1001, 3:20–22. For ease of reference, we will also refer to these claim limitations as "bidirectional accounts."

Through its briefing (PO Reply 4–5) and at oral argument, Patent Owner appears to proffer a construction of bidirectional accounts that distinguishes bidirectional accounts from the prior art. Unfortunately, we are unable to discern precisely what that construction is. The closest we are able to discern as pertaining to a claim construction, from Patent Owner's assertions, is that bidirectional accounts cannot have extra steps. To that end, we are unclear as to the relevance of steps in relation to bidirectional accounts, as bidirectional accounts would indicate an account having specific features, not steps. Presumably there are a non-trivial number of steps necessary in order to achieve a bidirectional account. Insofar as the claim limitation at issue only recites the end-product of those steps, however, and not the steps necessary to achieve the end-product, Patent Owner's assertions are misplaced. By analogy, if a claim limitation recites "a half-red and half-blue vehicle," Patent Owner is asserting that because the vehicle in the prior art was originally blue, and then portions of it were later painted red, it cannot correspond properly to the recited "half-red and half-

CBM2014-00159
Patent 8,396,808 B2

blue vehicle," because the red portion took extra steps to create. These extra steps are immaterial, as all that matters is whether the prior art discloses "a half-red and half-blue vehicle."

Even if steps were somehow relevant to a claim construction of bidirectional accounts, however, we are unpersuaded that Patent Owner's assertions are correct. A basic canon of patent law is that, absent limiting language, a claimed step does not preclude additional steps, so long as the claim language is met. As an illustration, assume we have a claim limitation of "walk 100 meters west." Presumably, the fastest way to accomplish that feat is to walk 100 meters directly in the westerly direction. Assume, however, that the prior art has an individual that instead walks 25 meters west, but then decides to go 10 meters north, walks another 50 meters west, goes 10 meters south, and then another 25 meters west. So, the individual has still met the limitation "go 100 meters west," but has taken additional steps that resulted in the individual walking 20 extra meters. Under Patent Owner's rationale, because the individual in the prior art took the additional steps of walking 10 meters north and 10 meters south, it would not meet the claim limitation "walk 100 meters west." Because the claim limitation in our example does not preclude the extra 20 meters, and bidirectional accounts similarly does not preclude additional steps to achieve that result, we are unpersuaded that Patent Owner's assertion is correct.

Patent Owner may be asserting that in order to meet "bidirectional accounts," a particular account must function *simultaneously* as both a merchant account and purchaser account. We disagree.

Beginning with the claim terms themselves, the word "selectively" is used. We discern that the ordinary and customary usage of this word

denotes expressly that a particular account need *not* function *simultaneously* as both a merchant account and a purchaser account; a user is permitted expressly to *select* which account mode is desired at the appropriate point in time. The following disclosure in the Specification is consistent with this understanding:

> An entity (e.g., a person, business, or other legally recognized entity) preferably creates an account within the payment system. The accounts of the payment system are preferably designed so that an account may selectively function as either a merchant or a purchaser during any particular transaction. In other words, within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts.

Ex. 1001, 3:15–22. Indeed, here, the Specification discloses expressly that being able to select which account mode is desired is the same as "bi-directional transaction accounts."

More specifically, Patent Owner appears to assert that because the purchaser mode and the merchant mode of the account in the prior art each has a different payment type (i.e., payment card for purchaser and Automated Clearing House (ACH) for a merchant), and neither payment type can be used in the reverse mode (i.e., payment card for merchant and ACH for a purchaser), the aforementioned claim limitation is not met. Patent Owner's assertions are misplaced, as the claim limitation does not require that the payment type be the same for both the purchaser mode and the merchant mode of the account; on this point, the claim only requires that the account have a purchaser mode and a merchant mode. Thus, the fact that the purchaser mode of an account may rely on payment cards while the merchant mode of the account may rely on ACH is immaterial.

CBM2014-00159
Patent 8,396,808 B2

In conclusion, for the reasons set forth above, we are unpersuaded that "wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser account during any particular transaction," as recited in independent claim 1, requires any express construction. The same is true for the corresponding limitations recited in independent claims 20, 21, and 22. Specifically, we are unpersuaded that the aforementioned claim limitations should be construed as requiring any of the above features asserted by Patent Owner, for example, a limit on the number of steps.

E.    *Obviousness of Claims 1–3, 5–7, 17, and 20–22 over Bemmel and Dalzell*

Petitioner asserts that claims 1–3, 5–7, 17, and 20–22 are unpatentable over a combination of Bemmel and Dalzell. Pet. 18–38 (citing Exs. 1002, 1005, 1006); Reply 4–13 (citing Exs. 1002, 1005, 1006). Patent Owner disagrees. PO Resp. 10–20 (citing Exs. 1001, 1002, 1005, 1006, 1007, 1011, 1012, 2018, 2021).

1.    *Bemmel (Ex. 1005)*

Bemmel discloses "a mobile architecture for payment transactions and, more specifically, a method and system for providing biometric authentication at a point-of-sale ('POS')." Ex. 1005 ¶ 2. Specifically, Bemmel discloses receiving a mobile phone number from a consumer, generating an electronic wallet for the consumer containing the mobile phone number, establishing a voice connection with the consumer's mobile device associated with the mobile phone number, capturing a voice sample from the consumer, and storing the voice sample in association with the mobile phone number for biometric authentication purposes. Ex. 1005 ¶ 15.

CBM2014-00159
Patent 8,396,808 B2

Once a consumer is enrolled in the mobile payment system, the consumer is then able to initiate payment transactions utilizing a mobile phone. Ex. 1005 ¶ 16. Specifically, Bemmel discloses the following:

> Upon receiving the authentication identifier through the mobile phone (confirming authentication of the consumer), the consumer is able to conduct a transaction at a merchant point-of-sale terminal through the teachings disclosed herein. In particular, when the consumer interacts with the merchant's point-of-sale terminal, the mobile payment system receives a request from the merchant point-of-sale terminal for consumer information (e.g., payment information such a credit card, debit card or checking account numbers, etc.) with the request including the authorization identifier, it matches the authorization identifier with a stored authorization identifier (for example and without limitation, "staged" transaction as further detailed herein) in order to obtain a consumer identifier associated with the stored authorization identifier, and it transmits stored consumer information (e.g., payment information such as a credit card, debit card, checking account, etc.) associated with the consumer identifier to the merchant point-of-sale terminal, which enables the merchant point-of-sale to authorize the transaction by communicating with a payment processor.

Ex. 1005 ¶ 17.

### 2. *Dalzell (Ex. 1006)*

Dalzell "relates to electronic marketplaces through which users buy and sell items over a computer network." Ex. 1006 ¶ 2. Specifically, Dalzell discloses user interfaces and methods through which users may place items for sale, locate items offered by others, and perform related actions within an electronic marketplace. Ex. 1006 ¶ 2. Dalzell discloses that the online marketplace system includes a database of information about products that may be listed by users within an online marketplace, with this information typically including product IDs, and descriptions and product

CBM2014-00159
Patent 8,396,808 B2

images provided by manufacturers or distributors of the products.  Ex. 1006

¶ 10.  Dalzell further discloses the following:

> As is conventional, users of the marketplace system can
> register online as marketplace sellers and thereafter create
> marketplace listings.  As part of seller registration and/or as
> marketplace listings are created, the system may allow the
> user/seller to specify shipping and other policies to be published
> to buyers, and specify a bank account into which proceeds from
> sales are to be deposited by the system or its operator.

Ex. 1006 ¶ 59.

### 3.    *Analysis*

Petitioner asserts that Bemmel discloses most of the limitations of

claims 1–3, 5–7, 17, and 20–22.  For the other limitations, Petitioner relies

on Dalzell.  Specifically, exemplary independent claim 1 recites "[a] method

for transferring an electronic payment between a purchaser and a merchant."

Petitioner cites both Bemmel and Dalzell for disclosing these claim

limitations.  Pet. 26 (citing Ex. 1005 ¶¶ 16, 17; Ex. 1006 ¶ 2).  Independent

claim 1 recites further "assigning a role of a merchant account to a first

account and a role of a purchaser account to a second account within a

payment system wherein the first account and the second account are

adapted to selectively function as either a merchant account or a purchaser

account during any particular transaction."  Petitioner cites Dalzell for

disclosing that marketplace users (i.e., buyers) can become marketplace

sellers, for example, by providing bank account information as to where

sales proceeds should be deposited.  Pet. 26–27 (citing Ex. 1006 ¶¶ 27, 61,

87, 132).  Independent claim 1 recites additionally "adding an item offered

for sale by the merchant from a product catalog stored in the payment

system to a purchase list."  Petitioner cites Dalzell for disclosing a user

CBM2014-00159
Patent 8,396,808 B2

browsing a product catalog, and then selecting an "add to cart" or "buy from seller" button for a particular product from the catalog. Pet. 27 (citing Ex. 1006 ¶¶ 3, 10, 15, 166). Independent claim 1 recites also "obtaining a user ID token of the purchaser from a merchant terminal, the merchant terminal being at a merchant location and the merchant location being different from the payment system." Petitioner cites Bemmel for disclosing a consumer providing an authorization identifier to a payment terminal, and then the payment terminal sending the authorization identifier to a merchant gateway. Pet. 28 (citing Ex. 1005 ¶¶ 17, 62, 63, 65, Fig. 3; Ex. 1006 ¶ 121). Independent claim 1 recites further "communicating identity confirmation information associated with the user ID token to the merchant terminal." Petitioner cites Bemmel for disclosing that the mobile payment system matches the authorization identifier with a stored authorization identifier in order to obtain a consumer identifier associated with the stored authorization identifier, and transmits the stored consumer information associated with the consumer identifier to the merchant point-of-sale terminal, which enables the merchant point-of-sale to authorize the transaction by communicating with a payment processor. Pet. 28–29 (citing Ex. 1005 ¶¶ 17, 29, 41, 63, 69, claim 12). Independent claim 1 recites additionally "transferring funds for a purchase price total from the purchaser account to the merchant account." Petitioner cites each of Bemmel and Dalzell for disclosing these claim limitations. Pet. 29 (citing Ex. 1005 ¶ 88; Ex. 1006 ¶ 17).

For the rationale for combining Bemmel and Dalzell, Petitioner asserts the following:

> As further explained by Dr. Sadeh-Koniecpol, it would have been obvious to one of ordinary skill at the relevant time to combine the teachings of Bemmel with those of Dalzell so as

to teach each and every feature of claims 1–3, 5–7, 17, and 20–22 of the '808 patent. One of ordinary skill in the art would have recognized that Bemmel and Dalzell are directed to similar systems and methods: a system that allows purchasers and merchants to conduct electronic transactions on their computing devices (Bemmel) and an electronic marketplace allowing users to buy and sell goods through their computer devices (Dalzell). *See* Ex. 1002 at ¶¶ 137–140. Furthermore, in June 2009, it was common practice for individuals designing electronic payment systems to research and combine the features of existing systems, especially where those features were complementary; combining Bemmel and Dalzell therefore would have been well within the capabilities of a person of skill in the art, and would represent a commonsense amalgamation of the robust product catalog and user interface of Dalzell with the authentication and mobile aspects of Bemmel. *See* Ex. 1002 at ¶¶ 141.

Furthermore, both Bemmel and Dalzell expressly provide logical rationale and motivation for the proposed combination. Dalzell explicitly states that its disclosed electronic marketplace can be employed in mobile devices and kiosks, such as the purchaser terminals and merchant terminals disclosed in Bemmel. *See* Ex. 1005 at [0045], [0121] – [0122] (stating that the marketplace can be employed in "in-store kiosk systems" and "personal digital assistant[s]" or "micro-browser[s] adapted for use on a handheld device."); *see* Ex. 1002 at ¶ 138. Accordingly, Dalzell suggests implementation on a mobile device for use in a mobile commerce system, such as the system disclosed by Bemmel. *See* Ex. 1002 at ¶ 139. Indeed, during the relevant time period, many existing electronic and web-based systems, including payment systems, were adapted for use in the mobile context. *See id.* at ¶ 92. The Bemmel reference, in turn, can be readily combined with a system like the Dalzell electronic marketplace, and expressly suggests implementation in "merchant channels, such as, but not limited to, an online or e-commerce transaction architecture [that] could also make use of the claimed invention." Ex. 1005 at [0086]; *see* Ex. 1002 at ¶ 139. Both references therefore teach that combining their respective features would yield expanded

CBM2014-00159
Patent 8,396,808 B2

> usability and other beneficial results as would be obvious to a
> person of skill in the art.

Pet. 24–25.  Petitioner makes similar analyses for claims 2, 3, 5–7, 17, and
20–22.  Pet. 18–38.

Patent Owner asserts that neither Bemmel nor Dalzell discloses "line
item data."  PO Resp. 11–14.  Patent Owner's assertions are misplaced, for,
as set forth above, none of the claims recites or requires "line item data."

Even if the claims did recite or require "line item data," however, we
find that Dalzell discloses such "line item data."  As set forth above, we
construe "line item data" as "itemized information from a larger group of
information, related to individual products involved in a purchase or sale,
that is capable of categorization," where non-limiting examples of "line item
data" may include one or more of "quantity, description, type, cost, product
identifier (e.g., stock keeping unit), tax, duty, shipping or other fees."
Dalzell is replete with references to such "line item data."  For example,
Dalzell discloses that at least the following information can be gleaned from
a purchase history page for a user, and can be provided for both purchases
made from marketplace sellers and purchases made from provider sellers:
product ID, product description, product title, order number, price paid,
condition of item when purchased, order date, and shipping recipient.
Ex. 1006 ¶¶ 103, 132.  These examples, individually and collectively, clearly

CBM2014-00159
Patent 8,396,808 B2

and unequivocally meet the aforementioned construction of "line item data."[9]

Patent Owner asserts further that Petitioner has failed to articulate a valid reason for combining Bemmel and Dalzell, because Dr. Sadeh-Koniecpol's opinions of industry custom are unsupported. We are unpersuaded that Dr. Sadeh-Koniecpol's opinions are unsupported, and especially unpersuaded that Dr. Sadeh-Koniecpol has not provided adequate support regarding the reasons for combining Bemmel and Dalzell. Dr. Sadeh-Koniecpol includes explicit citations to references, in particular Bemmel and Dalzell, for supporting his conclusions, and we determine that any purported "leaps of logic" taken by Dr. Sadeh-Koniecpol are reasonable given the underlying support. For example, Dr. Sadeh-Koniecpol opines that "one of ordinary skill in the art would have been motivated to combine the mobile payment system of Bemmel with the electronic marketplace of Dalzell." Ex. 1002 ¶ 136. Of course, this paragraph considered in isolation would be an unsupported opinion. Dr. Sadeh-Koniecpol, however, then goes on to support this opinion with explicit citations to Bemmel and Dalzell. Ex. 1002 ¶¶ 137, 139, 140. Dr. Sadeh-Koniecpol then reaches conclusions that we determine flow logically from those citations. Ex. 1002 ¶¶ 138, 141, 142.

---

[9] Insofar as Patent Owner may be asserting that "line item data" includes "other features" that would prevent the aforementioned examples from Dalzell from corresponding to "line item data," for example, technical limitations of ACH processing, Patent Owner did not set forth any such construction, and we are unable to discern independently such "other features" from this record.

By contrast, Patent Owner asserts the following:

> It was not industry custom to integrate product catalogs into payment systems. Generally, credit and debit card providers focused their innovative efforts on ways to prevent ever-increasing payment card fraud, not on ways to increase data transparency. Online marketplaces and mobile payments have been around since roughly the late 1990s. Yet, the '808 Patent was the first to integrate these two systems. Until the '808 Patent, these systems and their features were not considered complementary. Instead, they were considered different and independent systems and their combination would require improper hindsight. (*See* Ex. 2021, ¶ 29.)

> Even after July 31, 2009, the payments industry was not interested in integrating product catalogs into payments systems. Rather, the industry viewed doing so as "counterintuitive, technically problematic, and economically undesirable." (*Id.*, ¶¶ 9-12.) In fact, there is not even room in the traditional format for ACH payments data to include line item data; so integrating a product catalog into a payment system is not at all obvious. (*Id.*)

PO Resp. 14–15 (citing Ex. 2021). These assertions claim support in several paragraphs of a Declaration of Mr. Aaron Greenspan. As an initial matter, we note that the presence of corroborative evidence is especially important in evaluating Mr. Greenspan's testimony, because Mr. Greenspan is the named inventor of the '808 patent. In analogous contexts, the Federal Circuit has held repeatedly that in order to guard "against courts being deceived by inventors who may be tempted to mischaracterize the events of the past through their testimony," the law requires corroboration of a putative inventor's credible testimony, the sufficiency of which is measured under a "rule of reason" standard. *Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324, 1330 (Fed. Cir. 2014) (citing *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1374 (Fed. Cir. 2009)); *see also Bell & Howell Document*

*Mgmt. Prod. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) ("the testimony of an inventor . . . concerning claim construction . . . often is self-serving, after-the-fact attempt to start what should have been part of his or her patent application").  To that end, we note that of Patent Owner's citations to paragraphs 9–12 and 29 of Mr. Greenspan's Declaration in support of its assertions on this topic, none cites corroborating evidence. Paragraph 9 does make note of topics purportedly discussed at a NACHA Internet Council Meeting.  However, paragraph 9 does not cite any document, exhibit, or testimony to support Mr. Greenspan's assertions as to what was discussed at that meeting.  The same analysis is applicable to paragraph 10.[10]  Paragraph 29 does mention Bemmel and Dalzell, however, Mr. Greenspan does not include specific citations to Bemmel and Dalzell to support specific assertions, and the second half of the paragraph concerns issues that Mr. Greenspan admits are beyond the purview of Bemmel and Dalzell, limiting their value as corroborating evidence.  Accordingly, when evaluated under the rule-of-reason framework, paragraphs 9–12 and 29 of Mr. Greenspan's Declaration are entitled to little weight.

---

[10] Insofar as Patent Owner is attempting to use Exhibits 2037–2040, cited in its Reply to Motion to Amend, as corroborative evidence concerning the NACHA meetings held on February 24–25, 2010, and June 23–24, 2010, those assertions should have been set forth in the Patent Owner Response. Furthermore, even when we evaluate the evidence, while they are clearly corroborative evidence of Mr. Greenspan's presence and speaking at the February 24th meeting, neither Patent Owner nor Mr. Greenspan have explained, and we are unable to ascertain, corroboration of the relevant substantive assertions made by Mr. Greenspan in paragraphs 9 and 10 of his Declaration.

CBM2014-00159
Patent 8,396,808 B2

Absent much supporting weight from Mr. Greenspan's Declaration, Patent Owner's above assertions are almost entirely unpersuasive, and are insufficient to outweigh the assertions set forth by Petitioner that are supported by the testimony of Dr. Sadeh-Koniecpol. For example, Patent Owner asserts that "[i]t was not industry custom to integrate product catalogs into payment systems." PO Resp. 14. Patent Owner does not provide any direct evidentiary support for this assertion, and any support that can be tangentially extrapolated from paragraphs 9–12 and 29 of Mr. Greenspan's Declaration is entitled to little weight for the reasons set forth above. By contrast, Dr. Sadeh-Koniecpol's Declaration includes explicit citations to Bemmel and Dalzell, and the cited portions of those references, respectively, state unambiguously that the payment system features of Bemmel can be applied to an online or e-commerce transaction architecture (Ex. 1002 ¶ 139 (citing Ex. 1005 ¶ 86)), and that the product catalog features of Dalzell can be applied to "run on 'any type of computing device that enables a user (including both buyers and sellers) to interactively and remotely access the marketplace web site system 515 via the communication network' including 'a computer device that runs a proprietary client program, an interactive kiosk, a personal digital assistant[.]'" Ex. 1002 ¶ 137 (citing Ex. 1006 ¶¶ 121–122). Given this record, we are persuaded that, contrary to Patent Owner's assertions, it was known to integrate product catalogs into payment systems, and vice versa, at the time of the filing of the '808 patent. This analysis is also applicable to the other assertions made above by Patent Owner.

Patent Owner asserts further that Dr. Sadeh-Koniecpol's Declaration is problematic, because he does not identify which specific features are

complementary or explain why they are complementary. We disagree, as Dr. Sadeh-Koniecpol identifies explicitly that the product catalog of Dalzell and authentication system of Bemmel are complementary (Ex. 1002 ¶ 142), and the explanation is set forth in the previous paragraphs of his Declaration. Ex. 1002 ¶¶ 137–141.

Patent Owner asserts more specifically that there may be technical challenges to implementing the proffered combination of Bemmel and Dalzell, and that those technical challenges are not adequately addressed by Petitioner. Patent Owner's assertions are misplaced and unpersuasive. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). Accordingly, the fact that there may be technical challenges to implementing a proffered combination of two references is unavailing if the technical challenges would have been solvable by one of ordinary skill in the art at the time of the invention. To that end, we are persuaded that one of ordinary skill would have been able to overcome those technical challenges, for example, because Bemmel and Dalzell each disclose explicitly that mixing and matching different features in the e-commerce area was known and routine. Ex. 1005 ¶ 86; Ex. 1006 ¶¶ 45, 121–122.

Similarly, Patent Owner asserts generally that there would be many technical challenges to adapting the ACH system to accept line item data. There are many problems with this assertion. First of all, for the reasons discussed above, the claims do not require line item data. Furthermore, the claims also do not recite or mention anything about the ACH system. Additionally, Patent Owner asserts that adapting the ACH system to accept line item data would involve accommodating increased amounts of data. As

CBM2014-00159
Patent 8,396,808 B2

an initial matter, because line item data can be as little as a few characters, and the ACH system can, at a minimum, transfer a few characters, we are unclear as to why the ACH system cannot already accommodate line item data.  Moreover, we are unpersuaded that increasing the transmission capacity of the ACH system, while certainly daunting on a practical and cost basis, would not have been known and within the abilities of one of ordinary skill in the art.  We are unpersuaded that one of ordinary skill at the time of the invention would have been unfamiliar with ways in which to increase transmission capacity.

Insofar as Patent Owner may be arguing as to any technical challenges associated specifically with combining Bemmel and Dalzell, we note that the obviousness inquiry does not ask "whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole."  *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc); *see also In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (stating "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference").  To that end, our determination is the same as that set forth above.

Patent Owner asserts additionally that Dr. Sadeh-Koniecpol's testimony should be given little weight due to the mechanics of how his Declaration was drafted and certain observations concerning his cross-examination.  Concerning the mechanics of Declaration drafting, we have reviewed the Declarations of Dr. Sadeh-Koniecpol (Exs. 1002, 1021), as well as the transcript of his deposition (Exs. 2019–2020).  We find that the manner of Dr. Sadeh-Koniecpol's testimony is completely in line with

CBM2014-00159
Patent 8,396,808 B2

typical testimony before the Board, and agree with Petitioner that, absent
*much* further elaboration and analysis (which we do not authorize), Patent
Owner's line of inquiry concerning the mechanics of declaration preparation
is "a waste of time, both for the witness and the Board." *Pevarello v. Lan*,
Patent Interference 105,394 MPT, slip op. at 19–21 (BPAI Jan. 12, 2007)
(Paper 85). As to the observations during cross-examination, we note that
while we have considered them, any purported inconsistencies or gaps in
knowledge are vastly outweighed by Dr. Sadeh-Koniecpol's background,
analysis, and supporting evidence, which we find credible and persuasive
overall.

Patent Owner asserts also that Petitioner has failed to provide an
adequate predictable results analysis, because the proffered combination is
merely possible. Patent Owner's assertions are misplaced, as almost any
obviousness analysis, especially one involving multiple references, is a
hypothetical analysis of possibilities. Nevertheless, if such a hypothetical
analysis is supported and persuasive, as we determine it is here, it is
nonetheless legally sufficient in rendering claims obvious.

Patent Owner asserts further that the proffered combination of
Bemmel and Dalzell would not have predictable results. We disagree. As
an initial matter, we note that a predictable results analysis is typically
applicable to generally unpredictable arts, such as biology or chemistry. *In
re Fisher*, 427 F.2d 833, 839 (CCPA 1970) (indicating patents in the
mechanical or electrical arts involve predictable factors compared to the
more unpredictable chemical and biological arts). To that end, Patent Owner
has not explained sufficiently precisely what would be unpredictable here.
At a high level, the combination is the bio-authentication purchasing system

CBM2014-00159
Patent 8,396,808 B2

of Bemmel with the product catalog of Dalzell.  The self-evident result is a product catalog integrated with a bio-authentication purchasing system.  We are unpersuaded that such a result is not predictable.

Patent Owner asserts additionally that the Board should exercise its discretion under 35 U.S.C. § 325(d) and deny the Petition, because similar art was already before the Examiner during prosecution.  We note that 35 U.S.C. § 325(d) is normally exercised in a Decision on Institution. Moreover, we have already conducted a full trial in this proceeding subsequent to a Decision on Institution.  Furthermore, 35 U.S.C. § 325(d) is discretionary, and insofar as Patent Owner is requesting any vacating of the Decision on Institution, we decline to do so for the reasons set forth above.

In Patent Owner's Reply concerning its Motion to Amend, Patent Owner asserts that Dalzell does not disclose or render obvious "bidirectional accounts," because Dalzell requires extra steps to implement such accounts. PO Reply 4–5.  As set forth above, we are unpersuaded that the presence of extra steps is relevant to whether or not a prior art reference discloses a bidirectional account.  Furthermore, Patent Owner is admitting essentially that after implementation of the "extra" steps in Dalzell, the result is that an account which originally had only buyer capabilities now also has seller capabilities.  Tr. 29:1–30:8.  We agree.  We find further that this account of Dalzell corresponds properly to the "bidirectional accounts" required by independent claims 1 and 20–22.

Patent Owner asserts additionally that the accounts in Dalzell cannot be "bidirectional accounts," because they have separate payment systems. As set forth above, we are unpersuaded that the claims place such limitations on the number of payment systems, and as a matter of logic, we are

CBM2014-00159
Patent 8,396,808 B2

unpersuaded that a single account cannot be associated with multiple
payment systems.

Patent Owner further asserts the following:

> To get around this, Dr. Sadeh makes an unsupported
> logical leap. (Ex. 1002 at ¶ 151). "As illustrated in the citation
> listed above, according to Dalzell, a user account stores both
> payment information and bank account information (in
> particular for sellers). For each account, the system stores the
> information necessary for that account to be both a buyer and
> seller. *See also* Ex. 1006 at [0061]." (*Id.*) The first sentence is
> true, but the second sentence is not because, *as [0059] points
> out, the system must create a new and separate account for
> sellers that also uses separate payment data*, and therefore the
> system does not "store[ ] the information necessary for that
> account to be both a buyer and seller." (*Id.*)

PO Reply 5 (emphasis added). We are unpersuaded that Patent Owner's
above-emphasized assertion is correct, because our review of paragraph 59
of Dalzell does not support Patent Owner's assertion that a new seller
account must be created. Indeed, we find that a more logical reading of
paragraph 59 of Dalzell is that a buyer, from a particular account, can add a
seller feature to that particular account, without the need to create a whole
new account. Such a finding is supported by extensive analysis and
testimony by Dr. Sadeh-Koniecpol, with explicit citations to Dalzell, which
we find credible, reasonable, and persuasive. Ex. 1002 ¶¶ 147-164 (citing
Ex. 1006 ¶¶ 9, 27, 49, 57, 61, 82, 85, 87, 132, 163, Figs. 1A, 1B).

### 4.    *Conclusion*

For the foregoing reasons, after considering the Petition, Patent
Owner Response, Reply, and all supporting evidence, we are persuaded that
Petitioner has shown, by a preponderance of the evidence, that claims 1–3,

CBM2014-00159
Patent 8,396,808 B2

5–7, 17, and 20–22 are unpatentable over a combination of Bemmel and Dalzell.

### F.     Obviousness of Claim 4 over Bemmel, Dalzell, and Carlson

Petitioner argues that the subject matter of claim 4 would have been obvious over the combination of Bemmel, Dalzell, and Carlson.  Pet. 42–43. Patent Owner does not direct any argument in the Patent Owner Response to this particular challenge.  We have considered the arguments and evidence of record concerning this challenge and are persuaded that Petitioner has shown, by a preponderance of the evidence, that claim 4 is unpatentable on this basis.

### G.     Obviousness of Claims 9, 10, and 13–15 over Bemmel, Dalzell, and Tripp

Petitioner argues that the subject matter of claims 9, 10, and 13–15 would have been obvious over the combination of Bemmel, Dalzell, and Tripp.  Pet. 43–46.  Patent Owner does not direct any argument in the Patent Owner Response to this particular challenge.  We have considered the arguments and evidence of record concerning this challenge and are persuaded that Petitioner has shown, by a preponderance of the evidence, that claims 9, 10, and 13–15 are unpatentable on this basis.

### H.     Obviousness of Claim 11 over Bemmel, Dalzell, and Elston

Petitioner argues that the subject matter of claim 11 would have been obvious over the combination of Bemmel, Dalzell, and Elston.  Pet. 46–48. Patent Owner does not direct any argument in the Patent Owner Response to this particular challenge.  We have considered the arguments and evidence of record concerning this challenge and are persuaded that Petitioner has

shown, by a preponderance of the evidence, that claim 11 is unpatentable on this basis.

## I.    Obviousness of Claim 16 over Bemmel, Dalzell, and Deschryver

Petitioner argues that the subject matter of claim 16 would have been obvious over the combination of Bemmel, Dalzell, and Deschryver. Pet. 48–50. Patent Owner does not direct any argument in the Patent Owner Response to this particular challenge. We have considered the arguments and evidence of record concerning this challenge and are persuaded that Petitioner has shown, by a preponderance of the evidence, that claim 16 is unpatentable on this basis.

## J.    Patent Owner's Motion to Amend

### 1.    Introduction

Patent Owner's Motion to Amend seeks to substitute new claims 23–43 for original claims 1–18 and 20–22, respectively.[11] PO Motion 1–24. The ultimate burden of persuasion is with Patent Owner, the movant, to demonstrate the patentability of the amended claims. *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1307 (Fed. Cir. 2015). For the reasons discussed below, Patent Owner has not met that burden, and, thus, the Motion to Amend is *denied*.

---

[11] At oral argument, there was some confusion as to whether or not Patent Owner actually intended to cancel dependent claim 8, and whether or not Petitioner had detrimentally relied on Patent Owner's assertions concerning dependent claim 8 in the Patent Owner Response. As the Motion to Amend is denied in its entirety, however, that issue is moot.

CBM2014-00159
Patent 8,396,808 B2

> ### 2.    *Proposed Substitute Claims*

Patent Owner proposes to substitute independent claim 1 with

independent claim 23, as follows:

> 23.    A method for transferring an electronic payment between a purchaser and a merchant comprising:
>
> assigning a role of a merchant account to a first account and a role of a purchaser account to a second account with a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, <u>said payment system storing and communicating line item transaction data</u>;
>
> adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;
>
> obtaining a user ID token of the purchaser from a merchant terminal, the merchant terminal being at a merchant location and the merchant location being different from the payment system;
>
> communicating identity confirmation information associated with the user ID token to the merchant terminal; and
>
> transferring funds for a purchase price total from the purchaser account to the merchant account.

Essentially, Patent Owner proposes to require "line item transaction

data" expressly in independent claim 23.  The same is true for proposed

claims 24–43, which correspond, respectively, to original claims 2–18 and

20–22.

> ### 3.    *Analysis*

We deny Patent Owner's Motion to Amend for a variety of reasons.

As an initial matter, we note that the dispute concerning the instituted

grounds of unpatentability had to do with whether or not the recited

"purchase list," "product catalog," and "transaction record" required "line

item data."  The proposed amendment does nothing to clarify this, as the

CBM2014-00159
Patent 8,396,808 B2

"line item transaction data," in proposed independent claim 23, is completely disembodied from "purchase list," "product catalog," and "transaction record."

Even when we consider the added claim limitation, however, we are unpersuaded that it distinguishes the claimed invention from the prior art combinations set forth in the instituted grounds of unpatentability. Specifically, as set forth above in our claim construction analysis, we determined that "line item data" should be construed as "itemized information from a larger group of information, related to individual products involved in a purchase or sale, that is capable of categorization," where non-limiting examples of "line item data" may include one or more of "quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping or other fees."  We also noted above that we could not discern any practical difference between "line item data" and "line item transaction data."  As additionally set forth above, we found that Dalzell clearly and unequivocally discloses examples that correspond to the aforementioned construction of "line item data," and are persuaded that Bemmel and Dalzell are combinable for the reasons set forth above. Accordingly, given these determinations and findings, most of Patent Owner's assertions concerning the purported failure of certain prior art references to disclose "line item transaction data" are either unpersuasive or

CBM2014-00159
Patent 8,396,808 B2

moot, and all that is left to evaluate are Patent Owner's assertions concerning secondary considerations.[12]

Patent Owner asserts that there was a long-felt need for the invention of the '808 patent, and in support provides the Declaration of Mr. Greenspan and several supporting exhibits.  PO Motion 15–16 (citing Ex. 2021 ¶¶ 5–8, 19; Exs. 2026, 2028); PO Reply 1–3 (citing Ex. 2021 ¶¶ 6, 9–12; Exs. 2037, 2039, 2040, 2042, 2043, 2044).  To be given substantial weight in the determination of obviousness or non-obviousness, evidence of secondary considerations must be relevant to the subject matter as claimed, and therefore it must be determined whether there is a nexus between the merits of the claimed invention and the evidence of secondary considerations.  *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 305 n.42 (Fed. Cir. 1985).  Patent Owner does not even mention the word "nexus," and indeed, there is no analysis made between the proposed claims and what was or was not the subject of long-felt need.  Patent Owner's assertion of secondary consideration is unpersuasive on this point alone.  We will assume from Patent Owner's assertions concerning secondary considerations, however, a general intent to establish a nexus with "line item

---

[12] We note, however, that even if we were to determine that the secondary considerations weighed in favor of Patent Owner, such secondary considerations still must be weighed with the other factors set forth in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966), concerning obviousness.  *In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063, 1076–77 (Fed. Cir. 2012).  To that end, we note that the other three *Graham* factors weigh heavily against a determination of the non-obviousness of claims 23–43 for the reasons set forth above.

CBM2014-00159
Patent 8,396,808 B2

data," even though focusing solely on one feature of the claims is insufficient generally to establish nexus.

The primary evidence cited by Patent Owner in support of its assertions concerning long-felt need is the testimony of Mr. Greenspan (Ex. 2021 ¶¶ 5–12, 19). These paragraphs suffer from the same flaws as above concerning the testimony of interested parties, namely, a lack of corroborative evidence. Specifically, the only corroborating evidence cited in Mr. Greenspan's Declaration is in paragraph 6 with support to page 165 of the book Strategic Marketing in Practice 2007–2008 (Ex. 2042). We have considered that evidence. However, its corroborative value for showing long-felt need is undermined by Patent Owner's observation, which we agree with, that "[t]o the extent that the authors describe a solution to this problem, they also note that it works with only four banks." PO Motion 5. In other words, the evidence, for example, Figures 3 and 4 of Exhibit 2042, shows that even if there was a long-felt need, a solution was known as of 2007–2008. An assertion of long-felt need loses almost all persuasive value if the prior art shows a solution to that long-felt need. The fact that the solution was limited to "only four banks" is immaterial. There is nothing in the claims that requires widespread adoption; adoption by a small number of parties, and documentation of that adoption in a printed publication, is sufficient to show that it was known and would have been obvious. Regarding the corroborative evidence concerning NACHA meetings held on February 24–25, 2010, and June 23–24, 2010 (Exs. 2037–2040), while they are clearly corroborative evidence of Mr. Greenspan's presence and speaking at the February 24th meeting, neither Patent Owner nor Mr. Greenspan has explained, and we are unable to ascertain, any mention of

CBM2014-00159
Patent 8,396,808 B2

long-felt need concerning line-item data in this evidence.  Finally, regarding

Exhibits 2043 and 2044, Patent Owner asserts the following:

> The authors of the book, *Strategic Marketing in Practice*, thought they had found software ("Signifo," now "webexpenses") in 2007 that solves the problem central to the '808 Patent, but they did not, because Signifo does not transfer line item data.  The book's Figure 4 (Ex. 2042, loc. 3859 of 6384) shows each line as a different *transaction*; line item data can only be *manually entered* with a separate, offline product shown in Figure 3 (Id., loc. 3849 of 6384).  Even today, Signifo still does not offer line item data integration.  (Ex. 2043 & 2044.)  Thus, the referenced software does not actually transmit or receive line item data from any bank.

PO Reply 3.  As an initial matter, Patent Owner does not explain adequately

the contents of Exhibits 2043 and 2044.  The limitation that Patent Owner

proposes to add is "said payment system storing and communicating line

item transaction data."  Patent Owner has not explained adequately how

Exhibits 2043 and 2044 correspond to the aforementioned claim limitation,

let alone provide corroborative evidence of long-felt need.  If anything, as

best we are able to ascertain on our own, these Exhibits also undercut Patent

Owner's assertions concerning long-felt need, because Exhibit 2043

discloses importing credit card items, and Exhibit 2044 discloses uploading

a credit card file and categorizing line items.  Far from providing

corroborative evidence of long-felt need, these Exhibits would appear to

disclose actual implementations of "said payment system storing and

communicating line item transaction data."

We determine that Patent Owner has not shown that any of the

*Graham* factors, either individually or collectively, weigh in favor of the

non-obviousness of proposed substitute claims 23–43.

CBM2014-00159
Patent 8,396,808 B2

### 4.     Conclusion

Patent Owner has failed to carry its burden of demonstrating the patentability of amended claims 23–43.  Accordingly, Patent Owner's Motion to Amend is *denied*.

### K.     Petitioner's Motion to Exclude

Petitioner seeks to exclude Exhibit 2042 under Federal Rule of Evidence 106, Exhibits 2036–2044 as being outside the scope of a proper Reply to Motion to Amend, and certain arguments set forth in the Reply to Motion to Amend as being outside the scope of a proper Reply to Motion to Amend.  Mot. Exc. 1–2.  As the Board has considered all of the challenged Exhibits and assertions, and determines that Petitioner still prevails both regarding the unpatentability of claims 1–7, 9–11, 13–17, and 20–22, as well as the Motion to Amend, Petitioner's Motion to Exclude is *denied* as moot.

## III.     CONCLUSION

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–7, 9–11, 13–17, and 20–22 of the '808 patent are *unpatentable*.  Patent Owner's Motion to Amend is *denied*.  Petitioner's Motion to Exclude is *denied*.

## IV.     ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–7, 9–11, 13–17, and 20–22 of the '808 patent are held *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Amend is *denied*;

CBM2014-00159
Patent 8,396,808 B2

FURTHER ORDERED that Petitioner's Motion to Exclude is *denied*; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

CBM2014-00159
Patent 8,396,808 B2


For PETITIONER:

Michael T. Rosato
Robin L. Brewer
WILSON SONSINI GOODRICH & ROSATI, P.C.
mrosato@wsgr.com
rbrewer@wsgr.com


For PATENT OWNER:

Sean Goodwin
Michael Aschenbrener
ASCHENBRENER LAW, P.C.
sgg@aschenbrenerlaw.com
mga@aschenbrenerlaw.com

Trials@uspto.gov                                                    Paper 52
Tel: 571-272-7822                                    Entered: February 9, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SQUARE, INC.,
Petitioner,

v.

THINK COMPUTER CORPORATION,
Patent Owner.

_____

Case CBM2014-00159
Patent 8,396,808 B2

_____

Before TONI R. SCHEINER, MICHAEL W. KIM, and
BART A. GERSTENBLITH, *Administrative Patent Judges*.

KIM, *Administrative Patent Judge*.

DECISION ON REQUEST FOR REHEARING
*37 C.F.R. §§ 42.5, 42.71(d)*

On December 28, 2015, Patent Owner filed a Request for Rehearing

Pursuant to 37 C.F.R. § 42.71 (Paper 51; "Req.") concerning a Final Written

Decision mailed November 27, 2015 (Paper 47; Dec.).

A request for rehearing can only point out that which the Board

misapprehended or overlooked, and will be reviewed for abuse of discretion.

CBM2014-00159
Patent 8,396,808 B2

37 C.F.R. § 42.71(d).  Moreover, as the moving party, the burden of persuasion falls on Patent Owner.  37 C.F.R. § 42.20(c).  The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and where each matter was previously addressed in a motion, an opposition, or a reply.  Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012).

1. *"wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser account during any particular transaction"*

Fundamentally, most of Patent Owner's assertions, on this issue but also others, are misplaced, because while Patent Owner liberally uses the phrase "misapprehend or overlook," Patent Owner actually uses the phrase predominantly as a substitute for "disagree."  In doing so, Patent Owner misunderstands the purpose of requests for rehearing, and the importance of "specifically identify[ing] all matters the party believes the Board misapprehended or overlooked, *and where each matter was previously addressed in a motion, an opposition, or a reply*."  Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,768 (emphasis added).  This guidance is particularly important for a request for rehearing of a Final Written Decision, as the trial portion of the proceeding is now closed, and neither party is allowed to enter new arguments, citations, or evidence.

In the vast majority of its assertions, Patent Owner fails to identify where the arguments, citations, or evidence were previously addressed in a substantive paper.  A request for rehearing must necessarily be limited to such arguments already made, and citations and evidence already presented, because to do otherwise would be fundamentally unfair to the opposing party, in this case, the Petitioner.  Specifically, due process and fairness

CBM2014-00159
Patent 8,396,808 B2

dictates that for every assertion made by one party, the opposing party must have the opportunity to rebut that assertion.  That is why these trial proceedings provide very specific times and papers for which each party is allowed to make and rebut substantive assertions.  Allowing one party to make assertions outside of those confines upsets that balance.  To be sure, the Board is fallible, and so requests for rehearing are provided to ensure that every argument, citation, or evidence presented was properly considered in rendering a decision.  Nevertheless, it is to balance this desire for completeness with the aforementioned notions of due process and fairness that, in requests for rehearing, the moving party is scrupulously limited to identifying assertions already made, and citations, or evidence previously presented in conjunction with a substantive paper where the opposing party had the opportunity to respond, especially here where the trial portion of the proceeding has concluded.  When we apply this framework to most of Patent Owner's assertions, we see that Patent Owner has failed to meet both the letter and spirit of the aforementioned rules governing requests for rehearing.

For example, independent claim 1 recites "wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser account during any particular transaction," which all parties and the Board refer to as "bidirectional accounts."  Dec. 11–12.  Independent claims 20, 21, and 22 each recite a similar claim limitation.  Patent Owner asserts that the Board misapprehended or overlooked the prosecution history of U.S. Patent No. 8,396,808 B2 ("the '808 Patent") in construing "bidirectional accounts."  Req. 4–5.  In making that assertion, however, Patent Owner does not identify, and we are unable to discern independently, any previous motion, opposition, or reply in which Patent

CBM2014-00159
Patent 8,396,808 B2

Owner argued that the prosecution history specifically informs the construction of that term, thus failing to meet the aforementioned portion of the Office Trial Practice Guide.  Applying the above-referenced due process framework, consideration of this assertion would not be proper.  Because this assertion was not set forth in a previous motion, opposition, or reply, Petitioner did not have the chance to rebut this assertion, especially here, where the trial portion of the proceeding has concluded.  Accordingly, if we were to now make a construction in favor of Patent Owner based on assertions concerning which Petitioner did not have a chance to respond, such a determination would be fundamentally unfair to Petitioner, and thus cannot be allowed.

Patent Owner does identify "Paper 7 at 8, 17" (Req. 2), and may be asserting that this identification alone forms a proper basis in a previous motion, opposition, or reply for the aforementioned assertion.  This assertion is problematic for several reasons.  As an initial matter, Paper 7 is Patent Owner's Preliminary Response, to which Petitioner was not afforded a chance to reply.  A preliminary response is normally only a substantive paper in that it is used to assist the Board in deciding whether or not to institute a trial.  Once the Decision on Institution (Paper 9) was made, however, any substantive assertions Patent Owner wished the Petitioner to consider should have been made in the proper papers following institution and before the Final Written Decision to which Petitioner would have had a chance to reply, in this case, the Patent Owner Response (Paper 21) (to which Petitioner filed a Reply (Paper 30)) or Patent Owner's Motion to Amend (Paper 20) (to which Petitioner filed an Opposition (Paper 29)).  To hold otherwise would be procedurally unfair to Petitioner, who had

CBM2014-00159
Patent 8,396,808 B2

expected, and should only have expected, to respond to substantive assertions set forth in those papers, and not in the preliminary response. *See* Scheduling Order (Paper 10) at 4 ("The patent owner is cautioned that any arguments for patentability not raised in the response will be deemed waived.").  To that end, Patent Owner has not identified, and we are unable to discern independently, where Patent Owner previously made the aforementioned assertions concerning "bidirectional accounts" and the prosecution history in either the Patent Owner Response or the Patent Owner's Motion to Amend.

Setting aside the fact that Patent Owner relies upon its *Preliminary* Response, even when we consider the cited portions of the Preliminary Response, we are still unable to identify anything that could be considered a previous basis for assertions concerning "bidirectional accounts" and the prosecution history.  Indeed, the entirety of Patent Owner's analysis in the cited portions of the Preliminary Response that could even remotely be interpreted as relating to a proper claim construction of "bidirectional accounts" is as follows:

> The '808 Patent also solves the technical problem of the lack of role flexibility in traditional payment systems, which for decades has complicated data retrieval tasks for countless businesses by forcing them to maintain multiple accounts and/or identities for transaction counterparts due to legacy technical design flaws.  The '808 Patent solves the problem by flexibly assigning roles linked to a centralized legal entity database to create bi-directional account functionality, as opposed to using fixed roles with no bi-directionality and with no uniform entity identifiers, as in the prior art.

CBM2014-00159
Patent 8,396,808 B2

Prelim. Resp. 8.[1]  We are unclear as to how any of this analysis provides a proper basis for Patent Owner's aforementioned assertions concerning "bidirectional accounts" and the prosecution history.

Perhaps Patent Owner is asserting that the issue generally is "bidirectional accounts," and since "bidirectional accounts" generally was mentioned at the above-identified pages of the Preliminary Response, any specific arguments, citations, and evidence made under the general rubric of "bidirectional accounts" is proper at any time, because Petitioner should have been on notice that "bidirectional accounts" was a contested issue to which they should have set forth a rebuttal.  We disagree.  By that logic, Patent Owner would have to be asserting that Petitioner, based on the aforementioned vague reference to "bidirectional accounts" in the Preliminary Response, should have anticipated that Patent Owner would eventually make specific references to the portions of the prosecution history set forth in the Request for Rehearing, and thus should have preemptively addressed the assertions concerning "bidirectional accounts" and the prosecution history, even before they were made.  While we are cognizant that each party should be allowed some leeway in expanding on and clarifying specific arguments, citations, and evidence made in previous papers, we are unpersuaded, here, that the specific references to the portions of the prosecution history set forth in the Request for Rehearing is merely a

[1] Patent Owner also cites page 17 of the Preliminary Response, however, we have reviewed all of pages 17 to 19 of the Preliminary Response, and are unable to identify any portion that could be considered relevant to the above assertion.  Specifically, the only assertion made by Patent Owner is that Dalzell and Bemmel were similar to references already considered by the Examiner, and does not address assertions concerning "bidirectional accounts" and the prosecution history.

CBM2014-00159
Patent 8,396,808 B2

reasonable expansion or clarification of the vague reference to "bidirectional accounts" set forth in the Preliminary Response. Thus, we are unpersuaded that we misapprehended or overlooked the above-cited portions of the prosecution history in construing "bidirectional accounts."

In a similar manner, Patent Owner asserts further that the Board misapprehended or overlooked certain portions of the Specification and claims of the '808 Patent in construing "bidirectional accounts." Req. 2–7. Our analysis here is the same as that set forth above with respect to "bidirectional accounts" and the prosecution history, and need not be repeated.

Although identified in a later portion of the Request for Rehearing, pages 4 to 5 of Patent Owner's Reply in Support of Motion to Amend Under 37 C.F.R. § 42.221 (Paper 32) do set forth something that could plausibly be considered a tangential assertion concerning a proper construction of "bidirectional accounts," though the analysis is in the context of why Dalzell did not disclose "bidirectional accounts."[2] Even here, however, Patent Owner does not identify any of the allegedly misapprehended or overlooked portions of the prosecution history, Specification, or claims that are purportedly relevant to a claim construction of "bidirectional accounts." Indeed, here, Patent Owner does not even mention the Specification or prosecution history at all.

For the above reasons, we are unpersuaded that the Board misapprehended or overlooked the items identified by Patent Owner in construing "bidirectional accounts."

_____

[2] We note that even the assertion here was made in a Reply, to which Petitioner had a very limited chance to respond. Paper 34, 2–3.

CBM2014-00159
Patent 8,396,808 B2

Even if we were to consider some of the identified items, however, we are unpersuaded that they would alter our construction. For example, Patent Owner asserts that the claim limitation "any particular transaction" requires that "bidirectional account" be construed as allowing an account to function simultaneously as both a merchant account and a purchaser account under all transactions. We disagree, primarily because we are unclear as to what Patent Owner means by "under all transactions." The relevant limitation of independent claim 1 reads "wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser account during any particular transaction." We find that "[a]ny particular transaction" means any specific transaction, and is not necessarily limited to *all* transactions going forward, and find further that, logically, an account need only function in "merchant mode" or "purchaser mode" for that particular transaction; otherwise the account would be in the awkward position of performing a transaction with itself. Moreover, we are unclear as to why the same account cannot function as both, depending on the transaction, as an account is merely a repository within which funds are held, and whether the account is in "merchant mode" (i.e., the ability to send funds from the account) or "purchaser mode" (i.e., the ability to send funds to the account) does not alter the fundamental repository nature of the account itself.

A similar analysis of the cited portions of the prosecution history and Specification yields similar conclusions. For example, Patent Owner's discussion of the prosecution history on pages 4 and 5 of the Request for Rehearing do not amount to Patent Owner providing an explicit definition of "selectively function," "during any particular transition," or any other claim

CBM2014-00159
Patent 8,396,808 B2

term as meaning "simultaneously"; nor do Patent Owner's statements rise to the level of a clear and unmistakable disclaimer with respect to the meaning of the claim terms.

> 2.    *whether Dalzell fails to meet the claims' requirements*

Based on Patent Owner's proposed claim construction of "bidirectional accounts," Patent Owner asserts that Dalzell does not disclose "bidirectional accounts." Req. 7–10. As we are unpersuaded, however, that the Board misapprehended or overlooked the items identified by Patent Owner in construing "bidirectional accounts," we are unpersuaded that our analysis of Dalzell and "bidirectional accounts" set forth on pages 28 to 29 of the Final Written Decision should be modified in any way. *See* Dec. 29 ("[W]e find that a more logical reading of paragraph 59 of Dalzell is that a buyer, from a particular account, can add a seller feature to that particular account, without the need to create a whole new account. Such a finding is supported by extensive analysis and testimony by Dr. Sadeh-Koniecpol, with explicit citations to Dalzell, which we find credible, reasonable, and persuasive. Ex. 1002 ¶¶ 147-164 (citing Ex. 1006 ¶¶ 9, 27, 49, 57, 61, 82, 85, 87, 132, 163, Figs. 1A, 1B).")

> 3.    *"line item data" and "line item transaction data"*

Patent Owner asserts that the Board misconstrues "line item data" and "line item transaction data" (hereinafter "line item data"). Req. 10–15. Similar to the assertions set forth above with respect to "bidirectional accounts," we note that many of Patent Owner's assertions concerning this issue are set forth for the first time in the Request for Rehearing, without Patent Owner identifying, or the Board being able to ascertain independently, where those assertions were first made in a previous motion,

CBM2014-00159
Patent 8,396,808 B2

opposition, or reply.  Accordingly, those assertions have not been considered for the same reasons as set forth *supra* concerning "bidirectional accounts." Instead, we address below only those assertions that have a proper basis in a previous motion, opposition, or reply.

Patent Owner asserts that a proper construction of each of the recited claim limitations "purchase list," product catalog," and "transaction record" requires "line item data" as a necessary limitation to all claims, and that the Board misapprehended and overlooked two things in determining otherwise. We disagree.

First, Patent Owner asserts that the Board's determination that "purchase list" does not require "line item data" is unreasonably broad, because the Board overlooked or misapprehended the fact that the Specification does not provide a basis for the Board's unreasonably broad construction.  We disagree.  As set forth on page 7 of the Final Written Decision, the Board considered expressly the Specification as a basis for its construction.  To the extent that Patent Owner disagrees with how the Board used the Specification in making the aforementioned construction, the Board has considered anew the disclosures in the Specification identified by Patent Owner concerning whether "purchase list" requires "line item data," and are again unpersuaded our construction is in error.[3]

Second, Patent Owner asserts that the Board's determination that "purchase list" does not require "line item data" is unreasonably broad, because the Board overlooked or misapprehended the fact that *In re Van*

---

[3] Indeed, Patent Owner's "fruit orchard" analogy supports the Board's construction, as a fruit orchard, at times, may not include any fruit, for example, and merely consist of soil and trees.

CBM2014-00159
Patent 8,396,808 B2

*Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993), can be distinguished from the instant proceeding.  Specifically, Patent Owner asserts that "there is no alternative construction posited as was true in *In re Van Geuns*, and 'line item data' is not a familiar natural principle, in the way that a magnetic field is."  Req. 11.  We disagree.  Concerning whether or not there was an alternative construction posited in *In re Van Geuns*, the question in that case was whether a claim limitation concerning "substantially uniform magnetic field" should be construed as "substantially uniform magnetic field *required for NMR imaging*" (emphasis added).  Thus, contrary to Patent Owner's assertions, there were two alternative constructions posited, one broader and one narrower, and the broader one was determined to be correct.  Such is the exact fact scenario here concerning "purchase list" and "line item data."

Concerning the fact that "line item data" is not a familiar natural principle, we agree with Patent Owner.  We are unclear as to how that agreement, however, helps Patent Owner's position, as if "line item data" is not as certain as a familiar natural principle, the ambiguity should be construed against Patent Owner.  Specifically, if there is greater doubt as to whether or not "purchase list" requires "line item data" because the meaning of "line item data" is uncertain, the broader construction should be used, i.e., that "purchase list" does not require "line item data."

Patent Owner appears to assert additionally that the Board misapprehended or overlooked the fact that a proper construction, presumably of the independent claims, requires that in order for a prior art reference to meet the claimed system and method, the prior art must be capable of handling *all types* of "line item data," including "line item data" that includes gigabytes of data.  We disagree that this assertion was

CBM2014-00159
Patent 8,396,808 B2

misapprehended or overlooked, as Patent Owner has not identified where these assertions are set forth in any previous motion, opposition, or reply.[4]

Patent Owner asserts additionally that the Board has misapprehended or overlooked Patent Owner's characterizations of Exhibit 2042. The Board did not misapprehend or overlook Patent Owner's characterizations of Exhibit 2042; the Board disagreed with it. Indeed, page 36 of the Final Written Decision block quotes and addresses the exact assertions that Patent Owner asserts was misapprehended or overlooked.

Patent Owner asserts also that the Board has misapprehended or overlooked the fact that the items set forth in Figure 4 of Exhibit 2042 are not "line item data." We construed "line item data" as "information from a larger group of information, related to individual products involved in a purchase or sale, that is capable of categorization." Dec. 11. We are unpersuaded that at least one of the items set forth in Figure 4 of Exhibit 2042, such as any item listed under Description, Category, Date, Currency, and Amount, does not meet the above construction of "line item data."

IT IS ORDERED that insofar as we have addressed above the assertions set forth in Patent Owner's Request for Rehearing (Paper 51), the Request is *granted*. In all other respects, the Request is *denied*.

---

[4] Absent such a narrowing of the independent claims, and it is unclear which claim limitation would serve the basis for such a narrowing, Patent Owner's proffered analogy again supports the Board's construction, as a doorframe built for "humans" is met if the prior art discloses a doorframe that can accommodate a short child, but not Manute Bol.

CBM2014-00159
Patent 8,396,808 B2

For PETITIONER:

Michael T. Rosato
Robin L. Brewer
WILSON SONSINI GOODRICH & ROSATI, P.C.
mrosato@wsgr.com
rbrewer@wsgr.com


For PATENT OWNER:

Issac Rabicoff
RABICOFF LAW LLC
isaac@rabilaw.com

Michael Aschenbrener
ASCHENBRENER LAW, P.C.
mja@aschenbrenerlaw.com



US008396808B2

(12) **United States Patent**
    Greenspan

(10) **Patent No.:**      **US 8,396,808 B2**
(45) **Date of Patent:**      **Mar. 12, 2013**

(54) **METHOD AND SYSTEM FOR TRANSFERRING AN ELECTRONIC PAYMENT**

(75) Inventor: **Aaron J. Greenspan**, Palo Alto, CA (US)

(73) Assignee: **Think Computer Corporation**, Palo Alto, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 150 days.

(21) Appl. No.: **12/641,071**

(22) Filed: **Dec. 17, 2009**

(65) **Prior Publication Data**

US 2011/0029416 A1      Feb. 3, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/230,387, filed on Jul. 31, 2009.

(51) **Int. Cl.**
    **G06Q 20/00**      (2012.01)
(52) **U.S. Cl.** ................ **705/64**; 705/65; 705/67; 705/72; 705/79
(58) **Field of Classification Search** .............. 705/64, 705/65, 67, 72, 75, 78, 79
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,260,024 | B1 | 7/2001 | Shkedy | |
| 7,127,606 | B2 * | 10/2006 | Wheeler et al. | ............... 713/156 |
| 7,873,573 | B2 * | 1/2011 | Realini | ........................... 705/39 |

| | | | | |
|---|---|---|---|---|
| 2003/0061170 | A1 | 3/2003 | Uzo | |
| 2004/0167820 | A1 * | 8/2004 | Melick et al. | .................... 705/16 |
| 2004/0254861 | A1 | 12/2004 | Pentel | |
| 2005/0043996 | A1 * | 2/2005 | Silver | .............................. 705/15 |
| 2006/0099964 | A1 * | 5/2006 | Barrese et al. | ............. 455/456.3 |
| 2007/0055597 | A1 * | 3/2007 | Patel et al. | ....................... 705/35 |
| 2008/0120155 | A1 * | 5/2008 | Pliha | .................................. 705/7 |
| 2009/0099961 | A1 | 4/2009 | Ogilvy | |
| 2010/0125495 | A1 * | 5/2010 | Smith et al. | ................ 705/14.23 |
| 2010/0138344 | A1 * | 6/2010 | Wong et al. | ..................... 705/44 |
| 2010/0219234 | A1 * | 9/2010 | Forbes | .......................... 235/375 |
| 2010/0318219 | A1 * | 12/2010 | Kuehnrich et al. | ......... 700/232 |

OTHER PUBLICATIONS

Definition of "separate" as "detached, disconnected, or disjoined". Retrieved from Random House Dictionary, Random House, Inc. (2011).*
Zhang, J. (2006). The roles of players and reputation: Evidence from eBay online auctions. Decision Support Systems 42, 1800-1818 (hereinafter "eBay").*

* cited by examiner

*Primary Examiner* — Elaine Gort
*Assistant Examiner* — Peter Ludwig
(74) *Attorney, Agent, or Firm* — Jeffrey Schox; Derek Westbr5ng

(57) **ABSTRACT**

A method and system for transferring an electronic payment between a purchaser and a merchant that includes assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system, adding an item from a product catalog stored in the payment system to a purchase list, obtaining a user ID token of a purchaser from a merchant terminal, communicating identity confirmation information associated with the user ID token to the merchant terminal, and transferring funds for the purchase price total from the purchaser account to the merchant account.

**22 Claims, 9 Drawing Sheets**



SQUARE - EXHIBIT 1001



100
PAYMENT SYSTEM
LEGAL ENTITY ACCOUNT DATABASE
Business A
Consumer B
Business C
Consumer D
Business E
Consumer F
PHOTO DATABASE
B
D
F
H
K
L
MOBILE DEVICE PORTAL
AUTHENTICATION SUBSYSTEM
WEB-BASED PORTAL
CONSUMER F DESIRES GOODS OR SERVICES FROM BUSINESS A
S110 NEW TRANSACTION
Goods
Services
Business A
Consumer F
MERCHANT ROLE
PURCHASER ROLE
CONSUMER F CHOOSES PARTICULAR GOODS OR SERVICES
S120 ITEM SELECTION
Item 1 $5.00
Item 2 $10.00
Item 3 $2.00
Item 4 $4.25
Item 5 $9.99
Item 1 $5.00
Item 3 $2.00
Subtotal $7.00
Tax $0.70
Total $7.70
PRODUCT CATALOG
PURCHASE LIST
S130 USER ID TOKEN ACQUISITION
User ID
Token
Consumer F
MERCHANT DEVICE
PURCHASER DEVICE
S140 USER IDENTITY VERIFICATION
Compare
Visually
MERCHANT DEVICE
PURCHASER
MERCHANT CONFIRMS IDENTITY AND APPROVES TRANSACTION
S150
FUNDS ARE SENT FROM PURCHASER ACCOUNT TO MERCHANT ACCOUNT
S160
PURCHASER AUGMENTS TRANSACTION
S170
PURCHASER AND MERCHANT ARE NOTIFIED OF TRANSACTION

Figure 1



**Figure 2**

Appx055

**Figure 3**

Appx056



**Figure 4**



**Figure 5**

S164



**Figure 6**

Appx059



**Figure 7**

Appx060

S180



**Mobile Purchaser Device**

## Not Sufficient Funds

Sorry, but there isn't enough money in your account to cover this purchase.

You can view details, or choose an option.

**Authorize a Deposit**    ⊙
I authorize a debit of $50.00 from my checking account.

**Use Overdraft Protection**    ⊙
I consent to pay a fee of $10.00 and fund my account later.

**Hold**    ⊙
We'll save your order in your Pending Transactions.

**Cancel**    ⊙
Order details will be lost and you will not be charged.

⇕

Home    Order    Checkout    Pending    History

**Figure 8**

Appx061



**Figure 9**

US 8,396,808 B2

# 1
## METHOD AND SYSTEM FOR TRANSFERRING AN ELECTRONIC PAYMENT

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 61/230,387, filed 31 Jul. 2009, entitled "Method and System for Uniquely Identifying Purchasers of Specific Goods and Services and Associated Transaction Details" which is incorporated in its entirety by this reference.

### TECHNICAL FIELD

This invention relates generally to the payment transaction field, and more specifically to a new and useful method and system for transferring an electronic payment in the payment transaction field.

### BACKGROUND

Electronic payment transactions occur daily and have become ubiquitous in everyday life. The transactions and related execution costs, however, are becoming more burdensome for businesses and are adversely affecting the bottom line of businesses. This problem is especially acute for small businesses that rely on relatively thin profit margins.

Credit card companies have gained a foothold as the most widely accepted non-cash form of payment for transactions, and many consumers exclusively transact only with merchants that accept credit cards. Thus, many businesses are compelled to use the services of credit card companies despite the costly overhead associated with credit card transactions. Merchants have the additional burden of handling the secure information of a credit card, which exposes the business to legal liability. Despite the high cost of credit card transactions, the technology employed for credit cards is able to provide limited security at the time of sale and limited reporting information for a purchase. Thus, there is a need in the payment transaction field to create a new and useful method and system for transferring an electronic payment. This invention provides such a new and useful method and system.

### SUMMARY

The method for transferring an electronic payment of the preferred embodiment includes assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system for the given transaction, adding an item from a product catalog to a purchase list, transmitting one or more user identification (ID) tokens belonging to the purchaser from a terminal to the payment system, communicating identity confirmation information associated with the user ID from the payment system back to the terminal, allowing the purchaser to perform intermediate steps related to purchase tracking and marketing incentives, and transferring funds for the transaction from the purchaser's account to the merchant's account. The method functions to allow two parties, such as a merchant and a purchaser, to complete a transaction through an electronic terminal. More preferably, the method functions to allow for an electronic payment at a point of sale. The electronic terminal may be a personal computer, a mobile phone, or any suitable internet-enabled device. In one embodiment, the merchant uses a merchant terminal, but in alternative embodi-

ments a merchant terminal and a purchaser terminal may be used for carrying out steps of the preferred method. The merchant terminal and/or purchaser terminal preferably use an account portal to communicate with the payment system. An account portal is preferably a software application or a web-based software application that provides an interface on an electronic terminal for user interaction with the payment system. The method is preferably performed over an internet network that is used for communication between the payment system and the merchant terminal and/or purchaser terminal. The internet network is preferably a secure, TCP/IP-based network, but may be any suitable network. The product catalog of the merchant is preferably created by a merchant with an account on the payment system, and is preferably hosted by the payment system. The integration of the payment system and product catalog functions to enable recording and tracking transactions with itemized detail. The itemized detail is preferably available to both the merchant and the purchaser in real-time, which enables various forms of purchase augmentation, notification, and accounting on a per item basis. Most preferably the merchant and purchaser can access the payment system through an internet website on a desktop or laptop computer or a mobile device.

### BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** is a flowchart representation of a method for transferring an electronic payment of a preferred embodiment of the invention;

FIG. **2** is an exemplary screenshot of an electronic terminal displaying a portion of a product catalog of a merchant;

FIG. **3** is an exemplary screenshot of an electronic terminal displaying a purchase list;

FIG. **4** is an exemplary screenshot of an electronic terminal displaying an interface for adding a purchaser-variable value to the purchase price total;

FIG. **5** is an exemplary flowchart representation of charging a portion of a purchase price total to a second account;

FIG. **6** is an exemplary screenshot of an electronic terminal displaying an interface for assigning a transaction to a legal entity associated with the present purchaser using the payment system;

FIG. **7** is an exemplary screenshot of an electronic terminal displaying budgeting rule options;

FIG. **8** is an exemplary screenshot of an electronic terminal receiving purchaser approval for account-related warnings; and

FIG. **9** is a schematic representation of a system for transferring an electronic payment of a preferred embodiment of the invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

The following description of the preferred embodiments of the invention is not intended to limit the invention to these preferred embodiments, but rather to enable any person skilled in the art to make and use this invention.

1. Method for Transferring an Electronic Payment

As mentioned above and as shown in FIG. **1**, the method for transferring an electronic payment of the preferred embodiment includes assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system S**110**, adding an item from a product catalog to a purchase list S**120**, obtaining a user identification (ID) of a purchaser from a merchant terminal S**130**, communicating identity confirmation information associated with

**3**

the user ID from the payment system to the merchant terminal S**140**, and transferring funds for the purchase to the merchant account S**150**.

Step S**110**, which includes assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system, functions to register a purchaser and a merchant for a transaction within a single integrated system. The payment system preferably allows for transfer of information and data through various stages of the purchase process. The payment system preferably creates a standard protocol, interface, and user experience that enables enhancements to the payment process as described below. The payment system is preferably used for communicating to a merchant terminal and for completing payment transaction. An entity (e.g., a person, business, or other legally recognized entity) preferably creates an account within the payment system. The accounts of the payment system are preferably designed so that an account may selectively function as either a merchant or a purchaser during any particular transaction. In other words, within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts. The merchant is preferably the entity providing goods and/or services to the purchaser and typically receiving payment for the goods or services. In many situations the merchant account is a business but may alternatively be a person receiving payment from another person or a business. For a transaction, the merchant account role and the purchaser account role are preferably assigned to at least one account each. Among other benefits, the versatility of an entity account in the payment system enables simplified bookkeeping (e.g., elimination of duplicate database records). As part of the step of assigning a purchaser account and a merchant account, the payment system may additionally host an account portal that functions to support the interaction between the payment system and the merchant and purchaser, respectively. Through the account portal a user can preferably access account information, view and update a product catalog, access financial tools, carry out a transaction as merchant or a purchaser, and/or perform any suitable task within the payment system. The account portal is preferably a website but may alternatively use any suitable implementation to facilitate the use of the payment system, such as an Application Programming Interface (API) accessed by other parties. The payment system may additionally aid in the process of tracking transaction history, automatically completing tax forms based upon data from itemized history of an entity, performing general ledger accounting, tracking purchase or sales trends, performing budgeting tasks, and any performing any suitable service. Additionally, the payment system may aid in managing a social network of a plurality of entities. The social network is preferably based on the entity accounts and transactions that occur between various accounts of the payment system. Creating an entity account may include linking a financial account (e.g., credit card or bank account) with the system. Additionally or alternatively, the payment system may include the creation of a payment system account enabling the deposit and withdrawal of money into and out of a financial account (e.g. a traditional checking or savings account at a bank). As preparation of being assigned the role of a merchant account, creating an account (i.e., an entity account) may include the sub-step of creating a product catalog of the merchant. The product catalog preferably includes the products offered for sale by a merchant. A product may include any physical product, abstract product (e.g., insurance contract or home mortgage), a service, or any suitable salable item. The product catalog is preferably associated with a

**4**

particular entity, but may alternatively be shared by a plurality of entities (such as a corporate chain with shared product offering, or in cases where many discrete entities sell the same generic product). The product catalog preferably includes a listing of product descriptions and prices for each product contained within the product catalog. Additional information may be included for a product such as categories for tax purposes and other purposes, product-related IDs for each distributor of the product (e.g., Stock-Keeping Unit or "SKU"), images or media files related to the product, inventory related information (the number of items on hand, on order, etc. at each warehouse location), or any other suitable product-related data. The product catalog may be a database accessed by outside applications, but may additionally or alternatively include a hosted web-based store through which products can be added to a shopping cart (i.e., a purchase list). The product catalog is preferably served (sent via the internet) to a terminal (either of a merchant or a purchaser during a transaction), as shown in FIG. **2**. The product catalog may additionally include any suitable option used by a merchant in the pricing and sale of a product. For example, the product catalog may include options for implementing sales, promotional offerings, customizations (including customizing a first product with add-on products, or "up-selling"), allowing for hierarchical ordering of products, and allowing for any suitable pricing mechanism of a merchant (including quantity-based pricing or subscription based products with recurring charges).

Step S**120**, which includes adding an item from a product catalog to a purchase list, functions to form a list of all products of a purchase made by a purchaser and to calculate the purchase price total, as shown in FIG. **3**. The product catalog is preferably accessed by a representative of the merchant on a terminal, and the representative is preferably responsible for adding those items that a purchaser plans to purchase. The purchaser may alternatively or additionally add items to the purchase list in an embodiment where the product catalog is made accessible to a purchaser terminal. A product catalog of a merchant may be accessed by navigating to a unique address or, alternatively, by navigating to a product catalog based on purchaser terminal location. The step of navigating to a product catalog based on purchaser terminal location preferably includes obtaining the location of the purchaser terminal (such as by GPS, internet location techniques, telephone tower triangulation, etc.) and providing a product catalog of a merchant that is near the location of the purchaser terminal. In this situation, "near the location of the purchaser terminal" may be determined by absolute distance or relative distance compared to other merchants with product catalogs. The purchase list created on a purchaser terminal is preferably sent to the appropriate merchant terminal when the purchaser is ready to complete a purchase. In the variation of a purchaser-created purchase list, a merchant preferably performs step S**130** to establish a link between a purchaser and a merchant, and then the purchase list is sent to the merchant. The purchaser list from a purchaser terminal may additionally be merged with a purchase list from a merchant terminal.

Step S**130**, which includes obtaining user identification (ID) tokens of a purchaser from a merchant terminal, functions to gather at least one unique identifier of the purchaser. The user ID may be implemented in various forms. Preferably, the user ID is a barcode that encodes a user identification value (e.g., a alphanumeric code). More preferably, the barcode is a Code 128-C barcode corresponding to a user ID stored in an internet-accessible database table uniquely representing an entity account (i.e., the specific individual) used in making the purchase. The barcode is preferably collected

US 8,396,808 B2

**5**

from a terminal through a barcode scanner, a camera, or any suitable imaging device. The barcode may be read from a printed card, but may alternatively be displayed on a screen of a mobile device utilizing LCD, LED, OLED, e-Ink, or any suitable display technology. Alternatively, the user ID may be entered manually, read from a magnetic strip, read from an RFID tag, biometrically scanned, obtained from visual recognition, or entered in any other manner suitable for reading an encoded ID. The user identification value may additionally be used for situations where a barcode cannot be used. The user identification value is preferably an 11-digit value, but any suitable length of code may be used such as any standard code length used in a particular technology (Code 128-C barcode). The user ID is preferably sent over an internet connection to the payment system. Upon receiving the user ID the payment system can establish a transaction session between the merchant account logged into on the merchant terminal and the purchaser account identified from the user ID.

Step S140, which includes communicating identity confirmation information associated with the user ID from the payment system to the merchant terminal, functions to provide the merchant with a way to verify the identity of the purchaser. Preferably, Step S140 includes sending an image associated with the account ID. The image is preferably a photograph of the owner of the purchaser account, which a merchant can use as reference to verify that the purchaser (the person who is attempting to make the purchase and who is likely within visual range of the representative of the merchant) visually matches the person in the photograph associated with the account. Alternatively or in addition, any suitable form of verification may be used such as a security question and answer, a PIN number or password, address information, biometric signatures compared to biometric readings, and/or any other suitable information for identity confirmation. The payment system preferably receives a communication indicating purchase approval or purchase denial from the merchant terminal. The purchase is preferably denied by the representative of the merchant if the confirmation information is not approved.

Step S150, which includes transferring funds for the purchase price total to an account of the merchant, functions to finalize the purchase. Step S150 is preferably performed after receiving purchase approval from the merchant terminal. The amount of funds transferred to the merchant account preferably covers the purchase price total, which includes the sum total of the price of products in the purchase list, tax, and any additional costs such as gratuity. The payment system preferably performs the necessary tasks for transferring funds such as verifying that enough funds are in an account prior to making the transaction to avoid any penalty fees. Additionally, after completing a purchase, the method may additionally store purchase list information as a transaction record for the merchant account and/or the purchaser account, which functions to form an itemized purchase history. A purchaser or merchant can preferably access transaction records stored on a respective payment system account, and all data from a purchase list is preferably accessible. The itemized transaction records can be used for detailed analysis of purchase trends, account budgeting, or any suitable application.

Additionally or alternatively, the method of the preferred embodiment includes augmenting a transaction S160, which functions to provide a purchaser with control over purchasing options. The transaction is preferably the transaction associated with the transfer of funds of the purchase price total from the purchaser account to the merchant account. A purchaser or a merchant preferably provides input prior, during, or after

**6**

the transfer of funds and that input results in some action using transaction based information. Additionally or alternatively, during the process of augmenting of a transaction, account-related and/or transaction-related information may be communicated to the purchaser and/or merchant through a terminal. A transaction may be augmented through several variations including adding a purchaser-variable value to the purchase price total S162, charging a portion of the purchase price total to at least a second account S164, applying a budgeting rule that transfers money based in part on the purchase S166, and/or any other suitable manner of augmenting the financial effects of a purchase.

Step S162, which includes adding a purchaser-variable value to the purchase price total as shown in FIG. 4, functions to allow the common practice of adding a customer tip to a purchase. This has particular applications for purchases made at restaurants that require (or at least expect) tips, but may have wider applications such as for charities and fundraisers where a person donating money would want to specify the amount to pay. A purchaser-variable value item (or tip field) is preferably added to a purchase list. This may be added by the merchant or automatically added based on the classification of the merchant or by any suitable means. For example, a merchant with a Standard Industry Classification (SIC) of 58 corresponding to an "Eating and Drinking Place" would preferably have a tip field automatically added to purchases. Additionally, the specific location of the merchant may determine if a tip field should be added, such as in the situation where some locations of a particular merchant use tip and others do not. When a tip field is added to a purchase list, the purchaser preferably is provided with an interface on a purchaser terminal for entering a desired value to add to the purchase price total. As shown in FIG. 4, the interface may additionally suggest common tip amounts such as 10%, 15%, and 20% values of the purchase price pre-tax. The interface is preferably provided through the account portal on a purchaser terminal, but may additionally be provided through the account portal on the merchant terminal. Additionally, the tip field may be completed by a purchaser at a time after the initial payment of the purchase price total. The tip field preferably has an expiration time and a default tip value, so that if the purchaser forgets to enter a value within a set amount of time (e.g., 24 hours), a default tip will be added to the purchase price total. The default tip may be set at zero or set at a greater than zero amount.

Step S164, charging a portion of the purchase price total to at least a second account as shown in FIGS. 5 and 6, which functions to split the bill between multiple parties. This step may be useful when multiple people wish to split the cost of a purchase, such as group at a restaurant or a bar. Preferably, a first purchaser (primary purchaser) accepts the charges for the purchase from the merchant. Then the purchaser preferably distributes the cost of the purchase to at least a second purchaser and may additionally distribute the cost to any suitable number of purchasers. The primary purchaser may charge the second purchaser in a fashion substantially similar to the way a merchant completes a transaction with a purchaser (Steps S130, S140, and S150). As the identity of the second purchaser is preferably trusted by the first purchaser, the identity verification step may be omitted or disregarded. The second purchaser may additionally need to accept charges. In a first variation, the purchase price total is preferably split based on a percentage of the purchase price total. For example, the purchaser may charge a second person for 50% of the bill so that the two people evenly pay for the purchase. As a second variation shown in FIG. 5, a purchase may be divided on a per item basis. Items that a second person

7

should pay for are selected by a purchaser through an interface, and then the second purchaser is charged the sum total of the selected items (transferring funds from the second purchaser to the original purchaser). Additional purchase charges, such as tax and tip, are preferably divided so that each purchaser pays an appropriate amount resulting from the marked items is additionally charged to the other person. Additionally, a percentage of the cost of an individual item may be charged to the other person. The purchase price total may alternatively be divided in any suitable fashion. This step may additionally be applied to spread costs between various accounts of a single purchaser, as shown in FIG. **6**. As one example, a purchaser may have a corporate account for business purchases and a personal account for personal purchases. Through the step of S**164**, a purchaser would be able to easily distribute the cost of a purchase as the purchaser sees fit.

Step S**166**, which includes applying a budgeting rule that transfers money based in part on the purchase, functions to initiate account action outside of the purchase. Step S**166** is preferably used for money management rules of a purchaser account. The transfer of money may additionally be scheduled from some future date. As one example, S**166** may be used to automatically give a donation to a particular charity. As another example, S**166** may be used to automatically manage a budget for a purchaser such as by moving funds into a savings account for every purchase. The budgeting rule preferably uses small transaction amounts (e.g., fractions of a dollar) that are based on a percentage of the purchase price total, but may be fixed amounts or any suitable value. The budgeting rule in one preferred variation functions similar to a rewards program as is known in the art. The budgeting rule can use any suitable information about a purchase such as merchant name, merchant type (SKU code), individual item description, individual item price, or any suitable information collected about a purchase for determining where to transfer money and how to determine the amount to transfer. Additionally, a purchaser may select a desired budgeting rule (or reward) to enact for a purchase. For example, a purchaser may have several budgeting rules. A first budgeting rule may contribute a percentage of a purchase price total to a charity for all purchases made at grocery stores. A second budgeting rule may move a fixed amount into a savings account for every item that is determined to be a consumer electronics-related product. Of course, a third budgeting rule can act like a tax to dissuade certain purchases, such as alcohol or tobacco. Additionally, as part of the budgeting rule, an amount of money may have restricted use. The restricted use preferably prevents the money from being used for purchases other than those set by the rule. For example, money may be restricted for a particular vendor so as to function in a manner similar to a gift card for that particular vendor. The money may be restricted for food items, entertainment, bills, or any suitable category of purchases. This category restriction could function as a personal budgeting tool. For example, a user could set up a budgeting rule that for every dollar spent on consumer electronics two will be reserved for food items.

Additionally or alternatively, the method of the preferred embodiment includes communicating a notification of purchase related effects S**170**, which functions to provide information about a purchase to the merchant and/or purchaser at the time of sale. For a purchaser, the notification is preferably related to the purchaser account. As a first example many financial accounts offer rewards for purchases such as cash back rewards, points, mileage points, or any suitable reward system. Step S**170** would function to notify the purchaser of the number of rewards collected by each purchase. Additionally or alternatively, a notification may be sent containing the

8

account balance before and/or after a purchase. Used in combination with Step S**166**, notifications are provided to the purchaser containing information related to the amount of money transferred to other accounts (e.g., charities, savings accounts etc.) as part of a budgeting rule, as shown in FIG. **7**. Additionally, as one of the main benefits of having merchant product catalogs integrated into the payment system, line item transaction data can be communicated. The line item data is additionally stored as part of the transaction record of the accounts. This itemized information can be very useful, such as in one application where tax forms are automatically completed by aggregating each category of line item transaction data as appropriate. For a merchant, information such as the inventory levels of a product could be displayed along with any data related to the impact of a particular purchase.

Additionally, the method of the preferred embodiment may include receiving purchaser acknowledgment of an account-related warning S**180**. An account warning preferably includes an error or alert that the account does not have sufficient funds for a purchase. An insufficient funds warning is preferably identified in Step S**150** when the payment system is performing the steps of transferring funds. The account-related warning is preferably received at the time of purchase, and the acknowledgment includes obtaining purchaser consent to ameliorative actions at the time of purchase. The payment system will preferably provide various payment plan options that could be used in a situation where the purchaser account does not have sufficient funds, as shown in FIG. **8**. For example, the payment system may loan the purchaser money for the purchase or provide an option to deposit funds into the purchaser account from a second financial account. The account warning may additionally be related to an account balance dipping below a threshold and displaying a message informing the purchaser. The account warning may be activated due to suspicious spending on the account. In this variation, additional security questions can be displayed such that the correct answering of questions allows a purchase to be approved, while incorrect answering places a hold on the account. The security questions may be sent to the merchant or displayed on a device of the purchaser.

2. System for Transferring an Electronic Payment

As shown in FIG. **9**, the system **200** for transferring an electronic payment of the preferred embodiment includes a payment system **210**, an account portal **220**, and a product catalog **230**. The system **200** functions to provide the infrastructure for implementing the method described above.

The payment system **210** of the preferred embodiment functions to coordinate purchases that occur between a merchant and a purchaser. The payment system **210** preferably includes a plurality of payment system accounts stored in a connected account database **212**. The payment system accounts preferably can act as merchant accounts or purchaser accounts as described above. The payment system accounts are preferably used to identify a user of the payment system, for holding funds or alternatively linking to a financial account, and storing any suitable payment system account-related information. The payment system **210** is preferably a server or a plurality of servers that can connect a merchant or purchaser through a TCP/IP internet connection. However, any suitable protocol may alternatively be used such as IPv6.

The account portal **220** of the preferred embodiment functions as the interface between an electronic terminal (e.g., merchant terminal or a purchaser terminal) and the payment system. The account portal **220** preferably allows a user to manage an account and complete a purchase transaction as described in the method above through either a merchant

US 8,396,808 B2

**9**

interface or a purchaser interface. In this way, any account may be used in a transaction as either a merchant account or a purchaser account. The account portal **220** preferably includes transaction interface tools and a product catalog management tool. The account portal **220** is preferably a website, but may additionally or alternatively be an application communicating to the payment system through an application programming interface. The account portal **220** is preferably used on a hardware device and connects to the payment system **210** through a TCP/IP network connection. Additionally the account portal **220** functions to allow for control of a product catalog **230** of a merchant. The account portal **220** preferably allows for a user ID token to be retrieved from the account database **212** and displayed on an electronic terminal (e.g., a purchaser terminal) preferably in an encoded form (e.g. a barcode). A merchant terminal can then preferably collect the user ID token from a purchaser terminal displaying or transmitting the encoded the user ID token and pass the user ID token through the account portal to the payment system **210** to create a transaction session. The account portal **220** is preferably accessible by a variety of devices including personal computers and mobile devices.

The product catalog **230** of the preferred embodiment functions as an accessible database of for-sale offerings of a merchant. The product catalog is preferably stored within the payment system **210** and is preferably stored in a manner allowing each product to be linked to one or more merchant accounts. The product catalog **230** is preferably a database of relevant product information such as descriptions and prices. The items of the product catalog **230** are preferably pre-categorized (i.e., categorized prior to any transaction taking place) by type of product. The merchant preferably assigns the categorization of a product, but categorization may be assigned in any suitable manner. For example, a hamburger at a restaurant will be pre-categorized as food by the restaurant. Pre-categorization serves to simplify accounting for both the merchant and the purchaser. The payment system will preferably know which types of items were purchased or sold for an account. In one application, a tax form is automatically filled out by aggregating transaction information for the food category so that a 50% meals deduction offered by the IRS can be applied to those expenditures. The product catalog may additionally be accessed as an online store with products able to be added to a purchase list (shopping cart). The product catalog **220** is preferably accessible on a merchant terminal for management of the product catalog and for adding items to a purchase list for a purchaser. Additionally a product catalog may be accessed on a purchaser terminal for adding items to a purchase list.

As a person skilled in the art will recognize from the previous detailed description and from the figures and claims, modifications and changes can be made to the preferred embodiments of the invention without departing from the scope of this invention defined in the following claims.

I claim:

**1**. A method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;

adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;

**10**

obtaining a user ID token of the purchaser from a merchant terminal, the merchant terminal being at a merchant location and the merchant location being different from the payment system;

communicating identity confirmation information associated with the user ID token to the merchant terminal; and

transferring funds for a purchase price total from the purchaser account to the merchant account.

**2**. The method of claim **1**, further comprising storing purchase list information as a transaction record for the merchant account and the purchaser account.

**3**. The method of claim **2**, further comprising serving the product catalog to a purchaser terminal, wherein an item is added to the product catalog from the purchaser terminal.

**4**. The method of claim **3**, further comprising navigating the purchaser terminal to the product catalog of a merchant based on the location of the purchaser terminal.

**5**. The method of claim **2**, further comprising serving the product catalog to the merchant terminal, wherein an item is added to the product catalog from the merchant terminal.

**6**. The method of claim **2**, wherein the step of obtaining a user ID token of a purchaser includes scanning a barcode provided by the purchaser.

**7**. The method of claim **6**, further comprising providing a barcode displayable on a purchaser terminal.

**8**. The method of claim **2**, wherein the step of communicating identity confirmation information includes sending an image associated with an account ID, wherein the image comprises a photograph of an owner of the purchaser account, and receiving confirmation from the merchant terminal that the image associated with the account ID matches that of the purchaser.

**9**. The method of claim **2**, further comprising augmenting a transaction associated with the transfer of funds.

**10**. The method of claim **9**, wherein augmenting the transaction includes adding a purchaser-variable value to the purchase price total.

**11**. The method of claim **10**, wherein adding a purchaser-variable value to the purchase price total includes allowing the purchaser to set the purchaser-variable value after the purchase with the merchant is completed.

**12**. The method of claim **11**, wherein adding a purchaser-variable value to a purchase price includes setting a default value greater than zero, and using the default value as the purchaser-variable value if the purchaser-variable value is not set by an expiration time.

**13**. The method of claim **9**, wherein augmenting the transaction includes charging a portion of the purchase price total to at least a third account.

**14**. The method of claim **13**, wherein a percentage of the purchase price total is charged to the purchaser account and a remaining percentage of the purchase price total is charged to the third account.

**15**. The method of claim **13**, wherein the portion of the purchase price total charged to at least a third account is calculated from items from the product list that are selected to be charged to the third account.

**16**. The method of claim **9**, wherein augmenting the transaction includes applying a budgeting rule that transfers money based in part on the purchase.

**17**. The method of claim **2**, further comprising communicating a notification of purchase-related effects at the time of purchase.

**18**. The method of claim **2**, further comprising receiving purchaser acknowledgment of account-related warnings at the time of purchase and obtaining purchaser consent to ameliorative actions at the time of purchase.

**11**

**19**. A method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;

adding at least one item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;

providing a user ID token in the form of a barcode that is displayable on a purchaser terminal;

obtaining a user ID token of the purchaser from a merchant terminal by scanning a purchaser terminal display of the barcode user ID, the merchant terminal being at a merchant location and the merchant location being different from the payment system;

communicating identity confirmation information associated with the user ID token to the merchant terminal, wherein the identity confirmation information is an image of an owner of the purchaser account;

receiving confirmation from the merchant terminal that the image matches the owner of the purchaser account;

transferring funds for a purchase price total from the purchaser account to the merchant account; and

recording purchase list information as a transaction record for the merchant account and the purchaser account.

**20**. A system for transferring an electronic payment between a purchaser and a merchant comprising:

a payment system that manages transactions between the purchaser and the merchant and includes a payment system account database, wherein the account database includes a plurality of accounts that are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction and wherein the merchant is at a merchant location and the merchant location is different from the payment system;

a product catalog with categorized items offered for sale by the merchant that is hosted within the payment system;

an account portal that connects an electronic terminal to the payment system through a network connection, and includes transaction interface tools and product catalog management tool; and

wherein the account portal connects the purchaser to the payment system with a transaction interface for a purchaser and connects a merchant to the payment system with a merchant interface.

**21**. A method performed over a payment network for transferring an electronic payment between a purchaser and a merchant, the payment network comprising a plurality of merchant terminals connected to a plurality of payment servers, an accounts database that includes a plurality of accounts

**12**

adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, and a product catalog database of items offered for sale by the merchant, wherein each merchant terminal has an ID token reader, a display, and network capabilities, the method comprising the steps of:

assigning the role of a merchant account to a first account from the accounts database and the role of a purchaser account to a second account from the accounts database;

creating a purchase list with at least one item from the product catalog database;

reading, with the ID token reader of a merchant terminal, the user ID token of a purchaser and sending the user ID token to a payment server, the merchant terminal being at a merchant location and the merchant location being different from the product catalog database;

transmitting, from the payment server to the merchant terminal, identity confirmation information associated with the user ID token;

transmitting, from the merchant terminal to the payment server, a payment approval communication;

transferring, with the payment server, payment from the purchaser account to the merchant account.

**22**. A method performed over a payment network for transferring an electronic payment between a purchaser and a merchant, the payment network comprising a plurality of merchant terminals and purchaser terminals connected to a plurality of payment servers, an accounts database that includes a plurality of accounts adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, and a product catalog database of items offered for sale by the merchant, wherein each merchant terminal has an ID token reader, a display, and network capabilities, the method comprising the steps of:

assigning the role of a merchant account to a first account from the accounts database and the role of a purchaser account to a second account from the accounts database;

creating a purchase list with at least one item from the product catalog database;

transmitting, from a purchaser terminal to a merchant terminal, the user ID token of a purchaser and sending the user ID token to a payment server, the merchant terminal being at a merchant location and the merchant location being different from the product catalog database;

transmitting, from the payment server to the merchant terminal, identity confirmation information associated with the user ID token;

transmitting, from the merchant terminal to the payment server, a payment approval communication;

transferring, with the payment server, payment from the purchaser account to the merchant account.

\*   \*   \*   \*   \*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on September 13, 2016, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system. I further certify that all parties are registered CM/ECF users and have been served through the appellate CM/ECF system.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with Federal Express for delivery to the Clerk of Court, United States Court of Appeals for the Federal Circuit, 717 Madison Place, N.W., Washington, D.C. 20439.

DATED this 13th day of September, 2016

/s/ Isaac Rabicoff
Isaac Rabicoff

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,689 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b) (1)-(3).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Century Schoolbook.

DATED this 13th day of September, 2016

/s/ Isaac Rabicoff
Isaac Rabicoff