No. 2016-1818

_____

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE FEDERAL CIRCUIT

_____

THINK COMPUTER CORPORATION,

Appellant,

v.

SQUARE, INC.,

Appellee.

_____

Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board, No. CBM2014-00159

_____

## JOINT APPENDIX

_____

Isaac P. Rabicoff
RABICOFF LAW LLC
73 W Monroe Street
Chicago, Illinois  60603
(773) 669-4590


Attorney for Appellant
THINK COMPUTER CORPORATION

Michael T. Rosato
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, Washington  98104
(206) 883-2500

Robin L. Brewer
Eugene Marder
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
(415) 947-2000

Attorneys for Appellee
SQUARE, INC.

# United States Court of Appeals
## FOR THE FEDERAL CIRCUIT

### *Think Computer Corporation v. Square, Inc.*
### Appeal No. 2016-1818

### JOINT APPENDIX: TABLE OF CONTENTS

| Filing Date | Description | Pages Included |
|---|---|---|
| 11/27/2015 | Paper No. 47: Final Written Decision - 35 U.S.C. 328(a) and 37 C.F.R. 42.73 | Appx1-39 (cited Appx1; Appx11-15; Appx16-18; Appx27-29; Appx37) |
| 2/9/2016 | Paper No. 52: Decision on Request for Rehearing | Appx40-52 (cited Appx40-48; Appx51) |
| 7/21/2014 | Ex. 1001: U.S. Patent No. 8,396,808 to Greenspan | Appx53-68 (cited Appx53-54; Appx63-64; Appx67-68) |
|  | PTAB Docket for CBM2014-00159 | Appx69-70 |
| 7/21/2014 | Paper No. 3: Petition for Covered Business Method Review | Appx81; Appx95-97; Appx101-105; Appx109-110; Appx134-137 |
| 7/21/2014 | Ex. 1002: Declaration of Norman M. Sadeh-Koniecpol, Ph.D. | Appx166; Appx171-172; Appx175-176; Appx183-185; Appx194-198; Appx242-243 |
| 7/21/2014 | Ex. 1004: File History of U.S. Patent No. 8,396,808 | Appx291-299; Appx334-343; Appx457-481; Appx515-527; Appx534-550 |
| 7/21/2014 | Ex. 1005: U.S. Patent Pub. No. 20080046366 to Bemmel et al. | Appx 826 |

| Filing Date | Description | Pages Included |
|---|---|---|
| 7/21/2014 | Ex. 1006: U.S. Patent Pub. No. 20030204447 to Dalzell et al. | Appx849-851; Appx861; Appx863; Appx870; Appx872-874; Appx 876; Appx879-881; Appx883 |
| 7/21/2014 | Ex. 1011: U.S. Patent Pub. No. 20070255652 to Tumminaro et al. | Appx965; Appx1044-1045; Appx1074-1075; Appx1092-1093 |
| 7/21/2014 | Ex. 1014: Think Computer v. Square Complaint | Appx1283 |
| 10/20/2014 | Paper No. 7: Patent Owner Think Computer's Preliminary Response | Appx1302-1305; Appx1312-1313; Appx1339-1344; Appx1347-1349 |
| 10/20/2014 | Ex. 2006: Notice of Allowance for 8,396,808 Patent | Appx1591; Appx1596-1603 |
| 10/20/2014 | Ex. 2012: Office Action Response from 8,396,808 Patent | Appx1664; Appx1667; Appx1676-1677 |
| 12/29/2014 | Paper No. 9: Decision Institution of Covered Business Method Patent Review | Appx1692; Appx1706-1707 |
| 5/8/2015 | Paper No.20: Patent Owner's Motion to Amend under 37 CFR 42.221 | Appx1757-1781 |
| 5/8/2015 | Paper No. 21: Patent Owner's Opposition to CBM Review | Appx1783-1786; Appx1789-1794; Appx1796-1799; Appx1808-1809 |
| 5/8/2015 | Ex. 2021: Greenspan Supp. Declaration | Appx1955; Appx1958; Appx1962-1963 |

| Filing Date | Description | Pages Included |
|---|---|---|
| 8/3/2015 | Paper No. 29: Petitioner's Opposition to Patent Owner's Motion to Amend | Appx2179-2206 |
| 8/3/2015 | Paper No. 30: Petitioner's Reply to Patent Owner's Response | Appx2210-11 |
| 8/11/2015 | Paper No. 32: Patent Owner's Reply in Support of Motion to Amend | Appx2369-2374 |
| 8/18/2015 | Paper No. 37: Petitioner's Motion to Exclude Evidence | Appx2426-2429 |
| 12/28/2015 | Paper No. 51: Patent Owner Think's Motion for Rehearing | Appx2552-2571 |
| 4/7/2016 | Paper No. 53: Patent Owner Think's Notice of Appeal | Appx2572 |

Trials@uspto.gov                                              Paper No. 47
571-272-7822                                      Entered:  November 27, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SQUARE, INC.,
Petitioner,

v.

THINK COMPUTER CORPORATION,
Patent Owner.
_____

Case CBM2014-00159
Patent No. 8,396,808 B2
_____

Before TONI R. SCHEINER, MICHAEL W. KIM, and
BART A. GERSTENBLITH, *Administrative Patent Judges.*

KIM, *Administrative Patent Judge.*


FINAL WRITTEN DECISION
*35 U.S.C. § 328(a) and 37 C.F.R. § 42.73*

# I.     INTRODUCTION

Square, Inc. ("Petitioner") filed a Petition (Paper 3, "Pet.") requesting institution of a covered business method patent review of claims 1–11, 13–17, and 19–22 of U.S. Patent No. 8,396,808 B2 ("the '808 patent").  Think

CBM2014-00159
Patent 8,396,808 B2

Computer Corporation ("Patent Owner") filed a Preliminary Response
(Paper 7, "Prelim. Resp.").  On December 29, 2014, we instituted a covered
business method patent review of claims 1–8, 10, 11, 13–17, and 20–22 on
certain grounds of unpatentability alleged in the Petition.  Paper 9 ("Dec.").
After institution of trial, Patent Owner filed a Patent Owner Response
(Paper 21, "PO Resp.") and Petitioner filed a Reply (Paper 30, "Reply").
Patent Owner also filed a Motion to Amend (Paper 20, "PO Motion"), to
which Petitioner filed an Opposition (Paper 29, "Pet. Opp."), and Patent
Owner filed a Reply (Paper 32, "PO Reply").  Petitioner further filed a
Motion to Exclude (Paper 37, "Mot. Exc."), to which Patent Owner filed an
Opposition (Paper 40, "PO Opp."), and Petitioner filed a Reply (Paper 43,
"Pet. Reply").  An oral hearing was held on September 10, 2015.  Paper 46
("Tr.").

The Board has jurisdiction under 35 U.S.C. § 6(c).  In this Final
Written Decision, issued pursuant to 35 U.S.C. § 328(a) and 37 C.F.R.
§ 42.73, we determine that Petitioner has shown by a preponderance of the
evidence that all claims for which trial was instituted, claims 1–7, 9–11, 13–
17, and 20–22, are *unpatentable*.  Furthermore, Patent Owner's Motion to
Amend is *denied*.  Additionally, Petitioner's Motion to Exclude is *denied*.

## II.    DISCUSSION

### A.    *The '808 Patent*

The '808 patent is directed to an electronic payment system in which a
participant may act as either purchaser or merchant depending on whether
the participant's account is assigned either the purchaser or merchant role.
Ex. 1001, 3:17–20.

CBM2014-00159
Patent 8,396,808 B2

Claim 1 is illustrative of the challenged subject matter and is reproduced below.

> 1. A method for transferring an electronic payment between a purchaser and a merchant comprising:
>
> assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;
>
> adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;
>
> obtaining a user ID token of the purchaser from a merchant terminal, the merchant terminal being at a merchant location and the merchant location being different from the payment system;
>
> communicating identity confirmation information associated with the user ID token to the merchant terminal; and
>
> transferring funds for a purchase price total from the purchaser account to the merchant account.

B.    *Instituted Grounds of Unpatentability*

The Board instituted trial for claims 1–11, 13–17, and 19–22 on the following grounds of unpatentability, all of which are on the basis of obviousness under 35 U.S.C. § 103(a):

| References | Claim(s) Challenged |
|---|---|
| Bemmel[1] and Dalzell[2] | 1–3, 5–7, 17, and 20–22 |

---

[1] U.S. Pat. App. Pub. No. 2008/0046366 A1, pub. Feb. 21, 2008 (Ex. 1005).
[2] U.S. Pat. App. Pub. No. 2003/0204447 A1, pub. Oct. 30, 2003 (Ex. 1006).

CBM2014-00159
Patent 8,396,808 B2

| References | Claim(s) Challenged |
|---|---|
| Bemmel, Dalzell, and Carlson[3] | 4 |
| Bemmel, Dalzell, and Tripp[4] | 9, 10, and 13–15 |
| Bemmel, Dalzell, and Elston[5] | 11 |
| Bemmel, Dalzell, and Deschryver[6] | 16 |

Petitioner also relies upon Declarations of Norman M. Sadeh-Koniecpol, Ph.D. in support of its challenges.  Exs. 1002, 1021.

## C.    Standing

We determined, in the Decision on Institution, that the '808 patent is a covered business method patent, as defined in § 18(a)(1)(E) of the America Invents Act and 37 C.F.R. § 42.301, because at least one claim of the '808 patent is directed to a covered business method.  Dec. 5–9.  Patent Owner does not dispute our previous analysis in its Patent Owner Response. Thus, after considering the record again, we reaffirm our determination in the Decision on Institution and conclude that the '808 patent is eligible for a covered business method patent review.

## D.    Claim Construction

In a covered business method patent review, claim terms in an unexpired patent are interpreted according to their broadest reasonable

---

[3] U.S. Pat. App. Pub. No. 2007/0185785 A1, pub. Aug. 9, 2007 (Ex. 1008).
[4] U.S. Pat. App. Pub. No. 2006/0143087 A1, pub. June 29, 2006 (Ex. 1009).
[5] U.S. Pat. App. Pub. No. 2002/0143655 A1, pub. Oct. 3, 2002 (Ex. 1013).
[6] PCT Pub. No. WO 2007/008686 A2, pub. Jan. 18, 2007 (Ex. 1010).

CBM2014-00159
Patent 8,396,808 B2

construction in light of the Specification of the patent in which they appear. 37 C.F.R. § 42.300(b); *see also In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278–80 (Fed. Cir. 2015) ("Congress implicitly approved the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation."); *accord Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1328 (Fed. Cir. 2015) ("though the rules governing IPR matters at issue in *Cuozzo* will not necessarily govern all PGR/CBM matters, we see no basis for distinguishing between the two proceedings for purposes of the PTAB's use of BRI in claim construction here"). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). We must be careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993). We construe the terms below in accordance with these principles.

> *1.    Whether a Proper Construction of "Purchase List," "Product Catalog," or "Transaction Record" Requires "Line Item Data"*

Petitioner proposes constructions for several claim terms, including "transaction record." Pet. 12–18. Patent Owner asserts that Petitioner's constructions of "purchase list," "product catalog," and "transaction record," or their application to the prior art, are unreasonably broad for omitting the

CBM2014-00159
Patent 8,396,808 B2

material limitation of "line item data."  PO Resp. 4–9, 13 (citing Exs. 1001, 2005, 2021, 2022, 2023).[7]  After considering both Petitioner and Patent Owner's positions, as well as all supporting evidence, we are unpersuaded that a proper construction of "purchase list," "product catalog," or "transaction record" requires "line item data."

Patent Owner asserts the following:

> But a POSITA certainly would have understood that a purchase list, product catalog, and transaction record necessarily would include line item data because the term "line item data" had been in use in the field for years, if not decades.

PO Resp. 6.  Patent Owner then goes on to cite several Exhibits showing that the term "line item data" was known for years prior to July 2009.

PO Resp. 6–7 (citing Exs. 2021, 2022, 2023, QuickBooks, Duncan).  Patent Owner's assertions are misplaced.  We are persuaded, and thus find, that the term "line item data" was known prior to July 2009.  We are unclear, however, as to the connection between this finding and Patent Owner's position that the claim terms "purchase list," "product catalog," and "transaction record" require "line item data."  To use an analogy, Patent Owner is asserting that a claim term "fruit" requires "apples" because "apples" were known.  Certainly no one would dispute that "apples" are known, and that "apples" are a "fruit."  The fact that apples are known,

---

[7] Patent Owner also cites to excerpts from the following two books: *QuickBooks 2006: The Official Guide for Premier Edition Users*, published by McGraw-Hill/Osborne, ISBN 978-0-07226-274-2 ("QuickBooks"); *The Career Programmer: Guerilla Tactics for an Imperfect World* by Christopher Duncan, ISBN 978-1-59059-624-1 ("Duncan").  These books, however, do not appear to have been submitted as exhibits in this proceeding.  Accordingly, we have not considered them.

CBM2014-00159
Patent 8,396,808 B2

however, does not prevent other fruits, such as oranges or pears, from also meeting the claim term "fruit." Similarly, while we agree that the claim terms "purchase list," "product catalog," and "transaction record" encompass "line item data," we are unpersuaded that information other than "line item data" cannot also meet "purchase list," "product catalog," and "transaction record."

Patent Owner asserts further that its position is supported by the Specification, which discloses that "purchase list," "product catalog," and "transaction record" include "line item data." PO Resp. 7–9 (citing Exs. 1001, 2005). We are persuaded, and thus find, that the Specification, discloses that "purchase list," "product catalog," and "transaction record" *may* include "line item data." We are unpersuaded, however, that a proper construction of "purchase list," "product catalog," and "transaction record" **requires** "line item data." Part of our analysis is similar to that set forth above with respect to the Exhibits, and thus, need not be repeated here. Among other reasons informing our analysis, the Specification does not set forth any explicit definitions for "purchase list," "product catalog," or "transaction record" that require "line item data," for example, in a glossary or in any other manner that could be considered reasonably clear, deliberate, and precise. *See In re Paulsen*, 30 F.3d at 1480. At best, the Specification discloses that, in certain embodiments, "purchase list," "product catalog," and "transaction record" *may* include "line item data," but the Specification does not indicate that those embodiments are limiting. *See In re Van Geuns*, 988 F.2d at 1184.

Patent Owner further asserts that the term "line item data" may itself include certain additional information, citing the prosecution history of the

CBM2014-00159
Patent 8,396,808 B2

'808 patent.  PO Resp. 9 (citing Ex. 2005).  Patent Owner's assertion is not
persuasive, as we have determined that the proper constructions of the claim
terms "purchase list," "product catalog," and "transaction record" do not
require "line item data.

2.    *"Line Item Data" and "Line Item Transaction Data"*

In its Patent Owner Response and Motion to Amend, Patent Owner
sets forth several constructions for "line item data" and "line item
transaction data."  PO Resp. 9; Motion 10.[8]  As an initial matter, we are
unclear as to the exact delineation between the two terms, as the two terms
are often used interchangeably by Patent Owner.  *See, e.g.*, PO Resp. 9 ("the
limitation 'line item data' or 'line item transaction data' 'necessarily forms
part of elements recited in the claims'"); Ex. 1001, 8:6–13 ("[A]s one of the
main benefits of having merchant product catalogs integrated into the
payment system, *line item transaction data* can be communicated.  The *line
item data* is additionally stored as part of the transaction record of the
accounts . . . ." (emphasis added)).  The two terms are different, however, in
that one recites "transaction" while one does not.  As every word in a claim
limitation is usually presumed to have meaning, we construe "line item
transaction data" as a "line item data" related to a transaction, although as a
practical matter, we see little substantive difference between the two terms.
Nevertheless, with that clarification of "line item transaction data," we need
only focus our analysis on "line item data."

---

[8] Although none of the claims currently recites or requires "line item data"
or "line item transaction data," we determine that a formal construction of
those terms at this juncture would best assist us in properly evaluating both
the instituted grounds of unpatentability and the Motion to Amend.

CBM2014-00159
Patent 8,396,808 B2

Patent Owner sets forth two separate constructions for "line item data."  In the Patent Owner Response, Patent Owner asserts that "line item data" is "itemized data pertaining to products and services that is derived from the 'product catalog' and stored in the 'purchase list' and 'transaction record.'"  PO Resp. 9.  For support, Patent Owner cites the same Exhibits set forth above in our analysis of "purchase list," "product catalog," and "transaction record."  In the Motion to Amend, Patent Owner asserts that "line item data" is "the information given on each line of an invoice used to communicate the quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping, or any other fees that arrive at the total sum for the transaction."  Motion 10 (citing Ex. 2021); *see also* PO Reply 4 ("line item transaction data 'may include quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping or other fees'").  Petitioner asserts that Patent Owner's proposed constructions are inconsistent and overly narrow, and asserts that a proper construction of "line item data" is "one or more attributes used in relation to individual products involved in a purchase or sale."  Pet. Opp. 4–9 (citing Exs. 1001, 1020, 2005, 2021).

As an initial matter, we note that Patent Owner's proposed construction set forth in its Motion to Amend is not a claim construction, but a list of items that may be included under a proper construction of "line item data."  As an analogy, we would not say a definition of "fruit" is "apples, oranges, and pears."  Certainly, all those items are fruit, but a proper definition of "fruit" would express the boundaries from which one of ordinary skill could determine that apples, oranges, and pears are indeed fruit.  For example, Random House provides such a definition of "fruit" as

9

CBM2014-00159
Patent 8,396,808 B2

"any product of plant growth useful to humans or animals." *Dictionary.com*

*Unabridged*, Random House, Inc.,

http://dictionary.reference.com/browse/fruit (accessed: Nov. 24, 2015).

     To that end, the Patent Owner Response does set forth what could be

more properly considered a claim construction.  PO Resp. 9.  And indeed,

when considered in conjunction with Petitioner's proposed construction, the

two constructions are similar.  As noted by both Patent Owner and

Petitioner, the Specification only mentions "line item data," or similar

wording, as follows:

> Additionally, as one of the main benefits of having merchant
> product catalogs integrated into the payment system, *line item*
> *transaction data* can be communicated.  The *line item data* is
> additionally stored as part of the transaction record of the
> accounts.  This itemized information can be very useful, such as
> in one application where tax forms are automatically completed
> by aggregating each category of *line item transaction data* as
> appropriate.

Ex. 1001, 8:6–13.  From the aforementioned portion of the Specification, we

determine that the key to a proper construction of "line item data" is that it is

information that is *itemized* and capable of *categorization*.  In other words,

"line item data" is an itemized part of a larger whole, more specifically, but

not limited to, product catalogs, purchase lists, and transactions records, i.e.,

at a most granular level, individual products involved in a purchase or sale,

as advocated by Petitioner.  This focus on itemization and categorization of

products is supported by other portions of the Specification cited by the

parties, for example, column 2, lines 15–17, which recites that "[t]he

integration of the payment system and *product* catalog functions to enable

recording and tracking transactions with *itemized* detail" (emphases added).

*See also* Ex. 1001, 5:51–55 ("the method may additionally store purchase

CBM2014-00159
Patent 8,396,808 B2

list information as a transaction record for the merchant account and/or the purchaser account, which functions to form an *itemized* purchase history" (emphasis added)); 4:4–6 ("[t]he *product* catalog preferably includes a listing of *product* descriptions and prices for each *product* contained within the *product* catalog" (emphases added)); 4:6–13 ("[a]dditional information may be included for a *product* such as *categories* for tax purposes and other purposes, *product*-related IDs for each distributor of the *product* (e.g., Stock-Keeping Unit or 'SKU'), images or media files related to the *product*, inventory related information (the number of *items* on hand, on order, etc. at each warehouse location), or any other suitable product-related data" (emphases added)); 4:13–16 ("[t]he *product* catalog may be a database accessed by outside applications, but may additionally or alternatively include a hosted web-based store through which *products* can be added to a shopping cart (i.e., a purchase list)" (emphases added)).

Accordingly, we construe "line item data" as "itemized information from a larger group of information, related to individual products involved in a purchase or sale, that is capable of categorization," where non-limiting examples of "line item data" may include one or more of "quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping or other fees."

> 3.    *"Wherein the First Account and the Second Account Are Adapted to Selectively Function as Either a Merchant or a Purchaser Account During Any Particular Transaction"*

Patent Owner asserts that Dalzell does not disclose or render obvious "bidirectional accounts." PO Reply 4–5. There is no term "bidirectional accounts" set forth in the claims, but both parties use this term in their arguments. *See, e.g.*, PO Reply 4–5; Pet. 2–3. We presume that the parties

are referring to the following limitation of independent claim 1: "wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser account during any particular transaction." Independent claims 20, 21, and 22 each recite a similar claim limitation. The only mention of "bi-directional" in the Specification is as follows, and is consistent with the aforementioned presumption: "In other words, within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts." Ex. 1001, 3:20–22. For ease of reference, we will also refer to these claim limitations as "bidirectional accounts."

Through its briefing (PO Reply 4–5) and at oral argument, Patent Owner appears to proffer a construction of bidirectional accounts that distinguishes bidirectional accounts from the prior art. Unfortunately, we are unable to discern precisely what that construction is. The closest we are able to discern as pertaining to a claim construction, from Patent Owner's assertions, is that bidirectional accounts cannot have extra steps. To that end, we are unclear as to the relevance of steps in relation to bidirectional accounts, as bidirectional accounts would indicate an account having specific features, not steps. Presumably there are a non-trivial number of steps necessary in order to achieve a bidirectional account. Insofar as the claim limitation at issue only recites the end-product of those steps, however, and not the steps necessary to achieve the end-product, Patent Owner's assertions are misplaced. By analogy, if a claim limitation recites "a half-red and half-blue vehicle," Patent Owner is asserting that because the vehicle in the prior art was originally blue, and then portions of it were later painted red, it cannot correspond properly to the recited "half-red and half-

CBM2014-00159
Patent 8,396,808 B2

blue vehicle," because the red portion took extra steps to create. These extra steps are immaterial, as all that matters is whether the prior art discloses "a half-red and half-blue vehicle."

Even if steps were somehow relevant to a claim construction of bidirectional accounts, however, we are unpersuaded that Patent Owner's assertions are correct. A basic canon of patent law is that, absent limiting language, a claimed step does not preclude additional steps, so long as the claim language is met. As an illustration, assume we have a claim limitation of "walk 100 meters west." Presumably, the fastest way to accomplish that feat is to walk 100 meters directly in the westerly direction. Assume, however, that the prior art has an individual that instead walks 25 meters west, but then decides to go 10 meters north, walks another 50 meters west, goes 10 meters south, and then another 25 meters west. So, the individual has still met the limitation "go 100 meters west," but has taken additional steps that resulted in the individual walking 20 extra meters. Under Patent Owner's rationale, because the individual in the prior art took the additional steps of walking 10 meters north and 10 meters south, it would not meet the claim limitation "walk 100 meters west." Because the claim limitation in our example does not preclude the extra 20 meters, and bidirectional accounts similarly does not preclude additional steps to achieve that result, we are unpersuaded that Patent Owner's assertion is correct.

Patent Owner may be asserting that in order to meet "bidirectional accounts," a particular account must function *simultaneously* as both a merchant account and purchaser account. We disagree.

Beginning with the claim terms themselves, the word "selectively" is used. We discern that the ordinary and customary usage of this word

CBM2014-00159
Patent 8,396,808 B2

denotes expressly that a particular account need *not* function *simultaneously* as both a merchant account and a purchaser account; a user is permitted expressly to *select* which account mode is desired at the appropriate point in time. The following disclosure in the Specification is consistent with this understanding:

> An entity (e.g., a person, business, or other legally recognized entity) preferably creates an account within the payment system. The accounts of the payment system are preferably designed so that an account may selectively function as either a merchant or a purchaser during any particular transaction. In other words, within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts.

Ex. 1001, 3:15–22. Indeed, here, the Specification discloses expressly that being able to select which account mode is desired is the same as "bi-directional transaction accounts."

More specifically, Patent Owner appears to assert that because the purchaser mode and the merchant mode of the account in the prior art each has a different payment type (i.e., payment card for purchaser and Automated Clearing House (ACH) for a merchant), and neither payment type can be used in the reverse mode (i.e., payment card for merchant and ACH for a purchaser), the aforementioned claim limitation is not met. Patent Owner's assertions are misplaced, as the claim limitation does not require that the payment type be the same for both the purchaser mode and the merchant mode of the account; on this point, the claim only requires that the account have a purchaser mode and a merchant mode. Thus, the fact that the purchaser mode of an account may rely on payment cards while the merchant mode of the account may rely on ACH is immaterial.

CBM2014-00159
Patent 8,396,808 B2

In conclusion, for the reasons set forth above, we are unpersuaded that "wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser account during any particular transaction," as recited in independent claim 1, requires any express construction. The same is true for the corresponding limitations recited in independent claims 20, 21, and 22. Specifically, we are unpersuaded that the aforementioned claim limitations should be construed as requiring any of the above features asserted by Patent Owner, for example, a limit on the number of steps.

> E.    *Obviousness of Claims 1–3, 5–7, 17, and 20–22 over Bemmel and Dalzell*

Petitioner asserts that claims 1–3, 5–7, 17, and 20–22 are unpatentable over a combination of Bemmel and Dalzell. Pet. 18–38 (citing Exs. 1002, 1005, 1006); Reply 4–13 (citing Exs. 1002, 1005, 1006). Patent Owner disagrees. PO Resp. 10–20 (citing Exs. 1001, 1002, 1005, 1006, 1007, 1011, 1012, 2018, 2021).

> 1.    *Bemmel (Ex. 1005)*

Bemmel discloses "a mobile architecture for payment transactions and, more specifically, a method and system for providing biometric authentication at a point-of-sale ('POS')." Ex. 1005 ¶ 2. Specifically, Bemmel discloses receiving a mobile phone number from a consumer, generating an electronic wallet for the consumer containing the mobile phone number, establishing a voice connection with the consumer's mobile device associated with the mobile phone number, capturing a voice sample from the consumer, and storing the voice sample in association with the mobile phone number for biometric authentication purposes. Ex. 1005 ¶ 15.

CBM2014-00159
Patent 8,396,808 B2

Once a consumer is enrolled in the mobile payment system, the consumer is

then able to initiate payment transactions utilizing a mobile phone.  Ex. 1005

¶ 16.  Specifically, Bemmel discloses the following:

> Upon receiving the authentication identifier through the mobile phone (confirming authentication of the consumer), the consumer is able to conduct a transaction at a merchant point-of-sale terminal through the teachings disclosed herein.  In particular, when the consumer interacts with the merchant's point-of-sale terminal, the mobile payment system receives a request from the merchant point-of-sale terminal for consumer information (e.g., payment information such a credit card, debit card or checking account numbers, etc.) with the request including the authorization identifier, it matches the authorization identifier with a stored authorization identifier (for example and without limitation, "staged" transaction as further detailed herein) in order to obtain a consumer identifier associated with the stored authorization identifier, and it transmits stored consumer information (e.g., payment information such as a credit card, debit card, checking account, etc.) associated with the consumer identifier to the merchant point-of-sale terminal, which enables the merchant point-of-sale to authorize the transaction by communicating with a payment processor.

Ex. 1005 ¶ 17.

### 2.    *Dalzell (Ex. 1006)*

Dalzell "relates to electronic marketplaces through which users buy

and sell items over a computer network."  Ex. 1006 ¶ 2.  Specifically,

Dalzell discloses user interfaces and methods through which users may place

items for sale, locate items offered by others, and perform related actions

within an electronic marketplace.  Ex. 1006 ¶ 2.  Dalzell discloses that the

online marketplace system includes a database of information about products

that may be listed by users within an online marketplace, with this

information typically including product IDs, and descriptions and product

CBM2014-00159
Patent 8,396,808 B2

images provided by manufacturers or distributors of the products. Ex. 1006

¶ 10. Dalzell further discloses the following:

> As is conventional, users of the marketplace system can register online as marketplace sellers and thereafter create marketplace listings. As part of seller registration and/or as marketplace listings are created, the system may allow the user/seller to specify shipping and other policies to be published to buyers, and specify a bank account into which proceeds from sales are to be deposited by the system or its operator.

Ex. 1006 ¶ 59.

### 3.    Analysis

Petitioner asserts that Bemmel discloses most of the limitations of claims 1–3, 5–7, 17, and 20–22. For the other limitations, Petitioner relies on Dalzell. Specifically, exemplary independent claim 1 recites "[a] method for transferring an electronic payment between a purchaser and a merchant." Petitioner cites both Bemmel and Dalzell for disclosing these claim limitations. Pet. 26 (citing Ex. 1005 ¶¶ 16, 17; Ex. 1006 ¶ 2). Independent claim 1 recites further "assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction." Petitioner cites Dalzell for disclosing that marketplace users (i.e., buyers) can become marketplace sellers, for example, by providing bank account information as to where sales proceeds should be deposited. Pet. 26–27 (citing Ex. 1006 ¶¶ 27, 61, 87, 132). Independent claim 1 recites additionally "adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list." Petitioner cites Dalzell for disclosing a user

browsing a product catalog, and then selecting an "add to cart" or "buy from seller" button for a particular product from the catalog. Pet. 27 (citing Ex. 1006 ¶¶ 3, 10, 15, 166). Independent claim 1 recites also "obtaining a user ID token of the purchaser from a merchant terminal, the merchant terminal being at a merchant location and the merchant location being different from the payment system." Petitioner cites Bemmel for disclosing a consumer providing an authorization identifier to a payment terminal, and then the payment terminal sending the authorization identifier to a merchant gateway. Pet. 28 (citing Ex. 1005 ¶¶ 17, 62, 63, 65, Fig. 3; Ex. 1006 ¶ 121). Independent claim 1 recites further "communicating identity confirmation information associated with the user ID token to the merchant terminal." Petitioner cites Bemmel for disclosing that the mobile payment system matches the authorization identifier with a stored authorization identifier in order to obtain a consumer identifier associated with the stored authorization identifier, and transmits the stored consumer information associated with the consumer identifier to the merchant point-of-sale terminal, which enables the merchant point-of-sale to authorize the transaction by communicating with a payment processor. Pet. 28–29 (citing Ex. 1005 ¶¶ 17, 29, 41, 63, 69, claim 12). Independent claim 1 recites additionally "transferring funds for a purchase price total from the purchaser account to the merchant account." Petitioner cites each of Bemmel and Dalzell for disclosing these claim limitations. Pet. 29 (citing Ex. 1005 ¶ 88; Ex. 1006 ¶ 17).

For the rationale for combining Bemmel and Dalzell, Petitioner asserts the following:

> As further explained by Dr. Sadeh-Koniecpol, it would have been obvious to one of ordinary skill at the relevant time to combine the teachings of Bemmel with those of Dalzell so as

CBM2014-00159
Patent 8,396,808 B2

to teach each and every feature of claims 1–3, 5–7, 17, and 20–22 of the '808 patent. One of ordinary skill in the art would have recognized that Bemmel and Dalzell are directed to similar systems and methods: a system that allows purchasers and merchants to conduct electronic transactions on their computing devices (Bemmel) and an electronic marketplace allowing users to buy and sell goods through their computer devices (Dalzell). *See* Ex. 1002 at ¶¶ 137–140. Furthermore, in June 2009, it was common practice for individuals designing electronic payment systems to research and combine the features of existing systems, especially where those features were complementary; combining Bemmel and Dalzell therefore would have been well within the capabilities of a person of skill in the art, and would represent a commonsense amalgamation of the robust product catalog and user interface of Dalzell with the authentication and mobile aspects of Bemmel. *See* Ex. 1002 at ¶¶ 141.

Furthermore, both Bemmel and Dalzell expressly provide logical rationale and motivation for the proposed combination. Dalzell explicitly states that its disclosed electronic marketplace can be employed in mobile devices and kiosks, such as the purchaser terminals and merchant terminals disclosed in Bemmel. *See* Ex. 1005 at [0045], [0121] – [0122] (stating that the marketplace can be employed in "in-store kiosk systems" and "personal digital assistant[s]" or "micro-browser[s] adapted for use on a handheld device."); *see* Ex. 1002 at ¶ 138. Accordingly, Dalzell suggests implementation on a mobile device for use in a mobile commerce system, such as the system disclosed by Bemmel. *See* Ex. 1002 at ¶ 139. Indeed, during the relevant time period, many existing electronic and web-based systems, including payment systems, were adapted for use in the mobile context. *See id.* at ¶ 92. The Bemmel reference, in turn, can be readily combined with a system like the Dalzell electronic marketplace, and expressly suggests implementation in "merchant channels, such as, but not limited to, an online or e-commerce transaction architecture [that] could also make use of the claimed invention." Ex. 1005 at [0086]; *see* Ex. 1002 at ¶ 139. Both references therefore teach that combining their respective features would yield expanded

CBM2014-00159
Patent 8,396,808 B2

> usability and other beneficial results as would be obvious to a
> person of skill in the art.

Pet. 24–25.  Petitioner makes similar analyses for claims 2, 3, 5–7, 17, and

20–22.  Pet. 18–38.

Patent Owner asserts that neither Bemmel nor Dalzell discloses "line

item data."  PO Resp. 11–14.  Patent Owner's assertions are misplaced, for,

as set forth above, none of the claims recites or requires "line item data."

Even if the claims did recite or require "line item data," however, we

find that Dalzell discloses such "line item data."  As set forth above, we

construe "line item data" as "itemized information from a larger group of

information, related to individual products involved in a purchase or sale,

that is capable of categorization," where non-limiting examples of "line item

data" may include one or more of "quantity, description, type, cost, product

identifier (e.g., stock keeping unit), tax, duty, shipping or other fees."

Dalzell is replete with references to such "line item data."  For example,

Dalzell discloses that at least the following information can be gleaned from

a purchase history page for a user, and can be provided for both purchases

made from marketplace sellers and purchases made from provider sellers:

product ID, product description, product title, order number, price paid,

condition of item when purchased, order date, and shipping recipient.

Ex. 1006 ¶¶ 103, 132.  These examples, individually and collectively, clearly

CBM2014-00159
Patent 8,396,808 B2

and unequivocally meet the aforementioned construction of "line item data."[9]

Patent Owner asserts further that Petitioner has failed to articulate a valid reason for combining Bemmel and Dalzell, because Dr. Sadeh-Koniecpol's opinions of industry custom are unsupported. We are unpersuaded that Dr. Sadeh-Koniecpol's opinions are unsupported, and especially unpersuaded that Dr. Sadeh-Koniecpol has not provided adequate support regarding the reasons for combining Bemmel and Dalzell. Dr. Sadeh-Koniecpol includes explicit citations to references, in particular Bemmel and Dalzell, for supporting his conclusions, and we determine that any purported "leaps of logic" taken by Dr. Sadeh-Koniecpol are reasonable given the underlying support. For example, Dr. Sadeh-Koniecpol opines that "one of ordinary skill in the art would have been motivated to combine the mobile payment system of Bemmel with the electronic marketplace of Dalzell." Ex. 1002 ¶ 136. Of course, this paragraph considered in isolation would be an unsupported opinion. Dr. Sadeh-Koniecpol, however, then goes on to support this opinion with explicit citations to Bemmel and Dalzell. Ex. 1002 ¶¶ 137, 139, 140. Dr. Sadeh-Koniecpol then reaches conclusions that we determine flow logically from those citations. Ex. 1002 ¶¶ 138, 141, 142.

---

[9] Insofar as Patent Owner may be asserting that "line item data" includes "other features" that would prevent the aforementioned examples from Dalzell from corresponding to "line item data," for example, technical limitations of ACH processing, Patent Owner did not set forth any such construction, and we are unable to discern independently such "other features" from this record.

CBM2014-00159
Patent 8,396,808 B2

By contrast, Patent Owner asserts the following:

It was not industry custom to integrate product catalogs into payment systems. Generally, credit and debit card providers focused their innovative efforts on ways to prevent ever-increasing payment card fraud, not on ways to increase data transparency. Online marketplaces and mobile payments have been around since roughly the late 1990s. Yet, the '808 Patent was the first to integrate these two systems. Until the '808 Patent, these systems and their features were not considered complementary. Instead, they were considered different and independent systems and their combination would require improper hindsight. (*See* Ex. 2021, ¶ 29.)

Even after July 31, 2009, the payments industry was not interested in integrating product catalogs into payments systems. Rather, the industry viewed doing so as "counterintuitive, technically problematic, and economically undesirable." (*Id.*, ¶¶ 9-12.) In fact, there is not even room in the traditional format for ACH payments data to include line item data; so integrating a product catalog into a payment system is not at all obvious. (*Id.*)

PO Resp. 14–15 (citing Ex. 2021). These assertions claim support in several paragraphs of a Declaration of Mr. Aaron Greenspan. As an initial matter, we note that the presence of corroborative evidence is especially important in evaluating Mr. Greenspan's testimony, because Mr. Greenspan is the named inventor of the '808 patent. In analogous contexts, the Federal Circuit has held repeatedly that in order to guard "against courts being deceived by inventors who may be tempted to mischaracterize the events of the past through their testimony," the law requires corroboration of a putative inventor's credible testimony, the sufficiency of which is measured under a "rule of reason" standard. *Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324, 1330 (Fed. Cir. 2014) (citing *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1374 (Fed. Cir. 2009)); *see also Bell & Howell Document*

CBM2014-00159
Patent 8,396,808 B2

*Mgmt. Prod. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) ("the testimony of an inventor . . . concerning claim construction . . . often is self-serving, after-the-fact attempt to start what should have been part of his or her patent application").  To that end, we note that of Patent Owner's citations to paragraphs 9–12 and 29 of Mr. Greenspan's Declaration in support of its assertions on this topic, none cites corroborating evidence. Paragraph 9 does make note of topics purportedly discussed at a NACHA Internet Council Meeting.  However, paragraph 9 does not cite any document, exhibit, or testimony to support Mr. Greenspan's assertions as to what was discussed at that meeting.  The same analysis is applicable to paragraph 10.[10]  Paragraph 29 does mention Bemmel and Dalzell, however, Mr. Greenspan does not include specific citations to Bemmel and Dalzell to support specific assertions, and the second half of the paragraph concerns issues that Mr. Greenspan admits are beyond the purview of Bemmel and Dalzell, limiting their value as corroborating evidence.  Accordingly, when evaluated under the rule-of-reason framework, paragraphs 9–12 and 29 of Mr. Greenspan's Declaration are entitled to little weight.

---

[10] Insofar as Patent Owner is attempting to use Exhibits 2037–2040, cited in its Reply to Motion to Amend, as corroborative evidence concerning the NACHA meetings held on February 24–25, 2010, and June 23–24, 2010, those assertions should have been set forth in the Patent Owner Response. Furthermore, even when we evaluate the evidence, while they are clearly corroborative evidence of Mr. Greenspan's presence and speaking at the February 24th meeting, neither Patent Owner nor Mr. Greenspan have explained, and we are unable to ascertain, corroboration of the relevant substantive assertions made by Mr. Greenspan in paragraphs 9 and 10 of his Declaration.

CBM2014-00159
Patent 8,396,808 B2

Absent much supporting weight from Mr. Greenspan's Declaration, Patent Owner's above assertions are almost entirely unpersuasive, and are insufficient to outweigh the assertions set forth by Petitioner that are supported by the testimony of Dr. Sadeh-Koniecpol. For example, Patent Owner asserts that "[i]t was not industry custom to integrate product catalogs into payment systems." PO Resp. 14. Patent Owner does not provide any direct evidentiary support for this assertion, and any support that can be tangentially extrapolated from paragraphs 9–12 and 29 of Mr. Greenspan's Declaration is entitled to little weight for the reasons set forth above. By contrast, Dr. Sadeh-Koniecpol's Declaration includes explicit citations to Bemmel and Dalzell, and the cited portions of those references, respectively, state unambiguously that the payment system features of Bemmel can be applied to an online or e-commerce transaction architecture (Ex. 1002 ¶ 139 (citing Ex. 1005 ¶ 86)), and that the product catalog features of Dalzell can be applied to "run on 'any type of computing device that enables a user (including both buyers and sellers) to interactively and remotely access the marketplace web site system 515 via the communication network' including 'a computer device that runs a proprietary client program, an interactive kiosk, a personal digital assistant[.]'" Ex. 1002 ¶ 137 (citing Ex. 1006 ¶¶ 121–122). Given this record, we are persuaded that, contrary to Patent Owner's assertions, it was known to integrate product catalogs into payment systems, and vice versa, at the time of the filing of the '808 patent. This analysis is also applicable to the other assertions made above by Patent Owner.

Patent Owner asserts further that Dr. Sadeh-Koniecpol's Declaration is problematic, because he does not identify which specific features are

CBM2014-00159
Patent 8,396,808 B2

complementary or explain why they are complementary. We disagree, as Dr. Sadeh-Koniecpol identifies explicitly that the product catalog of Dalzell and authentication system of Bemmel are complementary (Ex. 1002 ¶ 142), and the explanation is set forth in the previous paragraphs of his Declaration. Ex. 1002 ¶¶ 137–141.

Patent Owner asserts more specifically that there may be technical challenges to implementing the proffered combination of Bemmel and Dalzell, and that those technical challenges are not adequately addressed by Petitioner. Patent Owner's assertions are misplaced and unpersuasive. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). Accordingly, the fact that there may be technical challenges to implementing a proffered combination of two references is unavailing if the technical challenges would have been solvable by one of ordinary skill in the art at the time of the invention. To that end, we are persuaded that one of ordinary skill would have been able to overcome those technical challenges, for example, because Bemmel and Dalzell each disclose explicitly that mixing and matching different features in the e-commerce area was known and routine. Ex. 1005 ¶ 86; Ex. 1006 ¶¶ 45, 121–122.

Similarly, Patent Owner asserts generally that there would be many technical challenges to adapting the ACH system to accept line item data. There are many problems with this assertion. First of all, for the reasons discussed above, the claims do not require line item data. Furthermore, the claims also do not recite or mention anything about the ACH system. Additionally, Patent Owner asserts that adapting the ACH system to accept line item data would involve accommodating increased amounts of data. As

25

CBM2014-00159
Patent 8,396,808 B2

an initial matter, because line item data can be as little as a few characters, and the ACH system can, at a minimum, transfer a few characters, we are unclear as to why the ACH system cannot already accommodate line item data. Moreover, we are unpersuaded that increasing the transmission capacity of the ACH system, while certainly daunting on a practical and cost basis, would not have been known and within the abilities of one of ordinary skill in the art. We are unpersuaded that one of ordinary skill at the time of the invention would have been unfamiliar with ways in which to increase transmission capacity.

Insofar as Patent Owner may be arguing as to any technical challenges associated specifically with combining Bemmel and Dalzell, we note that the obviousness inquiry does not ask "whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole." *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc); *see also In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (stating "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference"). To that end, our determination is the same as that set forth above.

Patent Owner asserts additionally that Dr. Sadeh-Koniecpol's testimony should be given little weight due to the mechanics of how his Declaration was drafted and certain observations concerning his cross-examination. Concerning the mechanics of Declaration drafting, we have reviewed the Declarations of Dr. Sadeh-Koniecpol (Exs. 1002, 1021), as well as the transcript of his deposition (Exs. 2019–2020). We find that the manner of Dr. Sadeh-Koniecpol's testimony is completely in line with

CBM2014-00159
Patent 8,396,808 B2

typical testimony before the Board, and agree with Petitioner that, absent *much* further elaboration and analysis (which we do not authorize), Patent Owner's line of inquiry concerning the mechanics of declaration preparation is "a waste of time, both for the witness and the Board." *Pevarello v. Lan*, Patent Interference 105,394 MPT, slip op. at 19–21 (BPAI Jan. 12, 2007) (Paper 85).  As to the observations during cross-examination, we note that while we have considered them, any purported inconsistencies or gaps in knowledge are vastly outweighed by Dr. Sadeh-Koniecpol's background, analysis, and supporting evidence, which we find credible and persuasive overall.

Patent Owner asserts also that Petitioner has failed to provide an adequate predictable results analysis, because the proffered combination is merely possible.  Patent Owner's assertions are misplaced, as almost any obviousness analysis, especially one involving multiple references, is a hypothetical analysis of possibilities.  Nevertheless, if such a hypothetical analysis is supported and persuasive, as we determine it is here, it is nonetheless legally sufficient in rendering claims obvious.

Patent Owner asserts further that the proffered combination of Bemmel and Dalzell would not have predictable results.  We disagree.  As an initial matter, we note that a predictable results analysis is typically applicable to generally unpredictable arts, such as biology or chemistry.  *In re Fisher*, 427 F.2d 833, 839 (CCPA 1970) (indicating patents in the mechanical or electrical arts involve predictable factors compared to the more unpredictable chemical and biological arts).  To that end, Patent Owner has not explained sufficiently precisely what would be unpredictable here. At a high level, the combination is the bio-authentication purchasing system

CBM2014-00159
Patent 8,396,808 B2

of Bemmel with the product catalog of Dalzell. The self-evident result is a product catalog integrated with a bio-authentication purchasing system. We are unpersuaded that such a result is not predictable.

Patent Owner asserts additionally that the Board should exercise its discretion under 35 U.S.C. § 325(d) and deny the Petition, because similar art was already before the Examiner during prosecution. We note that 35 U.S.C. § 325(d) is normally exercised in a Decision on Institution. Moreover, we have already conducted a full trial in this proceeding subsequent to a Decision on Institution. Furthermore, 35 U.S.C. § 325(d) is discretionary, and insofar as Patent Owner is requesting any vacating of the Decision on Institution, we decline to do so for the reasons set forth above.

In Patent Owner's Reply concerning its Motion to Amend, Patent Owner asserts that Dalzell does not disclose or render obvious "bidirectional accounts," because Dalzell requires extra steps to implement such accounts. PO Reply 4–5. As set forth above, we are unpersuaded that the presence of extra steps is relevant to whether or not a prior art reference discloses a bidirectional account. Furthermore, Patent Owner is admitting essentially that after implementation of the "extra" steps in Dalzell, the result is that an account which originally had only buyer capabilities now also has seller capabilities. Tr. 29:1–30:8. We agree. We find further that this account of Dalzell corresponds properly to the "bidirectional accounts" required by independent claims 1 and 20–22.

Patent Owner asserts additionally that the accounts in Dalzell cannot be "bidirectional accounts," because they have separate payment systems. As set forth above, we are unpersuaded that the claims place such limitations on the number of payment systems, and as a matter of logic, we are

CBM2014-00159
Patent 8,396,808 B2

unpersuaded that a single account cannot be associated with multiple payment systems.

Patent Owner further asserts the following:

> To get around this, Dr. Sadeh makes an unsupported logical leap. (Ex. 1002 at ¶ 151). "As illustrated in the citation listed above, according to Dalzell, a user account stores both payment information and bank account information (in particular for sellers). For each account, the system stores the information necessary for that account to be both a buyer and seller. *See also* Ex. 1006 at [0061]." (*Id.*) The first sentence is true, but the second sentence is not because, *as [0059] points out, the system must create a new and separate account for sellers that also uses separate payment data*, and therefore the system does not "store[ ] the information necessary for that account to be both a buyer and seller." (*Id.*)

PO Reply 5 (emphasis added). We are unpersuaded that Patent Owner's above-emphasized assertion is correct, because our review of paragraph 59 of Dalzell does not support Patent Owner's assertion that a new seller account must be created. Indeed, we find that a more logical reading of paragraph 59 of Dalzell is that a buyer, from a particular account, can add a seller feature to that particular account, without the need to create a whole new account. Such a finding is supported by extensive analysis and testimony by Dr. Sadeh-Koniecpol, with explicit citations to Dalzell, which we find credible, reasonable, and persuasive. Ex. 1002 ¶¶ 147-164 (citing Ex. 1006 ¶¶ 9, 27, 49, 57, 61, 82, 85, 87, 132, 163, Figs. 1A, 1B).

*4.    Conclusion*

For the foregoing reasons, after considering the Petition, Patent Owner Response, Reply, and all supporting evidence, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that claims 1–3,

CBM2014-00159
Patent 8,396,808 B2

5–7, 17, and 20–22 are unpatentable over a combination of Bemmel and
Dalzell.

### F.    Obviousness of Claim 4 over Bemmel, Dalzell, and Carlson

Petitioner argues that the subject matter of claim 4 would have been
obvious over the combination of Bemmel, Dalzell, and Carlson.  Pet. 42–43.
Patent Owner does not direct any argument in the Patent Owner Response to
this particular challenge.  We have considered the arguments and evidence
of record concerning this challenge and are persuaded that Petitioner has
shown, by a preponderance of the evidence, that claim 4 is unpatentable on
this basis.

### G.    Obviousness of Claims 9, 10, and 13–15 over Bemmel, Dalzell, and Tripp

Petitioner argues that the subject matter of claims 9, 10, and 13–15
would have been obvious over the combination of Bemmel, Dalzell, and
Tripp.  Pet. 43–46.  Patent Owner does not direct any argument in the Patent
Owner Response to this particular challenge.  We have considered the
arguments and evidence of record concerning this challenge and are
persuaded that Petitioner has shown, by a preponderance of the evidence,
that claims 9, 10, and 13–15 are unpatentable on this basis.

### H.    Obviousness of Claim 11 over Bemmel, Dalzell, and Elston

Petitioner argues that the subject matter of claim 11 would have been
obvious over the combination of Bemmel, Dalzell, and Elston.  Pet. 46–48.
Patent Owner does not direct any argument in the Patent Owner Response to
this particular challenge.  We have considered the arguments and evidence
of record concerning this challenge and are persuaded that Petitioner has

CBM2014-00159
Patent 8,396,808 B2

shown, by a preponderance of the evidence, that claim 11 is unpatentable on this basis.

## I.    Obviousness of Claim 16 over Bemmel, Dalzell, and Deschryver

Petitioner argues that the subject matter of claim 16 would have been obvious over the combination of Bemmel, Dalzell, and Deschryver. Pet. 48–50. Patent Owner does not direct any argument in the Patent Owner Response to this particular challenge. We have considered the arguments and evidence of record concerning this challenge and are persuaded that Petitioner has shown, by a preponderance of the evidence, that claim 16 is unpatentable on this basis.

## J.    Patent Owner's Motion to Amend

### 1.    Introduction

Patent Owner's Motion to Amend seeks to substitute new claims 23–43 for original claims 1–18 and 20–22, respectively.[11] PO Motion 1–24. The ultimate burden of persuasion is with Patent Owner, the movant, to demonstrate the patentability of the amended claims. *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1307 (Fed. Cir. 2015). For the reasons discussed below, Patent Owner has not met that burden, and, thus, the Motion to Amend is *denied*.

---

[11] At oral argument, there was some confusion as to whether or not Patent Owner actually intended to cancel dependent claim 8, and whether or not Petitioner had detrimentally relied on Patent Owner's assertions concerning dependent claim 8 in the Patent Owner Response. As the Motion to Amend is denied in its entirety, however, that issue is moot.

CBM2014-00159
Patent 8,396,808 B2

>           2.     *Proposed Substitute Claims*

Patent Owner proposes to substitute independent claim 1 with

independent claim 23, as follows:

>           23.    A method for transferring an electronic payment
> between a purchaser and a merchant comprising:
>           assigning a role of a merchant account to a first account
> and a role of a purchaser account to a second account with a
> payment system wherein the first account and the second
> account are adapted to selectively function as either a merchant
> account or a purchaser account during any particular
> transaction, said payment system storing and communicating
> line item transaction data;
>           adding an item offered for sale by the merchant from a
> product catalog stored in the payment system to a purchase list;
>           obtaining a user ID token of the purchaser from a
> merchant terminal, the merchant terminal being at a merchant
> location and the merchant location being different from the
> payment system;
>           communicating identity confirmation information
> associated with the user ID token to the merchant terminal; and
>           transferring funds for a purchase price total from the
> purchaser account to the merchant account.

Essentially, Patent Owner proposes to require "line item transaction

data" expressly in independent claim 23.  The same is true for proposed

claims 24–43, which correspond, respectively, to original claims 2–18 and

20–22.

>           3.     *Analysis*

We deny Patent Owner's Motion to Amend for a variety of reasons.

As an initial matter, we note that the dispute concerning the instituted

grounds of unpatentability had to do with whether or not the recited

"purchase list," "product catalog," and "transaction record" required "line

item data."  The proposed amendment does nothing to clarify this, as the

CBM2014-00159
Patent 8,396,808 B2

"line item transaction data," in proposed independent claim 23, is completely disembodied from "purchase list," "product catalog," and "transaction record."

Even when we consider the added claim limitation, however, we are unpersuaded that it distinguishes the claimed invention from the prior art combinations set forth in the instituted grounds of unpatentability. Specifically, as set forth above in our claim construction analysis, we determined that "line item data" should be construed as "itemized information from a larger group of information, related to individual products involved in a purchase or sale, that is capable of categorization," where non-limiting examples of "line item data" may include one or more of "quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping or other fees."  We also noted above that we could not discern any practical difference between "line item data" and "line item transaction data."  As additionally set forth above, we found that Dalzell clearly and unequivocally discloses examples that correspond to the aforementioned construction of "line item data," and are persuaded that Bemmel and Dalzell are combinable for the reasons set forth above. Accordingly, given these determinations and findings, most of Patent Owner's assertions concerning the purported failure of certain prior art references to disclose "line item transaction data" are either unpersuasive or

CBM2014-00159
Patent 8,396,808 B2

moot, and all that is left to evaluate are Patent Owner's assertions concerning secondary considerations.[12]

Patent Owner asserts that there was a long-felt need for the invention of the '808 patent, and in support provides the Declaration of Mr. Greenspan and several supporting exhibits. PO Motion 15–16 (citing Ex. 2021 ¶¶ 5–8, 19; Exs. 2026, 2028); PO Reply 1–3 (citing Ex. 2021 ¶¶ 6, 9–12; Exs. 2037, 2039, 2040, 2042, 2043, 2044). To be given substantial weight in the determination of obviousness or non-obviousness, evidence of secondary considerations must be relevant to the subject matter as claimed, and therefore it must be determined whether there is a nexus between the merits of the claimed invention and the evidence of secondary considerations. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 305 n.42 (Fed. Cir. 1985). Patent Owner does not even mention the word "nexus," and indeed, there is no analysis made between the proposed claims and what was or was not the subject of long-felt need. Patent Owner's assertion of secondary consideration is unpersuasive on this point alone. We will assume from Patent Owner's assertions concerning secondary considerations, however, a general intent to establish a nexus with "line item

---

[12] We note, however, that even if we were to determine that the secondary considerations weighed in favor of Patent Owner, such secondary considerations still must be weighed with the other factors set forth in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966), concerning obviousness. *In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063, 1076–77 (Fed. Cir. 2012). To that end, we note that the other three *Graham* factors weigh heavily against a determination of the non-obviousness of claims 23–43 for the reasons set forth above.

CBM2014-00159
Patent 8,396,808 B2

data," even though focusing solely on one feature of the claims is insufficient generally to establish nexus.

The primary evidence cited by Patent Owner in support of its assertions concerning long-felt need is the testimony of Mr. Greenspan (Ex. 2021 ¶¶ 5–12, 19). These paragraphs suffer from the same flaws as above concerning the testimony of interested parties, namely, a lack of corroborative evidence. Specifically, the only corroborating evidence cited in Mr. Greenspan's Declaration is in paragraph 6 with support to page 165 of the book Strategic Marketing in Practice 2007–2008 (Ex. 2042). We have considered that evidence. However, its corroborative value for showing long-felt need is undermined by Patent Owner's observation, which we agree with, that "[t]o the extent that the authors describe a solution to this problem, they also note that it works with only four banks." PO Motion 5. In other words, the evidence, for example, Figures 3 and 4 of Exhibit 2042, shows that even if there was a long-felt need, a solution was known as of 2007–2008. An assertion of long-felt need loses almost all persuasive value if the prior art shows a solution to that long-felt need. The fact that the solution was limited to "only four banks" is immaterial. There is nothing in the claims that requires widespread adoption; adoption by a small number of parties, and documentation of that adoption in a printed publication, is sufficient to show that it was known and would have been obvious. Regarding the corroborative evidence concerning NACHA meetings held on February 24–25, 2010, and June 23–24, 2010 (Exs. 2037–2040), while they are clearly corroborative evidence of Mr. Greenspan's presence and speaking at the February 24th meeting, neither Patent Owner nor Mr. Greenspan has explained, and we are unable to ascertain, any mention of

CBM2014-00159
Patent 8,396,808 B2

long-felt need concerning line-item data in this evidence.  Finally, regarding
Exhibits 2043 and 2044, Patent Owner asserts the following:

> The authors of the book, *Strategic Marketing in Practice*,
> thought they had found software ("Signifo," now
> "webexpenses") in 2007 that solves the problem central to the
> '808 Patent, but they did not, because Signifo does not transfer
> line item data.  The book's Figure 4 (Ex. 2042, loc. 3859 of
> 6384) shows each line as a different *transaction*; line item data
> can only be *manually entered* with a separate, offline product
> shown in Figure 3 (Id., loc. 3849 of 6384).  Even today, Signifo
> still does not offer line item data integration.  (Ex. 2043 &
> 2044.)  Thus, the referenced software does not actually transmit
> or receive line item data from any bank.

PO Reply 3.  As an initial matter, Patent Owner does not explain adequately
the contents of Exhibits 2043 and 2044.  The limitation that Patent Owner
proposes to add is "said payment system storing and communicating line
item transaction data."  Patent Owner has not explained adequately how
Exhibits 2043 and 2044 correspond to the aforementioned claim limitation,
let alone provide corroborative evidence of long-felt need.  If anything, as
best we are able to ascertain on our own, these Exhibits also undercut Patent
Owner's assertions concerning long-felt need, because Exhibit 2043
discloses importing credit card items, and Exhibit 2044 discloses uploading
a credit card file and categorizing line items.  Far from providing
corroborative evidence of long-felt need, these Exhibits would appear to
disclose actual implementations of "said payment system storing and
communicating line item transaction data."

   We determine that Patent Owner has not shown that any of the
*Graham* factors, either individually or collectively, weigh in favor of the
non-obviousness of proposed substitute claims 23–43.

CBM2014-00159
Patent 8,396,808 B2

### 4. Conclusion

Patent Owner has failed to carry its burden of demonstrating the patentability of amended claims 23–43. Accordingly, Patent Owner's Motion to Amend is *denied*.

### K. Petitioner's Motion to Exclude

Petitioner seeks to exclude Exhibit 2042 under Federal Rule of Evidence 106, Exhibits 2036–2044 as being outside the scope of a proper Reply to Motion to Amend, and certain arguments set forth in the Reply to Motion to Amend as being outside the scope of a proper Reply to Motion to Amend. Mot. Exc. 1–2. As the Board has considered all of the challenged Exhibits and assertions, and determines that Petitioner still prevails both regarding the unpatentability of claims 1–7, 9–11, 13–17, and 20–22, as well as the Motion to Amend, Petitioner's Motion to Exclude is *denied* as moot.

## III. CONCLUSION

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–7, 9–11, 13–17, and 20–22 of the '808 patent are *unpatentable*. Patent Owner's Motion to Amend is *denied*. Petitioner's Motion to Exclude is *denied*.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–7, 9–11, 13–17, and 20–22 of the '808 patent are held *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Amend is *denied*;

CBM2014-00159
Patent 8,396,808 B2

FURTHER ORDERED that Petitioner's Motion to Exclude is *denied*; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

CBM2014-00159
Patent 8,396,808 B2

For PETITIONER:

Michael T. Rosato
Robin L. Brewer
WILSON SONSINI GOODRICH & ROSATI, P.C.
mrosato@wsgr.com
rbrewer@wsgr.com

For PATENT OWNER:

Sean Goodwin
Michael Aschenbrener
ASCHENBRENER LAW, P.C.
sgg@aschenbrenerlaw.com
mga@aschenbrenerlaw.com

Trials@uspto.gov                                    Paper 52
Tel: 571-272-7822                        Entered: February 9, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

SQUARE, INC.,
Petitioner,

v.

THINK COMPUTER CORPORATION,
Patent Owner.

————————————

Case CBM2014-00159
Patent 8,396,808 B2

————————————

Before TONI R. SCHEINER, MICHAEL W. KIM, and
BART A. GERSTENBLITH, *Administrative Patent Judges*.

KIM, *Administrative Patent Judge*.

DECISION ON REQUEST FOR REHEARING
*37 C.F.R. §§ 42.5, 42.71(d)*

On December 28, 2015, Patent Owner filed a Request for Rehearing

Pursuant to 37 C.F.R. § 42.71 (Paper 51; "Req.") concerning a Final Written

Decision mailed November 27, 2015 (Paper 47; Dec.).

A request for rehearing can only point out that which the Board

misapprehended or overlooked, and will be reviewed for abuse of discretion.

CBM2014-00159
Patent 8,396,808 B2

37 C.F.R. § 42.71(d).  Moreover, as the moving party, the burden of persuasion falls on Patent Owner.  37 C.F.R. § 42.20(c).  The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and where each matter was previously addressed in a motion, an opposition, or a reply.  Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012).

1. *"wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser account during any particular transaction"*

Fundamentally, most of Patent Owner's assertions, on this issue but also others, are misplaced, because while Patent Owner liberally uses the phrase "misapprehend or overlook," Patent Owner actually uses the phrase predominantly as a substitute for "disagree."  In doing so, Patent Owner misunderstands the purpose of requests for rehearing, and the importance of "specifically identify[ing] all matters the party believes the Board misapprehended or overlooked, *and where each matter was previously addressed in a motion, an opposition, or a reply*."  Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,768 (emphasis added).  This guidance is particularly important for a request for rehearing of a Final Written Decision, as the trial portion of the proceeding is now closed, and neither party is allowed to enter new arguments, citations, or evidence.

In the vast majority of its assertions, Patent Owner fails to identify where the arguments, citations, or evidence were previously addressed in a substantive paper.  A request for rehearing must necessarily be limited to such arguments already made, and citations and evidence already presented, because to do otherwise would be fundamentally unfair to the opposing party, in this case, the Petitioner.  Specifically, due process and fairness

CBM2014-00159
Patent 8,396,808 B2

dictates that for every assertion made by one party, the opposing party must have the opportunity to rebut that assertion. That is why these trial proceedings provide very specific times and papers for which each party is allowed to make and rebut substantive assertions. Allowing one party to make assertions outside of those confines upsets that balance. To be sure, the Board is fallible, and so requests for rehearing are provided to ensure that every argument, citation, or evidence presented was properly considered in rendering a decision. Nevertheless, it is to balance this desire for completeness with the aforementioned notions of due process and fairness that, in requests for rehearing, the moving party is scrupulously limited to identifying assertions already made, and citations, or evidence previously presented in conjunction with a substantive paper where the opposing party had the opportunity to respond, especially here where the trial portion of the proceeding has concluded. When we apply this framework to most of Patent Owner's assertions, we see that Patent Owner has failed to meet both the letter and spirit of the aforementioned rules governing requests for rehearing.

For example, independent claim 1 recites "wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser account during any particular transaction," which all parties and the Board refer to as "bidirectional accounts." Dec. 11–12. Independent claims 20, 21, and 22 each recite a similar claim limitation. Patent Owner asserts that the Board misapprehended or overlooked the prosecution history of U.S. Patent No. 8,396,808 B2 ("the '808 Patent") in construing "bidirectional accounts." Req. 4–5. In making that assertion, however, Patent Owner does not identify, and we are unable to discern independently, any previous motion, opposition, or reply in which Patent

CBM2014-00159
Patent 8,396,808 B2

Owner argued that the prosecution history specifically informs the construction of that term, thus failing to meet the aforementioned portion of the Office Trial Practice Guide.  Applying the above-referenced due process framework, consideration of this assertion would not be proper.  Because this assertion was not set forth in a previous motion, opposition, or reply, Petitioner did not have the chance to rebut this assertion, especially here, where the trial portion of the proceeding has concluded.  Accordingly, if we were to now make a construction in favor of Patent Owner based on assertions concerning which Petitioner did not have a chance to respond, such a determination would be fundamentally unfair to Petitioner, and thus cannot be allowed.

Patent Owner does identify "Paper 7 at 8, 17" (Req. 2), and may be asserting that this identification alone forms a proper basis in a previous motion, opposition, or reply for the aforementioned assertion.  This assertion is problematic for several reasons.  As an initial matter, Paper 7 is Patent Owner's Preliminary Response, to which Petitioner was not afforded a chance to reply.  A preliminary response is normally only a substantive paper in that it is used to assist the Board in deciding whether or not to institute a trial.  Once the Decision on Institution (Paper 9) was made, however, any substantive assertions Patent Owner wished the Petitioner to consider should have been made in the proper papers following institution and before the Final Written Decision to which Petitioner would have had a chance to reply, in this case, the Patent Owner Response (Paper 21) (to which Petitioner filed a Reply (Paper 30)) or Patent Owner's Motion to Amend (Paper 20) (to which Petitioner filed an Opposition (Paper 29)).  To hold otherwise would be procedurally unfair to Petitioner, who had

CBM2014-00159
Patent 8,396,808 B2

expected, and should only have expected, to respond to substantive assertions set forth in those papers, and not in the preliminary response. *See* Scheduling Order (Paper 10) at 4 ("The patent owner is cautioned that any arguments for patentability not raised in the response will be deemed waived."). To that end, Patent Owner has not identified, and we are unable to discern independently, where Patent Owner previously made the aforementioned assertions concerning "bidirectional accounts" and the prosecution history in either the Patent Owner Response or the Patent Owner's Motion to Amend.

Setting aside the fact that Patent Owner relies upon its *Preliminary Response*, even when we consider the cited portions of the Preliminary Response, we are still unable to identify anything that could be considered a previous basis for assertions concerning "bidirectional accounts" and the prosecution history. Indeed, the entirety of Patent Owner's analysis in the cited portions of the Preliminary Response that could even remotely be interpreted as relating to a proper claim construction of "bidirectional accounts" is as follows:

> The '808 Patent also solves the technical problem of the lack of role flexibility in traditional payment systems, which for decades has complicated data retrieval tasks for countless businesses by forcing them to maintain multiple accounts and/or identities for transaction counterparts due to legacy technical design flaws. The '808 Patent solves the problem by flexibly assigning roles linked to a centralized legal entity database to create bi-directional account functionality, as opposed to using fixed roles with no bi-directionality and with no uniform entity identifiers, as in the prior art.

CBM2014-00159
Patent 8,396,808 B2

Prelim. Resp. 8.[1]  We are unclear as to how any of this analysis provides a proper basis for Patent Owner's aforementioned assertions concerning "bidirectional accounts" and the prosecution history.

Perhaps Patent Owner is asserting that the issue generally is "bidirectional accounts," and since "bidirectional accounts" generally was mentioned at the above-identified pages of the Preliminary Response, any specific arguments, citations, and evidence made under the general rubric of "bidirectional accounts" is proper at any time, because Petitioner should have been on notice that "bidirectional accounts" was a contested issue to which they should have set forth a rebuttal.  We disagree.  By that logic, Patent Owner would have to be asserting that Petitioner, based on the aforementioned vague reference to "bidirectional accounts" in the Preliminary Response, should have anticipated that Patent Owner would eventually make specific references to the portions of the prosecution history set forth in the Request for Rehearing, and thus should have preemptively addressed the assertions concerning "bidirectional accounts" and the prosecution history, even before they were made.  While we are cognizant that each party should be allowed some leeway in expanding on and clarifying specific arguments, citations, and evidence made in previous papers, we are unpersuaded, here, that the specific references to the portions of the prosecution history set forth in the Request for Rehearing is merely a

---

[1] Patent Owner also cites page 17 of the Preliminary Response, however, we have reviewed all of pages 17 to 19 of the Preliminary Response, and are unable to identify any portion that could be considered relevant to the above assertion.  Specifically, the only assertion made by Patent Owner is that Dalzell and Bemmel were similar to references already considered by the Examiner, and does not address assertions concerning "bidirectional accounts" and the prosecution history.

CBM2014-00159
Patent 8,396,808 B2

reasonable expansion or clarification of the vague reference to "bidirectional accounts" set forth in the Preliminary Response.  Thus, we are unpersuaded that we misapprehended or overlooked the above-cited portions of the prosecution history in construing "bidirectional accounts."

In a similar manner, Patent Owner asserts further that the Board misapprehended or overlooked certain portions of the Specification and claims of the '808 Patent in construing "bidirectional accounts."  Req. 2–7.  Our analysis here is the same as that set forth above with respect to "bidirectional accounts" and the prosecution history, and need not be repeated.

Although identified in a later portion of the Request for Rehearing, pages 4 to 5 of Patent Owner's Reply in Support of Motion to Amend Under 37 C.F.R. § 42.221 (Paper 32) do set forth something that could plausibly be considered a tangential assertion concerning a proper construction of "bidirectional accounts," though the analysis is in the context of why Dalzell did not disclose "bidirectional accounts."[2]  Even here, however, Patent Owner does not identify any of the allegedly misapprehended or overlooked portions of the prosecution history, Specification, or claims that are purportedly relevant to a claim construction of "bidirectional accounts."  Indeed, here, Patent Owner does not even mention the Specification or prosecution history at all.

For the above reasons, we are unpersuaded that the Board misapprehended or overlooked the items identified by Patent Owner in construing "bidirectional accounts."

---

[2] We note that even the assertion here was made in a Reply, to which Petitioner had a very limited chance to respond.  Paper 34, 2–3.

CBM2014-00159
Patent 8,396,808 B2

Even if we were to consider some of the identified items, however, we are unpersuaded that they would alter our construction. For example, Patent Owner asserts that the claim limitation "any particular transaction" requires that "bidirectional account" be construed as allowing an account to function simultaneously as both a merchant account and a purchaser account under all transactions. We disagree, primarily because we are unclear as to what Patent Owner means by "under all transactions." The relevant limitation of independent claim 1 reads "wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser account during any particular transaction." We find that "[a]ny particular transaction" means any specific transaction, and is not necessarily limited to *all* transactions going forward, and find further that, logically, an account need only function in "merchant mode" or "purchaser mode" for that particular transaction; otherwise the account would be in the awkward position of performing a transaction with itself. Moreover, we are unclear as to why the same account cannot function as both, depending on the transaction, as an account is merely a repository within which funds are held, and whether the account is in "merchant mode" (i.e., the ability to send funds from the account) or "purchaser mode" (i.e., the ability to send funds to the account) does not alter the fundamental repository nature of the account itself.

A similar analysis of the cited portions of the prosecution history and Specification yields similar conclusions. For example, Patent Owner's discussion of the prosecution history on pages 4 and 5 of the Request for Rehearing do not amount to Patent Owner providing an explicit definition of "selectively function," "during any particular transition," or any other claim

CBM2014-00159
Patent 8,396,808 B2

term as meaning "simultaneously"; nor do Patent Owner's statements rise to the level of a clear and unmistakable disclaimer with respect to the meaning of the claim terms.

>    2.    *whether Dalzell fails to meet the claims' requirements*

Based on Patent Owner's proposed claim construction of "bidirectional accounts," Patent Owner asserts that Dalzell does not disclose "bidirectional accounts." Req. 7–10. As we are unpersuaded, however, that the Board misapprehended or overlooked the items identified by Patent Owner in construing "bidirectional accounts," we are unpersuaded that our analysis of Dalzell and "bidirectional accounts" set forth on pages 28 to 29 of the Final Written Decision should be modified in any way. *See* Dec. 29 ("[W]e find that a more logical reading of paragraph 59 of Dalzell is that a buyer, from a particular account, can add a seller feature to that particular account, without the need to create a whole new account. Such a finding is supported by extensive analysis and testimony by Dr. Sadeh-Koniecpol, with explicit citations to Dalzell, which we find credible, reasonable, and persuasive. Ex. 1002 ¶¶ 147-164 (citing Ex. 1006 ¶¶ 9, 27, 49, 57, 61, 82, 85, 87, 132, 163, Figs. 1A, 1B).")

>    3.    *"line item data" and "line item transaction data"*

Patent Owner asserts that the Board misconstrues "line item data" and "line item transaction data" (hereinafter "line item data"). Req. 10–15. Similar to the assertions set forth above with respect to "bidirectional accounts," we note that many of Patent Owner's assertions concerning this issue are set forth for the first time in the Request for Rehearing, without Patent Owner identifying, or the Board being able to ascertain independently, where those assertions were first made in a previous motion,

CBM2014-00159
Patent 8,396,808 B2

opposition, or reply.  Accordingly, those assertions have not been considered for the same reasons as set forth *supra* concerning "bidirectional accounts." Instead, we address below only those assertions that have a proper basis in a previous motion, opposition, or reply.

Patent Owner asserts that a proper construction of each of the recited claim limitations "purchase list," product catalog," and "transaction record" requires "line item data" as a necessary limitation to all claims, and that the Board misapprehended and overlooked two things in determining otherwise. We disagree.

First, Patent Owner asserts that the Board's determination that "purchase list" does not require "line item data" is unreasonably broad, because the Board overlooked or misapprehended the fact that the Specification does not provide a basis for the Board's unreasonably broad construction.  We disagree.  As set forth on page 7 of the Final Written Decision, the Board considered expressly the Specification as a basis for its construction.  To the extent that Patent Owner disagrees with how the Board used the Specification in making the aforementioned construction, the Board has considered anew the disclosures in the Specification identified by Patent Owner concerning whether "purchase list" requires "line item data," and are again unpersuaded our construction is in error.[3]

Second, Patent Owner asserts that the Board's determination that "purchase list" does not require "line item data" is unreasonably broad, because the Board overlooked or misapprehended the fact that *In re Van*

---

[3] Indeed, Patent Owner's "fruit orchard" analogy supports the Board's construction, as a fruit orchard, at times, may not include any fruit, for example, and merely consist of soil and trees.

CBM2014-00159
Patent 8,396,808 B2

*Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993), can be distinguished from the instant proceeding. Specifically, Patent Owner asserts that "there is no alternative construction posited as was true in *In re Van Geuns*, and 'line item data' is not a familiar natural principle, in the way that a magnetic field is." Req. 11. We disagree. Concerning whether or not there was an alternative construction posited in *In re Van Geuns*, the question in that case was whether a claim limitation concerning "substantially uniform magnetic field" should be construed as "substantially uniform magnetic field *required for NMR imaging*" (emphasis added). Thus, contrary to Patent Owner's assertions, there were two alternative constructions posited, one broader and one narrower, and the broader one was determined to be correct. Such is the exact fact scenario here concerning "purchase list" and "line item data."

Concerning the fact that "line item data" is not a familiar natural principle, we agree with Patent Owner. We are unclear as to how that agreement, however, helps Patent Owner's position, as if "line item data" is not as certain as a familiar natural principle, the ambiguity should be construed against Patent Owner. Specifically, if there is greater doubt as to whether or not "purchase list" requires "line item data" because the meaning of "line item data" is uncertain, the broader construction should be used, i.e., that "purchase list" does not require "line item data."

Patent Owner appears to assert additionally that the Board misapprehended or overlooked the fact that a proper construction, presumably of the independent claims, requires that in order for a prior art reference to meet the claimed system and method, the prior art must be capable of handling *all types* of "line item data," including "line item data" that includes gigabytes of data. We disagree that this assertion was

CBM2014-00159
Patent 8,396,808 B2

misapprehended or overlooked, as Patent Owner has not identified where these assertions are set forth in any previous motion, opposition, or reply.[4]

Patent Owner asserts additionally that the Board has misapprehended or overlooked Patent Owner's characterizations of Exhibit 2042. The Board did not misapprehend or overlook Patent Owner's characterizations of Exhibit 2042; the Board disagreed with it. Indeed, page 36 of the Final Written Decision block quotes and addresses the exact assertions that Patent Owner asserts was misapprehended or overlooked.

Patent Owner asserts also that the Board has misapprehended or overlooked the fact that the items set forth in Figure 4 of Exhibit 2042 are not "line item data." We construed "line item data" as "information from a larger group of information, related to individual products involved in a purchase or sale, that is capable of categorization." Dec. 11. We are unpersuaded that at least one of the items set forth in Figure 4 of Exhibit 2042, such as any item listed under Description, Category, Date, Currency, and Amount, does not meet the above construction of "line item data."

IT IS ORDERED that insofar as we have addressed above the assertions set forth in Patent Owner's Request for Rehearing (Paper 51), the Request is *granted*. In all other respects, the Request is *denied*.

---

[4] Absent such a narrowing of the independent claims, and it is unclear which claim limitation would serve the basis for such a narrowing, Patent Owner's proffered analogy again supports the Board's construction, as a doorframe built for "humans" is met if the prior art discloses a doorframe that can accommodate a short child, but not Manute Bol.

CBM2014-00159
Patent 8,396,808 B2

For PETITIONER:

Michael T. Rosato
Robin L. Brewer
WILSON SONSINI GOODRICH & ROSATI, P.C.
mrosato@wsgr.com
rbrewer@wsgr.com

For PATENT OWNER:

Issac Rabicoff
RABICOFF LAW LLC
isaac@rabilaw.com

Michael Aschenbrener
ASCHENBRENER LAW, P.C.
mja@aschenbrenerlaw.com



US008396808B2

(12) **United States Patent**    (10) **Patent No.:**    **US 8,396,808 B2**

Greenspan    (45) **Date of Patent:**    **Mar. 12, 2013**

| (54) | **METHOD AND SYSTEM FOR TRANSFERRING AN ELECTRONIC PAYMENT** |
|---|---|

(75) Inventor: **Aaron J. Greenspan**, Palo Alto, CA (US)

(73) Assignee: **Think Computer Corporation**, Palo Alto, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 150 days.

(21) Appl. No.: **12/641,071**

(22) Filed: **Dec. 17, 2009**

(65) **Prior Publication Data**

US 2011/0029416 A1    Feb. 3, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/230,387, filed on Jul. 31, 2009.

(51) **Int. Cl.**
    *G06Q 20/00*    (2012.01)

(52) **U.S. Cl.** ................ **705/64**; 705/65; 705/67; 705/72; 705/79

(58) **Field of Classification Search** ........... 705/64, 705/65, 67, 72, 75, 78, 79
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 6,260,024 B1 | 7/2001 | Shkedy | |
| 7,127,606 B2 * | 10/2006 | Wheeler et al. | 713/156 |
| 7,873,573 B2 * | 1/2011 | Realini | 705/39 |

| 2003/0061170 A1 | 3/2003 | Uzo | |
| 2004/0167820 A1 * | 8/2004 | Melick et al. | 705/16 |
| 2004/0254861 A1 | 12/2004 | Pentel | |
| 2005/0043996 A1 * | 2/2005 | Silver | 705/15 |
| 2006/0099964 A1 * | 5/2006 | Barrese et al. | 455/456.3 |
| 2007/0055597 A1 * | 3/2007 | Patel et al. | 705/35 |
| 2008/0120155 A1 * | 5/2008 | Pliha | 705/7 |
| 2009/0099961 A1 | 4/2009 | Ogilvy | |
| 2010/0125495 A1 * | 5/2010 | Smith et al. | 705/14.23 |
| 2010/0138344 A1 * | 6/2010 | Wong et al. | 705/44 |
| 2010/0219234 A1 * | 9/2010 | Forbes | 235/375 |
| 2010/0318219 A1 * | 12/2010 | Kuehnrich et al. | 700/232 |

OTHER PUBLICATIONS

Definition of "separate" as "detached, disconnected, or disjoined". Retrieved from Random House Dictionary, Random House, Inc. (2011).*

Zhang, J. (2006). The roles of players and reputation: Evidence from eBay online auctions. Decision Support Systems 42, 1800-1818 (hereinafter "eBay").*

* cited by examiner

*Primary Examiner* — Elaine Gort
*Assistant Examiner* — Peter Ludwig
(74) *Attorney, Agent, or Firm* — Jeffrey Schox; Derek Westberg

(57)    **ABSTRACT**

A method and system for transferring an electronic payment between a purchaser and a merchant that includes assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system, adding an item from a product catalog stored in the payment system to a purchase list, obtaining a user ID token of a purchaser from a merchant terminal, communicating identity confirmation information associated with the user ID token to the merchant terminal, and transferring funds for the purchase price total from the purchaser account to the merchant account.

**22 Claims, 9 Drawing Sheets**



SQUARE - EXHIBIT 1001



100
PAYMENT SYSTEM
LEGAL ENTITY ACCOUNT DATABASE
Business A
Consumer B
Business C
Consumer D
Business E
Consumer F
PHOTO DATABASE
B D F H K L
MOBILE DEVICE PORTAL
AUTHENTICATION SUBSYSTEM
WEB-BASED PORTAL
CONSUMER F DESIRES GOODS OR SERVICES FROM BUSINESS A
S110 NEW TRANSACTION
Goods
Services
Business A
Consumer F
MERCHANT ROLE
PURCHASER ROLE
CONSUMER F CHOOSES PARTICULAR GOODS OR SERVICES
S120 ITEM SELECTION
Item 1 $5.00
Item 2 $10.00
Item 3 $2.00
Item 4 $4.25
Item 5 $9.99
Item 1 $5.00
Item 3 $2.00
Subtotal $7.00
Tax $0.70
Total $7.70
PRODUCT CATALOG
PURCHASE LIST
S130 USER ID TOKEN ACQUISITION
User ID
Token
MERCHANT DEVICE
PURCHASER DEVICE
S140 USER IDENTITY VERIFICATION
Compare
Visually
MERCHANT DEVICE
PURCHASER
MERCHANT CONFIRMS IDENTITY AND APPROVES TRANSACTION
S150
FUNDS ARE SENT FROM PURCHASER ACCOUNT TO MERCHANT ACCOUNT
S160
PURCHASER AUGMENTS TRANSACTION
S170
PURCHASER AND MERCHANT ARE NOTIFIED OF TRANSACTION

Figure 1

**Figure 2**

**Figure 3**



**Figure 4**



Figure 5



**Figure 6**



Figure 7



**Figure 8**



Figure 9

US 8,396,808 B2

**1**

## METHOD AND SYSTEM FOR TRANSFERRING AN ELECTRONIC PAYMENT

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 61/230,387, filed 31 Jul. 2009, entitled "Method and System for Uniquely Identifying Purchasers of Specific Goods and Services and Associated Transaction Details" which is incorporated in its entirety by this reference.

### TECHNICAL FIELD

This invention relates generally to the payment transaction field, and more specifically to a new and useful method and system for transferring an electronic payment in the payment transaction field.

### BACKGROUND

Electronic payment transactions occur daily and have become ubiquitous in everyday life. The transactions and related execution costs, however, are becoming more burdensome for businesses and are adversely affecting the bottom line of businesses. This problem is especially acute for small businesses that rely on relatively thin profit margins.

Credit card companies have gained a foothold as the most widely accepted non-cash form of payment for transactions, and many consumers exclusively transact only with merchants that accept credit cards. Thus, many businesses are compelled to use the services of credit card companies despite the costly overhead associated with credit card transactions. Merchants have the additional burden of handling the secure information of a credit card, which exposes the business to legal liability. Despite the high cost of credit card transactions, the technology employed for credit cards is able to provide limited security at the time of sale and limited reporting information for a purchase. Thus, there is a need in the payment transaction field to create a new and useful method and system for transferring an electronic payment. This invention provides such a new and useful method and system.

### SUMMARY

The method for transferring an electronic payment of the preferred embodiment includes assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system for the given transaction, adding an item from a product catalog to a purchase list, transmitting one or more user identification (ID) tokens belonging to the purchaser from a terminal to the payment system, communicating identity confirmation information associated with the user ID from the payment system back to the terminal, allowing the purchaser to perform intermediate steps related to purchase tracking and marketing incentives, and transferring funds for the transaction from the purchaser's account to the merchant's account. The method functions to allow two parties, such as a merchant and a purchaser, to complete a transaction through an electronic terminal. More preferably, the method functions to allow for an electronic payment at a point of sale. The electronic terminal may be a personal computer, a mobile phone, or any suitable internet-enabled device. In one embodiment, the merchant uses a merchant terminal, but in alternative embodi-

**2**

ments a merchant terminal and a purchaser terminal may be used for carrying out steps of the preferred method. The merchant terminal and/or purchaser terminal preferably use an account portal to communicate with the payment system. An account portal is preferably a software application or a web-based software application that provides an interface on an electronic terminal for user interaction with the payment system. The method is preferably performed over an internet network that is used for communication between the payment system and the merchant terminal and/or purchaser terminal. The internet network is preferably a secure, TCP/IP-based network, but may be any suitable network. The product catalog of the merchant is preferably created by a merchant with an account on the payment system, and is preferably hosted by the payment system. The integration of the payment system and product catalog functions to enable recording and tracking transactions with itemized detail. The itemized detail is preferably available to both the merchant and the purchaser in real-time, which enables various forms of purchase augmentation, notification, and accounting on a per item basis. Most preferably the merchant and purchaser can access the payment system through an internet website on a desktop or laptop computer or a mobile device.

### BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** is a flowchart representation of a method for transferring an electronic payment of a preferred embodiment of the invention;

FIG. **2** is an exemplary screenshot of an electronic terminal displaying a portion of a product catalog of a merchant;

FIG. **3** is an exemplary screenshot of an electronic terminal displaying a purchase list;

FIG. **4** is an exemplary screenshot of an electronic terminal displaying an interface for adding a purchaser-variable value to the purchase price total;

FIG. **5** is an exemplary flowchart representation of charging a portion of a purchase price total to a second account;

FIG. **6** is an exemplary screenshot of an electronic terminal displaying an interface for assigning a transaction to a legal entity associated with the present purchaser using the payment system;

FIG. **7** is an exemplary screenshot of an electronic terminal displaying budgeting rule options;

FIG. **8** is an exemplary screenshot of an electronic terminal receiving purchaser approval for account-related warnings; and

FIG. **9** is a schematic representation of a system for transferring an electronic payment of a preferred embodiment of the invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

The following description of the preferred embodiments of the invention is not intended to limit the invention to these preferred embodiments, but rather to enable any person skilled in the art to make and use this invention.

1. Method for Transferring an Electronic Payment

As mentioned above and as shown in FIG. **1**, the method for transferring an electronic payment of the preferred embodiment includes assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system S**110**, adding an item from a product catalog to a purchase list S**120**, obtaining a user identification (ID) of a purchaser from a merchant terminal S**130**, communicating identity confirmation information associated with

US 8,396,808 B2

**3**

the user ID from the payment system to the merchant terminal S**140**, and transferring funds for the purchase to the merchant account S**150**.

Step S**110**, which includes assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system, functions to register a purchaser and a merchant for a transaction within a single integrated system. The payment system preferably allows for transfer of information and data through various stages of the purchase process. The payment system preferably creates a standard protocol, interface, and user experience that enables enhancements to the payment process as described below. The payment system is preferably used for communicating to a merchant terminal and for completing payment transaction. An entity (e.g., a person, business, or other legally recognized entity) preferably creates an account within the payment system. The accounts of the payment system are preferably designed so that an account may selectively function as either a merchant or a purchaser during any particular transaction. In other words, within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts. The merchant is preferably the entity providing goods and/or services to the purchaser and typically receiving payment for the goods or services. In many situations the merchant account is a business but may alternatively be a person receiving payment from another person or a business. For a transaction, the merchant account role and the purchaser account role are preferably assigned to at least one account each. Among other benefits, the versatility of an entity account in the payment system enables simplified bookkeeping (e.g., elimination of duplicate database records). As part of the step of assigning a purchaser account and a merchant account, the payment system may additionally host an account portal that functions to support the interaction between the payment system and the merchant and purchaser, respectively. Through the account portal a user can preferably access account information, view and update a product catalog, access financial tools, carry out a transaction as merchant or a purchaser, and/or perform any suitable task within the payment system. The account portal is preferably a website but may alternatively use any suitable implementation to facilitate the use of the payment system, such as an Application Programming Interface (API) accessed by other parties. The payment system may additionally aid in the process of tracking transaction history, automatically completing tax forms based upon data from itemized history of an entity, performing general ledger accounting, tracking purchase or sales trends, performing budgeting tasks, and any performing any suitable service. Additionally, the payment system may aid in managing a social network of a plurality of entities. The social network is preferably based on the entity accounts and transactions that occur between various accounts of the payment system. Creating an entity account may include linking a financial account (e.g., credit card or bank account) with the system. Additionally or alternatively, the payment system may include the creation of a payment system account enabling the deposit and withdrawal of money into and out of a financial account (e.g. a traditional checking or savings account at a bank). As preparation of being assigned the role of a merchant account, creating an account (i.e., an entity account) may include the sub-step of creating a product catalog of the merchant. The product catalog preferably includes the products offered for sale by a merchant. A product may include any physical product, abstract product (e.g., insurance contract or home mortgage), a service, or any suitable salable item. The product catalog is preferably associated with a

**4**

particular entity, but may alternatively be shared by a plurality of entities (such as a corporate chain with shared product offering, or in cases where many discrete entities sell the same generic product). The product catalog preferably includes a listing of product descriptions and prices for each product contained within the product catalog. Additional information may be included for a product such as categories for tax purposes and other purposes, product-related IDs for each distributor of the product (e.g., Stock-Keeping Unit or "SKU"), images or media files related to the product, inventory related information (the number of items on hand, on order, etc. at each warehouse location), or any other suitable product-related data. The product catalog may be a database accessed by outside applications, but may additionally or alternatively include a hosted web-based store through which products can be added to a shopping cart (i.e., a purchase list). The product catalog is preferably served (sent via the internet) to a terminal (either of a merchant or a purchaser during a transaction), as shown in FIG. **2**. The product catalog may additionally include any suitable option used by a merchant in the pricing and sale of a product. For example, the product catalog may include options for implementing sales, promotional offerings, customizations (including customizing a first product with add-on products, or "up-selling"), allowing for hierarchical ordering of products, and allowing for any suitable pricing mechanism of a merchant (including quantity-based pricing or subscription based products with recurring charges).

Step S**120**, which includes adding an item from a product catalog to a purchase list, functions to form a list of all products of a purchase made by a purchaser and to calculate the purchase price total, as shown in FIG. **3**. The product catalog is preferably accessed by a representative of the merchant on a terminal, and the representative is preferably responsible for adding those items that a purchaser plans to purchase. The purchaser may alternatively or additionally add items to the purchase list in an embodiment where the product catalog is made accessible to a purchaser terminal. A product catalog of a merchant may be accessed by navigating to a unique address or, alternatively, by navigating to a product catalog based on purchaser terminal location. The step of navigating to a product catalog based on purchaser terminal location preferably includes obtaining the location of the purchaser terminal (such as by GPS, internet location techniques, telephone tower triangulation, etc.) and providing a product catalog of a merchant that is near the location of the purchaser terminal. In this situation, "near the location of the purchaser terminal" may be determined by absolute distance or relative distance compared to other merchants with product catalogs. The purchase list created on a purchaser terminal is preferably sent to the appropriate merchant terminal when the purchaser is ready to complete a purchase. In the variation of a purchaser-created purchase list, a merchant preferably performs step S**130** to establish a link between a purchaser and a merchant, and then the purchase list is sent to the merchant. The purchaser list from a purchaser terminal may additionally be merged with a purchase list from a merchant terminal.

Step S**130**, which includes obtaining user identification (ID) tokens of a purchaser from a merchant terminal, functions to gather at least one unique identifier of the purchaser. The user ID may be implemented in various forms. Preferably, the user ID is a barcode that encodes a user identification value (e.g., a alphanumeric code). More preferably, the barcode is a Code 128-C barcode corresponding to a user ID stored in an internet-accessible database table uniquely representing an entity account (i.e., the specific individual) used in making the purchase. The barcode is preferably collected

US 8,396,808 B2

5

6

from a terminal through a barcode scanner, a camera, or any suitable imaging device. The barcode may be read from a printed card, but may alternatively be displayed on a screen of a mobile device utilizing LCD, LED, OLED, e-Ink, or any suitable display technology. Alternatively, the user ID may be entered manually, read from a magnetic strip, read from an RFID tag, biometrically scanned, obtained from visual recognition, or entered in any other manner suitable for reading an encoded ID. The user identification value may additionally be used for situations where a barcode cannot be used. The user identification value is preferably an 11-digit value, but any suitable length of code may be used such as any standard code length used in a particular technology (Code 128-C barcode). The user ID is preferably sent over an internet connection to the payment system. Upon receiving the user ID the payment system can establish a transaction session between the merchant account logged into on the merchant terminal and the purchaser account identified from the user ID.

Step S140, which includes communicating identity confirmation information associated with the user ID from the payment system to the merchant terminal, functions to provide the merchant with a way to verify the identity of the purchaser. Preferably, Step S140 includes sending an image associated with the account ID. The image is preferably a photograph of the owner of the purchaser account, which a merchant can use as reference to verify that the purchaser (the person who is attempting to make the purchase and who is likely within visual range of the representative of the merchant) visually matches the person in the photograph associated with the account. Alternatively or in addition, any suitable form of verification may be used such as a security question and answer, a PIN number or password, address information, biometric signatures compared to biometric readings, and/or any other suitable information for identity confirmation. The payment system preferably receives a communication indicating purchase approval or purchase denial from the merchant terminal. The purchase is preferably denied by the representative of the merchant if the confirmation information is not approved.

Step S150, which includes transferring funds for the purchase price total to an account of the merchant, functions to finalize the purchase. Step S150 is preferably performed after receiving purchase approval from the merchant terminal. The amount of funds transferred to the merchant account preferably covers the purchase price total, which includes the sum total of the price of products in the purchase list, tax, and any additional costs such as gratuity. The payment system preferably performs the necessary tasks for transferring funds such as verifying that enough funds are in an account prior to making the transaction to avoid any penalty fees. Additionally, after completing a purchase, the method may additionally store purchase list information as a transaction record for the merchant account and/or the purchaser account, which functions to form an itemized purchase history. A purchaser or merchant can preferably access transaction records stored on a respective payment system account, and all data from a purchase list is preferably accessible. The itemized transaction records can be used for detailed analysis of purchase trends, account budgeting, or any suitable application.

Additionally or alternatively, the method of the preferred embodiment includes augmenting a transaction S160, which functions to provide a purchaser with control over purchasing options. The transaction is preferably the transaction associated with the transfer of funds of the purchase price total from the purchaser account to the merchant account. A purchaser or a merchant preferably provides input prior, during, or after

the transfer of funds and that input results in some action using transaction based information. Additionally or alternatively, during the process of augmenting of a transaction, account-related and/or transaction-related information may be communicated to the purchaser and/or merchant through a terminal. A transaction may be augmented through several variations including adding a purchaser-variable value to the purchase price total S162, charging a portion of the purchase price total to at least a second account S164, applying a budgeting rule that transfers money based in part on the purchase S166, and/or any other suitable manner of augmenting the financial effects of a purchase.

Step S162, which includes adding a purchaser-variable value to the purchase price total as shown in FIG. 4, functions to allow the common practice of adding a customer tip to a purchase. This has particular applications for purchases made at restaurants that require (or at least expect) tips, but may have wider applications such as for charities and fundraisers where a person donating money would want to specify the amount to pay. A purchaser-variable value item (or tip field) is preferably added to a purchase list. This may be added by the merchant or automatically added based on the classification of the merchant or by any suitable means. For example, a merchant with a Standard Industry Classification (SIC) of 58 corresponding to an "Eating and Drinking Place" would preferably have a tip field automatically added to purchases. Additionally, the specific location of the merchant may determine if a tip field should be added, such as in the situation where some locations of a particular merchant use tip and others do not. When a tip field is added to a purchase list, the purchaser preferably is provided with an interface on a purchaser terminal for entering a desired value to add to the purchase price total. As shown in FIG. 4, the interface may additionally suggest common tip amounts such as 10%, 15%, and 20% values of the purchase price pre-tax. The interface is preferably provided through the account portal on a purchaser terminal, but may additionally be provided through the account portal on the merchant terminal. Additionally, the tip field may be completed by a purchaser at a time after the initial payment of the purchase price total. The tip field preferably has an expiration time and a default tip value, so that if the purchaser forgets to enter a value within a set amount of time (e.g., 24 hours), a default tip will be added to the purchase price total. The default tip may be set at zero or set at a greater than zero amount.

Step S164, charging a portion of the purchase price total to at least a second account as shown in FIGS. 5 and 6, which functions to split the bill between multiple parties. This step may be useful when multiple people wish to split the cost of a purchase, such as group at a restaurant or a bar. Preferably, a first purchaser (primary purchaser) accepts the charges for the purchase from the merchant. Then the purchaser preferably distributes the cost of the purchase to at least a second purchaser and may additionally distribute the cost to any suitable number of purchasers. The primary purchaser may charge the second purchaser in a fashion substantially similar to the way a merchant completes a transaction with a purchaser (Steps S130, S140, and S150). As the identity of the second purchaser is preferably trusted by the first purchaser, the identity verification step may be omitted or disregarded. The second purchaser may additionally need to accept charges. In a first variation, the purchase price total is preferably split based on a percentage of the purchase price total. For example, the purchaser may charge a second person for 50% of the bill so that the two people evenly pay for the purchase. As a second variation shown in FIG. 5, a purchase may be divided on a per item basis. Items that a second person

7

should pay for are selected by a purchaser through an interface, and then the second purchaser is charged the sum total of the selected items (transferring funds from the second purchaser to the original purchaser). Additional purchase charges, such as tax and tip, are preferably divided so that each purchaser pays an appropriate amount resulting from the marked items is additionally charged to the other person. Additionally, a percentage of the cost of an individual item may be charged to the other person. The purchase price total may alternatively be divided in any suitable fashion. This step may additionally be applied to spread costs between various accounts of a single purchaser, as shown in FIG. **6**. As one example, a purchaser may have a corporate account for business purchases and a personal account for personal purchases. Through the step of S**164**, a purchaser would be able to easily distribute the cost of a purchase as the purchaser sees fit.

Step S**166**, which includes applying a budgeting rule that transfers money based in part on the purchase, functions to initiate account action outside of the purchase. Step S**166** is preferably used for money management rules of a purchaser account. The transfer of money may additionally be scheduled from some future date. As one example, S**166** may be used to automatically give a donation to a particular charity. As another example, S**166** may be used to automatically manage a budget for a purchaser such as by moving funds into a savings account for every purchase. The budgeting rule preferably uses small transaction amounts (e.g., fractions of a dollar) that are based on a percentage of the purchase price total, but may be fixed amounts or any suitable value. The budgeting rule in one preferred variation functions similar to a rewards program as is known in the art. The budgeting rule can use any suitable information about a purchase such as merchant name, merchant type (SKU code), individual item description, individual item price, or any suitable information collected about a purchase for determining where to transfer money and how to determine the amount to transfer. Additionally, a purchaser may select a desired budgeting rule (or reward) to enact for a purchase. For example, a purchaser may have several budgeting rules. A first budgeting rule may contribute a percentage of a purchase price total to a charity for all purchases made at grocery stores. A second budgeting rule may move a fixed amount into a savings account for every item that is determined to be a consumer electronics-related product. Of course, a third budgeting rule can act like a tax to dissuade certain purchases, such as alcohol or tobacco. Additionally, as part of the budgeting rule, an amount of money may have restricted use. The restricted use preferably prevents the money from being used for purchases other than those set by the rule. For example, money may be restricted for a particular vendor so as to function in a manner similar to a gift card for that particular vendor. The money may be restricted for food items, entertainment, bills, or any suitable category of purchases. This category restriction could function as a personal budgeting tool. For example, a user could set up a budgeting rule that for every dollar spent on consumer electronics two will be reserved for food items.

Additionally or alternatively, the method of the preferred embodiment includes communicating a notification of purchase related effects S**170**, which functions to provide information about a purchase to the merchant and/or purchaser at the time of sale. For a purchaser, the notification is preferably related to the purchaser account. As a first example many financial accounts offer rewards for purchases such as cash back rewards, points, mileage points, or any suitable reward system. Step S**170** would function to notify the purchaser of the number of rewards collected by each purchase. Additionally or alternatively, a notification may be sent containing the

8

account balance before and/or after a purchase. Used in combination with Step S**166**, notifications are provided to the purchaser containing information related to the amount of money transferred to other accounts (e.g., charities, savings accounts etc.) as part of a budgeting rule, as shown in FIG. **7**. Additionally, as one of the main benefits of having merchant product catalogs integrated into the payment system, line item transaction data can be communicated. The line item data is additionally stored as part of the transaction record of the accounts. This itemized information can be very useful, such as in one application where tax forms are automatically completed by aggregating each category of line item transaction data as appropriate. For a merchant, information such as the inventory levels of a product could be displayed along with any data related to the impact of a particular purchase.

Additionally, the method of the preferred embodiment may include receiving purchaser acknowledgment of an account-related warning S**180**. An account warning preferably includes an error or alert that the account does not have sufficient funds for a purchase. An insufficient funds warning is preferably identified in Step S**150** when the payment system is performing the steps of transferring funds. The account-related warning is preferably received at the time of purchase, and the acknowledgment includes obtaining purchaser consent to ameliorative actions at the time of purchase. The payment system will preferably provide various payment plan options that could be used in a situation where the purchaser account does not have sufficient funds, as shown in FIG. **8**. For example, the payment system may loan the purchaser money for the purchase or provide an option to deposit funds into the purchaser account from a second financial account. The account warning may additionally be related to an account balance dipping below a threshold and displaying a message informing the purchaser. The account warning may be activated due to suspicious spending on the account. In this variation, additional security questions can be displayed such that the correct answering of questions allows a purchase to be approved, while incorrect answering places a hold on the account. The security questions may be sent to the merchant or displayed on a device of the purchaser.

2. System for Transferring an Electronic Payment

As shown in FIG. **9**, the system **200** for transferring an electronic payment of the preferred embodiment includes a payment system **210**, an account portal **220**, and a product catalog **230**. The system **200** functions to provide the infrastructure for implementing the method described above.

The payment system **210** of the preferred embodiment functions to coordinate purchases that occur between a merchant and a purchaser. The payment system **210** preferably includes a plurality of payment system accounts stored in a connected account database **212**. The payment system accounts preferably can act as merchant accounts or purchaser accounts as described above. The payment system accounts are preferably used to identify a user of the payment system, for holding funds or alternatively linking to a financial account, and storing any suitable payment system account-related information. The payment system **210** is preferably a server or a plurality of servers that can connect a merchant or purchaser through a TCP/IP internet connection. However, any suitable protocol may alternatively be used such as IPv6.

The account portal **220** of the preferred embodiment functions as the interface between an electronic terminal (e.g., merchant terminal or a purchaser terminal) and the payment system. The account portal **220** preferably allows a user to manage an account and complete a purchase transaction as described in the method above through either a merchant

9

10

interface or a purchaser interface. In this way, any account may be used in a transaction as either a merchant account or a purchaser account. The account portal **220** preferably includes transaction interface tools and a product catalog management tool. The account portal **220** is preferably a website, but may additionally or alternatively be an application communicating to the payment system through an application programming interface. The account portal **220** is preferably used on a hardware device and connects to the payment system **210** through a TCP/IP network connection. Additionally the account portal **220** functions to allow for control of a product catalog **230** of a merchant. The account portal **220** preferably allows for a user ID token to be retrieved from the account database **212** and displayed on an electronic terminal (e.g., a purchaser terminal) preferably in an encoded form (e.g. a barcode). A merchant terminal can then preferably collect the user ID token from a purchaser terminal displaying or transmitting the encoded the user ID token and pass the user ID token through the account portal to the payment system **210** to create a transaction session. The account portal **220** is preferably accessible by a variety of devices including personal computers and mobile devices.

The product catalog **230** of the preferred embodiment functions as an accessible database of for-sale offerings of a merchant. The product catalog is preferably stored within the payment system **210** and is preferably stored in a manner allowing each product to be linked to one or more merchant accounts. The product catalog **230** is preferably a database of relevant product information such as descriptions and prices. The items of the product catalog **230** are preferably pre-categorized (i.e., categorized prior to any transaction taking place) by type of product. The merchant preferably assigns the categorization of a product, but categorization may be assigned in any suitable manner. For example, a hamburger at a restaurant will be pre-categorized as food by the restaurant. Pre-categorization serves to simplify accounting for both the merchant and the purchaser. The payment system will preferably know which types of items were purchased or sold for an account. In one application, a tax form is automatically filled out by aggregating transaction information for the food category so that a 50% meals deduction offered by the IRS can be applied to those expenditures. The product catalog may additionally be accessed as an online store with products able to be added to a purchase list (shopping cart). The product catalog **220** is preferably accessible on a merchant terminal for management of the product catalog and for adding items to a purchase list for a purchaser. Additionally a product catalog may be accessed on a purchaser terminal for adding items to a purchase list.

As a person skilled in the art will recognize from the previous detailed description and from the figures and claims, modifications and changes can be made to the preferred embodiments of the invention without departing from the scope of this invention defined in the following claims.

I claim:

**1**. A method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;

adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;

obtaining a user ID token of the purchaser from a merchant terminal, the merchant terminal being at a merchant location and the merchant location being different from the payment system;

communicating identity confirmation information associated with the user ID token to the merchant terminal; and

transferring funds for a purchase price total from the purchaser account to the merchant account.

**2**. The method of claim **1**, further comprising storing purchase list information as a transaction record for the merchant account and the purchaser account.

**3**. The method of claim **2**, further comprising serving the product catalog to a purchaser terminal, wherein an item is added to the product catalog from the purchaser terminal.

**4**. The method of claim **3**, further comprising navigating the purchaser terminal to the product catalog of a merchant based on the location of the purchaser terminal.

**5**. The method of claim **2**, further comprising serving the product catalog to the merchant terminal, wherein an item is added to the product catalog from the merchant terminal.

**6**. The method of claim **2**, wherein the step of obtaining a user ID token of a purchaser includes scanning a barcode provided by the purchaser.

**7**. The method of claim **6**, further comprising providing a barcode displayable on a purchaser terminal.

**8**. The method of claim **2**, wherein the step of communicating identity confirmation information includes sending an image associated with an account ID, wherein the image comprises a photograph of an owner of the purchaser account, and receiving confirmation from the merchant terminal that the image associated with the account ID matches that of the purchaser.

**9**. The method of claim **2**, further comprising augmenting a transaction associated with the transfer of funds.

**10**. The method of claim **9**, wherein augmenting the transaction includes adding a purchaser-variable value to the purchase price total.

**11**. The method of claim **10**, wherein adding a purchaser-variable value to the purchase price total includes allowing the purchaser to set the purchaser-variable value after the purchase with the merchant is completed.

**12**. The method of claim **11**, wherein adding a purchaser-variable value to a purchase price includes setting a default value greater than zero, and using the default value as the purchaser-variable value if the purchaser-variable value is not set by an expiration time.

**13**. The method of claim **9**, wherein augmenting the transaction includes charging a portion of the purchase price total to at least a third account.

**14**. The method of claim **13**, wherein a percentage of the purchase price total is charged to the purchaser account and a remaining percentage of the purchase price total is charged to the third account.

**15**. The method of claim **13**, wherein the portion of the purchase price total charged to at least a third account is calculated from items from the product list that are selected to be charged to the third account.

**16**. The method of claim **9**, wherein augmenting the transaction includes applying a budgeting rule that transfers money based in part on the purchase.

**17**. The method of claim **2**, further comprising communicating a notification of purchase-related effects at the time of purchase.

**18**. The method of claim **2**, further comprising receiving purchaser acknowledgment of account-related warnings at the time of purchase and obtaining purchaser consent to ameliorative actions at the time of purchase.

US 8,396,808 B2

**11**

**19**. A method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;

adding at least one item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;

providing a user ID token in the form of a barcode that is displayable on a purchaser terminal;

obtaining a user ID token of the purchaser from a merchant terminal by scanning a purchaser terminal display of the barcode user ID, the merchant terminal being at a merchant location and the merchant location being different from the payment system;

communicating identity confirmation information associated with the user ID token to the merchant terminal, wherein the identity confirmation information is an image of an owner of the purchaser account;

receiving confirmation from the merchant terminal that the image matches the owner of the purchaser account;

transferring funds for a purchase price total from the purchaser account to the merchant account; and

recording purchase list information as a transaction record for the merchant account and the purchaser account.

**20**. A system for transferring an electronic payment between a purchaser and a merchant comprising:

a payment system that manages transactions between the purchaser and the merchant and includes a payment system account database, wherein the account database includes a plurality of accounts that are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction and wherein the merchant is at a merchant location and the merchant location is different from the payment system;

a product catalog with categorized items offered for sale by the merchant that is hosted within the payment system;

an account portal that connects an electronic terminal to the payment system through a network connection, and includes transaction interface tools and product catalog management tool; and

wherein the account portal connects the purchaser to the payment system with a transaction interface for a purchaser and connects a merchant to the payment system with a merchant interface.

**21**. A method performed over a payment network for transferring an electronic payment between a purchaser and a merchant, the payment network comprising a plurality of merchant terminals connected to a plurality of payment servers, an accounts database that includes a plurality of accounts

**12**

adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, and a product catalog database of items offered for sale by the merchant, wherein each merchant terminal has an ID token reader, a display, and network capabilities, the method comprising the steps of:

assigning the role of a merchant account to a first account from the accounts database and the role of a purchaser account to a second account from the accounts database;

creating a purchase list with at least one item from the product catalog database;

reading, with the ID token reader of a merchant terminal, the user ID token of a purchaser and sending the user ID token to a payment server, the merchant terminal being at a merchant location and the merchant location being different from the product catalog database;

transmitting, from the payment server to the merchant terminal, identity confirmation information associated with the user ID token;

transmitting, from the merchant terminal to the payment server, a payment approval communication;

transferring, with the payment server, payment from the purchaser account to the merchant account.

**22**. A method performed over a payment network for transferring an electronic payment between a purchaser and a merchant, the payment network comprising a plurality of merchant terminals and purchaser terminals connected to a plurality of payment servers, an accounts database that includes a plurality of accounts adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, and a product catalog database of items offered for sale by the merchant, wherein each merchant terminal has an ID token reader, a display, and network capabilities, the method comprising the steps of:

assigning the role of a merchant account to a first account from the accounts database and the role of a purchaser account to a second account from the accounts database;

creating a purchase list with at least one item from the product catalog database;

transmitting, from a purchaser terminal to a merchant terminal, the user ID token of a purchaser and sending the user ID token to a payment server, the merchant terminal being at a merchant location and the merchant location being different from the product catalog database;

transmitting, from the payment server to the merchant terminal, identity confirmation information associated with the user ID token;

transmitting, from the merchant terminal to the payment server, a payment approval communication;

transferring, with the payment server, payment from the purchaser account to the merchant account.

\*    \*    \*    \*    \*

## Prosecution History for CBM2014-00159

| Paper | Date | Title | Filing Party |
|---|---|---|---|
| 1 | 7/21/2014 | Power of Attorney | petitioner |
| 2 | 7/21/2014 | Related Matters | petitioner |
| 3 | 7/21/2014 | Petition for Covered Business Method Review | petitioner |
| 4 | 7/30/2014 | Notice of Filing Date Accorded to Petition | board |
| 5 | 8/14/2014 | Related Matters | potential po |
| 6 | 8/14/2014 | Power of Attorney | patentowner |
| 7 | 10/20/2014 | Patent Owner Think Computer's Preliminary Response | patentowner |
| 8 | 11/20/2014 | ORDER Conduct of the Proceeding | board |
| 9 | 12/29/2014 | Decision Institution of Covered Business Method Patent Review | board |
| 10 | 12/29/2014 | Scheduling Order | board |
| 11 | 1/27/2015 | Patent Owner's Motion for Pro Hac Vice of Michael J. Aschenbrener | patentowner |
| 12 | 3/4/2015 | Power of Attorney | potential po |
| 13 | 3/4/2015 | Motion To Withdraw As Counsel | patentowner |
| 14 | 3/12/2015 | Order Conduct of the Proceeding | board |
| 15 | 3/12/2015 | Decision Patent Owner's Motion for Pro Hac Vice Recognition of Counsel | board |
| 16 | 3/13/2015 | Power of Attorney | potential po |
| 17 | 3/13/2015 | Related Matters | potential po |
| 18 | 3/23/2015 | Notice of Deposition_Dr. Sadeh | patentowner |
| 19 | 4/6/2015 | Joint Stipulation to Extend Deadline Dates | patentowner |
| 20 | 5/8/2015 | Patent Owner's Motion to Amend under 37 CFR 42.221 | patentowner |
| 21 | 5/8/2015 | Patent Owner's Opposition to CBM Review | patentowner |
| 22 | 6/24/2015 | Order Conduct of Proceeding | board |
| 23 | 6/25/2015 | Petitioner's Notice of Deposition of Aaron Greenspan | petitioner |
| 24 | 7/7/2015 | Order - re Authorization for Petitoner to File Motion for Sanctions | board |
| 25 | 7/8/2015 | ERRATA | board |
| 26 | 7/14/2015 | Petitioners Motion for Sanctions | petitioner |
| 27 | 7/15/2015 | Third Joint Stipulation to Extend Due Dates 2 and 3 | petitioner |
| 28 | 7/23/2015 | Patent Owner Opposition to Motion for Sanctions | patentowner |
| 29 | 8/3/2015 | PETITIONERS OPPOSITION TO PATENT OWNERS MOTION TO AMEND | petitioner |
| 30 | 8/3/2015 | PETITIONERS REPLY TO PATENT OWNERS RESPONSE | petitioner |
| 31 | 8/3/2015 | PETITIONERS REPLY IN SUPPORT OF ITS MOTION FOR SANCTIONS | petitioner |
| 32 | 8/11/2015 | PO's Reply in Support of Motion to Amend | patentowner |
| 33 | 8/12/2015 | Expunged | patentowner |
| 34 | 8/14/2015 | Order - Conduct of Proceeding | board |
| 35 | 8/15/2015 | Motion to Withdraw as Counsel for Patent Owner | patentowner |
| 36 | 8/18/2015 | PETITIONERS NOTICE OF OBJECTION TO EVIDENCE. | petitioner |
| 37 | 8/18/2015 | PETITIONERS MOTION TO EXCLUDE EVIDENCE. | petitioner |

| 38 | 8/18/2015 | PETITIONERS REQUEST FOR ORAL ARGUMENT | petitioner |
| 39 | 8/18/2015 | PO's Request for Oral Argument | patentowner |
| 40 | 8/25/2015 | PO's Opposition to Petitioner's Motion to Exclude Evidence | patentowner |
| 41 | 8/31/2015 | Order Trial Hearing | board |
| 42 | 8/31/2015 | Order Motion to Withdraw as Counsel | board |
| 43 | 9/1/2015 | Petitioners Reply to Patent Owners Opposition to Motion to Exclude Evidence. | petitioner |
| 44 | 9/4/2015 | Petitioners Submission of Demonstrative Exhibits | petitioner |
| 45 | 9/4/2015 | Petitioners Updated Exhibit List | petitioner |
| 46 | 11/5/2015 | Record of Oral Hearing | board |
| 47 | 11/27/2015 | Final Written Decision - 35 U.S.C. 328(a) and 37 C.F.R. 42.73 | board |
| 48 | 11/27/2015 | Order - Decision on Motion for Sanctions - 37 C.F.R. 42.5, 42.12 | board |
| 49 | 12/21/2015 | Power of Attorney | potential po |
| 50 | 12/27/2015 | Expunged | patentowner |
| 51 | 12/28/2015 | Think's Motion for Rehearing | patentowner |
| 52 | 2/9/2016 | Decision on Request for Rehearing | board |
| 53 | 4/7/2016 | Think's Notice of Appeal | patentowner |

Filed:  July 21, 2014

Filed on behalf of:  Square, Inc.
By:    Michael T. Rosato
       Robin L. Brewer
       WILSON SONSINI GOODRICH & ROSATI
       Professional Corporation
       701 Fifth Avenue, Suite 5100
       Seattle, Washington  98104-7036
       Telephone: (206) 883-2529
       Facsimile: (206) 883-2699
       Email: mrosato@wsgr.com
       Email: rbrewer@wsgr.com

## UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

SQUARE, INC.,
Petitioner

v.

THINK COMPUTER CORPORATION,
Patent Owner

Patent No. 8,396,808

**PETITION FOR COVERED BUSINESS METHOD PATENT REVIEW**

| Ground | Claims | Description |
|--------|--------|-------------|
| 9 | 4 | Obvious under § 103 over Tumminaro, Ogilvy, Ondrus and Dalzell in view of Carlson. |
| 10 | 11 | Obvious under § 103 over Tumminaro, Ogilvy and Ondrus in view of Elston. |
| 11 | 15 | Obvious under § 103 over Tumminaro, Ogilvy and Ondrus in view of Tripp. |
| 12 | 16 | Obvious under § 103 over Tumminaro, Ogilvy and Ondrus in view of Deschryver. |

## VI.    CLAIM CONSTRUCTION

A claim subject to covered business method patent review receives the "broadest reasonable construction in light of the specification of the patent in which it appears."[1]  37 C.F.R. § 42.300(b).  Claim terms are given their ordinary and accustomed meaning as would be understood by one of ordinary skill in the art.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  Here, the claim terms of the '808 patent should be given their plain and ordinary meaning, and a few terms that warrant explanation.

(Role of a) merchant account / (role of a) purchaser account:  Each

---

[1] Petitioner's comments here are made pursuant to the broadest reasonable construction standard.  Petitioner reserves the right to adopt a different claim construction in accordance with the appropriate standard for the applicable forum.

independent claim (1, 19-22) of the '808 patent refers to a "merchant account" and "purchaser account." *See also* Ex. 1001, claims 2, 8, 14. Specifically, the independent claims dictate that the alleged invention must allow user accounts to "function as" or assume "the role of" a merchant account or purchaser account, "during any particular transaction."

The specification and prosecution history make clear that, under the claimed methods and systems, a single account can perform the functions of either receiving or sending money, depending on the particular transaction. *See, e.g.*, Ex. 1001 at 3:4-8 ("Step S110, which includes assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system, functions to register a purchaser and a merchant for a transaction within a single integrated system."); *id.* at 3:20-22 ("In other words, within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts."); *see* Ex. 1002 at ¶ 40. In distinguishing from a prior art reference cited by the examiner during prosecution, the applicant further clarified that while the reference "discloses that a *person* can assume these different roles, … this does not teach that an *account* within a payment system is adapted to selectively function as either a merchant account or a purchaser account during any particular transaction." Ex. 1004 at 58 (Response to Office Action mailed on Oct. 24, 2012, at 14) (emphasis added). Accordingly, the alleged distinguishing feature of the claimed invention is that a user account (rather than a human person) can assume or function as either role.

Notably, the claims say that these roles are "assign[ed]" by the claimed system. The specification does not define what constitutes assigning or prescribe any particular method of assigning a role. Given the disclosure in the '808 patent, "assigning" is best understood as allowing a single user account to take on the role of a recipient of payment or remitter of payment, depending on the transaction.

In addition, the specification discloses no limitation to the terms "merchant" and "purchaser" beyond the ability to receive and send money, respectively. *See, e.g.*, Ex. 1001 at 3:25-27 ("In many situations the merchant account is a business but may alternatively be a person receiving payment from another person or a business."); *see also* Ex. 1002 at ¶ 44. In light of the '808 patent specification, a person of ordinary skill in the art would therefore understand the terms "merchant account" and "purchaser account" to mean "an account able to receive payment" and "an account able to send payment," respectively. *See* Ex. 1002 at ¶ 46.

User ID Token:  Claims 1, 6, 19, 21, and 22 require a "user ID token." The specification of the '808 patent discloses that a user ID token is an encoded value that identifies a user and may be implemented in various forms, including a barcode, magnetic coding, an RFID tag, or biometrics. Ex. 1001 at 4:58-5:9. Accordingly, under its broadest reasonable construction in light of the specification, a "user ID token" is an "encoded value that includes information identifying a user, which can be a barcode."

Identity Confirmation Information:  Independent claims 1, 19, 21, and 22 require transmitting or communicating "identity confirmation information" from the payment system to the merchant terminal.

in the art would understand that "notification of purchase-related effects" means "notification of information about the effects of a purchase." *See* Ex. 1002 at ¶ 75.

## VII. DETAILED EXPLANATION OF GROUNDS FOR UNPATENTABILITY

### A. Grounds Based on Bemmel and Dalzell

#### 1. [Ground 1] Claims 1-3, 5-7, 17, and 20-22 Are Obvious Over Bemmel in View of Dalzell Pursuant to § 103.

Bemmel (attached as Ex. 1005) was published on February 21, 2008. Dalzell (attached as Ex. 1006) was published on October 30, 2003. Therefore, both are prior art under 35 U.S.C. § 102(b) based on the earliest possible effective filing of the '808 patent. Neither of these references was cited or considered during the prosecution of the '808 patent. Together, the teachings of Bemmel and Dalzell can be combined to describe each and every feature of claims 1-3, 5-7, 17, and 20-22 of the '808 patent, thereby rendering those claims obvious under 35 U.S.C. § 103. *See* Ex. 1002 at ¶ 143. As discussed in detail below, the combination of these references discloses a mobile payment system that includes all the features of the '808 patent claims, including those the applicant argued were missing from the prior art during the '808 patent prosecution. *Id.* Specifically, while Bemmel describes the transaction flow and user identification of the '808 patent, it does not describe bi-directional transaction accounts or a product catalog stored in the payment server. These elements, in turn, are described by Dalzell.

Bemmel and Dalzell are described in further detail below. The following detailed explanation includes narrative commentary corresponding to elements of

the '808 patent claims, as well as a claim chart providing an element-by-element showing of exemplary disclosure in the prior art.

Bemmel discloses a mobile payment system that utilizes personal information authentication "through a mobile device to provide a convenient and secure payment means at a POS." Bemmel at [0014]; *see* Ex. 1002 at ¶ 79, (e.g., Ex. 1001, preamble of claim 1). Bemmel allows a purchaser to use his or her mobile device to conduct a transaction with a merchant at a point of sale ("POS"). The transaction and necessary authorization measures are carried out by an "identity provider service" ("IPS") that functions as a "payment server," as disclosed in the '808 patent. *See* Ex. 1002 at ¶ 81. The



FIG. 3

mobile payment system disclosed by Bemmel therefore includes all three components claimed by the '808 patent:  (1) a mobile device used to make purchases ("purchaser terminal"); (2) a POS ("merchant terminal"); and (3) an IPS ("payment system"). *See* Ex. 1002 at ¶¶ 81, 83; Ex. 1005 at FIG. 3; Ex. 1001, at claim 1; *id.* at claim 3.

Moreover, as explained by Dr. Sadeh-Koniecpol, Bemmel describes the same transaction flow as the '808 patent. First, the user ID token (or "authorization identifier," in Bemmel) is passed from the purchaser terminal to the merchant terminal and sent to the payment system, thereby accomplishing the '808 patent's

claimed step of obtaining a user ID token of the purchaser from a merchant terminal.  *See* Ex. 1002 at ¶ 174; *see, e.g.*, Ex. 1005 at [0017], [0045], [0062]; Ex. 1001 at claim 1, step 3.  The authorization identifier in Bemmel includes a barcode, which may be displayed on a purchaser terminal.  Ex. 1006 at [0065] ("If the authorization is barcode data, the consumer can present it on the display of a mobile device 102 and it can be obtained via a barcode reader included within the POS terminal.")  Next, the payment system of Bemmel communicates identity confirmation information to the merchant terminal in the form of data suitable to confirm user identity taken from the purchaser's electronic wallet.  *See* Ex. 1002 at ¶¶ 183-185; *see, e.g.*, Ex. 1005 at [0017], [0068]; Ex. 1001 at claim 1, step 4.  Finally, the merchant terminal can approve the transaction, thus transmitting, from the merchant terminal to the payment server, a payment approval communication as required by the '808 patent.  *See* Ex. 1002 at ¶ 253; *see, e.g.*, Ex. 1006 at [0017], Ex. 1001 at claim 21, step 5.  The transaction steps used by the mobile payment system in Bemmel therefore coincide with the steps claimed in the '808 patent.

Like Bemmel, Dalzell discloses "electronic marketplaces through which users buy and sell items over a computer network."  Ex. 1006 at [0002]; Ex. 1002 at ¶ 88.  The system of Dalzell therefore allows purchasers and merchants to engage in electronic transactions.  *Id.*  Moreover, Dalzell explicitly discloses that purchasers and sellers may engage in transactions by using any computing device, such as a handheld device.  Ex. 1006 at [0121]; Ex. 1002 at ¶ 92.  Accordingly, Dalzell discloses the same components as claimed in the '808 patent—merchant and purchaser terminals and a payment system.  *Id; see, e.g.*, Ex. 1006 at [0002],

[0121]-[0122]; Ex. 1001 at claim 1; *id.* at claim 3.

Moreover, Dalzell includes the very features that, according to the applicant himself, distinguished the '808 patent from the wide body of available prior art: bi-directional transaction accounts and a product catalog stored in the payment system.  First, Dalzell discloses bi-directional transaction accounts.  Ex. 1002 at ¶¶ 147-163.  According to the '808 patent specification, "accounts of the payment system are preferably designed so that an account may selectively function as either a merchant or a purchaser during any particular transaction.  In other words, within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts."  Ex. 1001 at 3:17-21.  The electronic payment system disclosed in Dalzell allows and encourages user accounts to function as either a purchaser or merchant in any given transaction.  *See* Ex. 1002 at ¶ 161.  For example, Dalzell discloses that "the option to sell a unit of an item within the marketplace is displayed in conjunction with (e.g., on the same product detail page as) an option to buy a unit of that item.  Thus, users who access the catalog for purposes of making purchases are exposed to the process by which they may list items for sale."  *See* Ex. 1006 at [0087].  To facilitate these bi-directional transaction accounts, the system disclosed in Dalzell stores both purchaser and merchant information for each user account:  "For each user, [stored] information may include, for example … payment information, [and] bank account information (particularly for sellers ….)"  Ex. 1006 at [0132]; Ex. 1002 at ¶ 150.  Under Dalzell, users can both buy and sell goods in the electronic marketplace without having to switch accounts.  *See* Ex. 1002 at ¶ 140.  The Dalzell reference therefore

discloses assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, as claimed by the '808 patent, by allowing users to either make purchases or sell their goods through a single account. *See* Ex. 1002 at ¶ 161; *see, e.g.*, Ex. 1006 at [0061], [0087]; Ex. 1001 at claim 1, step 1.

Second, as explained by Dr. Sadeh-Koniecpol, Dalzell discloses a product catalog that is stored in the payment system and not at the merchant location. The Dalzell reference discloses a "user system" that "remotely access[es] the market-place website system." Ex. 1006 at [0121]; *id.* at FIG. 5A; *see* Ex. 1002 at ¶ 169. These user systems are therefore necessarily "remote" from the marketplace web-site system, which acts as the payment system. *Id.* Dalzell further shows that the "Product Information Database **560** and Product Listing Database **562** are both part of Marketplace Web Site **515**," meaning that the product catalog is stored in the



*FIG. 5A*

payment system. Ex. 1006 at FIG. 5A; *see* Ex. 1002 at ¶ 169.

Accordingly, Dalzell allows purchasers to add an item offered for sale by the merchant from a product catalog stored in the payment system (the payment system being different from the merchant location) to a purchase list, as claimed by the '808 patent, by providing purchasers with a browsable catalogue

The following chart provides an element-by-element showing explaining in detail how Bemmel and Dalzell in combination disclose every element of claims 1-3, 5-7, 17 and 20-22 of the '808 patent.  *See also* Ex. 1002 at ¶¶ 144-258.

| Claim Limitation | Ground 1 |
| --- | --- |
| **1.** A method for transferring an electronic payment between a purchaser and a merchant comprising:<br><br>("electronic payment method") | Bemmel and Dalzell are each directed to an electronic payment method.<br><br>**Bemmel (U.S. Pub. No. 2008/0046366) discloses:**<br><br>"Once a consumer is enrolled in the mobile payment system, he is able to initiate payment transactions utilizing his mobile phone."  [0016]<br><br>"Upon receiving the authentication identifier through the mobile phone (confirming authentication of the consumer), the consumer is able to conduct a transaction at a merchant point-of-sale terminal through the teachings disclosed herein."  [0017].<br><br>**Dalzell (Pub. No. US 2003/0204447) discloses:**<br><br>"The present invention relates to electronic marketplaces through which users buy and sell items over a computer network."  [0002]<br><br>*See* Ex. 1002, ¶¶ 144-146. |
| **[1.1]** assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;<br><br>("bi-directional transaction accounts") | Dalzell discloses the bi-directional transaction accounts limitation.<br><br>**Dalzell (Pub. No. US 2003/0204447) discloses:**<br><br>"An important aspect of the embodiment depicted in FIGS. 1A and 1B is that the option to sell a unit of an item within the marketplace is displayed in conjunction with (e.g., on the same product detail page as) an option to buy a unit of that item.  Thus, users who access the catalog for purposes of making purchases are exposed to the process by which they may list items for sale.  As a result of such exposure, users are more likely to become marketplace sellers.  Another benefit is that users can use the same catalog search and navigation tools for both buying and selling products."  [0087]<br><br>"The user database 564 stores information about existing users of the marketplace web site system 515.  **For each user**, this information may include, for |

| Claim Limitation | Ground 1 |
|---|---|
|  | example, a name, password, shipping address, e-mail address, **payment information, bank account information (particularly for sellers who have elected to have sales proceeds deposited into their bank accounts),** wish list contents, preference settings, **and a purchase history**." [0132] (emphasis added); *see also* [0049] ("The term 'user' refers generally to an individual, or a set of individuals, associated with a particular user account.") |
|  | "[O]nce a user becomes familiar with the navigation tools and methods that exist for browsing the catalog (e.g., as the result of making purchases), the user can use the same tools and methods to locate/specify a product to be sold." [0061] |
|  | *See* Fig. 1A which "illustrates an exemplary product detail page showing marketplace product listings." [0027] |
|  | *See* Ex. 1002, ¶¶ 147-164. |
| **[1.2]** adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list; ("remote product catalog") | Dalzell discloses the remote product catalog limitation. |
|  | **Dalzell (Pub. No. US 2003/0204447) discloses:** |
|  | "Users browse the catalog using well known navigational tools and locate and purchase products of interest." [0003] |
|  | "The product information is viewable by end users through a browsable electronic catalog in which each product is preferably fully identified within a corresponding product detail page." [0010] |
|  | "Some or all of the detail pages may also provide an option to purchase the product from a preferred retailer or 'provider seller' …." [0015] |
|  | "FIG. 10 illustrates a process 1000 that typically occurs when a buyer makes a purchase from a marketplace listing. This process may be initiated, for example, when a buyer selects an "add to cart" button (not depicted) or a "buy from seller" button 129 (see FIG. 1B) from a product detail page (block 1005)." [0166]; *see also* FIG. 5A, *supra* p. 21. |
|  | *See* Ex. 1002, ¶¶ 165-171. |
| **[1.3]** obtaining a user ID token of the purchaser | Bemmel discloses the user ID limitation. |

known online commerce methods in a mobile context, and Tumminaro, Ogilvy, and Ondrus illustrates the '808 patent claims as a simple amalgamation of known features existing in mobile commerce platforms. While Grounds 8-12 discuss the same references used in conjunction with Bemmel and Dalzell in Grounds 2-6, the dependent structure of the claims addressed in these grounds means that the nature of the overall combinations differs substantially. Because the '808 patent claims systems and methods that are simply amalgamations of known electronic commerce references, both grounds of rejections are necessary to fairly demonstrate the Petitioner's case.

### 2. [Ground 7] Claims 1, 2, 6-10, 13, 14, and 19-22 Are Obvious Over Tumminaro, Ogilvy and Ondrus Pursuant to § 103.

Tumminaro (submitted as Ex. 1011), entitled "Mobile Person-to-Person Payment System," was filed on March 30, 2007, and published on November 1, 2007. Ogilvy (submitted as Ex. 1012), entitled "A Transaction Processing Method, Apparatus and System," was filed on June 24, 2005, and published on January 5, 2006. Therefore, both are prior art under 35 U.S.C. § 102(b) based on the earliest possible effective filing of the '808 patent. Neither of these references was cited or considered during the prosecution of the '808 patent.

Together, the teachings of Tumminaro, Ogilvy, and Ondrus (discussed *supra*, V.A.2) can be combined to describe each and every feature of claims 1, 2, 6-10, 13, 14, and 19-22 of the '808 patent, thereby rendering those claims obvious under 35 U.S.C. § 103. *See* Ex. 1002 at ¶ 354. As discussed in detail below, the combination of these references discloses a mobile payment system that includes

the features that the applicant argued were missing from the prior art during the '808 patent prosecution. *Id.*

While Tumminaro teaches the transaction flow and bi-directional transaction accounts of the '808 patent, Ogilvy discloses a system for mobile transactions using devices such as mobile telephones, including a product catalog stored in the system. Neither Ogilvy nor Tumminaro discloses the precise user identity confirmation steps of the '808 patent. Ondrus, which describes a mobile payment system similar to those of Tumminaro and Ogilvy, includes user authentication as described in the '808 patent, including sending a user ID from the purchaser to the merchant to the payment system and communicating identity confirmation information from the payment system to the merchant. *See* Ex. 1002 at ¶ 110.

Tumminaro, Ogilvy, and Ondrus are described in further detail below. The detailed explanation includes narrative commentary corresponding to elements of the '808 patent claims as well as a claim chart providing an element-by-element showing of exemplary disclosure in the prior art.

Turning first to Tumminaro, Tumminaro discloses "[a] mobile payment platform and service [that] provides a fast, easy way to make payments by users of mobile devices." Ex. 1011 at [0021]. Tumminaro further discloses that user mobile devices can interact with the merchant's POS to conduct a transaction. *See, e.g.*, Ex. 1011 at [0444]; Ex. 1002 at ¶ 96. Therefore, Tumminaro discloses all three components utilized to conduct transactions in the '808 patent claims: user mobile devices ("purchaser terminal"), POS terminals ("merchant terminal"), and a payment platform and service ("payment system"). *see, e.g.*, Ex. 1011 at [0021],

[0444]; Ex. 1001 at claim 1; *id.* at claim 3.

Moreover, Tumminaro discloses a payment method that utilizes the same transaction steps as the method claimed by the '808 patent. First, Tumminaro discloses the POS receiving a user ID token in the form of account information from the purchaser terminal and sending the information to the payment platform, thereby accomplishing the '808 patent's claimed method of obtaining a user ID token of the purchaser from a merchant terminal. *See, e.g.*, Ex. 1011 at [0444], [0450]; Ex. 1001 at claim 1, step 3; Ex. 1002 at ¶¶ 377-379. Second, Tumminaro discloses the merchant terminal receiving a notification from the payment system that includes a message indicating that the purchaser has sent the merchant money. *see, e.g.*, Ex. 1011 at 25 Flow D, Step 4; Ex. 1001 at claim 1, step 4. Third, Tumminaro discloses sending authorization or approval in order to complete the transaction, thus transmitting a payment approval communication. Ex. 1002 at ¶ 466; *see, e.g.*, Ex. 1011 at Flow D, Step 11, [0444], [0450]; Ex. 1001 at claim 21, step 5. Tumminaro therefore teaches each step of the payment process claimed by the '808 patent.

Tumminaro also discloses one of the only features that the applicant claimed distinguished the '808 patent from the prior art: bi-directional transaction accounts. Specifically, Tumminaro allows any user to "access the mobile client application to send money or request money from anyone." Ex. 1011 at [0692]; *see* Ex. 1002 at ¶¶ 359-367. Users can use the accounts provided by the Tumminaro system to both make and receive payments. Ex. 1002 at ¶ 359. Given that the terms "merchant account" and "purchaser account" as used in the '808

patent mean "an account able to receive payment" and "an account able to send payment," respectively, Tumminaro's disclosure of "true person-to-person financial transaction capabilities" allows user accounts to function as bi-directional transaction accounts. *See, e.g.*, Ex. 1011 at [0446]; Ex. 1002 at ¶ 365. The Tumminaro reference therefore discloses assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, as claimed by the '808 patent, by allowing users to engage in peer-to-peer transactions from a single account, either sending or receiving money, depending on the transaction. *See* Ex. 1002 at ¶¶ 363-365; *see, e.g.*, Ex. 1011 at [0446], [0692]; Ex. 1001 at claim 1, step 1. While Tumminaro teaches the transaction flow and bi-directional accounts of the '808 patent, it does not fully teach a product catalog stored in a payment system or the user identity confirmation steps of the '808 patent.

Ogilvy discloses a product catalog stored in a payment system. Specifically, Ogilvy discloses a system for mobile transactions using devices such as mobile telephones. *See, e.g.*, Ex. 1012 at 2:8-20; Ex. 1002 at ¶ 102. These devices can be used by both payers (purchasers) and payees (merchants) to complete transactions through a system "for processing of payments." *See, e.g.*, Ex. 1012 at [Abstract]; Ex. 1002 at ¶ 104. Accordingly, Ogilvy discloses the same components as claimed in the '808 patent—mobile devices used as merchant and purchaser terminals and a payment system. *Id.* at ¶¶ 102, 104. Ogilvy also discloses a product catalog that is

Paper No. _____

Filed: _____

Filed on behalf of:  Square, Inc.
By:    Michael T. Rosato
       Robin L. Brewer
       WILSON SONSINI GOODRICH & ROSATI
       701 Fifth Avenue
       Suite 5100
       Seattle, WA  98104-7036
       Tel.:  206-883-2529
       Fax:  206-883-2699
       Email:  mrosato@wsgr.com
       Email:  rbrewer@wsgr.com

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————————————

SQUARE, INC.,
Petitioner

v.

THINK COMPUTER CORPORATION,
Patent Owner

————————————————————

Patent No. 8,396,808

————————————————————

**DECLARATION OF NORMAN M. SADEH-KONIECPOL, PH.D.**

various other documents in arriving at my opinions, and may cite to them in this declaration. For convenience, the information considered in arriving at my opinions is listed in Appendix A.

## III.    LEVEL OF ORDINARY SKILL AND RELEVANT TIME

17.    I have been advised that the '808 patent application was filed on December 17, 2009. I understand that the patent claims priority to a provisional application filed on July 31, 2009.

18.    I have been advised that "a person of ordinary skill in the relevant field" is a hypothetical person to whom one could assign a routine task with reasonable confidence that the task would be successfully carried out. I have been advised that the relevant timeframe is prior to July 31, 2009. When I refer to July 2009, I am referring specifically to a period prior to July 31, 2009.

19.    In my opinion, a person of ordinary skill in the relevant field in July 2009 would include someone who had, through education or practical experience, the equivalent of a bachelor's degree in a business or finance discipline or bachelor's degree in a computer science or electrical engineering discipline and at least an additional two years of work experience designing and implementing mobile commerce or e-commerce systems.

20.    By virtue of my education, experience and training, I am familiar with the level of skill in the art of the '808 patent in the July 2009 timeframe.

## IV.    OVERVIEW OF THE '808 PATENT

21.    The '808 patent is entitled "Method and System for Transferring an Electronic Payment."

22.    The '808 patent is generally directed to systems and methods of transferring electronic payments between purchasers and merchants. Claim 1 of the '808 patent recites:

A method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to

-4-

selectively function as either a merchant account or a purchaser account during any particular transaction;

adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;

obtaining a user ID token of the purchaser from a merchant terminal, the merchant terminal being at a merchant location and the merchant location being different from the payment system;

communicating identity confirmation information associated with the user ID token to the merchant terminal; and

transferring funds for a purchase price total from the purchaser account to the merchant account.

23.    As can be seen above, claim 1 recites the steps of a transaction as performed by the payment system.  Generally, these steps include: (1) assigning each of two accounts a role as a "purchaser" or "merchant," depending on the transaction (hereinafter "bi-directional transaction accounts"); (2) adding an item from the product catalog to a purchase list; (3) obtaining a user ID token of the purchaser at a merchant terminal and then sending the token to the payment system; (4) sending identity confirmation information associated with the user ID token from the payment system back to the merchant; and (5) transferring funds from the purchaser to the merchant.

24.    In my opinion, this transaction process was a commonplace combination of functionality elements and features of electronic commerce systems already developed at the time of the invention.

25.    It is evident from the specification and the claims of the '808 patent that the patent generally covers a mobile payment system.  Many such systems were known and widely used in June of 2009, including Mobipay, Obopay NTT DoCoMo's Osaifu-Keitai, and SK Telecom's MONETA to name just a few. Electronic commerce systems were even more prevalent, including Amazon, Paypal, eBay, Expedia and many others. In fact, as early as 2001, when I wrote my book on M-Commerce, *see supra* ¶ 5, I pointed to a report from the Electronic Payment Systems Observatory identifying over 30 different mobile payment solutions. My own book listed 17 of these payments solutions in a chapter devoted to this topic.

38.    **(Role of a) merchant account / (role of a) purchaser account**:  Each independent claim (1, 19-22) of the '808 patent refers to a "merchant account" and "purchaser account."  In addition, dependent claim 2 refers to both a "merchant account" and "purchaser account," and dependent claims 8 and 14 refer to a "purchaser account."

39.    The independent claims of the '808 patent require "assigning the role of a merchant account to a first account and a role of a purchaser account to a second account."  *Id.* at claims 1, 19-22.

40.    The specification of the '808 patent makes clear that the claims purport to cover a method and system in which one user account can perform the functions of either receiving or sending money, depending on the particular transaction.

41.    For example, "Step S110, which includes assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system, functions to register a purchaser and a merchant for a transaction within a single integrated system."  '808 patent at 3:4-8.  In other words, within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts.  *Id.* at 3:20-22.

42.    During prosecution, the applicant further clarified that while the prior art reference cited by the Examiner "discloses that a *person* can assume these different roles, . . . this does not teach that an *account* within a payment system is adapted to selectively function as either a merchant account or a purchaser account during any particular transaction."  Ex. 1004 at 58 (emphasis added).  My opinion is that this characterization clearly indicates that the applicant intended to claim a system in which a person can sign up for one account that is able to send money or receive money, depending on the transaction, without needing to switch to a different account.

43.    As far as "assigning" a role, as recited in the '808 patent claims, none of those claims specifically require that either the user or the system alone perform the assigning.  As such, assigning a role, as recited in the '808 patent claims, can occur by actions of the user, via the payment system, or a combination thereof.

44.    Under the '808 patent, "merchants" and "purchasers" are not limited beyond the ability to receive and send money, respectively.  For example, under the specification a merchant may be a "business but may alternatively be a person

receiving payment from another person or a business." Ex. 1001 at 3:25-27. Similarly, the system stores transaction records for both merchants and purchasers, *id.* at 5:51-55, and both merchants and purchasers can receive notification of "purchase-related effects" at the time of sale. *Id.* at 7:57-61.

45.    In addition to the disclosures in the specification and prosecution history, a person of ordinary skill in the art would view that the primary distinction between a purchaser and a merchant in an electronic payment system is the ability to send and receive payments, respectively.

46.    Therefore, it is my opinion that a person of ordinary skill in the art would understand the terms "merchant account" and "purchaser account" to mean "an account able to receive payment" and "an account able to send payment," respectively.

47.    Under the '808 patent, during each individual transaction, the payment system will assign the role of merchant account to the user that will receive money, and the role of purchaser account to the user that will send money. *Id.* at 3:27-29.

48.    **User ID Token**: Claims 1, 6, 19, 21, and 22 require a "user ID token."

49.    The specification of the '808 patent discloses that a "user ID token" "functions to gather at least one unique identifier of the purchaser." Ex. 1001 at 4:58-60. "The user ID may be implemented in various forms. Preferably, the user ID is a barcode that encodes a user identification value (*e.g.*, a alphanumeric code). . . . Alternatively, the user ID may be entered manually, read from a magnetic strip, read from an RFID tag, biometrically scanned, obtained from visual recognition, or entered in any other manner suitable for reading an encoded ID." *Id.* at 4:61-5:9.

50.    Therefore, based on representations from counsel, my understanding is that a "user ID token" is an "encoded value that includes information identifying a user, which can be a barcode."

51.    **Identity Confirmation Information**:  Independent claims 1, 19, 21, and 22 require "identity confirmation information."

52.    The specification of the '808 patent discloses that "identity conformation information" may be "any suitable form of verification . . . such as a security question and answer, PIN number or password, address information,

85.    Bemmel allows a user "enrolled in the mobile payment system . . . to initiate payment transactions using his mobile phone." Ex. 1005 at [0016]. Bemmel additionally notes "that other merchant channels, such as, but not limited to, an online or e-commerce transaction architecture could also make use of the claimed invention." Ex. 1005 at [0086].

    ii.   <u>U.S. Pub. No. 2003/0204447 A1 ("Dalzell")</u>

86.    U.S. Patent Publication No. 2003/0204447 A1 to Richard L. Dalzell et al. ("Dalzell" submitted as Ex. 1006), entitled "Metadata Service That Supports User-to-User Sales Via Third Party Web Pages," was filed on May 9, 2002 and was published on October 30, 2003.

87.    I have been asked to review Dalzell and consider the '808 patent claims in view of this reference. I have been advised that Dalzell constitutes prior art in relation to the '808 patent and therefore can be applied in assessing the validity of the '808 patent claims.

88.    Dalzell discloses "electronic marketplaces through which users buy and sell items over a computer network." Ex. 1006 at [002].

89.    Figure 5A of Dalzell illustrates the components of the "electronic



FIG. 5A

-16-

marketplace" disclosed in Dalzell:

"One or more user devices or systems 505 (one shown) allow users to access a marketplace web site system 515 over a communication network 520, such as the Internet 525. Similarly, one or more volume seller systems 510 may access the marketplace web site system over the communication network 520." Ex. 1006 at [120].

90.    Dalzell allows users to make purchases from "marketplace listings." Ex. 1006 at [0166]. "The term 'marketplace listing,' or 'marketplace product listing' refers generally to an electronic listing for selling a product . . . within a marketplace. In a preferred embodiment, marketplace listings are associated with particular product records in a products database." Ex. 1006 at [0046].

91.    Dalzell teaches a marketplace of "buyers" and "sellers." A person of ordinary skill in the art would understand "buyers" and "sellers" to be equivalent to the "purchasers" and "merchants" of the '808 patent.

92.    "The user systems 505 in the illustrated embodiment can be any type of computing device that enables a user (including both buyers and sellers) to interactively and remotely access the marketplace web site system 515 via the communication network 520. Each such device 505 runs a web browser 530, such as Netscape® Navigator, Microsoft® Internet Explorer, or a micro-browser adapted for use on a handheld device." Ex. 1006 at [0121]. Accordingly, Dalzell could be implemented on a mobile device for use in a mobile commerce system. In fact, a number of internet sites and web-based systems, including payment systems, were being adapted for use in the mobile context around the time that Dalzell was published. Such systems were widely implemented well before July 2009.

93.    Dalzell further discloses that [a]lthough described primarily in the context of a web site system, the various inventive features are also applicable to other types of multi-user interactive systems in which users may browse and make purchases from an electronic catalog, including but not limited to online services networks, interactive television systems, in-store kiosk systems, and systems that support browsing by voice." Ex. 1006 at [0045]. In [0122], Dalzell discloses that "the user system 505 may be in the form of…a computing device…a personal digital assistant…" A person of skill in the art would therefore understand Dalzell as covering mobile access by both sellers and buyers (or purchasers and merchants) of the proposed electronic marketplace and associated payment

methods – in other words, Dalzell teaches providing access from both mobile purchaser terminals and mobile merchant terminals.

### iii.   U.S. Pub. No. 2007/0255652 A1 ("Tumminaro")

94.   U.S. Patent Publication No. 2007/0255652 A1 to John Tumminaro et al. ("Tumminaro" submitted as Ex. 1011), entitled "Mobile Person-to-Person Payment System," was filed on March 30, 2007 and was published on November 1, 2007.

95.   I have been asked to review Tumminaro and consider the '808 patent claims in view of this reference. I have been advised that Tumminaro constitutes prior art in relation to the '808 patent and therefore can be applied in assessing the validity of the '808 patent claims.

96.   Tumminaro teaches "A mobile payment platform and service [that] provides a fast, easy way to make payments by users of mobile devices. The platform also interfaces with nonmobile channels and devices such as e-mail, instant messenger, and Web. In an implementation, funds are accessed from an account holder's mobile device such as a mobile phone or a personal digital assistant to make or receive payments." Ex. 1011 at [0021].

97.   Tumminaro teaches using a mobile phone to perform electronic purchases. Ex. 1011 at [Abstract]. In my opinion, a person of ordinary skill in the art would consider the "mobile phone" of Tumminaro to be equivalent to the "purchaser terminal" of the '808 patent.

98.   Tumminaro teaches "a mobile client application" that can be used by both buyers and sellers to "perform financial transactions in a fast, secure manner." Ex. 1011 at [0021]; *see also id.* at [0692], [0693].

99.   Tumminaro teaches that "account information" must be received by the merchant terminal from the purchaser terminal. Ex. 1011 at [0444]. Because the "account information" described in Tumminaro functions to provide electronic information identifying a user, a person of ordinary skill in the art would consider "account information" to include information equivalent to a "user ID token" of the '808 patent.

### iv.   WO 2006/00021 A1 ("Ogilvy")

147.   To simplify discussion of this limitation, I refer to it as the "bi-directional transaction accounts" limitation, the same shorthand used in the '808 specification.  Ex. 1001 at 3:21-22.

148.   Dalzell discloses that the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction:

> "An important aspect of the embodiment depicted in FIGS. 1A and 1B is that the option to sell a unit of an item within the marketplace is displayed in conjunction with (*e.g.*, on the same product detail page as) an option to buy a unit of that item.  Thus, users who access the catalog for purposes of making purchases are exposed to the process by which they may list items for sale.  . . .   Another benefit is that users can use the same catalog search and navigation tools for both buying and selling products."

Ex. 1006 at [0087].  This is also illustrated in Dalzell, Ex. 1006, at [0049], [0057], [0061], [0163].

149.   According to Dalzell, as illustrated in the citation above, users browsing the disclosed marketplace have the option of either purchasing or selling the listed items.  Users are not restricted to merely purchase or sell items while using the invention, and Dalzell does not require switching accounts to engage in either purchasing or selling.

150.   Furthermore, in Dalzell:

> "The user database 564 stores information about existing users of the marketplace web site system 515.  For each user, this information may include, for example, a name, password, shipping address, e-mail address, payment information, bank account information (particularly for sellers who have elected to have sales proceeds deposited into their bank accounts), wish list contents, preference settings, and a purchase history."

Ex. 1006 at [0132].

151.   As illustrated in the citation listed above, according to Dalzell, a user account stores both payment information and bank account information (in particular for sellers).  For each account, the system stores the information

-27-

necessary for that account to be both a buyer and seller.  *See also* Ex. 1006 at [0061].

152.    Dalzell further discloses that transactions can occur between different users of the system, including user-to-user transactions.  *See e.g.*, Ex. 1006 at [0009] ("The present invention comprises various inventive features for facilitating user-to-user and other sales in an online marketplace.").

153.    Therefore, users of the marketplace disclosed in Dalzell can both buy and sell the listed items, using only one account.  As the primary difference between a merchant account and purchaser account is the ability to buy and sell, and accounts under Dalzell can do both at different times, those accounts are bi-directional transaction accounts.  It is therefore my opinion that Dalzell discloses that user accounts selectively function as either merchant accounts or purchaser accounts during any particular transaction.

154.    Dalzell further teaches assigning a role of the merchant account to a first account and a role of the purchaser account to a second account.  For example, Figure 1A "illustrates an exemplary product detail page showing marketplace product listings."  Ex. 1006 at [0027]:



FIG. 1A

*See also* Ex. 1006 at Fig. 1B.

155.   The marketplace listing contains "the provider tag 115 [that] allows a user to immediately purchase a product . . . from the provider seller . . . ."  Ex. 1006 at [0082].  For example, the marketplace listing contains an "add to shopping cart" button.  *See also* Ex. 1006 at Fig. 1B.

156.    The marketplace listing "also includes a 'sell yours here' button 127 for allowing a user to create a marketplace listing for the product, Ex. 1006 at [0085]. This button itself appears in an area labeled "Buy and Sell Used Items." *See also* Ex. 1006 at Fig. 1B.

157.    In other words, the marketplace listings in Dalzell allow a user to both buy and sell the same item. And as discussed above in ¶¶ 148 – 153, the user can use the same account to both buy and sell.

158.    Therefore, Dalzell discloses assigning a role of merchant account to a first account. Where the user of the first account hits "sell yours here," the first account is assigned the role of the merchant account. That account is now able to receive money from a purchaser.

159.    Dalzell further teaches assigning a role of purchaser account to a second account. Where the user of that first account hits "add to shopping cart," the second account is assigned the role of purchaser account. That account is now able to send money to the merchant.

160.    Dalzell further teaches that

users who access the catalog for purposes of making purchases are exposed to the process by which they may list items for sale. As a result of such exposure, users are more likely to become marketplace sellers. Another benefit is that users can use the same catalog search and navigation tools for both buying and selling products.

Ex. 1006 at [0087].

161.    In other words, Dalzell encourages individual users to both buy and sell items using the same account, assigning the role of merchant when a user lists an item for sale on a marketplace listing and the role of purchaser when a user purchases a product from a marketplace listing.

162.    Depending on the choice of the user, for each transaction under Dalzell, the user account is assigned the role of a merchant or purchaser account depending on whether the user is buying or listing an item in one the marketplace listings. Users may choose to browse the catalog and buy items (acting as purchasers) or list their own items for sale (acting as merchants). Each transaction therefore includes

-30-

both a merchant and a purchaser, and any user's account can be assigned either role, depending on the transaction.

163.    Therefore, Dalzell discloses bi-directional transaction accounts, in the manner specifically recited in claim 1.

164.    In my opinion, at the time of the invention, the use of bi-directional peer-to-peer transaction accounts was well-known within the art. For example, other well-known mobile payment systems like Paypal, TextPayMe, Obopay and MHITS are just a few mobile payment solutions that allowed for bi-directional transaction accounts by 2009.

**adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list**

165.    Dalzell discloses a product catalog with items offered for sale by a merchant:

> "[T]he online marketplace system includes a database of information about products that may be listed by users within an online marketplace.  This information typically includes product IDs, and descriptions and product images provided by manufacturers and distributors of the products.  The product information is viewable by end users through a browsable electronic catalog in which each product is preferably fully identified within a corresponding product detail page."

Ex. 1006 at [0010].    Therefore, Dalzell discloses listing products in a database.

166.    As discussed above, "users" can be merchants. *See supra* ¶ 148.

167.    Dalzell also discloses adding an item offered for sale by the merchant from a product catalog to a purchase list.  Specifically, Dalzell discloses known systems in which "[u]sers browse the catalog using well known navigational tools and locate and purchase products of interest."  Ex. 1006 at [0003].

168.    Dalzell teaches "a process 1000 that typically occurs when a buyer makes a purchase from a marketplace listing. This process may be initiated, for example, when a buyer selects an 'add to cart' button (not depicted) or a "buy from seller" button 129 (see FIG. 1B) from a product detail page (block 1005)."  Ex. 1006 at [0166].  Accordingly, it is my opinion that Dalzell discloses adding items

-31-

357.   While I believe this aspect is apparent from the teachings of Tumminaro, Ogilvy additionally teaches a method for transferring an electronic payment between a purchaser and a merchant.

358.   Ogilvy teaches an "invention [that] relates to transaction processing, for processing of payments between payers (usually individual payers) and payee's [sic] (usually merchants)."  Ex. 1012 at [Abstract].

> **assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;**

359.   Tumminaro discloses bi-directional transaction accounts.  First, Tumminaro supports accounts that selectively function as either a merchant account or a purchaser account.  For example, Tumminaro teaches a mobile client application that "simplifies . . . performing financial transactions in a fast, secure manner."  Ex. 1011 at [0021].  Specifically, the mobile client application of Tumminaro teaches:

> allows people to pay friends, shop, and transfer funds by their mobile device. An *account holder can access the mobile client application to send money or request money* from anyone with a mobile device that supports text messaging or mobile Internet capabilities. They can also see the balance and history of their account in real-time.

Ex. 1011 at [0692] (emphasis added).

360.   Tumminaro further discloses that "[t]he mobile client application supports the following features: *Pay*, Balance, History, *Request Pay*, Refer or Invite, Add Money (*i.e.*, Load), Settings, Help. MCA [Mobile Client Application] can be used to *send money* from an account holder's account to any mobile subscriber whose device supports text messaging."  Ex. 1011 at [0693] (emphasis added).

361.   In other words, users can use the *accounts* taught by Tumminaro to both make and receive payments.

362.   As I understand that the difference between the role of a merchant account and the role of a purchaser account is that the merchant can receive

payments and the purchaser can make payments, *see* ¶ 46 above, Tumminaro supports accounts that selectively function as either a merchant account or a purchaser account.

363.   Second, Tumminaro teaches assigning a role of a merchant account to a first account and a role of a purchaser account to a second account.   As discussed above, the "account holder can access the mobile client application to send money or request money." Ex. 1011 at [0692].

364.   At the outset of each individual transaction, once an account holder selects whether to send or receive money, he becomes either a payer (purchaser) or payee (merchant).  If the account holder is the payer, the invention of Tumminaro will guide him or her through the transaction using payer-specific steps, including sending payment.  *See* Ex. 1011 [0694] – [0725].  If the account holder is the payee, the invention of Tumminaro will guide him or her through the transaction using payee-specific steps, including receiving payment.  *See id.* at [0726] – [0742]. Therefore, Tumminaro discloses assigning different roles to an individual account depending on whether the user is the payer or payee, and those individual roles differentiate between the account that sends money and the account that receives it.

365.   Furthermore, Tumminaro discloses that "the present invention is flexible enough to implement true person-to-person financial transaction capabilities." Ex. 1011 at [0446].  Therefore, Tumminaro discloses assigning a role of a merchant account to a first account and a role of a purchaser account to a second account.

366.   In sum, Tumminaro teaches bi-directional transaction accounts.

367.   Furthermore, in my opinion, at the time of the invention, the use of bi-directional transaction account was well-known within the art.  For example, other well-known mobile payment systems like Paypal, TextPayMe, and MHITS_are just a few mobile payment solutions that allowed for bi-directional transaction accounts by 2009.

**adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list**

368.   Ogilvy discloses an item offered for sale by the merchant from a product catalog.  Ogilvy teaches a method that includes "a listing including a plurality of product identifiers may be provided to the payer electronic device and the payer can then select from that listing." Ex. 1012 at 3:17-19.  *See also id.* 4:19-

-76-

| ***Notice of Allowability*** | Application No. | Applicant(s) | |
|---|---|---|---|
| | 12/641,071 | GREENSPAN, AARON  J. | |
| | **Examiner** | **Art Unit** | |
| | PETER L. LUDWIG | 3687 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application.  If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.**  This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant.  See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *response filed 01/07/2013*.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1-22*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov .

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐  All   b) ☐ Some*   c) ☐ None  of the:

       1. ☐ Certified copies of the priority documents have been received.

       2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

       3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below.  Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment
6. ☒ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

/Elaine  Gort/
Primary Examiner, Art Unit 3687

Application/Control Number: 12/641,071                                          Page 2
Art Unit: 3687

*Notice of Allowability*

1.      This Notice of Allowability is in response to Applicant's response filed on
01/07/2013.  In that response, Applicant argued that the claim limitations are neither,
disclosed, taught, nor suggested by the cited prior art.  The examiner respectfully agrees
with Applicant on this issue for the reasons stated below.  Claims 1-22 are currently
allowed.

---

*Examiner's Reasons for Allowance*

2.      The examiner notes that the Declaration under 37 C.F.R. § 1.131 did not have to
be taken into consideration, and therefore was not taken into consideration, for this
application to be allowed.

3.      The most remarkable piece of prior art U.S. Pat. Pub. No. 2010/0138344 to Wong
et al. ("Wong").  In general, Wong is directed to a system for one user to conduct a
transaction with another user, wherein one user's mobile device receives a barcode from
a payment system, wherein the barcode is used to pay for a product/service with the
second user.  *See abstract.*  Relevant Figures are copied below:

Application/Control Number: 12/641,071                                    Page 3

Art Unit: 3687



FIG. 3A                              FIG. 3B



FIG. 4

As noted by the examiner, Wong fails to disclose the following limitations of claim 1:

Application/Control Number: 12/641,071                                    Page 4
Art Unit: 3687

3          assigning a role of a merchant account to a first account and a role of a
4     purchaser account to a second account within a payment system wherein the first
5     account and the second account are adapted to selectively function as either a
6     merchant account or a purchaser account during any particular transaction;
7          adding an item offered for sale by the merchant from a product catalog stored
8     in the payment system to a purchase list;

As noted by Applicant, neither U.S. Pat. Pub. No. 2008/0120155 to Pliha ("Pliha") nor
Zhang, J. (2006). The roles of players and reputations: Evidence from eBay online
auctions. *Decision Support Systems 42*, 1800-1818 (hereinafter "eBay") remedy the
deficiencies of Wong with respect to the claimed invention. To be clear, there is nothing
in this particular art (e.g., e-commerce transaction payment and e-commerce transaction
authorization art) that describes the limitation of: "adding an item offered for sale by the
merchant from a product catalog stored in the payment system to a purchase list" that
can be properly combined with Wong to read on this claim.

            As correctly noted by Applicant:

        Wong et al. is directed toward completing purchase transactions using a mobile device.
    According to an embodiment of Wong et al., an application on a mobile device having a screen,
    such as a cell phone, enables the user to generate a bar code on the screen, which can be scanned
    for payment. The bar code is valid for a limited period of time (e.g., one minute). Once
    scanned, payment is transferred from the user's account to the merchant's account. According to
    Wong et al., this allows users to easily and safely pay for purchases using a cell phone at any
    location having a suitable scanning device. See Wong et al. at paras. [0002]-[0011].

        Pliha is not directed toward completing purchase transactions at all. Rather, Pliha is
    directed toward distributing targeted incentives to customers of financial institutions based on
    each customer's financial or demographic data, or both. Specifically, Pliha's Abstract describes
    its invention as follows:

            An incentive distribution system is used in distributing, tracking and redeeming
        product incentives offered by manufacturers and distributors of consumer goods
        through a financial institution. A financial institution distributes an incentives list
        to each of its customers, based on information relating to the customers,
        containing the incentives relating to the category for which the customer qualifies.

                                              9

Qualifying criteria includes transactional activity within the account held with the
financial institution distributing the incentives, demographic data relating to the
customer, and various account data. The system tracks purchases made by a
customer at a participating retailer or dealership and updates the customer's
qualifications based on these purchases. Further, the financial institution acts as a
redemption warehouse by debiting the accounts of the manufacturers and
distributors offering the incentives and crediting the accounts held by the retailers
and dealerships honoring the incentives.

Therefore, Wong et al. and Pliha are directed toward solving fundamentally different
problems which are encountered fundamentally different contexts. Specifically, Wong et al. is
directed toward facilitating payments for purchases using a cell phone and a scanning device,
whereas, Pliha is directed toward distributing consumer product incentives in a targeted fashion
by analyzing records held at a financial institution where the records reflect past transactions of a
consumer. Therefore, a significant difference is that Wong et al. is directed toward completing
real-time processing of purchase transactions whereas Pliha is directed toward analyzing records
of past transactions after the transactions have occurred. And, the purpose of Wong et al. is to
facilitate such purchase transactions, whereas, the purpose of Pliha is to distribute incentives to
make product purchases.

In view of these significant differences, the Applicant respectfully submits that there
would not have been a reason to combine Wong et al. and Pliha references in the manner
suggested in the office action. Each claim rejection contained in the office action mailed on
October 24, 2012, depends upon this combination. Therefore, for at least this reason, Applicant's
claimed invention is allowable over Wong et al. and Pliha.

Regarding Pliha, the office action mailed on October 24, 2012, states as follows:

In particular, the financial institution maintains a product catalog of offers to
various merchants, and when, the user takes an action with the financial
institution (but indirectly with the merchant) the financial institution records the
activity, and then places one of its "products" from its "product catalog" with the
consumer, wherein the "product" provided to the consumer is "purchased" by the
consumer acting as he/she did in the course of the one or more transaction
completed by the merchant.

This characterization of Pliha is incorrect for a number of reasons. First, Pliha cannot
reasonably be considered as disclosing the "product catalog" recited in Applicant's claims.
Taking claim 1 as an example, it recites adding an item from a product catalog to a purchase list
and then transferring funds for a purchase price total from the purchaser account to the merchant

10

Application/Control Number: 12/641,071                                    Page 6
Art Unit: 3687

account. Therefore, the product catalog of Applicant's claim 1 is clearly a catalog of products offered for sale by the merchant. In contrast, Pliha does not use the term "product catalog" or anything equivalent.[1] The incentives discussed in Pliha cannot reasonably be considered "products" nor can the collection of such incentives be reasonably considered a "product catalog" as those terms are used in the Applicant's claim 1. This is at least because, when Applicant's claim 1 is considered as a whole, as it must according to 35 U.S.C. § 103, these terms clearly refer to items being purchased by a purchaser and do not refer to "incentives" to make purchases, as in Pliha. In contrast, the incentives distributed by Pliha are simply informational since they inform the consumer of incentives offered to that particular consumer (see para. [0076] of Pliha). While the Applicant does not consider it necessary, to further clarify this point, Applicant previously amended the independent claims to recite that the items added to the "purchase list" from the "product catalog" are offered for sale by the merchant.

The office action mailed on October 24, 2012, further alleges that paragraph 26 of Pliha discloses a product catalog that includes "items for sale by the merchant," and wherein the items purchased by the user are added to a "purchase list." The Applicant respectfully disagrees. The quoted terms or their equivalents do not appear in paragraph 26 of Pliha. Rather, paragraph 26 of Pliha is discussing a redemption process which involves debiting and crediting bank accounts of retailers, dealerships, manufacturers, and distributors. This redemption of incentives is unrelated to the items for sale by the merchant and the purchase list that are recited in Applicant's claims. This is at least because the redemptions are transacted among the financial institution, retailers, dealerships, manufacturers, and distributors separate from any purchase transactions made by a customer. This is clear from paragraph 25 of Pliha because it explains that the redemptions are performed after a log of any purchase transactions is compiled and communicated to the financial institution.

Moreover, it would not make any sense to substitute the items being purchased in the context of Wong et al. with the incentives to make purchases as in Pliha. Regarding Pliha, the office action states that "the financial institution records the activity, and then places one of its

---

[1] The office action mailed on October 25, 2012, argues that the references do not need to recite the claim limitations word-for-word. This misapprehends the Applicant's argument. The Applicant submits that Pliha does not disclose the recited product catalog or anything equivalent, regardless of terminology. This office action, as well as prior office actions, uses quotations around claim terminology when discussing the cited art. See e.g., the paragraph spanning pages 4-5 of the office action mailed on October 25, 2012. This gives the impression that the cited art also

13

Application/Control Number: 12/641,071                                    Page 7
Art Unit: 3687

'products' from its 'product catalog' with the consumer, wherein the 'product' provided to the consumer is 'purchased' by the consumer." However, even if the "incentives" of Pliha could reasonably be considered "products," this is not how Pliha actually operates. Rather, as Pliha shows in Figure 10 and discusses at paras. [0097]-[0098], the financial institution only records consumer activity and it does this in "end-of-day" batches, not in real-time. Additionally, Pliha shows in Figure 11 and discusses at paras. [0099]-[0100] that its incentives are also not distributed in real-time. Rather, as discussed by Pliha, a customer is informed of incentives as part of the financial institution's monthly statement after it has completed end-of-month processing. Because of these differences, the distribution of incentives as taught by Pliha would be incompatible with the system of Wong et al.

The office action additionally alleges that Pliha discloses "having the financial institution maintain a product catalog to distribute purchased products to the consumer." See office action mailed on October 24, 2012, at page 5. The Applicant respectfully disagrees. Pliha states throughout its specification that it is intended to match consumers with financial products, e.g. incentives such as coupons, offered by the financial institution based on demographics and other metrics. Pliha does not suggest that the financial institution would in any way "maintain a product catalog" or "distribute purchased products to the consumer."

Moreover, the incentives disclosed by Pliha relate to financial services[2] offered by financial institutions. Pliha explains that the incentives are based upon the level, amount and type of transactions made by each customer regarding the accounts held by the customers with the financial institution, such as a number of ATM transactions made by the customer. See Pliha at paras. [0053], [0067], and [0069]. The incentives offered to a particular customer are not listed in a "product catalog" but are instead predicated on the analysis of each customer's purchase history. And, according to Pliha, consumers are informed of incentives on a paper statement aggregating transactions for a month. As such, there is no "product catalog" of items offered for sale by Pliha from which any prospective customer might selectively add an item to a purchase list.

---

uses that terminology when, in fact, it does not. For this reason, the Applicant pointed out that Pliha does not actually use the term "product catalog."
[2] The emphasistic phrase "financial product" that appears in Pliha is misleading insofar as many financial products are not actually products at all, but complex, structured financial services, frequently involving investments.

12

Application/Control Number: 12/641,071                                    Page 8
Art Unit: 3687

Additionally regarding Pliha, the office action alleges that it would have been obvious to combine Pliha with Wong et al. "because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog." This also incorrectly characterizes Pliha at least because Pliha does not disclose distribution of a product catalog. Instead, Pliha discloses distributing incentives to make future purchases. Moreover, the distribution of these incentives is not contemporaneous with a purchase but is instead performed periodically via end-of-month statements of the financial institution. In contrast, Wong et al. is directed toward completing real-time processing of purchase transactions. Therefore, to make the combination as suggested in the office action would materially alter the manner in which the systems described in the cited references function. As such, this reasoning to make the alleged combination does not appear to be based on what the cited references fairly teach, but appears instead to be based on improper hindsight reconstruction using the applicant's claims as a template. As explained in the Manual of Patent Examining Procedure at Section 2143.01, if a proposed modification or combination of cited art would change the principle of operation of the cited art invention being modified, then the teachings of the references are not sufficient to render the claims *prima facie* obvious.

In view of the above, the Applicant respectfully submits that Applicant's claimed invention is allowable over the cited art. Specifically, the Applicant's independent claims all require that a product catalog is stored in a payment system that is at a location that is different from the merchant's location. Neither Wong et al. nor Pliha, whether considered individually or in combination, discloses such a product catalog.

The examiner notes that the arguments focused on by the examiner relate to the arguments surrounding the issue of combining Wong with Pliha, and how one of ordinary skill in the art at the time of the invention would not have been motivated to make such a combination. The claimed language recites a combination of features that could have only been taught by the combination of Wong with Pliha through the use of improper hindsight. As exhibited in the prior art, such a combination had not been contemplated.

Application/Control Number: 12/641,071                                        Page 9
Art Unit: 3687

## *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to PETER L. LUDWIG whose telephone number is (571)270-5599.  The examiner can normally be reached on Mon-Fri, 9:00am - 5:00pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Matthew Gart can be reached on 571-272-3955.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/Elaine  Gort/

Primary Examiner, Art Unit 3687/Elaine  Gort/

Primary Examiner, Art Unit 3687


/PETER L. LUDWIG/

Examiner, Art Unit 3687

## REMARKS

Claims 1-22 were pending.  All stand rejected.  No new amendments are proposed.  The Applicant respectfully requests further examination and reconsideration in view of the remarks below.


<u>Rejections under 35 U.S.C. § 103</u>

Claims 1, 2, 5-7, 9, 13-15 and 17-22 were rejected as allegedly being obvious in view of U.S. Patent Publication No. 2010/0138344 by Wong et al. (hereinafter, "Wong et al.") in view of U.S. Patent Publication No. 2008/0120155 by Pliha (hereinafter, "Pliha") and further in view of "The roles of players and reputation:  Evidence from eBay online auctions," by Zhang, J. (hereinafter "Zhang").  The remaining dependent claims were rejected under 35 U.S.C. § 103 as allegedly being obvious in view of Wong et al. in combination with Pliha and further in view of other cited art.

The Applicant respectfully disagrees with the rejections.  Regarding Applicant's claim 1, it recites a "product catalog stored in a payment system" and a "merchant location being different from the payment system."  In other words, claim 1 requires that the product catalog is stored in the payment system at a location that is different from the merchant location.  The office action mailed on October 24, 2012, states as follows:

> However, Wong does not explicitly disclose wherein the product catalog is stored in the payment system at a location different from that of the merchant terminal. Wong also may not disclose "adding an item offered for sale by the merchant *from a product catalog stored in the payment system to a purchase list*." (emphasis added).  The only portion of this feature that Wong fails to disclose is "from a product catalog in the payment system."  As noted below, Pliha does teach this.

See office action mailed on October 24, 2012, at pages 4-5.  Thus, it appears that the examiner agrees that Wong et al. do not disclose the requirement of Applicant's claim 1 in which the product catalog is stored in the payment system at a location that is different from the merchant location.  In any event, the Applicant maintains that Wong et al. do <u>not</u> disclose, either explicitly or implicitly, a product catalog stored in the payment system at a location that is different from the merchant location.

The office action mailed on October 24, 2012, alleges that Pliha discloses this limitation by its disclosure of "an incentive distribution system."  Specifically, the office action alleges that

such incentives are "products" in a "product catalog." See office action mailed on October 24, 2012, at pages 4-5. As explained previously and in more detail herein, the Applicant respectfully submits that the incentives disclosed by Pliha cannot reasonably be considered equivalent to the items offered for sale by the merchant or the product catalog, as recited by Applicant's claim 1.

The office action mailed on October 24, 2012, additionally states:

> Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (barcode payment system) with the teachings on Pliha (having the financial institution maintain a product catalog to distribute purchased products to the consumer) because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through the product catalog. This allows the financial institution to play a more active role in the process of transacting with the consumer, and can even turn the financial institution into a consumer as well.

See office action mailed on October 24, 2012, at pages 4-5.

The Applicant respectfully disagrees with this reasoning. Specifically, the Applicant submits that it would not have been obvious to combine Wong et al. and Pliha in the manner suggested in the office action. And, even if these references could properly be combined, such a combination would not result in Applicant's claimed invention.

Wong et al. is directed toward completing purchase transactions using a mobile device. According to an embodiment of Wong et al., an application on a mobile device having a screen, such as a cell phone, enables the user to generate a bar code on the screen, which can be scanned for payment. The bar code is valid for a limited period of time (e.g., one minute). Once scanned, payment is transferred from the user's account to the merchant's account. According to Wong et al., this allows users to easily and safely pay for purchases using a cell phone at any location having a suitable scanning device. See Wong et al. at paras. [0002]-[0011].

Pliha is not directed toward completing purchase transactions at all. Rather, Pliha is directed toward distributing targeted incentives to customers of financial institutions based on each customer's financial or demographic data, or both. Specifically, Pliha's Abstract describes its invention as follows:

> An incentive distribution system is used in distributing, tracking and redeeming product incentives offered by manufacturers and distributors of consumer goods through a financial institution. A financial institution distributes an incentives list to each of its customers, based on information relating to the customers, containing the incentives relating to the category for which the customer qualifies.

Qualifying criteria includes transactional activity within the account held with the financial institution distributing the incentives, demographic data relating to the customer, and various account data. The system tracks purchases made by a customer at a participating retailer or dealership and updates the customer's qualifications based on these purchases. Further, the financial institution acts as a redemption warehouse by debiting the accounts of the manufacturers and distributors offering the incentives and crediting the accounts held by the retailers and dealerships honoring the incentives.

Therefore, Wong et al. and Pliha are directed toward solving fundamentally different problems which are encountered fundamentally different contexts. Specifically, Wong et al. is directed toward facilitating payments for purchases using a cell phone and a scanning device, whereas, Pliha is directed toward distributing consumer product incentives in a targeted fashion by analyzing records held at a financial institution where the records reflect past transactions of a consumer. Therefore, a significant difference is that Wong et al. is directed toward completing real-time processing of purchase transactions whereas Pliha is directed toward analyzing records of past transactions after the transactions have occurred. And, the purpose of Wong et al. is to facilitate such purchase transactions, whereas, the purpose of Pliha is to distribute incentives to make product purchases.

In view of these significant differences, the Applicant respectfully submits that there would not have been a reason to combine Wong et al. and Pliha references in the manner suggested in the office action. Each claim rejection contained in the office action mailed on October 24, 2012, depends upon this combination. Therefore, for at least this reason, Applicant's claimed invention is allowable over Wong et al. and Pliha.

Regarding Pliha, the office action mailed on October 24, 2012, states as follows:

In particular, the financial institution maintains a product catalog of offers to various merchants, and when, the user takes an action with the financial institution (but indirectly with the merchant) the financial institution records the activity, and then places one of its "products" from its "product catalog" with the consumer, wherein the "product" provided to the consumer is "purchased" by the consumer acting as he/she did in the course of the one or more transaction completed by the merchant.

This characterization of Pliha is incorrect for a number of reasons. First, Pliha cannot reasonably be considered as disclosing the "product catalog" recited in Applicant's claims. Taking claim 1 as an example, it recites adding an item from a product catalog to a purchase list and then transferring funds for a purchase price total from the purchaser account to the merchant

account.  Therefore, the product catalog of Applicant's claim 1 is clearly a catalog of products offered for sale by the merchant.  In contrast, Pliha does not use the term "product catalog" or anything equivalent.[1]  The incentives discussed in Pliha cannot reasonably be considered "products" nor can the collection of such incentives be reasonably considered a "product catalog" as those terms are used in the Applicant's claim 1.  This is at least because, when Applicant's claim 1 is considered as a whole, as it must according to 35 U.S.C. § 103, these terms clearly refer to items being purchased by a purchaser and do not refer to "incentives" to make purchases, as in Pliha.  In contrast, the incentives distributed by Pliha are simply informational since they inform the consumer of incentives offered to that particular consumer (see para. [0076] of Pliha).  While the Applicant does not consider it necessary, to further clarify this point, Applicant previously amended the independent claims to recite that the items added to the "purchase list" from the "product catalog" are offered for sale by the merchant.

The office action mailed on October 24, 2012, further alleges that paragraph 26 of Pliha discloses a product catalog that includes "items for sale by the merchant," and wherein the items purchased by the user are added to a "purchase list."  The Applicant respectfully disagrees.  The quoted terms or their equivalents do not appear in paragraph 26 of Pliha.  Rather, paragraph 26 of Pliha is discussing a redemption process which involves debiting and crediting bank accounts of retailers, dealerships, manufacturers, and distributors.  This redemption of incentives is unrelated to the items for sale by the merchant and the purchase list that are recited in Applicant's claims.  This is at least because the redemptions are transacted among the financial institution, retailers, dealerships, manufacturers, and distributors separate from any purchase transactions made by a customer.  This is clear from paragraph 25 of Pliha because it explains that the redemptions are performed after a log of any purchase transactions is compiled and communicated to the financial institution.

Moreover, it would not make any sense to substitute the items being purchased in the context of Wong et al. with the incentives to make purchases as in Pliha.  Regarding Pliha, the office action states that "the financial institution records the activity, and then places one of its

---

[1] The office action mailed on October 25, 2012, argues that the references do not need to recite the claim limitations word-for-word.  This misapprehends the Applicant's argument.  The Applicant submits that Pliha does not disclose the recited product catalog or anything equivalent, regardless of terminology.  This office action, as well as prior office actions, uses quotations around claim terminology when discussing the cited art.  See e.g., the paragraph spanning pages 4-5 of the office action mailed on October 25, 2012.  This gives the impression that the cited art also

'products' from its 'product catalog' with the consumer, wherein the 'product' provided to the consumer is 'purchased' by the consumer." However, even if the "incentives" of Pliha could reasonably be considered "products," this is not how Pliha actually operates. Rather, as Pliha shows in Figure 10 and discusses at paras. [0097]-[0098], the financial institution only records consumer activity and it does this in "end-of-day" batches, not in real-time. Additionally, Pliha shows in Figure 11 and discusses at paras. [0099]-[0100] that its incentives are also not distributed in real-time. Rather, as discussed by Pliha, a customer is informed of incentives as part of the financial institution's monthly statement after it has completed end-of-month processing. Because of these differences, the distribution of incentives as taught by Pliha would be incompatible with the system of Wong et al.

The office action additionally alleges that Pliha discloses "having the financial institution maintain a product catalog to distribute purchased products to the consumer." See office action mailed on October 24, 2012, at page 5. The Applicant respectfully disagrees. Pliha states throughout its specification that it is intended to match consumers with financial products, e.g. incentives such as coupons, offered by the financial institution based on demographics and other metrics. Pliha does not suggest that the financial institution would in any way "maintain a product catalog" or "distribute purchased products to the consumer."

Moreover, the incentives disclosed by Pliha relate to financial services[2] offered by financial institutions. Pliha explains that the incentives are based upon the level, amount and type of transactions made by each customer regarding the accounts held by the customers with the financial institution, such as a number of ATM transactions made by the customer. See Pliha at paras. [0053], [0067], and [0069]. The incentives offered to a particular customer are not listed in a "product catalog" but are instead predicated on the analysis of each customer's purchase history. And, according to Pliha, consumers are informed of incentives on a paper statement aggregating transactions for a month. As such, there is no "product catalog" of items offered for sale by Pliha from which any prospective customer might selectively add an item to a purchase list.

---

uses that terminology when, in fact, it does not. For this reason, the Applicant pointed out that Pliha does not actually use the term "product catalog."

[2] The euphemistic phrase "financial product" that appears in Pliha is misleading insofar as many financial products are not actually products at all, but complex, structured financial services, frequently involving investments.

Additionally regarding Pliha, the office action alleges that it would have been obvious to combine Pliha with Wong et al. "because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog." This also incorrectly characterizes Pliha at least because Pliha does not disclose distribution of a product catalog. Instead, Pliha discloses distributing incentives to make future purchases. Moreover, the distribution of these incentives is not contemporaneous with a purchase but is instead performed periodically via end-of-month statements of the financial institution. In contrast, Wong et al. is directed toward completing real-time processing of purchase transactions. Therefore, to make the combination as suggested in the office action would materially alter the manner in which the systems described in the cited references function. As such, this reasoning to make the alleged combination does not appear to be based on what the cited references fairly teach, but appears instead to be based on improper hindsight reconstruction using the applicant's claims as a template. As explained in the Manual of Patent Examining Procedure at Section 2143.01, if a proposed modification or combination of cited art would change the principle of operation of the cited art invention being modified, then the teachings of the references are not sufficient to render the claims *prima facie* obvious.

In view of the above, the Applicant respectfully submits that Applicant's claimed invention is allowable over the cited art. Specifically, the Applicant's independent claims all require that a product catalog is stored in a payment system that is at a location that is different from the merchant's location. Neither Wong et al. nor Pliha, whether considered individually or in combination, discloses such a product catalog.

Additionally, independent claims 1, 19, 20, 21 and 22 recite essentially that the accounts within the payment system are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction. The office action alleges that Wong et al. inherently or implicitly discloses this limitation because "the user *could*, after the registration phase, sign up as a merchant, and then the account assigned to the user *could be* associated with a merchant account, and then the merchant *could* register as a user and the merchant's first account *could be* transformed into a user account." See office action mailed on October 24, 2012, at page 6 (emphasis added). The Applicant respectfully disagrees with this reasoning. That Wong et al. *could be* made to operate in a particular fashion, does not imply that Wong et

al. inherently or implicitly discloses doing so.  The fact that a certain result or characteristic may occur or may be present in the prior art is not sufficient to establish the inherency of that result or characteristic.  MPEP 2112, *citing*, *In re Rijckaert*, 9 F.3d 1531, 1534, 28 USPQ2d 1955, 1957 (Fed. Cir. 1993) (reversed rejection because inherency was based on what would result due to optimization of conditions, not what was necessarily present in the prior art); *In re Oelrich*, 666 F.2d 578, 581-82, 212 USPQ 323, 326 (CCPA 1981) (Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.); *In re Robertson*, 169 F.3d 743, 745, 49 USPQ2d 1949, 1950-51 (Fed. Cir. 1999) (To establish inherency, the extrinsic evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill.).  Therefore, the examiner must provide a basis in fact and/or technical reasoning to reasonably support the determination that the allegedly inherent characteristic necessarily flows from the teachings of the applied prior art.  Here, the examiner would need to provide a basis in fact and/or technical reasoning to support a conclusion that the accounts of Wong et al. are necessarily adapted to selectively function as either a merchant account or a purchaser account during any particular transaction.  This would not be possible based on the teachings of Wong et al.

The office action additionally alleges that Zhang discloses "that an account can at times be selectively designated as a buying account and at other times selectively designated as a selling account (see e.g. Table 4)."  The Applicant respectfully submits that Zhang merely shows in Table 4 that a "seller" can receive both selling and buying feedback.  At page 1801, Zhang further discusses that "[a] user can take the role as a buyer at some times, and as a seller at other times."  At most, this discloses that a *person* can assume these different roles, however, this does not teach that an *account within a payment system* is adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, as in Applicant's claim 1.

Therefore, because Zhang does not disclose this feature missing from Wong et al. and Pliha, this is another reason why Applicants' claim 1 is allowable over the cited references taken singly or in combination.  Moreover, because Wong et al. lacks such flexibility, it would not have been obvious to modify Wong et al. as suggested in the office action in order to achieve the Applicant's claimed invention.  Therefore, this is an additional reason why claim 1 is allowable.

Dependent claims 2-18 are allowable at least because they are dependent upon an allowable base claim 1.  Independent claims 19, 20, 21, and 22 are allowable for at least the same reasons that claim 1 is allowable.

The Applicant respectfully believes that the above is sufficient to patentably distinguish all of the Applicant's claims from the cited art.  As such, the Applicant need not specifically address every statement made in the office action, and does not thereby admit the correctness thereof.

Priority of Invention

The attached affidavit sets forth specific facts that show the Applicant made his invention, at least with respect to certain specified claims, prior to the effective date of Wong et al.  Specifically, the Applicant conceived of the claimed invention prior to the effective date of Wong et al. and was diligent in reducing the invention to practice.  Therefore, the rejection is overcome with respect to those claims.

Conclusion

In view of the above, the Applicant submits that all of the pending claims are allowable.  Allowance at an early date would be greatly appreciated.  Should any outstanding issues remain, the examiner is encouraged to contact the undersigned at (650) 968-0410 so that any such issues can be expeditiously resolved.

Respectfully Submitted,

Dated:  January 7, 2013                    /Derek J. Westberg/ (Reg. No. 40,872)

**PATENT APPLICATION**

**UNITED STATES PATENT AND TRADEMARK OFFICE**

In re application of

Aaron J. Greenspan

Application No.: 12/641,071

Filed: December 17, 2009

Group Art Unit: 3687

Examiner: Peter L. Ludwig

For:    METHOD AND SYSTEM FOR TRANSFERRING AN ELECTRONIC PAYMENT

**DECLARATION UNDER 37 C.F.R. § 1.131**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

1.    I, Aaron Greenspan, do declare and state:

2.    I am the sole inventor of all claims of above-identified application.

3.    I am a citizen of the United States of America, residing at 884 College Avenue, Palo Alto, CA  94306.

4.    I am also the President & CEO of Think Computer Corporation ("Think"), incorporated as an Ohio corporation in 1998.

5.    On April 26, 1998, I assisted a friend, Peter Ledford, with his computer running Microsoft Windows 95, causing him to be listed in Think's accounting database as a client.  On September 3, 1998, I purchased a Western Digital 2GB hard drive from Mr. Ledford for $20.00, causing him to be listed in Think's accounting database a second time as a vendor.  At that point it became clear to me that there was a need for an accounting and payment system that could simultaneously treat the

1

DECLARATION OF AARON GREENSPAN

same legal entity as both a client and a vendor without duplicating data, as described in claim 1 of the above referenced application ("assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction").

6.    In my capacity with Think, I created an on-line student portal at Harvard University in August, 2003 called houseSYSTEM.  As of September 19, 2003, houseSYSTEM web sites featured a common section called The Universal Facebook, in which students, staff, faculty and alumni could upload digital images of their faces to an central web-based directory (Exhibit A).  From 2005 through early 2008, I attempted to continue working on houseSYSTEM under the name CommonRoom, which also involved storing digital images of members' faces.

7.    Since as early as 2003, Think had offered for sale a business accounting program that I conceived of, designed and programmed, called Exponent.  Exponent was designed to be sold to small businesses ("users").  Exponent's potential was limited by two major factors: the intentional separation of each user's database from the databases of all other Exponent users; and the separation of clients and vendors within each Exponent user database.  These limitations, common to the design of many accounting and order management programs, often caused the same business to appear twice within an Exponent user's database if that business had both bought and sold goods or services from the Exponent user.  These same limitations also caused Exponent users to frequently need to manually enter client and/or vendor data that had already been entered by another Exponent user in a separate and independent Exponent database.  I was aware of both limitations and intended to eventually create a second product to remove them.

8.    At least as early as May, 2004, the Exponent database schema (Exhibit B) contained a table for line items called "lineitems" with fields to store, among other pieces of information:

A)    A unique line item record ID;

DECLARATION OF AARON GREENSPAN

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/641,071 | 12/17/2009 | Aaron J. Greenspan | FaceCash | 9904 |

79613        7590        10/24/2012
Think Computer Corporation
884 College Avenue
Palo Alto, CA 94306-1303

| EXAMINER |
|---|
| LUDWIG, PETER L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3687 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/24/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| **Office Action Summary** | **Application No.** 12/641,071 | **Applicant(s)** GREENSPAN, AARON J. |
|---|---|---|
| | **Examiner** PETER L. LUDWIG | **Art Unit** 3687 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>16 February 2012</u>.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

5)☒ Claim(s) <u>1-22</u> is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) <u>1-22</u> is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

    1.☐ Certified copies of the priority documents have been received.

    2.☐ Certified copies of the priority documents have been received in Application No. _____ .

    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

## Attachment(s)

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____ .

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____ .

Application/Control Number: 12/641,071                                    Page 2
Art Unit: 3687

## DETAILED ACTION

### *Continued Examination Under 37 CFR 1.114*

1.     A request for continued examination under 37 CFR 1.114, including the fee set

forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this

application is eligible for continued examination under 37 CFR 1.114, and the fee set

forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action

has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submission filed on

2/16/2012 has been entered.

2.     As a result of the Amendment filed, claims 1-22 remain pending.

### *Claim Rejections - 35 USC § 103*

3.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

4.      **Claims 1, 2, 5-7, 9, 13-15, and 17-22 are rejected under 35 U.S.C. 103(a) as being unpatentable over U.S. Patent Publication No. 2010/0138344 to Wong et al. ("Wong") in view of U.S. Pat. Pub. No. 2008/0120155 to Pliha ("Pliha") and further in view of Zhang, J. (2006). The roles of players and reputation: Evidence from eBay online auctions.** *Decision Support Systems 42,* **1800−1818 (hereinafter "eBay").**

5.      <u>With respect to claim 1,</u> Wong teaches a method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account (see e.g. ¶0027, merchant account information within payment system) and a role of a purchaser account to a second account (see e.g. ¶0025, user registers account information with payment system) within a payment system;

adding an item <u>offered for sale by the merchant</u> from a product catalog stored in the payment system to a purchase list (e.g., ¶0021, "point of sale (POS) after the user has finished shopping . . . .");

obtaining a user ID token of a purchaser from a merchant terminal (see e.g., ¶0027, wherein the user is provided a barcode by payment provider on his/her mobile device, and then merchant, at merchant terminal, scans the barcode from the mobile device)<u>, the merchant terminal being at a merchant location and the merchant location</u>

being different from the payment system (the merchant terminal and the payment system are not in the same physical location, wherein this is evidenced all over ¶0025-30, such as at ¶0028, "The POS software at the merchant location then makes a DoAuthorization API call to the payment provider to authorize the payment" wherein a call would not have to be made if the merchant and the payment system were one and the same, or at the same location, wherein this is a communication between two entities such as between Wells Fargo (i.e. payment service) and merchant terminal at Dick's Sporting Goods (i.e., merchant location) regarding whether or not user has sufficient funds on credit card account to pay for his Air Jordan shoes);

communicating identity confirmation information associated with the user ID token to the merchant terminal (e.g., ¶0028); and

transferring funds for the purchase price total from the purchaser account to the merchant account (e.g., ¶0029, "As a result, funds are transferred from the user's account to the merchant's account for the purchase of the desired item(s).").

However, Wong does not explicitly disclose wherein the product catalog is stored in the payment system at a location different than that of the merchant terminal. Wong also may not disclose "adding an item offered for sale by the merchant *from a product catalog stored in the payment system to a purchase list.*" (emphasis added). The only portion of this feature that Wong fails to disclose is "from a product catalog in the payment system". As noted below, Pliha does teach this.

Pliha does teach this. In general, Pliha discloses "an incentive distribution system used in distributing, tracking and redeeming product incentives offered by manufacturers and distributors of consumer goods *through a financial institution*. See abstract (emphasis added). In particular, the financial institution maintains a product catalog of offers to various merchants, and when the user takes an action with the financial institution (but indirectly with the merchant) the financial institution records the activity, and then places one of its "products" from its "product catalog" with the

consumer, wherein the "product" provided the consumer is "purchased" by the consumer acting as he/she did in the course of the one or more transaction completed by the merchant. See abstract an" Figures. In addition, Pliha does teach wherein the product catalog includes items "<u>offered for sale by the merchant</u>" and wherein the items purchased by the user are added to a "purchase list" (see ¶0026, wherein when the user makes a purchase through the use of an incentive granted to the user from the merchant through the financial institution, the financial institution adds such a purchase to a purchase list).

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (barcode payment system) with the teachings of Pliha (having the financial institution maintain a product catalog to distribute purchased products to the consumer) because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog. This allows the financial institution to play a more active role in the process of transacting with the consumer, and can even turn the financial institution to a merchant as well.

Moreover, the elements are all known but not combined as claimed. *See KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed to combine the elements as claimed and the results of the combination are predictable. *See id.* When combined, the elements perform the same function as they did separately. *See id.*

Wong also does not disclose the amended feature of "<u>wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction</u>". Wong discloses wherein the user registers with a service provider, the merchant registers with the service provider, and the user and the merchant are assigned accounts to use for the transaction (the user's account identifying user information such as financial information; the merchant

account designating an account of merchant information including an indication of where to place the funds from the user account. Thus, the only feature of this limitation that Wong does not disclose is "<u>wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction</u>". This is likely inherent/implicitly disclosed in Wong, as the user could, after the registration phase, sign up as a merchant, and then the account assigned to the user could be associated with a merchant account, and then the merchant could register as a user and the merchant's first account could be transformed into a user account. However, even if not inherent/implicit in Wong, this has been done in the electronic transaction arts.

In particular, eBay teaches this feature. eBay teaches that an account can at times be selectively designated as a buying account and at other times selectively designated as a selling account (see e.g. Table 4). eBay allows users to selectively decide if they want to be the buyer, and if so, their account is marked as a buyer (or potential buyer if only in the bidding stage); and if they want to be the seller in the case where the user wants their account designated as the seller (or merchant) account.

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (mobile barcode generation payment) with the teachings of eBay (ability to have an account be selectively designated as either the buyer account or the merchant account) because Wong discloses a system of a transaction, wherein a barcode is generated and funds are transferred. Similarly, eBay discloses a system that allows user to buy and sell goods through their account, but in association with other user (buyers and sellers). One of ordinary skill in the art would have combined Wong with eBay because this allows the user of Wong to set up one account and have the ability to select if he/she wants to buy something that day with the generated barcode, or if the user wants to accept someone

Application/Control Number: 12/641,071                                 Page 7
Art Unit: 3687

else generated barcode (and be the merchant that day). As illustrated in eBay, this
concept has been done before, and it would have been obvious to combine.

Moreover, the elements are all known but not combined as claimed. *See KSR Int'l
Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed to combine the
elements as claimed and the results of the combination are predictable. *See id.* When
combined, the elements perform the same function as they did separately. *See id.*

6.    <u>With respect to claim 2,</u> Wong/Pliha/eBay teach the method of claim 1, and
Wong further teaches the step of storing purchase list information as a transaction
record for the merchant account and the purchaser account (e.g., ¶0008, 0030).

7.    <u>With respect to claim 5,</u> Wong/Pliha/eBay teach the method of claim 2, and
Wong further teaches the step of serving the product catalog to a merchant terminal,
wherein an item is added to the product catalog from a merchant terminal (e.g., ¶0004-
5; 0021, wherein an item is inherently added to the product catalog by the merchant if
the purchaser is able to purchase it from a list of products while shopping online).

8.    <u>With respect to claim 6,</u> Wong/Pliha/eBay teach the method of claim 2, and
Wong further teaches the step of obtaining a user ID token of a purchaser includes
scanning a barcode provided by a purchaser (¶0021, "the user presents the barcode
image to the merchant" where the barcode is scanned by the merchant).

9.    <u>With respect to claim 7,</u> Wong/Pliha/eBay teach the method of claim 6, and
Wong further teaches the step of providing a barcode displayable on a purchaser
terminal (e.g., ¶0020, "the user is presented with a screen showing a barcode; Fig. 3B).

10.   <u>With respect to claim 9,</u> Wong/Pliha/eBay teach the method of claim 2, and

Wong further teaches the step of augmenting a transaction associated with the transfer of funds (e.g., ¶0026).

11.    <u>With respect to claim 13,</u> Wong/Pliha/eBay teach the method of claim 9, and Wong further teaches wherein augmenting the transaction includes charging a portion of the purchase price total to at least a second account (see e.g., ¶0026, wherein the barcode allows access to all the funds in a user's account, and then another barcode is scanned, such as from the purchaser's friend's account, or from one of the children's account of a family account).

12.    <u>With respect to claim 14,</u> Wong/Pliha/eBay teach the method of claim 13, and Wong further teaches wherein a percentage of the purchase price total is charged to a first purchaser and a remaining percentage of the purchase price total is charged to the second account (see e.g., ¶0026, wherein a child with a "maximum amount of transaction" uses his/her maximum amount, and then the rest of the percentage of the bill is debited to another purchaser, such as his/her sibling who still has funds to utilize).

13.    <u>With respect to claim 15,</u> Wong/Pliha/eBay teach the method of claim 13, and Wong further teaches wherein the portion of the purchase price total charged to at least a second account is calculated from items from the product list that are selected to be charged to the second account (see e.g., ¶0026, wherein the first purchaser buys certain products/services with his barcode, and then cannot purchase certain products/services because the barcode does not allow the purchaser to purchase some products/service. In that case, another account from another purchaser would have to be used, and the products would be specified).

14.    <u>With respect to claim 17,</u> Wong/Pliha/eBay teach the method of claim 2, and Wong further teaches communicating a notification of purchase-related effects at the time of purchase (e.g., ¶0027, "payment provider may also send a confirmation to both the user and merchant that funds have been transferred").

15.    <u>With respect to claim 18,</u> Wong/Pliha/eBay teach the method of claim 2, and Wong further teaches the step of receiving purchaser acknowledgment of account-related warnings at the time of purchase and obtaining purchaser consent to ameliorative actions at the time of purchase (e.g., ¶0028).

16.    <u>With respect to claim 19,</u> Wong discloses a method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account (see e.g. ¶0027, merchant account information within payment system) and a role of a purchaser account to a second account (see e.g. ¶0025, user registers account information with payment system) within a payment system;

adding at least one item from a product catalog stored in the payment system to a purchase list (e.g., ¶0021, "point of sale (POS) after the user has finished shopping . . . .");

providing a user ID token in the form of a barcode that is displayable on a purchaser terminal (e.g., ¶0026, "the user is presented with a screen showing a barcode; Fig. 3B);

obtaining a user ID token of a purchaser from a merchant terminal by scanning a purchaser terminal display of the barcode user ID (see e.g., ¶0027, wherein the user is provided a barcode by payment provider on his/her mobile device, and then merchant, at merchant terminal, scans the barcode from the mobile device) <u>, the merchant terminal being at a merchant location and the merchant location between separate from the</u>

<u>payment system</u> (the merchant terminal and the payment system are not in the same location physical, wherein this is evidenced all over ¶0025-30, such as at ¶0028, "The POS software at the merchant location then makes a DoAuthorization API call to the payment provider to authorize the payment" wherein a call would not have to be made if the merchant and the payment system were one and the same, or at the same location, wherein this is a communication between two entities such as between Wells Fargo (i.e. payment service) and merchant terminal at Dick's Sporting Goods (i.e., merchant location) regarding whether or not user has sufficient funds on credit card account to pay for his Air Jordan shoes);

communicating identity confirmation information associated with the user ID token to the merchant terminal, wherein the identity confirmation information is an image of the owner of the purchaser account (see e.g., ¶0028, wherein the payment provider, following scan of the barcode, sends to the merchant terminal an image associated with the client (either in the form of an electronic signature pad or OK button));

receiving confirmation from the merchant terminal that the image associated with the account ID matches that of the purchaser (the confirmation being that the purchaser has signed the signature pad, and the merchant has verified that the purchaser is in fact the fact by asking to see a credit card associated with the purchaser, and viewing the signature on the back of the credit card, to ensure that the signature matches the signature on the electronic signature pad (as typically done, and by law required to do so in some instances and in some states);

transferring funds for the purchase price total from the purchaser account to the merchant account (e.g., ¶0029, "As a result, funds are transferred from the user's account to the merchant's account for the purchase of the desired item(s)."); and

recording the purchase list information as a transaction record for the merchant account and the purchaser account (e.g., ¶0031, exemplifying that the payment provider

Application/Control Number: 12/641,071                                    Page 11
Art Unit: 3687

saves all of the transaction related information).

However, Wong may not explicitly disclose wherein the product catalog is stored in the payment system at a location different than that of the merchant terminal.

Pliha does teach this. In general, Pliha discloses "an incentive distribution system used in distributing, tracking and redeeming product incentives offered by manufacturers and distributors of consumer goods *through a financial institution*. See abstract (emphasis added). In particular, the financial institution maintains a product catalog of offers to various merchants, and when the user takes an action with the financial institution (but indirectly with the merchant) the financial institution records the activity, and then places one of its "products" from its "product catalog" with the consumer, wherein the "product" provided the consumer is "purchased" by the consumer acting as he/she did in the course of the one or more transaction completed by the merchant. See abstract an" Figures.

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (barcode payment system) with the teachings of Pliha (having the financial institution maintain a product catalog to distribute purchased products to the consumer) because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog. This allows the financial institution to play a more active role in the process of transacting with the consumer, and can even turn the financial institution to a merchant as well.

Moreover, the elements are all known but not combined as claimed. *See KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed to combine the elements as claimed and the results of the combination are predictable. *See id.* When combined, the elements perform the same function as they did separately. *See id.*

Wong also does not disclose the amended feature of "<u>wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction</u>".  Wong discloses wherein the user registers with a service provider, the merchant registers with the service provider, and the user and the merchant are assigned accounts to use for the transaction (the user's account identifying user information such as financial information; the merchant account designating an account of merchant information including an indication of where to place the funds from the user account.  Thus, the only feature of this limitation that Wong does not disclose is "<u>wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction</u>".  This is likely inherent/implicitly disclosed in Wong, as the user could, after the registration phase, sign up as a merchant, and then the account assigned to the user could be associated with a merchant account, and then the merchant could register as a user and the merchant's first account could be transformed into a user account.  However, even if not inherent/implicit in Wong, this has been done in the electronic transaction arts.

In particular, eBay teaches this feature.  eBay teaches that an account can at times be selectively designated as a buying account and at other times selectively designated as a selling account (see e.g. Table 4).  eBay allows users to selectively decide if they want to be the buyer, and if so, their account is marked as a buyer (or potential buyer if only in the bidding stage); and if they want to be the seller in the case where the user wants their account designated as the seller (or merchant) account.

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (mobile barcode generation payment) with the teachings of eBay (ability to have an account be selectively designated as either the buyer account or the merchant account) because Wong discloses a system of a transaction, wherein a barcode is generated and funds are

Application/Control Number: 12/641,071                                    Page 13
Art Unit: 3687

transferred.  Similarly, eBay discloses a system that allows user to buy and sell goods through their account, but in association with other user (buyers and sellers).  One of ordinary skill in the art would have combined Wong with eBay because this allows the user of Wong to set up one account and have the ability to select if he/she wants to buy something that day with the generated barcode, or if the user wants to accept someone else generated barcode (and be the merchant that day).  As illustrated in eBay, this concept has been done before, and it would have been obvious to combine.

Moreover, the elements are all known but not combined as claimed.  *See KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007).  The technical ability existed to combine the elements as claimed and the results of the combination are predictable.  *See id.*  When combined, the elements perform the same function as they did separately.  *See id.*

17.    <u>With respect to claim 20,</u> Wong teaches a system for transferring an electronic payment between a purchaser and a merchant comprising:

a payment system that manages transactions between the purchaser and the merchant and includes a payment system account database (¶0027 discusses the payment system with account database)<u>, the merchant terminal being at a merchant location and the merchant location between separate from the payment system</u> (the merchant terminal and the payment system are not in the same location physical, wherein this is evidenced all over ¶0025-30, such as at ¶0028, "The POS software at the merchant location then makes a DoAuthorization API call to the payment provider to authorize the payment" wherein a call would not have to be made if the merchant and the payment system were one and the same, or at the same location, wherein this is a communication between two entities such as between Wells Fargo (i.e. payment service) and merchant terminal at Dick's Sporting Goods (i.e., merchant location) regarding whether or not user has sufficient funds on credit card account to pay for his Air Jordan shoes);

a product catalog with categorized items that is hosted within the payment
system (see e.g., ¶0005, 0029);

an account portal that connects an electronic terminal to the payment system
through a network connection, and includes transaction interface tools and product
catalog management tool (see e.g., Fig. 3A and 3B; see also ¶0004-5, disclosing wherein
consumers and merchants are now using mobile phones for e-commerce and other
social activities); and

wherein the account portal connects a purchaser to the payment system with a
transaction interface for a purchaser and connects a merchant to the payment system
with a merchant interface (see e.g., Fig. 3A-3B).

However, Wong may not explicitly disclose wherein the product catalog is
stored in the payment system at a location different than that of the merchant terminal.

Pliha does teach this. In general, Pliha discloses "an incentive distribution
system used in distributing, tracking and redeeming product incentives offered by
manufacturers and distributors of consumer goods *through a financial institution*. See
abstract (emphasis added). In particular, the financial institution maintains a product
catalog of offers to various merchants, and when the user takes an action with the
financial institution (but indirectly with the merchant) the financial institution records
the activity, and then places one of its "products" from its "product catalog" with the
consumer, wherein the "product" provided the consumer is "purchased" by the
consumer acting as he/she did in the course of the one or more transaction completed
by the merchant. See abstract an" Figures.

Therefore, it would have been obvious to one of ordinary skill in the art at the
time of the invention to combine the teachings of Wong (barcode payment system) with
the teachings of Pliha (having the financial institution maintain a product catalog to
distribute purchased products to the consumer) because when the financial institution,
which is at a different location than the merchant, also collects data on consumer

Application/Control Number: 12/641,071                                    Page 15
Art Unit: 3687

activity, the financial institution can now distribute relevant information to the user through its product catalog. This allows the financial institution to play a more active role in the process of transacting with the consumer, and can even turn the financial institution to a merchant as well.

Moreover, the elements are all known but not combined as claimed. *See KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed to combine the elements as claimed and the results of the combination are predictable. *See id.* When combined, the elements perform the same function as they did separately. *See id.*

Wong also does not disclose the amended feature of "<u>wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction</u>". Wong discloses wherein the user registers with a service provider, the merchant registers with the service provider, and the user and the merchant are assigned accounts to use for the transaction (the user's account identifying user information such as financial information; the merchant account designating an account of merchant information including an indication of where to place the funds from the user account. Thus, the only feature of this limitation that Wong does not disclose is "<u>wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction</u>". This is likely inherent/implicitly disclosed in Wong, as the user could, after the registration phase, sign up as a merchant, and then the account assigned to the user could be associated with a merchant account, and then the merchant could register as a user and the merchant's first account could be transformed into a user account. However, even if not inherent/implicit in Wong, this has been done in the electronic transaction arts.

In particular, eBay teaches this feature. eBay teaches that an account can at times be selectively designated as a buying account and at other times selectively designated as a selling account (see e.g. Table 4). eBay allows users to selectively decide if they

Application/Control Number: 12/641,071                                    Page 16
Art Unit: 3687

want to be the buyer, and if so, their account is marked as a buyer (or potential buyer if
only in the bidding stage); and if they want to be the seller in the case where the user
wants their account designated as the seller (or merchant) account.

     Therefore, it would have been obvious to one of ordinary skill in the art at the
time of the invention to combine the teachings of Wong (mobile barcode generation
payment) with the teachings of eBay (ability to have an account be selectively
designated as either the buyer account or the merchant account) because Wong
discloses a system of a transaction, wherein a barcode is generated and funds are
transferred.  Similarly, eBay discloses a system that allows user to buy and sell goods
through their account, but in association with other user (buyers and sellers).  One of
ordinary skill in the art would have combined Wong with eBay because this allows the
user of Wong to set up one account and have the ability to select if he/she wants to buy
something that day with the generated barcode, or if the user wants to accept someone
else generated barcode (and be the merchant that day).  As illustrated in eBay, this
concept has been done before, and it would have been obvious to combine.

     Moreover, the elements are all known but not combined as claimed.  *See KSR Int'l
Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007).  The technical ability existed to combine the
elements as claimed and the results of the combination are predictable.  *See id.*  When
combined, the elements perform the same function as they did separately.  *See id.*

18.    <u>With respect to claim 21,</u> Wong teaches a method performed over a payment
network, the payment network comprising a plurality of merchant terminals connected
to a plurality of payment servers, an accounts database, and a product catalog database,
wherein each merchant terminal has an ID token reader, a display, and network
capabilities, the method comprising the steps of:

Application/Control Number: 12/641,071                          Page 17
Art Unit: 3687

assigning a role of a merchant account to a first account (see e.g. ¶0027, merchant
account information within payment system) and a role of a purchaser account to a
second account (see e.g. ¶0025, user registers account information with payment
system) within a payment system;

creating a purchase list with at least one item from the product catalog database
(e.g., ¶0021, "point of sale (POS) after the user has finished shopping . . . .");

reading, with the ID token reader of a merchant terminal, the user ID token of a
purchaser and sending the user ID token to a payment server (¶0027, "the user presents
the barcode image to the merchant" where the barcode is scanned by the merchant)_,
the merchant terminal being at a merchant location and the merchant location between
separate from the payment system (the merchant terminal and the payment system are
not in the same location physical, wherein this is evidenced all over ¶0025-30, such as at
¶0028, "The POS software at the merchant location then makes a DoAuthorization API
call to the payment provider to authorize the payment" wherein a call would not have
to be made if the merchant and the payment system were one and the same, or at the
same location, wherein this is a communication between two entities such as between
Wells Fargo (i.e. payment service) and merchant terminal at Dick's Sporting Goods (i.e.,
merchant location) regarding whether or not user has sufficient funds on credit card
account to pay for his Air Jordan shoes);

transmitting, from the payment server to the merchant terminal, identity
confirmation information associated with the user ID token (see e.g., ¶0028, wherein the
payment provider, following scan of the barcode, sends to the merchant terminal an
image associated with the client (either in the form of an electronic signature pad or OK
button));

transmitting, from the merchant terminal to the payment server, a payment
approval communication (the confirmation being that the purchaser has signed the
signature pad, and the merchant has verified that the purchaser is in fact the fact by

asking to see a credit card associated with the purchaser, and viewing the signature on the back of the credit card, to ensure that the signature matches the signature on the electronic signature pad (as typically done, and by law required to do so in some instances and in some states);

transferring, with the payment server, payment from the purchaser account to the merchant account (e.g., ¶0029, "As a result, funds are transferred from the user's account to the merchant's account for the purchase of the desired item(s).").

However, Wong may not explicitly disclose wherein the product catalog is stored in the payment system at a location different than that of the merchant terminal.

Pliha does teach this. In general, Pliha discloses "an incentive distribution system used in distributing, tracking and redeeming product incentives offered by manufacturers and distributors of consumer goods *through a financial institution*. See abstract (emphasis added). In particular, the financial institution maintains a product catalog of offers to various merchants, and when the user takes an action with the financial institution (but indirectly with the merchant) the financial institution records the activity, and then places one of its "products" from its "product catalog" with the consumer, wherein the "product" provided the consumer is "purchased" by the consumer acting as he/she did in the course of the one or more transaction completed by the merchant. See abstract an" Figures.

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (barcode payment system) with the teachings of Pliha (having the financial institution maintain a product catalog to distribute purchased products to the consumer) because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog. This allows the financial institution to play a more active

role in the process of transacting with the consumer, and can even turn the financial institution to a merchant as well.

Moreover, the elements are all known but not combined as claimed. *See KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed to combine the elements as claimed and the results of the combination are predictable. *See id.* When combined, the elements perform the same function as they did separately. *See id.*

Wong also does not disclose the amended feature of "wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction". Wong discloses wherein the user registers with a service provider, the merchant registers with the service provider, and the user and the merchant are assigned accounts to use for the transaction (the user's account identifying user information such as financial information; the merchant account designating an account of merchant information including an indication of where to place the funds from the user account. Thus, the only feature of this limitation that Wong does not disclose is "wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction". This is likely inherent/implicitly disclosed in Wong, as the user could, after the registration phase, sign up as a merchant, and then the account assigned to the user could be associated with a merchant account, and then the merchant could register as a user and the merchant's first account could be transformed into a user account. However, even if not inherent/implicit in Wong, this has been done in the electronic transaction arts.

In particular, eBay teaches this feature. eBay teaches that an account can at times be selectively designated as a buying account and at other times selectively designated as a selling account (see e.g. Table 4). eBay allows users to selectively decide if they want to be the buyer, and if so, their account is marked as a buyer (or potential buyer if

only in the bidding stage); and if they want to be the seller in the case where the user
wants their account designated as the seller (or merchant) account.

Therefore, it would have been obvious to one of ordinary skill in the art at the
time of the invention to combine the teachings of Wong (mobile barcode generation
payment) with the teachings of eBay (ability to have an account be selectively
designated as either the buyer account or the merchant account) because Wong
discloses a system of a transaction, wherein a barcode is generated and funds are
transferred. Similarly, eBay discloses a system that allows user to buy and sell goods
through their account, but in association with other user (buyers and sellers). One of
ordinary skill in the art would have combined Wong with eBay because this allows the
user of Wong to set up one account and have the ability to select if he/she wants to buy
something that day with the generated barcode, or if the user wants to accept someone
else generated barcode (and be the merchant that day). As illustrated in eBay, this
concept has been done before, and it would have been obvious to combine.

Moreover, the elements are all known but not combined as claimed. *See KSR Int'l
Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed to combine the
elements as claimed and the results of the combination are predictable. *See id.* When
combined, the elements perform the same function as they did separately. *See id.*

19.    <u>With respect to claim 22,</u> Wong teaches a method performed over a payment
network, the payment network comprising a plurality of merchant terminals and
purchaser terminals connected to a plurality of payment servers, an accounts database,
and a product catalog database, wherein each merchant terminal has an ID token
reader, a display, and network capabilities, the method comprising the steps of:

assigning a role of a merchant account to a first account (see e.g. ¶0027, merchant
account information within payment system) and a role of a purchaser account to a

second account (see e.g. ¶0025, user registers account information with payment
system) within a payment system;

creating a purchase list with at least one item from the product catalog database
(e.g., ¶0021, "point of sale (POS) after the user has finished shopping . . . .");

transmitting, from the purchaser terminal to the merchant terminal, the user ID
token of a purchaser and sending the user ID token to a payment server (¶0027, "the
user presents the barcode image to the merchant" where the barcode is scanned by the
merchant) , the merchant terminal being at a merchant location and the merchant
location between separate from the payment system (the merchant terminal and the
payment system are not in the same location physical, wherein this is evidenced all over
¶0025-30, such as at ¶0028, "The POS software at the merchant location then makes a
DoAuthorization API call to the payment provider to authorize the payment" wherein a
call would not have to be made if the merchant and the payment system were one and
the same, or at the same location, wherein this is a communication between two entities
such as between Wells Fargo (i.e. payment service) and merchant terminal at Dick's
Sporting Goods (i.e., merchant location) regarding whether or not user has sufficient
funds on credit card account to pay for his Air Jordan shoes);

transmitting, from the payment server to the merchant terminal, identity
confirmation information associated with the user ID token (see e.g., ¶0028, wherein the
payment provider, following scan of the barcode, sends to the merchant terminal an
image associated with the client (either in the form of an electronic signature pad or OK
button));

transmitting, from the merchant terminal to the payment server, a payment
approval communication (the confirmation being that the purchaser has signed the
signature pad, and the merchant has verified that the purchaser is in fact the fact by
asking to see a credit card associated with the purchaser, and viewing the signature on
the back of the credit card, to ensure that the signature matches the signature on the

electronic signature pad (as typically done, and by law required to do so in some instances and in some states);

transferring, with the payment server, payment from the purchaser account to the merchant account (e.g., ¶0029, "As a result, funds are transferred from the user's account to the merchant's account for the purchase of the desired item(s).").

However, Wong may not explicitly disclose wherein the product catalog is stored in the payment system at a location different than that of the merchant terminal.

Pliha does teach this. In general, Pliha discloses "an incentive distribution system used in distributing, tracking and redeeming product incentives offered by manufacturers and distributors of consumer goods *through a financial institution*. See abstract (emphasis added). In particular, the financial institution maintains a product catalog of offers to various merchants, and when the user takes an action with the financial institution (but indirectly with the merchant) the financial institution records the activity, and then places one of its "products" from its "product catalog" with the consumer, wherein the "product" provided the consumer is "purchased" by the consumer acting as he/she did in the course of the one or more transaction completed by the merchant. See abstract an" Figures.

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (barcode payment system) with the teachings of Pliha (having the financial institution maintain a product catalog to distribute purchased products to the consumer) because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog. This allows the financial institution to play a more active role in the process of transacting with the consumer, and can even turn the financial institution to a merchant as well.

Application/Control Number: 12/641,071                                    Page 23
Art Unit: 3687

    Moreover, the elements are all known but not combined as claimed.  *See KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007).  The technical ability existed to combine the elements as claimed and the results of the combination are predictable.  *See id.*  When combined, the elements perform the same function as they did separately.  *See id.*  Wong also does not disclose the amended feature of "<u>wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction</u>".  Wong discloses wherein the user registers with a service provider, the merchant registers with the service provider, and the user and the merchant are assigned accounts to use for the transaction (the user's account identifying user information such as financial information; the merchant account designating an account of merchant information including an indication of where to place the funds from the user account.  Thus, the only feature of this limitation that Wong does not disclose is "<u>wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction</u>".  This is likely inherent/implicitly disclosed in Wong, as the user could, after the registration phase, sign up as a merchant, and then the account assigned to the user could be associated with a merchant account, and then the merchant could register as a user and the merchant's first account could be transformed into a user account.  However, even if not inherent/implicit in Wong, this has been done in the electronic transaction arts.

    In particular, eBay teaches this feature.  eBay teaches that an account can at times be selectively designated as a buying account and at other times selectively designated as a selling account (see e.g. Table 4).  eBay allows users to selectively decide if they want to be the buyer, and if so, their account is marked as a buyer (or potential buyer if only in the bidding stage); and if they want to be the seller in the case where the user wants their account designated as the seller (or merchant) account.

Application/Control Number: 12/641,071                                         Page 24
Art Unit: 3687

     Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (mobile barcode generation payment) with the teachings of eBay (ability to have an account be selectively designated as either the buyer account or the merchant account) because Wong discloses a system of a transaction, wherein a barcode is generated and funds are transferred. Similarly, eBay discloses a system that allows user to buy and sell goods through their account, but in association with other user (buyers and sellers). One of ordinary skill in the art would have combined Wong with eBay because this allows the user of Wong to set up one account and have the ability to select if he/she wants to buy something that day with the generated barcode, or if the user wants to accept someone else generated barcode (and be the merchant that day). As illustrated in eBay, this concept has been done before, and it would have been obvious to combine.

     Moreover, the elements are all known but not combined as claimed. *See KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed to combine the elements as claimed and the results of the combination are predictable. *See id.* When combined, the elements perform the same function as they did separately. *See id.*

Atty Dkt. No.  THNK-00100

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:  Aaron J. Greenspan        Confirmation No. 9904

Serial No.:  12/641,071              Group Art Unit:  3687

Filed:  December 17, 2009        Examiner:  Peter L. Ludwig

Title:      Method and System for Transferring an Electronic Payment

\* \* \*

**RESPONSE TO OFFICE ACTION MAILED ON JANUARY 26, 2012**

---

**Certificate of Electronic (EFS-WEB) Transmission under 37 CFR 1.8(a)**
I hereby certify that this correspondence is being submitted via the U.S. Patent
and Trademark Office Electronic Filing System in accordance with 37 CFR
1.6(a)(4) on the date indicated below:

Date of Submission: Feb. 16, 2012

Typed Name:  Derek J. Westberg

Signature: _____

---

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Examiner:

The following is in response to the official action mailed on January 26, 2012:

## AMENDMENTS TO THE CLAIMS

This listing of all claims will replace all prior versions, and listings, of claims in the application:

1. (Currently Amended)  A method for transferring an electronic payment between a purchaser and a merchant comprising:

    assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;

    adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;

    obtaining a user ID token of [[a]]the purchaser from a merchant terminal, the merchant terminal being at a merchant location and the merchant location being different from the payment system;

    communicating identity confirmation information associated with the user ID token to the merchant terminal; and

    transferring funds for a purchase price total from the purchaser account to the merchant account.

2. (Original)  The method of claim 1, further comprising storing purchase list information as a transaction record for the merchant account and the purchaser account.

3. (Original)  The method of claim 2, further comprising serving the product catalog to a purchaser terminal, wherein an item is added to the product catalog from the purchaser terminal.

4. (Currently Amended)  The method of claim 3, further comprising navigating [[a]]the purchaser terminal to the product catalog of a merchant based on the location of the purchaser terminal.

1     5. (Currently Amended)  The method of claim 2, further comprising serving the
2     product catalog to [[a]]<u>the</u> merchant terminal, wherein an item is added to the
3     product catalog from [[a]]<u>the</u> merchant terminal.

1     6. (Currently Amended)  The method of claim 2, wherein the step of obtaining a
2     user ID token of a purchaser includes scanning a barcode provided by [[a]]<u>the</u>
3     purchaser.

1     7. (Original)  The method of claim 6, further comprising providing a barcode
2     displayable on a purchaser terminal.

1     8. (Previously Presented)  The method of claim 2, wherein the step of
2     communicating identity confirmation information includes sending an image
3     associated with an account ID, wherein the image comprises a photograph of an
4     owner of the purchaser account, and receiving confirmation from the merchant
5     terminal that the image associated with the account ID matches that of the purchaser.

1     9. (Original)  The method of claim 2, further comprising augmenting a transaction
2     associated with the transfer of funds.

1     10. (Original)  The method of claim 9, wherein augmenting the transaction includes
2     adding a purchaser-variable value to the purchase price total.

1     11. (Original)  The method of claim 10, wherein adding a purchaser-variable value
2     to the purchase price total includes allowing the purchaser to set the purchaser-
3     variable value after the purchase with the merchant is completed.

1     12. (Previously Presented)  The method of claim 11, wherein adding a purchaser-
2     variable value to a purchase price includes setting a default value greater than zero,
3     and using the default value as the purchaser-variable value if the purchaser-variable
4     value is not set by an expiration time.

13.  (Previously Presented)  The method of claim 9, wherein augmenting the transaction includes charging a portion of the purchase price total to at least a third account.

14.  (Currently Amended)  The method of claim 13, wherein a percentage of the purchase price total is charged to ~~a first~~the purchaser account and a remaining percentage of the purchase price total is charged to the ~~second~~third account.

15.  (Currently Amended)  The method of claim 13, wherein the portion of the purchase price total charged to at least a ~~second~~third account is calculated from items from the product list that are selected to be charged to the ~~second~~third account.

16.  (Previously Presented)  The method of claim 9, wherein augmenting the transaction includes applying a budgeting rule that transfers money based in part on the purchase.

17.  (Original)  The method of claim 2, further comprising communicating a notification of purchase-related effects at the time of purchase.

18.  (Original)  The method of claim 2, further comprising receiving purchaser acknowledgment of account-related warnings at the time of purchase and obtaining purchaser consent to ameliorative actions at the time of purchase.

19.  (Currently Amended)  A method for transferring an electronic payment between a purchaser and a merchant comprising:

    assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;

7       adding at least one item offered for sale by the merchant from a product
8   catalog stored in the payment system to a purchase list;

9       providing a user ID token in the form of a barcode that is displayable on a
10  purchaser terminal;

11      obtaining a user ID token of [[a]]the purchaser from a merchant terminal by
12  scanning a purchaser terminal display of the barcode user ID, the merchant terminal
13  being at a merchant location and the merchant location being different from the
14  payment system;

15      communicating identity confirmation information associated with the user ID
16  token to the merchant terminal, wherein the identity confirmation information is an
17  image of an owner of the purchaser account;

18      receiving confirmation from the merchant terminal that the image matches
19  the owner of the purchaser account;

20      transferring funds for a purchase price total from the purchaser account to the
21  merchant account; and

22      recording purchase list information as a transaction record for the merchant
23  account and the purchaser account.

1   20. (Currently Amended)  A system for transferring an electronic payment between a
2   purchaser and a merchant comprising:

3       a payment system that manages transactions between the purchaser and the
4   merchant and includes a payment system account database, wherein the account
5   database includes a plurality of accounts that are adapted to selectively function as
6   either a merchant account or a purchaser account during any particular transaction
7   and wherein the merchant is at a merchant location and the merchant location is
8   different from the payment system ;

9       a product catalog with categorized items offered for sale by the merchant that
10  is hosted within the payment system;

11      an account portal that connects an electronic terminal to the payment system
12  through a network connection, and includes transaction interface tools and product
13  catalog management tool; and

14          wherein the account portal connects [[a]]the purchaser to the payment system

15          with a transaction interface for a purchaser and connects a merchant to the payment

16          system with a merchant interface.

1          21.  (Currently Amended)  A method performed over a payment network for

2          transferring an electronic payment between a purchaser and a merchant, the payment

3          network comprising a plurality of merchant terminals connected to a plurality of

4          payment servers, an accounts database that includes a plurality of accounts adapted

5          to selectively function as either a merchant account or a purchaser account during

6          any particular transaction, and a product catalog database of items offered for sale by

7          the merchant, wherein each merchant terminal has an ID token reader, a display, and

8          network capabilities, the method comprising the steps of:

9          assigning the role of a merchant account to a first account from the accounts

10          database and the role of a purchaser account to a second account from the accounts

11          database;

12          creating a purchase list with at least one item from the product catalog

13          database;

14          reading, with the ID token reader of a merchant terminal, the user ID token of

15          a purchaser and sending the user ID token to a payment server, the merchant terminal

16          being at a merchant location and the merchant location being different from the

17          product catalog database;

18          transmitting, from the payment server to the merchant terminal, identity

19          confirmation information associated with the user ID token;

20          transmitting, from the merchant terminal to the payment server, a payment

21          approval communication;

22          transferring, with the payment server, payment from the purchaser account to

23          the merchant account.

1          22.  (Currently Amended)  A method performed over a payment network for

2          transferring an electronic payment between a purchaser and a merchant, the payment

3          network comprising a plurality of merchant terminals and purchaser terminals

4      connected to a plurality of payment servers, an accounts database <u>that includes a</u>

5      <u>plurality of accounts adapted to selectively function as either a merchant account or a</u>

6      <u>purchaser account during any particular transaction</u>, and a product catalog database

7      <u>of items offered for sale by the merchant</u>, wherein each merchant terminal has an ID

8      token reader, a display, and network capabilities, the method comprising the steps of:

9           assigning the role of a merchant account to a first account from the accounts

10     database and the role of a purchaser account to a second account from the accounts

11     database;

12          creating a purchase list with at least one item from the product catalog

13     database;

14          transmitting, from a purchaser terminal to a merchant terminal, the user ID

15     token of a purchaser and sending the user ID token to a payment server, the merchant

16     terminal being at a merchant location and the merchant location being different from

17     the product catalog database;

18          transmitting, from the payment server to the merchant terminal, identity

19     confirmation information associated with the user ID token;

20          transmitting, from the merchant terminal to the payment server, a payment

21     approval communication;

22          transferring, with the payment server, payment from the purchaser account to

23     the merchant account.

## REMARKS

Claims 1-22 were pending. All stand rejected. By the above amendments the Applicant has amended claims 1, 4-6, 14, 15, 19, 20, 21 and 22. The Applicant respectfully requests further examination and reconsideration in view of the amendments above and remarks below.

Applicant has amended the claims to improve their clarity. Specifically, independent claims 1, 19, 20, 21 and 22 are amended to recite that the items added to the "purchase list" from the "product catalog" are offered for sale by the merchant. These claims are also amended to recite that the accounts within the payment system are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction. Additionally, claims 1, 19, and 20 are amended to replace "a purchaser" with "the purchaser" as antecedent basis for "the purchaser" is recited in the preamble of the claims. Claims 4-6 are amended to replace "a purchaser terminal," "a merchant terminal," and "a purchaser" with "the purchaser terminal," "the merchant terminal," and "the purchaser" as antecedent basis for these terms are provided in the claims upon which claims 4-6 depend. Claims 14 and 15 are amended to clarify the three accounts recited in the claims. Claims 21 and 22 are additionally amended to clarify that the method is for transferring an electronic payment between a purchaser and a merchant.

<u>Rejections under 35 U.S.C. § 103</u>

Claims 1, 2, 5-7, 9, 13-15 and 17-22 were rejected as allegedly being obvious in view of U.S. Patent Publication No. 2010/0138344 by Wong et al. (hereinafter, "Wong et al.") taken in combination with U.S. Patent Publication No. 2008/0120155 by Pliha (hereinafter, "Pliha"). The remaining dependent claims were rejected under 35 U.S.C. § 103 as allegedly being obvious in view of Wong et al. in combination with Pliha and further in view of other cited art.

The Applicant respectfully disagrees with the rejections. Regarding Applicant's claim 1, it recites a "product catalog stored in a payment system" and a "merchant location being different from the payment system." In other words, claim 1 requires that the product catalog is stored in the payment system at a location that is different from the merchant location. The office action mailed on January 26, 2012, appears to allege that Wong discloses this feature. See page 3 of the office action, as well as the paragraph spanning pages 3-4, where the office action discusses each limitation of claim 1 in connection with Wong et al.; see also page 2 of the office action where it states that Wong et al. "may not explicitly disclose" this feature. The fact that Wong et al does

not disclose this feature has been thoroughly addressed by the Applicant on multiple occasions during the prosecution of this application. Specifically, this was discussed in Applicant's response filed on June 6, 2011; in Applicant's response filed on August 8, 2011; in Applicant's Interview Agenda submitted on December 12, 2011; and in Applicant's response filed on December 13, 2011. This issue was also discussed by telephone during the interview which took place on December 13, 2011. Moreover, the Applicant-Initiated Examiner Interview Summary mailed by the Office on December 20, 2011, states that "the claimed invention, once amended, appears to be different than Wong." The Applicant maintains that Wong et al. does <u>not</u> disclose, either explicitly or implicitly, a product catalog stored in the payment system at a location that is different from the merchant location.

The office action mailed on January 26, 2012, additionally alleges that Pliha discloses this limitation and that it would have been obvious to incorporate the teachings on Pliha into Wong so as to achieve the Applicant's claimed invention. See office action mailed on January 26, 2012, at pages 4-5.

The Applicant respectfully disagrees. As explained fully below, the Applicant submits that it would not have been obvious to combine Wong et al. and Pliha in the manner suggested in the office action. And, even if these references could properly be combined, such a combination would not result in Applicant's claimed invention.

Wong et al. is directed toward completing purchase transactions using a mobile device. According to an embodiment of Wong et al., an application on a mobile device having a screen, such as a cell phone, enables the user to generate a bar code on the screen, which can be scanned for payment. The bar code is valid for a limited period of time (e.g., one minute). Once scanned, payment is transferred from the user's account to the merchant's account. According to Wong et al., this allows users to easily and safely pay for purchases using a cell phone at any location having a suitable scanning device. See Wong et al. at paras. [0002]-[0011].

Pliha is not directed toward completing purchase transactions at all. Rather, Pliha is directed toward distributing targeted incentives to customers of financial institutions based on each customer's financial or demographic data, or both. Specifically, Pliha's Abstract describes its invention as follows:

> An incentive distribution system is used in distributing, tracking and redeeming
> product incentives offered by manufacturers and distributors of consumer goods

through a financial institution.  A financial institution distributes an incentives list
to each of its customers, based on information relating to the customers,
containing the incentives relating to the category for which the customer qualifies.
Qualifying criteria includes transactional activity within the account held with the
financial institution distributing the incentives, demographic data relating to the
customer, and various account data.  The system tracks purchases made by a
customer at a participating retailer or dealership and updates the customer's
qualifications based on these purchases.  Further, the financial institution acts as a
redemption warehouse by debiting the accounts of the manufacturers and
distributors offering the incentives and crediting the accounts held by the retailers
and dealerships honoring the incentives.

Therefore, Wong et al. and Pliha are directed toward solving fundamentally different
problems which are encountered fundamentally different contexts.  Specifically, Wong et al. is
directed toward facilitating payments for purchases using a cell phone and a scanning device,
whereas, Pliha is directed toward distributing consumer product incentives in a targeted fashion
by analyzing records held at a financial institution where the records reflect past purchases made
by a consumer.  Therefore, a significant difference is that Wong et al. is directed toward
completing real-time processing of purchase transactions whereas Pliha is directed toward
analyzing records of past transactions after the transactions have occurred.  And, the purpose of
Wong et al. is to facilitate such purchase transactions, whereas, the purpose of Pliha is to
distribute incentives to make product purchases.

In view of these significant differences, the Applicant respectfully submits that there
would not have been a reason to combine these references in the manner suggested in the office
action.  However, each claim rejection contained in the office action mailed on January 26, 2012,
depends upon this combination.  Therefore, for at least this reason, Applicant's claimed invention
is allowable over Wong et al. and Pliha.

Regarding Pliha, the office action mailed on January 26, 2012, states as follows:

In particular, the financial institution maintains a product catalog of offers to
various merchants, and when, the user takes an action with the financial
institution (but indirectly with the merchant) the financial institution records the
activity, and then places one of its "products" from its "product catalog" with the
consumer, wherein the "product" provided to the consumer is "purchased" by the
consumer acting as he/she did in the course of the one or more transaction
completed by the merchant.

This characterization of Pliha is incorrect for a number of reasons.  First, Pliha does not
disclose a "product catalog" as recited in Applicant's claims.  Taking claim 1, for example, it

recites adding an item from a product catalog to a purchase list and then transferring funds for a purchase price total from the purchaser account to the merchant account. Therefore, the product catalog of Applicant's claim 1 is clearly a catalog of products offered for sale by the merchant. In contrast, Pliha does not use the term "product catalog" or anything similar. The incentives discussed in Pliha cannot reasonably be considered "products" nor can the collection of such incentives be reasonably considered a "product catalog" as those terms are used in the Applicant's claim 1. This is at least because, when Applicant's claim 1 is considered as a whole, as it must according to 35 U.S.C. § 103, these terms clearly refer to items being purchased by a purchaser and do not refer to "incentives" to make purchases, as in Pliha. In contrast, the incentives distributed by Pliha are simply informational since they inform the consumer of incentives offered to that particular consumer (see para. [0076] of Pliha). While the Applicant does not consider it necessary, to further clarify this point, Applicant has amended the independent claims to recite that the items added to the "purchase list" from the "product catalog" are offered for sale by the merchant.

　　　Second, it would not make any sense to substitute the items being purchased in the context of Wong et al. with the incentives to make purchases as in Pliha. Regarding Pliha, the office action states that "the financial institution records the activity, and then places one of its 'products' from its 'product catalog' with the consumer, wherein the 'product' provided to the consumer is 'purchased' by the consumer." However, even if the "incentives" of Pliha could reasonably be considered "products," this is not how Pliha actually operates. Rather, as Pliha shows in Figure 10 and discusses at paras. [0097]-[0098], the financial institution only records consumer activity and it does this in "end-of-day" batches, not in real-time. Additionally, Pliha shows in Figure 11 and discusses at paras. [0099]-[0100] that its incentives are also not distributed in real-time. Rather, as discussed by Pliha, a customer is informed of incentives as part of the financial institution's monthly statement after it has completed end-of-month processing. Because of these differences, the distribution of incentives as taught by Pliha would be incompatible with the system of Wong et al.

　　　Additionally regarding Pliha, the office action alleges that it would have been obvious to combine Pliha with Wong et al. "because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog." This also incorrectly

characterizes Pliha at least because Pliha does not disclose a distribution of a product catalog, but instead discloses distributing incentives to make future purchases. Moreover, the distribution of these incentives is not contemporaneous with a purchase but is instead performed periodically via end-of-month statements of the financial institution. In contrast, Wong et al. is directed toward completing real-time processing of purchase transactions. Therefore, to make the combination as suggested in the office action would materially alter the manner in which the systems described in the cited references function. As such, this reasoning to make the alleged combination does not appear to be based on what the cited references fairly teach, but appears instead to be based on improper hindsight reconstruction using the applicant's claims as a template. As explained in the Manual of Patent Examining Procedure at Section 2143.01, if a proposed modification or combination of cited art would change the principle of operation of the cited art invention being modified, then the teachings of the references are not sufficient to render the claims *prima facie* obvious.

In view of the above, the Applicant respectfully submits that Applicant's claim 1 is allowable over the cited art. Specifically, the Applicant's independent claims all require that a product catalog is stored in a payment system that is at a location that is different from the merchant's location. Neither Wong et al. nor Pliha, whether considered individually or in combination, discloses such a product catalog.

Dependent claims 2-18 are allowable at least because they are dependent upon an allowable base claim 1. Independent claims 19, 20, 21, and 22 are allowable for at least the same reasons that claim 1 is allowable.

Additionally, independent claims 1, 19, 20, 21 and 22 are amended to recite essentially that the accounts within the payment system are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction. This feature is disclosed in the Applicant's specification at least at paras. [0017], [0029] and [0030]. Neither Wong et al., nor Pliha suggest or disclose such a feature. Moreover, because Wong et al. lacks such flexibility, it would not have been obvious to modify Wong et al. as suggested in the office action in order to achieve the Applicant's claimed invention. Therefore, this is an additional reason why claims 1-22 are allowable.

The Applicant respectfully believes that the above is sufficient to patentably distinguish all of the Applicant's claims from the cited art. As such, the Applicant need not specifically

address every statement made in the office action, and does not thereby admit the correctness thereof.  The Applicant also reserves the right to antedate any cited art applied under 35 U.S.C. § 102(e), such as Wong et al.

Conclusion

In view of the above, the Applicant submits that all of the pending claims are allowable. Allowance at an early date would be greatly appreciated.  Should any outstanding issues remain, the examiner is encouraged to contact the undersigned at (650) 968-0410 so that any such issues can be expeditiously resolved.

Respectfully Submitted,

Dated: Feb. 16, 2012

Derek J. Westberg (Reg. No. 40,872)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 12/641,071 | GREENSPAN, AARON J. |
| | Examiner | Art Unit | |
| | PETER L. LUDWIG | 3687 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>13 December 2011</u>.

2a)☒ This action is **FINAL**.    2b)☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5)☒ Claim(s) <u>1-22</u> is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) <u>1-22</u> is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____ .

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____ .

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____ .

## DETAILED ACTION

1.      This Final Rejection is in response to Applicant's amendment filed on 12/13/2011.  Accordingly, the Examiner withdraws the 35 USC 112, first paragraph, rejection made in the Non-Final Rejection.  Claims 1-22 are currently pending and examined below.

### *Claim Rejections - 35 USC § 103*

2.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

3.      **Claims 1, 2, 5-7, 9, 13-15, and 17-22 are rejected under 35 U.S.C. 103(a) as being unpatentable over U.S. Patent Publication No. 2010/0138344 to Wong et al. ("Wong") in view of U.S. Pat. Pub. No. 2008/0120155 to Pliha ("Pliha").**

4.      <u>With respect to claim 1,</u> Wong teaches a method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account (see e.g. ¶0027, merchant account information within payment system) and a role of a purchaser account to a second account (see e.g. ¶0025, user registers account information with payment system ) within a payment system;

adding an item from a product catalog stored in the payment system to a purchase list (e.g., ¶0021, "point of sale (POS) after the user has finished shopping . . . .");

obtaining a user ID token of a purchaser from a merchant terminal (see e.g., ¶0027, wherein the user is provided a barcode by payment provider on his/her mobile device, and then merchant, at merchant terminal, scans the barcode from the mobile device)<u>, the merchant terminal being at a merchant location and the merchant location being different from the payment system (</u>the merchant terminal and the payment system are not in the same physical location, wherein this is evidenced all over ¶0025-30, such as at ¶0028, "The POS software

at the merchant location then makes a DoAuthorization API call to the payment
provider to authorize the payment" wherien a call would not have to be made if
the merchant and the payment system were one and the same, or at the same
location, wherein this is a communication between two entities such as between
Wells Fargo (i.e. payment service) and merchant terminal at Dick's Sporting
Goods (i.e., merchant location) regarding whether or not user has sufficient
funds on credit card account to pay for his Air Jordan shoes);

communicating identity confirmation information associated with the
user ID token to the merchant terminal (e.g., ¶0028); and

transferring funds for the purchase price total from the purchaser account
to the merchant account (e.g., ¶0029, "As a result, funds are transferred from the
user's account to the merchant's account for the purchase of the desired
item(s).").

However, Wong may not explicitly disclose wherein the product catalog is
stored in the payment system at a location different than that of the merchant
terminal.

Pliha does teach this.  In general, Pliha discloses "an incentive
distribution system used in distributing, tracking and redeeming product
incentives offered by manufacturers and distributors of consumer goods *through
a financial institution*.  See abstract (emphasis added).  In particular, the financial
institution maintains a product catalog of offers to various merchants, and when
the user takes an action with the financial institution (but indirectly with the
merchant) the financial institution records the activity, and then places one of its
"products" from its "product catalog" with the consumer, wherein the "product"
provided the consumer is "purchased" by the consumer acting as he/she did in
the course of the one or more transaction completed by the merchant.  See
abstract an" Figures.

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (barcode payment system) with the teachings of Pliha (having the financial institution maintain a product catalog to distribute purchased products to the consumer) because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog. This allows the financial institution to play a more active role in the process of transacting with the consumer, and can even turn the financial institution to a merchant as well.

Moreover, the elements are all known but not combined as claimed. *See KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed to combine the elements as claimed and the results of the combination are predictable. *See id.* When combined, the elements perform the same function as they did separately. *See id.*

5.     <u>With respect to claim 2,</u> Wong and Pliha teach the method of claim 1, and Wong further teaches the step of storing purchase list information as a transaction record for the merchant account and the purchaser account (e.g., ¶0008, 0030).

6.     <u>With respect to claim 5,</u> Wong and Pliha teach the method of claim 2, and Wong further teaches the step of serving the product catalog to a merchant terminal, wherein an item is added to the product catalog from a merchant terminal (e.g., ¶0004-5; 0021, wherein an item is inherently added to the product catalog by the merchant if the purchaser is able to purchase it from a list of products while shopping online).

7.     <u>With respect to claim 6,</u> Wong and Pliha teach the method of claim 2, and

Wong further teaches the step of obtaining a user ID token of a purchaser includes scanning a barcode provided by a purchaser (¶0021, "the user presents the barcode image to the merchant" where the barcode is scanned by the merchant).

8.    <u>With respect to claim 7,</u> Wong and Pliha teach the method of claim 6, and Wong further teaches the step of providing a barcode displayable on a purchaser terminal (e.g., ¶0020, "the user is presented with a screen showing a barcode; Fig. 3B).

9.    <u>With respect to claim 9,</u> Wong and Pliha teach the method of claim 2, and Wong further teaches the step of augmenting a transaction associated with the transfer of funds (e.g., ¶0026).

10.    <u>With respect to claim 13,</u> Wong and Pliha teach the method of claim 9, and Wong further teaches wherein augmenting the transaction includes charging a portion of the purchase price total to at least a second account (see e.g., ¶0026, wherein the barcode allows access to all the funds in a user's account, and then another barcode is scanned, such as from the purchaser's friend's account, or from one of the children's account of a family account).

11.    <u>With respect to claim 14,</u> Wong and Pliha teach the method of claim 13, and Wong further teaches wherein a percentage of the purchase price total is charged to a first purchaser and a remaining percentage of the purchase price total is charged to the second account (see e.g., ¶0026, wherein a child with a "maximum amount of transaction" uses his/her maximum amount, and then the rest of the percentage of the bill is debited to another purchaser, such as his/her sibling who still has funds to utilize).

12.    <u>With respect to claim 15,</u> Wong and Pliha teach the method of claim 13, and Wong further teaches wherein the portion of the purchase price total charged to at least a second account is calculated from items from the product list that are selected to be charged to the second account (see e.g, ¶0026, wherein the first purchaser buys certain products/services with his barcode, and then cannot purchase certain products/services because the barcode does not allow the purchaser to purchase some products/service.  In that case, another account from another purchaser would have to be used, and the products would be specified).

13.    <u>With respect to claim 17,</u> Wong and Pliha teach the method of claim 2, and Wong further teaches communicating a notification of purchase-related effects at the time of purchase (e.g., ¶0027, "payment provider may also send a confirmation to both the user and merchant that funds have been transferred").

14.    <u>With respect to claim 18,</u> Wong and Pliha teach the method of claim 2, and Wong further teaches the step of receiving purchaser acknowledgment of account-related warnings at the time of purchase and obtaining purchaser consent to ameliorative actions at the time of purchase (e.g., ¶0028).

15.    <u>With respect to claim 19,</u> Wong and Pliha teach a method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account (see e.g. ¶0027, merchant account information within payment system) and a role of a purchaser account to a second account (see e.g. ¶0025, user registers account information with payment system) within a payment system;

adding at least one item from a product catalog stored in the payment
system to a purchase list (e.g., ¶0021, "point of sale (POS) after the user has
finished shopping . . . .");

providing a user ID token in the form of a barcode that is displayable on a
purchaser terminal (e.g., ¶0026, "the user is presented with a screen showing a
barcode; Fig. 3B);

obtaining a user ID token of a purchaser from a merchant terminal by
scanning a purchaser terminal display of the barcode user ID (see e.g., ¶0027,
wherein the user is provided a barcode by payment provider on his/her mobile
device, and then merchant, at merchant terminal, scans the barcode from the
mobile device) , the merchant terminal being at a merchant location and the
merchant location between separate from the payment system (the merchant
terminal and the payment system are not in the same location physical, wherein
this is evidenced all over ¶0025-30, such as at ¶0028, "The POS software at the
merchant location then makes a DoAuthorization API call to the payment
provider to authorize the payment" wherien a call would not have to be made if
the merchant and the payment system were one and the same, or at the same
location, wherein this is a communication between two entities such as between
Wells Fargo (i.e. payment service) and merchant terminal at Dick's Sporting
Goods (i.e., merchant location) regarding whether or not user has sufficient
funds on credit card account to pay for his Air Jordan shoes);

communicating identity confirmation information associated with the
user ID token to the merchant terminal, wherein the identity confirmation
information is an image of the owner of the purchaser account (see e.g., ¶0028,
wherein the payment provider, following scan of the barcode, sends to the
merchant terminal an image associated with the client (either in the form of an
electronic signature pad or OK button));

receiving confirmation from the merchant terminal that the image
associated with the account ID matches that of the purchaser (the confirmation
being that the purchaser has signed the signature pad, and the merchant has
verified that the purchaser is in fact the fact by asking to see a credit card
associated with the purchaser, and viewing the signature on the back of the
credit card, to ensure that the signature matches the signature on the electronic
signature pad (as typically done, and by law required to do so in some instances
and in some states);

transferring funds for the purchase price total from the purchaser account
to the merchant account (e.g., ¶0029, "As a result, funds are transferred from the
user's account to the merchant's account for the purchase of the desired
item(s)."); and

recording the purchase list information as a transaction record for the
merchant account and the purchaser account (e.g., ¶0031, exemplifying that the
payment provider saves all of the transaction related information).

However, Wong may not explicitly disclose wherein the product catalog is
stored in the payment system at a location different than that of the merchant
terminal.

Pliha does teach this.  In general, Pliha discloses "an incentive
distribution system used in distributing, tracking and redeeming product
incentives offered by manufacturers and distributors of consumer goods *through
a financial institution*.  See abstract (emphasis added).  In particular, the financial
institution maintains a product catalog of offers to various merchants, and when
the user takes an action with the financial institution (but indirectly with the
merchant) the financial institution records the activity, and then places one of its
"products" from its "product catalog" with the consumer, wherein the "product"
provided the consumer is "purchased" by the consumer acting as he/she did in

the course of the one or more transaction completed by the merchant.  See
abstract an" Figures.

Therefore, it would have been obvious to one of ordinary skill in the art at
the time of the invention to combine the teachings of Wong (barcode payment
system) with the teachings of Pliha (having the financial institution maintain a
product catalog to distribute purchased products to the consumer) because when
the financial institution, which is at a different location than the merchant, also
collects data on consumer activity, the financial institution can now distribute
relevant information to the user through its product catalog.  This allows the
financial institution to play a more active role in the process of transacting with
the consumer, and can even turn the financial institution to a merchant as well.

Moreover, the elements are all known but not combined as claimed.  *See
KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007).  The technical ability existed
to combine the elements as claimed and the results of the combination are
predictable.  *See id.*  When combined, the elements perform the same function as
they did separately.  *See id.*

16.    <u>With respect to claim 20,</u> Wong teaches a system for transferring an
electronic payment between a purchaser and a merchant comprising:

a payment system that manages transactions between the purchaser and
the merchant and includes a payment system account database (¶0027 discusses
the payment system with account database<u>), the merchant terminal being at a
merchant location and the merchant location between separate from the payment
system (</u>the merchant terminal and the payment system are not in the same
location physical, wherein this is evidenced all over ¶0025-30, such as at ¶0028,
"The POS software at the merchant location then makes a DoAuthorization API
call to the payment provider to authorize the payment" wherien a call would not
have to be made if the merchant and the payment system were one and the same,

or at the same location, wherein this is a communication between two entities such as between Wells Fargo (i.e. payment service) and merchant terminal at Dick's Sporting Goods (i.e., merchant location) regarding whether or not user has sufficient funds on credit card account to pay for his Air Jordan shoes);

a product catalog with categorized items that is hosted within the payment system (see e.g., ¶0005, 0029);

an account portal that connects an electronic terminal to the payment system through a network connection, and includes transaction interface tools and product catalog management tool (see e.g., Fig. 3A and 3B; see also ¶0004-5, disclosing wherein consumers and merchants are now using mobile phones for e-commerce and other social activities); and

wherein the account portal connects a purchaser to the payment system with a transaction interface for a purchaser and connects a merchant to the payment system with a merchant interface (see e.g., Fig. 3A-3B).

However, Wong may not explicitly disclose wherein the product catalog is stored in the payment system at a location different than that of the merchant terminal.

Pliha does teach this. In general, Pliha discloses "an incentive distribution system used in distributing, tracking and redeeming product incentives offered by manufacturers and distributors of consumer goods *through a financial institution*. See abstract (emphasis added). In particular, the financial institution maintains a product catalog of offers to various merchants, and when the user takes an action with the financial institution (but indirectly with the merchant) the financial institution records the activity, and then places one of its "products" from its "product catalog" with the consumer, wherein the "product" provided the consumer is "purchased" by the consumer acting as he/she did in the course of the one or more transaction completed by the merchant. See abstract an" Figures.

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (barcode payment system) with the teachings of Pliha (having the financial institution maintain a product catalog to distribute purchased products to the consumer) because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog. This allows the financial institution to play a more active role in the process of transacting with the consumer, and can even turn the financial institution to a merchant as well.

Moreover, the elements are all known but not combined as claimed. *See KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed to combine the elements as claimed and the results of the combination are predictable. *See id.* When combined, the elements perform the same function as they did separately. *See id.*

17. <u>With respect to claim 21,</u> Wong teaches a method performed over a payment network, the payment network comprising a plurality of merchant terminals connected to a plurality of payment servers, an accounts database, and a product catalog database, wherein each merchant terminal has an ID token reader, a display, and network capabilities, the method comprising the steps of:

assigning a role of a merchant account to a first account (see e.g. ¶0027, merchant account information within payment system) and a role of a purchaser account to a second account (see e.g. ¶0025, user registers account information with payment system) within a payment system;

creating a purchase list with at least one item from the product catalog database (e.g., ¶0021, "point of sale (POS) after the user has finished shopping . . . .");

reading, with the ID token reader of a merchant terminal, the user ID
token of a purchaser and sending the user ID token to a payment server (¶0027,
"the user presents the barcode image to the merchant" where the barcode is
scanned by the merchant) , the merchant terminal being at a merchant location
and the merchant location between separate from the payment system (the
merchant terminal and the payment system are not in the same location physical,
wherein this is evidenced all over ¶0025-30, such as at ¶0028, "The POS software
at the merchant location then makes a DoAuthorization API call to the payment
provider to authorize the payment" wherien a call would not have to be made if
the merchant and the payment system were one and the same, or at the same
location, wherein this is a communication between two entities such as between
Wells Fargo (i.e. payment service) and merchant terminal at Dick's Sporting
Goods (i.e., merchant location) regarding whether or not user has sufficient
funds on credit card account to pay for his Air Jordan shoes);

transmitting, from the payment server to the merchant terminal, identity
confirmation information associated with the user ID token (see e.g., ¶0028,
wherein the payment provider, following scan of the barcode, sends to the
merchant terminal an image associated with the client (either in the form of an
electronic signature pad or OK button));

transmitting, from the merchant terminal to the payment server, a
payment approval communication (the confirmation being that the purchaser
has signed the signature pad, and the merchant has verified that the purchaser is
in fact the fact by asking to see a credit card associated with the purchaser, and
viewing the signature on the back of the credit card, to ensure that the signature
matches the signature on the electronic signature pad (as typically done, and by
law required to do so in some instances and in some states);

transferring, with the payment server, payment from the purchaser
account to the merchant account (e.g., ¶0029, "As a result, funds are transferred

from the user's account to the merchant's account for the purchase of the desired item(s).").

However, Wong may not explicitly disclose wherein the product catalog is stored in the payment system at a location different than that of the merchant terminal.

Pliha does teach this. In general, Pliha discloses "an incentive distribution system used in distributing, tracking and redeeming product incentives offered by manufacturers and distributors of consumer goods *through a financial institution*. See abstract (emphasis added). In particular, the financial institution maintains a product catalog of offers to various merchants, and when the user takes an action with the financial institution (but indirectly with the merchant) the financial institution records the activity, and then places one of its "products" from its "product catalog" with the consumer, wherein the "product" provided the consumer is "purchased" by the consumer acting as he/she did in the course of the one or more transaction completed by the merchant. See abstract an" Figures.

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to combine the teachings of Wong (barcode payment system) with the teachings of Pliha (having the financial institution maintain a product catalog to distribute purchased products to the consumer) because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog. This allows the financial institution to play a more active role in the process of transacting with the consumer, and can even turn the financial institution to a merchant as well.

Moreover, the elements are all known but not combined as claimed. *See KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed to combine the elements as claimed and the results of the combination are

predictable.  *See id.*  When combined, the elements perform the same function as
they did separately.  *See id.*

18.    <u>With respect to claim 22,</u> Wong teaches a method performed over a
payment network, the payment network comprising a plurality of merchant
terminals and purchaser terminals connected to a plurality of payment servers,
an accounts database, and a product catalog database, wherein each merchant
terminal has an ID token reader, a display, and network capabilities, the method
comprising the steps of:

assigning a role of a merchant account to a first account (see e.g. ¶0027,
merchant account information within payment system) and a role of a purchaser
account to a second account (see e.g. ¶0025, user registers account information
with payment system) within a payment system;

creating a purchase list with at least one item from the product catalog
database (e.g., ¶0021, "point of sale (POS) after the user has finished shopping . . .
.");

transmitting, from the purchaser terminal to the merchant terminal, the
user ID token of a purchaser and sending the user ID token to a payment server
(¶0027, "the user presents the barcode image to the merchant" where the barcode
is scanned by the merchant)<u>, the merchant terminal being at a merchant location</u>
<u>and the merchant location between separate from the payment system (</u>the
merchant terminal and the payment system are not in the same location physical,
wherein this is evidenced all over ¶0025-30, such as at ¶0028, "The POS software
at the merchant location then makes a DoAuthorization API call to the payment
provider to authorize the payment" wherien a call would not have to be made if
the merchant and the payment system were one and the same, or at the same
location, wherein this is a communication between two entities such as between
Wells Fargo (i.e. payment service) and merchant terminal at Dick's Sporting

Goods (i.e., merchant location) regarding whether or not user has sufficient funds on credit card account to pay for his Air Jordan shoes);

transmitting, from the payment server to the merchant terminal, identity confirmation information associated with the user ID token (see e.g., ¶0028, wherein the payment provider, following scan of the barcode, sends to the merchant terminal an image associated with the client (either in the form of an electronic signature pad or OK button));

transmitting, from the merchant terminal to the payment server, a payment approval communication (the confirmation being that the purchaser has signed the signature pad, and the merchant has verified that the purchaser is in fact the fact by asking to see a credit card associated with the purchaser, and viewing the signature on the back of the credit card, to ensure that the signature matches the signature on the electronic signature pad (as typically done, and by law required to do so in some instances and in some states);

transferring, with the payment server, payment from the purchaser account to the merchant account (e.g., ¶0029, "As a result, funds are transferred from the user's account to the merchant's account for the purchase of the desired item(s).").

However, Wong may not explicitly disclose wherein the product catalog is stored in the payment system at a location different than that of the merchant terminal.

Pliha does teach this.  In general, Pliha discloses "an incentive distribution system used in distributing, tracking and redeeming product incentives offered by manufacturers and distributors of consumer goods *through a financial institution*.  See abstract (emphasis added).  In particular, the financial institution maintains a product catalog of offers to various merchants, and when the user takes an action with the financial institution (but indirectly with the merchant) the financial institution records the activity, and then places one of its

"products" from its "product catalog" with the consumer, wherein the "product"
provided the consumer is "purchased" by the consumer acting as he/she did in
the course of the one or more transaction completed by the merchant. See
abstract an" Figures.

Therefore, it would have been obvious to one of ordinary skill in the art at
the time of the invention to combine the teachings of Wong (barcode payment
system) with the teachings of Pliha (having the financial institution maintain a
product catalog to distribute purchased products to the consumer) because when
the financial institution, which is at a different location than the merchant, also
collects data on consumer activity, the financial institution can now distribute
relevant information to the user through its product catalog. This allows the
financial institution to play a more active role in the process of transacting with
the consumer, and can even turn the financial institution to a merchant as well.

Moreover, the elements are all known but not combined as claimed. *See*
*KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ.2d 1385 (2007). The technical ability existed
to combine the elements as claimed and the results of the combination are
predictable. *See id.* When combined, the elements perform the same function as
they did separately. *See id.*



(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2008/0046366 A1

Bemmel et al. (43) **Pub. Date:** **Feb. 21, 2008**

(54) **METHOD AND SYSTEM FOR PROVIDING BIOMETRIC AUTHENTICATION AT A POINT-OF-SALE VIA A MOBILE DEVICE**

(76) Inventors: **Vincent Bemmel**, Dublin, CA (US); **Shaoib Mian**, Pleasanton, CA (US)

Correspondence Address:
**PEPPER HAMILTON LLP**
**ONE MELLON CENTER, 50TH FLOOR, 500 GRANT STREET**
**PITTSBURGH, PA 15219**

(21) Appl. No.: **11/566,987**

(22) Filed: **Dec. 5, 2006**

**Related U.S. Application Data**

(60) Provisional application No. 60/806,126, filed on Jun. 29, 2006.

**Publication Classification**

(51) **Int. Cl.**
*G06Q 40/00* (2006.01)

(52) **U.S. Cl.** ........................................................ **705/44**

(57) **ABSTRACT**

A system and method is provided for authorizing a payment for a point of sale transaction by authenticating the user of a mobile device, such as a mobile phone. The present invention authenticates the consumer and verifies that he is authorized to conduct a transaction at the point of sale by means of the consumer's mobile device.



SQUARE - EXHIBIT 1005

(19) **United States**

(12) **Patent Application Publication**    (10) Pub. No.: **US 2003/0204447 A1**

Dalzell et al.        (43) **Pub. Date:**     **Oct. 30, 2003**

---

(54) **METADATA SERVICE THAT SUPPORTS USER-TO-USER SALES VIA THIRD PARTY WEB PAGES**

(76) Inventors: **Richard L. Dalzell**, Greater Seattle, WA (US); **Neil C. Roseman**, Seattle, WA (US); **Paul Kotas**, Seattle, WA (US); **Jeffrey P. Bezos**, Greater Seattle, WA (US); **Bruce C. Moore**, Seattle, WA (US); **Jeffrey M. Blackburn**, Seattle, WA (US)

Correspondence Address:
KNOBBE MARTENS OLSON & BEAR LLP
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614 (US)

(21) Appl. No.:    10/142,743

(22) Filed:      **May 9, 2002**

**Related U.S. Application Data**

(60) Provisional application No. 60/336,409, filed on Oct. 31, 2001. Provisional application No. 60/351,207, filed on Jan. 22, 2002.

**Publication Classification**

(51) Int. Cl.[7] ................................................. G06F 17/60
(52) U.S. Cl. ............................................................... 705/26

(57)          **ABSTRACT**

An online marketplace system provides various features for assisting users in listing products for sale, locating the listings for a product, and performing related actions. A user wishing to sell a product can browse to an existing description of the product in an electronic catalog and then select an option to create a corresponding listing. To create the listing for the selected product, the user preferably specifies the product's condition and a selling price. Others may view and make purchases from such listings while browsing the catalog. In one embodiment which is part of a web page metadata service, the World Wide Web serves as the electronic catalog such that users may create, view and make purchases from product listings during viewing of third party web pages that describe the associated products. The system may also provide an option for buyers to preorder products from unspecified sellers.





100
File
Edit
View
Go
Favorite
Help
Back
Forw...
Stop
Refresh
Home
Search
Favorite
Print
Font
Mail
Address
http://www.store.com/music/train.html
SEARCH
MUSIC
GO
STORE.COM
BOOKS
MUSIC
VIDEO
GIFTS
ELECTRONICS
115
Drops of Jupiter
Train (Audio CD)
PHOTO
List Price: $18.07
Our Price: $13.99
You Save: $4.98 (26%)
Used Price: $11.00
Availability: This title usually ships within 24 hours.
See larger picture
READY TO BUY?
Add to Shopping Cart
(you can always remove it later)
(Use if you're redeeming a promotional certificate or coupon.)
OR
USE 1-CLICK
Returning customer?
Sign in to turn on 1-Click ordering
Shopping with us is safe.
Guaranteed.
Add to Wish List
120
105
BUY & SELL USED ITEMS
1 collectible from $29.95
7 used from $11.00
I have one to sell!
Sell yours here
130
135
140
127
125
<Customer/Professional reviews, related products list, etc.>

FIG. 1A

File Edit View Go Favorite Help
Back Forw... Stop Refresh Home Search Favorite Print Font Mail
Address http://www.store.com/music/train.html
SEARCH
MUSIC
GO
STORE.COM
BOOKS MUSIC VIDEO GIFTS ELECTRONICS
Drops of Jupiter
Train (Audio CD)
PHOTO
List Price: $18.07
Our Price: $13.99
You Save: $4.98 (26%)
Used Price: $11.00
THIS ITEM IS ALSO AVAILABLE TO BUY
New from Store.com $13.99
1 collectible from $29.95
I have one to sell! Sell yours here
105
150
127
Availability: This title usually ships within 24 hours.
Audio CD
7 used available from Store.com Marketplace sellers! (How does this work?)
Buying from Store.com Marketplace sellers is safe--the A-to-Z Guarantee covers purchases up to $2,500.
1. Condition: Listened to only once - no scratches
Buy from seller
129
seller:
Seller:
SALLY SMALL
This seller is rated:
Seller's Price:
$11.00
Usually ships in 2 business days
Ships from: NJ, United States
select address & credit card next.
2. Condition: Like New - FACTORY SEALED - NEW NOT USED
Buy from seller
129
seller:
Seller:
LARRY LARGE
This seller is rated:
Seller's Price:
$11.79
Usually ships in 2 business days
Ships from: NY, United States
select address & credit card next.

FIG. 1B

500
505
USER SYSTEM
530
WEB BROWSER
520
COMMUNICATION NETWORK
525
INTERNET
520
COMMUNICATION NETWORK
525
INTERNET
510
VOLUME SELLER SYSTEM
535
INVENTORY MANAGEMENT SYSTEM
515
MARKETPLACE WEB SITE
WEB DOCUMENTS
542
540
WEB SERVER
546
LOADER
550
BACKEND PAYMENT PROCESSING SYSTEM
548
560
PRODUCT INFORMATION DATABASE
PRODUCT IDS
562
PRODUCT LISTING DATABASE
MARKETPLACE LISTINGS
PREORDER LISTINGS
564
USER DATABASE
ACCOUNTS
PURCHASE HISTORIES
WEB SITE CODE
1– MARKETPLACE LISTING CREATION PROCESS
2– PREORDERING PROCESS
3– LISTING REQUEST PROCESS
4– PURCHASING PROCESS
5– BULK UPLOADING AND OTHER VOLUME SELLER PROCESSES
544

FIG. 5A



SELLER                                    WEB SITE

SELECT SELL OPTION ~605

SPECIFY CONDITION ~610

GATHER PRICING INFORMATION ~615

ENTER PRICE ~620

ENTER LOCATION ~625

SIGN—IN/REGISTER (IF APPLICABLE) ~630

GENERATE ELECTRONIC SUMMARY PAGE FOR TRANSACTION ~635

COMMIT LISTING ~640

CHECK PREORDERS AND UPDATE PRODUCT LISTING DATABASE ~645

~600

FIG. 6

# METADATA SERVICE THAT SUPPORTS USER-TO-USER SALES VIA THIRD PARTY WEB PAGES

## RELATED APPLICATIONS

[0001] The present application claims priority benefit under 35 U.S.C. § 119(e) of U.S. Provisional Application No. 60/336,409, filed Oct. 31, 2001, and U.S. Provisional Application No. 60/351,207, filed Jan. 22, 2002, the disclosures of which are hereby incorporated by reference.

## FIELD OF THE INVENTION

[0002] The present invention relates to electronic marketplaces through which users buy and sell items over a computer network. More specifically, the invention relates to user interfaces and methods through which users may place items for sale, locate items offered by others, and perform related actions within an electronic marketplace.

## BACKGROUND OF THE INVENTION

[0003] As the popularity and accessibility of computer networks continue to increase, it has become common for retail merchants to set up online "stores" for marketing and selling products. Typically, an online store includes a web-based or other electronic catalog of products that are available for purchase. Users browse the catalog using well known navigational tools to locate and purchase products of interest.

[0004] Electronic systems that support user-to-user sales of products have also become popular. These user-to-user sales systems typically include an electronic server system, such as a web site or an online services network, that provides services for users to list products for sale to, and purchase products from, other users. Sellers in such systems typically include both small merchants and non-merchant individuals. Existing user-to-user sales systems typically support fixed-price sales, auctions, or both. Product listings can typically be located using a search engine. In some cases, the user-to-user sales system is operated in association with an online retail store such that a customer can search a retail catalog, as well as a database of product listings from users, via a single search query.

[0005] User-to-user sales systems have the potential to attract large numbers of users, thereby potentially generating large and varied product listings of both new and used products. However, such systems commonly suffer from a number of deficiencies. For example, existing systems typically rely on sellers to supply descriptions of the products they are selling. The task of creating marketplace listings can therefore be cumbersome particularly for small sellers. For example, to create an effective listing, the seller typically must obtain and upload a detailed product description and image.

[0006] In addition, different sellers in an online marketplace will often use very different terminology to describe identical products. As a result, buyers seeking certain products often fail to find relevant listings, and sometimes become overwhelmed in less-relevant listings. Further, small sellers sometimes fail to fully and accurately describe their products, resulting in lost sales and/or erroneous purchases. Further, unlike the retail listings in some online stores, marketplace listings typically do not include customer ratings, customer and professional reviews, sales rank data, and other types of product-related data provided by sources other than the sellers.

[0007] Some user-to-user sales systems seek to address the above problems by allowing a seller to specify a UPC (Universal Product Code) or other product identifier of a product being listed. This allows the system to associate all of the seller listings for a particular product. Typically, however, the seller must know or look up the correct product identifier in order to create such a listing.

[0008] Embodiments of the present invention seek to overcome some or all of the above and other problems.

## SUMMARY OF THE INVENTION

[0009] The present invention comprises various inventive features for facilitating user-to-user and other sales in an online marketplace, including features for assisting users in efficiently creating and locating marketplace listings. These features may be embodied individually or in an appropriate combination within a particular system.

[0010] In a preferred embodiment, the online marketplace system includes a database of information about products that may be listed by users within an online marketplace. This information typically includes product IDs, and descriptions and product images provided by manufacturers or distributors of the products. The product information in this database is viewable by end users through a browsable electronic catalog in which each product is preferably fully identified within a corresponding product detail page. Each product detail page typically includes a product image and description, and may include customer ratings, customer and professional reviews, sales rank data, lists of related products, and/or other types of supplemental data that may assist consumers in making informed purchase decisions. This supplemental data may be maintained or generated by the operator of the marketplace system as a service to its customers. Users of the system can preferably locate specific product detail pages within the catalog by executing search queries, navigating a browse tree, or using any other navigation method supported by the particular system.

[0011] To add a listing for selling a particular product within the marketplace, a seller may browse to the detail page for that product and then select a link for adding a listing. Because the seller fully identifies the product to be listed by browsing to the corresponding detail page, the listing may be accurately associated with a particular product ID (UPC, ISBN, etc.) without the need for the seller to supply the product ID.

[0012] In addition, because detailed information already exists within the database for that product, there is no need for the seller to supply a complete description of the item. For example, in one embodiment, the seller can simply specify the condition and selling price of the particular unit of the product. Because the seller need not supply a detailed product description, listings may be added more rapidly and efficiently. The newly added product listing (referred to generally as a "marketplace listing" or "marketplace product listing") may, for example, be in the form of a fixed-price listing or an auction listing.

[0013] To assist potential buyers in efficiently locating the marketplace listings for a particular product, each product

response to the existence of preorder requests; for example, when the number of preorder requests for an item exceeds a particular threshold, the system may identify and send email-based listing requests to users who recently purchased that item.

[0023] Another feature of the invention is a service for suggesting prices to creators of marketplace and/or preorder listings. In one embodiment, when a user initiates creation of a marketplace listing for a particular product (e.g., from a product detail or a purchase history, as described above), the system may suggest a selling price to the user. This price may be based on one or more of the following, as well as other, criteria: (1) the current retail price for the product in an associated online store, (2) the manufacturer's suggested retail price, (3) the condition and/or age of the product (as specified by the user, or as predicted or determined from the user's purchase history in the case of a re-sell item), (4) prices paid by other marketplace users for the same or similar products of like condition, (5) prices at which the product is currently available from other marketplace sellers; (6) prices specified in any pending preorder requests for the item, (7) the current demand for the product as evidenced by preorder requests. The same or similar criteria may also be used to suggest a maximum purchase price to the creator of a preorder listing.

[0024] As will be recognized, some of the foregoing features may be implemented in a particular system without others without departing from the scope of the invention. By way of example and not limitation, one or more of the foregoing methods for creating product listings may be implemented without others, and/or without the ability to preorder products from marketplace sellers.

[0025] Further, some or all of the features may be embodied within a metadata service in which a metadata server provides web page metadata to a metadata client for display to users. In such an embodiment, the entire World Wide Web, or a selected subset of the World Wide Web, may be used as the products catalog. For instance, when a user views a web page that, based on an analysis of web page content performed by the metadata service, displays a description of a first product, the service may present to the user an option to sell a unit of the first product. If the user selects this option and creates a product or preorder listing, the service may thereafter display this product or preorder listing to other service users when such users access the same web page or any other web page that includes a description of the first product.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0026] A system that implements the foregoing and other features will now be described with reference to the drawings. The drawings and the associated descriptions are provided to illustrate specific embodiments and features of the invention and not to limit the scope of the invention. Throughout the drawings, reference numbers are re-used to indicate correspondence between referenced elements. In addition, the first digit of each reference number indicates the figure in which the element first appears.

[0027] FIG. 1A illustrates an exemplary product detail page showing marketplace product listings, and an option to create a marketplace listing, according to one embodiment of the invention.

[0028] FIG. 1B illustrates another view or version of the product detail page of FIG. 1A, with additional information about marketplace listings for used products.

[0029] FIG. 2 illustrates a product detail page of a product that is not currently available from a marketplace seller.

[0030] FIG. 3A illustrates an example web page for creating a preorder listing for the product featured in FIG. 2.

[0031] FIG. 3B illustrates an example product detail page showing pending preorder listings for the displayed product.

[0032] FIGS. 3C-3E illustrate an example sequence of pages for creating a marketplace product listing once a product has been selected.

[0033] FIG. 4A illustrates an example purchase history page that provides functionality for selecting products to list for sale (or "resale") within the marketplace.

[0034] FIG. 4B illustrates an example resale page corresponding to the product selections shown in FIG. 4A.

[0035] FIG. 4C illustrates an example listing request that solicits a marketplace listing from a user based on the user's purchase history.

[0036] FIG. 5A illustrates a block diagram of an example web-based implementation of the marketplace system.

[0037] FIG. 5B illustrates a process for generating a product detail page.

[0038] FIG. 6 illustrates one method by which a seller may create a marketplace listing.

[0039] FIG. 7A illustrates a bulk uploading process that may be used by volume sellers to list products for sale.

[0040] FIG. 7B illustrates representative logic for matching an uploaded product with a product description contained in a catalog.

[0041] FIG. 8 illustrates a process by which a user may preorder a product.

[0042] FIG. 9 illustrates a process by which a marketplace listing may be created for a product listed in a user's purchase history.

[0043] FIG. 10 illustrates a buying process for making a purchase.

[0044] FIG. 11 illustrates an embodiment in which the marketplace service is implemented as part of a web page metadata service.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

[0045] An online marketplace system which embodies the above and other inventive features will now be described in detail. As will be apparent, many of the disclosed features may be used without others, and may be implemented differently than described herein and/or in combination with features not disclosed herein. Although described primarily in the context of a web site system, the various inventive features are also applicable to other types of multi-user interactive systems in which users may browse and make purchases from an electronic catalog, including but not limited to online services networks, interactive television

systems, in-store kiosk systems, and systems that support browsing by voice. The following description is thus intended to illustrate, and not limit, the invention.

[0046] Throughout the description, the term "marketplace" is used to refer generally to an electronic forum through which users may buy and sell products using a preexisting electronic catalog of products. The term "marketplace listing," or "marketplace product listing" refers generally to an electronic listing for selling a product (and typically a specific product unit) within a marketplace. In a preferred embodiment, marketplace listings are associated with particular product records in a products database, and are displayed in the product catalog in association with corresponding product descriptions.

[0047] The term "marketplace system," or merely "system," is used to refer generally to the underlying computer hardware, software and data components that provide the marketplace. In one embodiment, the marketplace system also provides services for users to (1) use the product catalog to make retail purchases from a preferred seller, and (2) buy and sell items in an area in which sellers' product listings are not associated with specific product records or displayed within the electronic catalog (referred to as "non-catalog-based" listings or "non-marketplace" listings).

[0048] The term "product" may, depending on its context, refer to either (a) a particular unit or copy of a product, or (b) any unit or copy of that product. The term "unit" is used in some instances to emphasize that a particular unit or copy of a product is involved.

[0049] The term "user" refers generally to an individual, or a set of individuals, associated with a particular user account. In some contexts, the term may also refer to an individual who has not set up an account.

[0050] I. Overview

[0051] According to one embodiment of the invention, the marketplace system includes various computer-implemented services through which sellers can list products for sale in a preexisting electronic catalog, and buyers can browse the catalog to purchase and preorder items from marketplace sellers. As described below, the catalog also provides an option to purchase retail versions of some or all of the products from a preferred retailer. The electronic catalog is preferably controlled or administered by a single business entity, referred to herein as the "marketplace operator" or "marketplace provider."

[0052] The products represented in the catalog are typically physical products that are shipped to the buyer, such as books, CDs, DVDs, electronic devices, and toys. In some embodiments, the products may also include digital products downloaded or transmitted to a buyer's computing device, such as music files, viewable content, or software programs. Other examples of the types of products that may be included in the catalog include tickets for travel or events, cars, and movie titles. In some embodiments, the purchases need not involve an actual transfer of ownership, but may involve leases, licenses, rentals, subscriptions, and other types of business transactions.

[0053] The electronic catalog is preferably accessible over the Internet or other network using an ordinary web browser. Some or all of the products represented in the electronic

catalog are products that may be listed for sale within the marketplace by users of the system. Preferably, the electronic catalog includes representations of many millions of products, including products falling in many different product categories, to facilitate the ability for users to list the products they wish to sell. The catalog content preferably includes "static" product descriptions and images provided by their manufacturers, distributors, and/or another appropriate source. This content is preferably stored in a database used to dynamically generate the catalog pages, but may alternatively be contained within the HTML or other coding of such pages.

[0054] The electronic catalog can be navigated through a number of conventional mechanisms. For example, users may browse a hierarchy of product categories and associated products, often referred to as a browse tree. Moreover, users may enter search terms into a search engine and obtain search results. In any event, users may navigate the electronic catalog to locate information on one or more products of interest.

[0055] As is common in some online store systems, detailed information about a product can be obtained by navigating to the product's detail page within the catalog. Each detail page may include, for example, a product name, a unique product ID, a specification or other description of the product (including manufacturer, brand, author, artist, etc., as applicable), a picture or multimedia presentation of the product, reviews of the product (e.g., from customers and/or professional reviewers), average customer ratings, a listing of similar or related products, pricing and availability information, shipping information, and/or sales rank data maintained by the system. Two or more different versions or views of the same product detail page may be presented within the electronic catalog (see, e.g., **FIGS. 1A and 1B**), and these views may be customized or personalized for the viewer of the page. Some or all of the product information displayed in a detail page is preferably "static" information (e.g., provided by the product's manufacturer or distributor) that does not change over time (except under the control of the marketplace operator) as marketplace listings are added and removed. As described below, each detail page also preferably lists or summarizes the existing marketplace listings for the product on that page (and optionally for related or similar products), and provides an option for a user to add a marketplace listing for that product.

[0056] Each particular product detail page typically provides an option to purchase the displayed product from one or more sellers. For example, a detail page may provide an option to purchase the product from a preferred retailer or "provider seller," which may be either a provider/operator of the marketplace system or a business partner thereof. Typically, each provider seller is a well known retail merchant. (The name "Store.com" is used in the screen displays to represent a hypothetical provider seller.) Two or more different provider sellers may sell products via the system, with each assigned to a different respective product category or set of categories (e.g., books versus toys versus electronics). Alternatively, the different provider sellers may be periodically rotated on a particular product category or set of categories based on criteria negotiated with the marketplace operator. In some embodiments, the catalog does not provide an option to purchase products from a provider seller (e.g., the system may only support user-to-user sales).

US 2003/0204447 A1

5

Oct. 30, 2003

[0057] A detail page may also include one or more marketplace listings created by end users of the system (generally "marketplace sellers"). The marketplace sellers typically include individual users and small merchants, and in some implementations, may also include large merchants (including retailers) that are not provider sellers. The marketplace listings may be for used or preowned products, retail or other new products, and/or other types of products such as collectibles. In some implementations, and/or for certain products or product categories, the system may only support marketplace listings of used product units.

[0058] Typically, each marketplace listing is for a particular unit of a product, and is removed from the detail page once that unit is purchased. Persistent listings used to sell an inventory of product units may also be supported; for example, the system may support the ability for a marketplace seller to request that the listing remain in place until a specified number of units have been sold.

[0059] As is conventional, users of the marketplace system can register online as marketplace sellers and thereafter create marketplace listings. As part of seller registration and/or as marketplace listings are created, the system may allow the user/seller to specify shipping and other policies to be published to buyers, and specify a bank account into which proceeds from sales are to be deposited by the system or its operator. An example process by which users may efficiently create links to their bank accounts is described in U.S. patent appl. Ser. No. 09/517,563, filed Mar. 2, 2000, the disclosure of which is hereby incorporated by reference.

[0060] The system may also support the ability for users to add product "preorder" listings, such as when a desired product is currently unavailable within the marketplace. For example, a buyer may add a preorder listing to a product detail page specifying that the buyer wishes to purchase a next available used product unit available from a marketplace seller for a designated price (see FIGS. 2 and 3A, discussed below). Preorder listings advantageously entice possessors of a product to sell that product. The preorder listings may also be used by a provider seller to gauge the level of current demand for a given product, as may be desirable for purposes of inventory management. As with marketplace listings, users can preferably initiate creation of preorder listings from corresponding product detail pages. As discussed below, the system may automatically match preorder listings over time with suitable marketplace listings.

[0061] Once registered with the marketplace system, a marketplace seller may add a marketplace listing for a particular product from the catalog description, and preferably from the product detail page, for that product. For example, when a seller wishes to sell a book he or she is finished with, according to one embodiment, the seller may access the product detail page associated with the book, and as discussed in detail below, add a marketplace listing to the product detail page. Thus, once a user becomes familiar with the navigation tools and methods that exist for browsing the catalog (e.g., as the result of making purchases), the user can use the same tools and methods to locate/specify a product to be sold. An important benefit of this method for adding marketplace listings is that the seller need not supply a description of the product (although the marketplace seller may nevertheless be permitted to supply descriptive con-

tent). For instance, in one embodiment, a seller may create a marketplace listing from a product detail page by merely specifying a selling price and the product's condition, without more. Another benefit is that sellers need not supply UPCs, ISBNs, or other standard product identifiers for the products they wish to list within the marketplace.

[0062] As described below, users may also be permitted to add marketplace listings from their respective purchase histories, without browsing to the associated product descriptions in the catalog. For instance, a user who previously bought an electronics device (from a marketplace seller or a provider seller) using the system may select that item from a listing of his or her purchase history, and then simply specify a price and product condition for re-selling the item within the marketplace (see FIGS. 4A and 4B). To enable this feature, the marketplace system maintains user purchase histories that reflect the purchases made by each user of the system. A user's purchase history may also include purchases by others of gifts for that user, including but not limited to purchases made from a wish list for the user.

[0063] An important benefit of the above-described methods for adding marketplace and preorder listings is that each such listing may be stored by the marketplace system in association with a corresponding product ID or product record within a product database. As a result, the marketplace system can accurately identify and display all marketplace (and/or preorder) listings associated with a particular product. Thus, the likelihood that buyers will fail to locate relevant listings is significantly reduced.

[0064] Significant benefits may also be achieved by displaying the current marketplace and/or preorder listings in association with catalog content (product descriptions) obtained from sources other than the marketplace sellers themselves. (As used herein, the term "catalog content" refers generally to product descriptions and data obtained from sources other than the marketplace sellers of the associated products—such as manufacturers, publishers, distributors, professional reviewers, the provider/operator of the system, etc.) For example, for marketplace listings, because buyers can identify the listed products from such catalog content, without the need to rely on the accuracy of descriptions supplied by the marketplace sellers, there is a reduced likelihood that buyers will misidentify, or be unable to identify, the listed products. Further, in embodiments in which the catalog content includes professional reviews, customer reviews, average customer ratings, and/or other types of supplemental information not commonly found in auction and other user-to-user sales listings, potential buyers can efficiently make informed purchase decisions of products listed in the marketplace.

[0065] The foregoing association of product listings to individual product detail pages is preferably accomplished through the use of product IDs. The product IDs can include Uniform Product Codes (UPCs), ISBNs, and other types of standard product codes. For purposes of uniformity, even if a product already has a standardized ID (ISBN, UPC, etc.) associated with it, each product in the catalog is preferably assigned a store standard ID referred to herein as an "ASIN." For other products that lack a standardized ID, the operator of the marketplace system may generate and assign ASINs.

[0066] According to one embodiment, the online marketplace system uses ASINs as an index to relate or otherwise

7

listings, the system accommodates sellers who wish to sell items that are not currently represented in the catalog at the same time that they sell items represented in the catalog.

[0077]   II. Example Web Pages

[0078]   Example pages and page flows illustrating specific web-based implementations of the above-described features will now be described with reference to FIGS. 1A-4B. Associated web site components and process flows are illustrated in FIGS. 5-10 and are described separately below. Although the example pages depict fixed-price sales, it will be recognized that the illustrated features may also be used for auction listings.

[0079]   A. Example Product Detail Pages

[0080]   FIGS. 1A, 1B, 2, and 3B illustrate some of the types of information and options that may be presented within product detail pages in accordance with one embodiment of the invention. Some types of catalog content mentioned above (customer and professional reviews, etc.) are omitted from these figures to simplify the drawings. The example pages represent an implementation in which products may be purchased from both provider sellers and marketplace sellers, and in which the marketplace listings are for fixed price sales. As mentioned above, the option to make purchases from provider sellers may be omitted in some embodiments. In addition, in some implementations, some or all of the marketplace listings may be in the form of auction listings.

[0081]   As shown in FIG. 1A, each product detail page 100 includes product information 105 (one type of catalog content) and one or more boxes or "tags." A provider tag 115 comprises various user activity buttons 120 relating to purchasing the displayed product from a provider seller. In the FIG. 1 example, the provider tag 115 allows a user to immediately purchase the product (a music CD in this example) from the provider seller; or add the product to a personal shopping cart for subsequent purchase. The page also includes a button 120 for adding the product to a personal wish list. Other buttons (not shown) may be included for, for example, allowing users to submit customer ratings and reviews of the product.

[0082]   The product detail page 100 in this example also includes a marketplace tag 125. The marketplace tag 125 comprises information related to the existing marketplace listings for the product, if any. As shown in FIG. 1A, the tag 125 specifies the types of the marketplace listings 130 ("collectible" and "used" in this example), the quantity 135 of listings of each of such type, and one or more of the associated prices 140 (the lowest price of all available used items in this example). Other types of marketplace listings such as "Refurbished," "New," "Retail," and "Auction" may be supported. In some implementations (and/or for certain products), the system may only permit marketplace listings for used products.

[0083]   Although the marketplace tag 125 displays a marketplace listing summary in this example, additional details may be displayed in the tag 125 or elsewhere in the product detail page 100. The marketplace tag may also list or summarize any existing preorder listings for the product (see FIG. 3B, discussed below). In addition, the marketplace tag 125 may display a button for creating a preorder listing for the product (see "pre-order item" button in FIG. 2).

[0084]   When a buyer wishes to purchase the product from the provider seller, the buyer may do so by selecting an appropriate button or link located in the provider tag 115. Alternatively, when the buyer compares the price associated with the provider listing with the price indication 140 for various types of marketplace listings, the buyer may be motivated to select one of the marketplace listings. The buyer selects which marketplace listing to view by clicking on the corresponding hypertext link in the marketplace listing ("collectible" or "used" in the present example). Clicking on the marketplace listing takes the buyer to a marketplace listing detail page as described in detail below.

[0085]   The marketplace tag 125 also includes a "sell yours here" button 127 for allowing a user to create a marketplace listing for the product. Upon selection of this button in one embodiment, the user is prompted via one or more separate pages to specify the product's condition and a selling price (see FIGS. 3C and 3D, discussed below). Fields, drop down menus, and/or other display elements may alternatively be included in the product detail page for allowing the user to specify the condition and price, so that the user may create the listing without the need to first access an additional page. The user's identity may be determined using a browser cookie, although in some cases (e.g., where the selling price exceeds a certain threshold), the user may also be prompted to supply a user ID or other authentication information. An example page flow for adding a marketplace listing to a product detail page is shown in FIGS. 3C-3E (described below), and an associated process flow is illustrated in FIG. 6 (also described below).

[0086]   For each marketplace listing category in which one or more listings exist, the marketplace tag 125 includes a hypertext link to more information related to those listings. In one embodiment, selection of such a link causes the system to effectively supplement the product detail page with detailed information about the subject listings. For example, selection of the "7 used" link in FIG. 1A preferably causes the marketplace system to return a version of the detail page that includes detailed information about each listing falling in the "used" category, as depicted in FIG. 1B (two such listings shown). For each such marketplace listing, the page includes additional details about the listing, such as, for example, the name of the marketplace seller, the seller's average customer rating (based on ratings submitted by prior buyers), the price, the condition of the product, the seller's shipping policy, and a buy button 129 or other link for initiating a purchase (such as adding the product to a shopping cart).

[0087]   An important aspect of the embodiment depicted in FIGS. 1A and 1B is that the option to sell a unit of an item within the marketplace is displayed in conjunction with (e.g., on the same product detail page as) an option to buy a unit of that item. Thus, users who access the catalog for purposes of making purchases are exposed to the process by which they may list items for sale. As a result of such exposure, users are more likely to become marketplace sellers. Another benefit is that users can use the same catalog search and navigation tools for both buying and selling products.

[0088]   When a user purchases a product from a marketplace seller by selecting the corresponding buy button 129 to that marketplace listing, the marketplace system typically

US 2003/0204447 A1

10

Oct. 30, 2003

sion by the user of review or rating for the item; (3) purchase by the user of a superceding or replacement item; (4) the existence of a threshold number of preorder requests for the item. The marketplace system may also generate listing requests for products other than those actually known to have been purchased by the relevant user. For example, a request to list an item may be sent to a user who merely (1) is the recipient of a wish list or other gift purchase of the item by another user; (2) has submitted a rating or review of the item, (3) has recommended the item to another user through a "community" type service or forum of the system, or (4) has explicitly indicated ownership of the item.

[0110] The product detail and other pages of FIGS. 1A-4B represent specific embodiments of the invention, and are not intended to be limiting. Rather, a skilled artisan will recognize from the disclosure herein that a wide number of combinations of differing tags, tabs, links and/or other display elements may be used to covey to a user the product listings and options available. In addition, some or all of the displayed information and options may be presented using displays other than web pages, or may be presented audibly through a voice interface. Further, the number of pages used to create a listing, and the number and types of information elements requested from the listing creator, may be varied from those shown (see, e.g., subsection IV below titled "single-action creation of marketplace listings.")

[0111] III. Display of Marketplace Options of Pages of Related Products

[0112] In the example pages described above, the options to buy, sell, and preorder a particular product in the online marketplace are presented within a product detail page for that product. One extension is to also display one or more of these options within the product detail pages of related products. For instance, when a marketplace listing exists for product A, this listing may be displayed within the product detail pages of product A plus the N products most closely related to product A. With reference to FIG. 2, for example, selection of the "similar products" tab may reveal a list of products that are related to the product featured on the detail page, together with an indication of whether any marketplace listings exist for each such product. The detail page may similarly include options to sell and/or preorder each such related product.

[0113] The display within a given product's detail page of marketplace listings for related products may be made contingent upon whether any marketplace listings exist for the given product. With this approach, the user is informed of listings of related products only when no marketplace listings exist for the product being viewed.

[0114] To implement this extension, a table or database may be maintained with information about which products in the catalog are closely related. This information may also be encoded within the HTML or other files used to generate product detail pages. For instance, the coding for product A's detail page may indicate that the page should also display any existing marketplace listings for products B, C and D.

[0115] In one embodiment, the "product relatedness" data used to implement this feature is generated automatically by periodically analyzing browsing histories of users to identify products that are frequently viewed during the same brows-

ing session. For example, products A and B may be deemed related because a large percentage of users who viewed A also viewed B during the same session. An important attribute of this method is that the related products reflected in the table tend to be substitutes (because customers tend to view like or substitute products during individual browsing sessions). Product relatedness data may also be generated based on user purchase histories (e.g., products A and B are related because a large percentage of customers who bought A also bought B). Example methods for identifying related products using product viewing and purchase histories are described in U.S. patent application Ser. No. 09/821,712, filed Mar. 29, 2001, and U.S. Pat. No. 6,266,649, the disclosures of which are hereby incorporated by reference. The task of identifying related products may alternatively be performed using other sources of information, such as product descriptions and/or product classifications.

[0116] IV. Single-Action Creation of Marketplace Listings

[0117] As mentioned above, the online marketplace system may also support the ability for users to add marketplace product listings through a single mouse click or other single action, without the need to perform any further action. This may be accomplished, for example, by providing multiple single-action buttons or other links, each of which corresponds to a particular condition and selling price for listing the displayed product. For example, the following single-action links may be displayed in addition to the option to manually enter the condition and price: "Like new—list immediately for $20;""Very good condition—list immediately for $18;""Good condition—list immediately for $15," or the like.

[0118] The foregoing single-actions links for a given product may be displayed in the product's detail page, in the purchase history of a user who purchased the product (see FIG. 4A), and/or in a listing request transmitted to a user. Selection of such a single-action link preferably causes the advertised transaction to be completed without further action by the seller, although the seller may be permitted to subsequently cancel the transaction. In one embodiment, the option to post new marketplace listings by single action may be enabled and disabled by users as an account setting.

[0119] V. System Architecture

[0120] FIG. 5A illustrates the user and system components to enable marketplace sales according to one web-based embodiment. One or more user devices or systems 505 (one shown) allow users to access a marketplace web site system 515 over a communication network 520, such as the Internet 525. Similarly, one or more volume seller systems 510 may access the marketplace web site system over the communication network 520. The marketplace web site system 515 preferably includes or communicates with a backend payment processing system 548 that handles such tasks as credit card processing and ACH (Automated Clearing House) transfers. Although the marketplace system is in the form of a web site system 515 in the embodiment of FIG. 5A, other types of server systems may be used (e.g., those of an online services network or interactive television system).

[0121] The user systems 505 in the illustrated embodiment can be any type of computing device that enables a user (including both buyers and sellers) to interactively and

11

remotely access the marketplace web site system **515** via the communication network **520**. Each such device **505** runs a web browser **530**, such as Netscape® Navigator, Microsoft® Internet Explorer, or a micro-browser adapted for use on a handheld device.

[0122] As will be appreciated, the type or types of user devices **505** supported will generally depend on the type of platform used to host the marketplace system (e.g., web site, online services network, interactive television system, etc.). For example, in some embodiments, the user system **505** may be in the form of an interactive television, a computing device that runs a proprietary client program, an interactive kiosk, a personal digital assistant, or a telephone that connects to an Automated Voice Recognition ("AVR") system.

[0123] The volume seller systems **510** may be any of the foregoing types of user systems **505**, or a combination thereof. Typically, the volume seller system **510** will include an inventory management system **535** which stores and tracks information regarding the inventory of the volume seller, such as, for example, product information, product IDs, quantities, and if applicable, product conditions. In one embodiment of the marketplace web site, a volume seller may export its inventory data into a spreadsheet (or create the spreadsheet manually), and then upload the spreadsheet to the marketplace web site system **515** to create the associated marketplace listings. Although bulk uploading support for volume sellers is preferably provided, such support may be omitted.

[0124] The marketplace web site system **515** hosts the electronic catalog, and provides the various functionality and services of the marketplace system. The web site system **515** may be implemented using Windows or Unix based server systems, although other types of computer systems may be used. As mentioned above, the web site may be operated by a provider seller that uses the electronic catalog to sell retail items to customers. The provider seller may also take commissions on, and/or otherwise charge fees for, the listing and sales activities of marketplace sellers. In some embodiments, the marketplace system may include multiple, distinct web sites **515** or other systems, including web sites associated with affiliated merchants; for example, where multiple provider sellers are involved, each may host its own catalog content on its own respective web site. In still other environments, the operator of the marketplace web site system **515** may limit its role solely to creation and maintenance of an accurate catalog of goods, with all new and used goods being offered for sale by third parties.

[0125] As illustrated, the marketplace web site system **515** includes a web server **540** which accesses a database of web documents **542** and related content. The web documents **542** may include standard HTML documents and templates, as well as other types of documents, used to generate web pages of the types depicted in the preceding figures. The documents used to create product detail pages, and other types of pages that include dynamic content, preferably include coding that specifies the particular database look-up operations needed to obtain the dynamic content. An example process that may be used to generate product detail pages is illustrated in FIG. 5B and is discussed below.

[0126] The marketplace web site system **515** also includes a database collection **544**, a loader **546**, and web site code **550**. The web site code **550** includes various service com-

ponents used to generate dynamic web pages and to process form submissions and requests submitted by users. Flow diagrams for some of the processes embodied within the web site code are included in FIGS. 5B-10 and are described below.

[0127] As shown in **FIG. 5A**, the database collection **544** preferably comprises a product information database **560** (also referred to as a "product database"), a product listing database **562**, and a user database **564**. Each database may be in the form of a relational database, a flat file system, and/or any other type of suitable data repository. A greater or lesser number of databases may be used.

[0128] The product information database **560** stores information about the various products that users can purchase and sell through the marketplace web site, and is the primary source of the catalog content displayed in product detail pages (and other types of pages). The product information stored in this database may include, for example, product IDs, product names and descriptions, product images, customer and professional reviews, information about which products are similar to other products, prices, and other types of information as described above. As is conventional, the information for each item may be arranged within fields, such as "author,""title," and "product ID" fields, enabling the catalog to be searched by users on a field-restricted basis using a search engine of the web site.

[0129] The product information database **560** may include two or more sub-databases, each of which is associated with a particular type or category of product. For instance, book titles may be represented in a bibliographic database that is separate from a database used for electronics devices.

[0130] The product information database **560**, or another appropriate data repository, may also store lists of products that tend to be purchased in sequence (e.g., Harry Potter books 1-4). This information may be used, for example, to trigger the generation of a listing request when a user purchases the next product in the sequence (e.g., soliciting listing of Harry Potter book 1 upon purchase of Harry Potter book 2). The sequences may be specified by administrators, and/or may be detected by a software component that analyzes user purchase histories. The product database **560** may also store information about products that are deemed to supersede one another, and this information may similarly be used to generate listing requests.

[0131] The product listing database **562** stores information about the various types of listings, including marketplace product listings and preorder listings. This database may also store information about which products, if any, are currently available from a provider seller, and may store non-catalog-based listings. For each marketplace or preorder listing, the product listing database **562** preferably stores information about the type of the listing, the product to which it corresponds (which may be specified by an ASIN or other product ID), the creator of the listing, and the status of the listing (pending, fulfilled, expired, etc.). Some of this information may be in the form of links or pointers to entries or records in other databases **560, 564**. As product detail pages are accessed by users of the marketplace web site, the product listing database **562** is queried to determine whether any marketplace or preorder listings exist that should be displayed on such pages.

[0132] The user database **564** stores information about existing users of the marketplace web site system **515**. For

12

each user, this information may include, for example, a name, password, shipping address, e-mail address, payment information, bank account information (particularly for sellers who have elected to have sales proceeds deposited into their bank accounts), wish list contents, preference settings, and a purchase history. Each purchase history may include information about the purchases made by and for a respective user, including the relevant product IDs, purchase prices, product conditions, and purchase dates.

[0133] With further reference to **FIG. 5A**, the web site system also includes a loader component **546** that provides functionality, including application program interfaces (APIs), for volume sellers to perform bulk uploads as described above. The bulk uploading process is described in further detail below.

[0134] **FIG. 5B** illustrates a process that may be used by the web site system to generate product detail pages in response to requests from user devices **505**. Initially, the web server **540** receives a page request that identifies a particular product (e.g., by its ASIN or other product ID), and retrieves a template or other base document for generating a product detail page (blocks **570** and **572**). The base document preferably includes a link for initiating creation of a marketplace listing, as in **FIGS. 1A and 1B**.

[0135] To populate the detail page, the web server **540** invokes code **550** that accesses the product information database **560** and the product listings database **562** to retrieve catalog content and pending listings, respectively, for the subject product (blocks **574** and **576**). The information about pending marketplace listings and/or preorder listings may be displayed on the page in a summarized form, as in **FIG. 1A**. In some embodiments, the page may also be customized or personalized for the particular user who requested the page, as is known in the art.

[0136] The data retrieved from the databases **560**, **562** may also include information about whether the product is currently available from a provider seller. This information may be used to determine the types of purchase options to display within the page (not shown). As mentioned above, any marketplace listings for "new" products may be omitted from the display if the product is currently available from a provider seller.

[0137] As depicted by blocks **578** and **580** in **FIG. 5B**, if the product is not currently available from a marketplace seller, the page is preferably generated to include an option to preorder the item from an unspecified marketplace seller, as in **FIG. 2**. In some implementations, the preordering option may alternatively be displayed regardless of whether the product is currently available from a marketplace seller. Further, the option to preorder may be restricted based on the types of marketplace listings that currently exist; for instance, if the product is currently available from marketplace sellers but not in the "collectable" category, an option to preorder a collectable unit of the product may be provided.

[0138] The populated product detail page is finally returned to the requesting user device at block **582**.

[0139] VI. Example Process Flows

[0140] Process flow diagrams illustrating interactions between users and the marketplace web site will now be described with reference to **FIG. 6** (showing creation of a marketplace listing), **FIG. 7** (showing a bulk uploading process), **FIG. 8** (showing creation of a preorder listing), **FIG. 9** (showing parallel creation of multiple marketplace listings from a purchase history), and **FIG. 10** (showing a purchase transaction). The left side of each such drawing represents actions performed by a user (via a user system **505** and web browser **530**), and the actions shown on the right are those of the web site system **515** performed via executable code. As will be recognized, the order in which the actions occur may be varied, and some actions may be omitted.

[0141] A. Creation of Marketplace Listings

[0142] **FIG. 6** further illustrates the marketplace listing creation process depicted in FIGS. 3D-3E. As described above, this process may be used to create a marketplace listing from a product detail page or a purchase history listing. As illustrated, the user initially selects a "sell" option for a particular product (block **605**), and specifies the product's condition (block **610**). As described above, the condition can preferably be specified by selecting a predefined condition descriptor ("like new,""very good," etc.), and may be further specified by entering a textual comment. In response to submission of the condition information, the system preferably looks up pricing information from the product information and product listing databases **560**, **562** (block **615**), and returns such information (and/or price values calculated therefrom) to the user system **505** for display. **FIG. 3D** illustrates examples of the types of price information that may be returned to assist the seller in selecting a selling price.

[0143] As depicted by blocks **620** and **625**, the seller then specifies the selling price and the location from which the product will be shipped. The location information is preferably used by the system to calculate shipping costs to be charged to the buyer. The seller may also be asked to specify the shipping methods supported, as in **FIG. 3D**.

[0144] The user may also be prompted to sign-in, and if applicable, to register as a seller (block **630**). In one embodiment, an unregistered seller may finish creating the marketplace listing before registering, although buyers may be prevented from buying the listed item until registration is complete. As part of seller registration, the seller may be required, or given the option, to specify a bank account into which sales proceeds are to be automatically deposited by ACH transfer.

[0145] In response to submission of the various information items, the web site system preferably generates a transaction summary page of the type shown in **FIG. 3E** (block **635**). From this page, the user can confirm the transaction (block **640**). Upon such confirmation, the web site system preferably determines whether the new marketplace listing satisfies or "matches" any preorder listings that exist for the product in the product listing database **562**. A match with a preorder listing may be deemed to occur if both (1) the selling price is equal to or below the "maximum price" of the preorder listing, and (2) the condition specified by the seller is the same as or better than the minimum condition specified in the preorder listing (see **FIG. 3A**). If multiple matches exist, the preorder request that was created first may be used. If a match is found, the seller may be immediately notified that a buyer has been found, and the

US 2003/0204447 A1                                                                 Oct. 30, 2003

14

TABLE 1-continued

Process for matching bulk-uploaded record to Product ID (ASIN)

If no ASIN matches exact title, perform a wild card title search using
search APIs
For each ASIN obtained from search, fetch record from database
Check author name, publisher, publish date and the binding information of
the incoming record against this database record.
Calculate accuracy score based on how much information in incoming
record and database record is the same.
Compare all ASINs based on the total score and availability
Pick/reject ASINs based on set of rules (see appendix)
For an in-print ASIN, all of the fields may be required to match.
For an out-of-print (oop) ASIN, only the item-title and author name
fields may be required to match.

[0157]  FIG. 7B illustrates the logic used in one embodiment to attempt to uniquely match a record in an inventory file to a product (and thus ASIN) in a product database. If a single match is found, the record is associated with the ASIN of the matching product, and the record is loaded into the product listings database as a marketplace listing for display on the matching product's detail page. If either (1) no matches are found, or (2) multiple matches are found, the record is not loaded as a marketplace listing but may be loaded as a non-catalog-based listing. A scoring process is preferably used to determine whether a "match" exists.

[0158]  C. Preordering Process

[0159]  FIG. 8 further illustrates a preorder process 800 by which a user may preorder a product, as depicted in FIGS. 2 and 3A. As described above, the user preferably initiates this process from the product's detail page (block 805). In some embodiments, users may also or alternatively be permitted to initiate preordering from other types of catalog pages, including browse node pages and other pages that feature multiple products.

[0160]  The user first specifies the minimum condition of the product (block 810). As depicted in block 815, the system may use the condition descriptor selected by the buyer to suggest a price. The price may alternatively be suggested without regard to the condition specified by the buyer, as in FIG. 3A. The user then enters the price (taking into account or ignoring the suggested price) (block 820), the maximum duration the listing is to remain active (block 825), and payment and shipping information for purchasing the product (block 830). The user may also be prompted to sign in or register (not shown).

[0161]  The system then generates and returns a transaction summary page that provides an option for the user to confirm the transaction (block 835). If the user confirms the transaction (block 840), the system updates the product listing database 562 with the preorder listing (block 845), causing the preorder listing to thereafter be displayed on the product's detail page. A background task may be executed periodically to remove unfulfilled preorder listings that have expired.

[0162]  D. Listing Requests

[0163]  FIG. 9 illustrates a general process 800 by which the marketplace system may use listing requests to solicit new marketplace listings. As mentioned above, the transmission of a listing request to a user may be triggered by a particular event, such as passage of a selected time interval from a product's purchase, submission by the user of a review or rating, purchase by the user of a superceding product, or the existence of preorders for the product. As depicted by blocks 905 and 910, the listing request may be for one or more products in the target user's purchase history, and may be conveyed by email or a custom web page. Pop up windows and other display methods may also be used.

[0164]  For each product, the listing request preferably includes a link to a page of the type shown in FIG. 3D, allowing the user to initiate creation of a marketplace listing. The link is preferably a hyperlink that may be selected by the user, but may alternatively be a simple URL (uniform resource locator) that may be copied into the address field of a browser. The ID of the product may be encoded within this link to allow the web site system to identify the product upon selection of the link. As depicted in blocks 915 and 920, for each product selected by the user to resell, the process beginning at block 610 of FIG. 6 may be repeated. The listing request may also support the ability for the user to create multiple marketplace listings in parallel, as depicted in FIGS. 4A and 4B.

[0165]  E. Purchasing Process

[0166]  FIG. 10 illustrates a process 1000 that typically occurs when a buyer makes a purchase from a marketplace listing. This process may be initiated, for example, when a buyer selects an "add to cart" button (not depicted) or a "buy from seller" button 129 (see FIG. 1B) from a product detail page (block 1005). In response to the buy request, the web site system prompts the buyer to specify the shipping address and payment method (block 1010). The buyer may typically specify each such item of information either by selecting/confirming information retrieved from the user database 564, or by entering new information. In some cases (not illustrated), single-action ordering may alternatively be used, in which case pre-specified shipping and payment information are used to immediately complete the transaction.

[0167]  In the illustrated example, the system then generates and returns a transaction summary page that provides an option for the user to confirm the transaction (block 1015). If the user confirms the transaction (block 1020), the system performs the following actions: (1) performs a fraud check of buyer/seller; (2) charges the buyer's credit card (or otherwise collects payment); (3) transfers resulting proceeds, minus a commission, by ACH to the seller's bank account (although the proceeds from multiple sales may be aggregated for purposes of such transfers); (4) updates the product listing database 562 to reflect the sale, and (5) sends a purchase notification message by email to the seller with shipping instructions (block 1025). These actions (1)-(5) are also performed when a preorder listing is matched with a marketplace listing. Additional communications may also be transmitted to the buyer or seller, depending on the processes selected by the marketplace operator.

[0168]  A purchase confirmation may also be transmitted by email to the buyer (not shown). In some cases, this confirmation may include a shipment tracking number obtained from the seller, or may specify a store location from which the purchased item may be picked up. This informa-

Case: 16-1818



US 20070255652A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2007/0255652 A1
Tumminaro et al. (43) **Pub. Date:** **Nov. 1, 2007**

(54) **MOBILE PERSON-TO-PERSON PAYMENT SYSTEM**

(75) Inventors: **John Tumminaro**, Palo Alto, CA (US);
**Carol Realini**, Woodside, CA (US);
**Pete Hosokawa**, Castro Valley, CA
(US); **David Schwartz**, San Francisco,
CA (US); **Hesham Shawki**, Santa
Clara, CA (US); **Nirav Vasantkumar
Shah**, San Ramon, CA (US)

Correspondence Address:
**LAW OFFICES OF JAMES E. EAKIN**
**P.O. Box 1250**
**Menlo Park, CA 94025 (US)**

(73) Assignee: **Obopay Inc.**, Redwood City, CA (US)

(21) Appl. No.: **11/694,747**

(22) Filed: **Mar. 30, 2007**

**Related U.S. Application Data**

(60) Provisional application No. 60/744,013, filed on Mar.
30, 2006. Provisional application No. 60/744,930,
filed on Apr. 15, 2006. Provisional application No.
60/870,484, filed on Dec. 18, 2006.

**Publication Classification**

(51) **Int. Cl.**
*G06Q 40/00* (2006.01)
(52) **U.S. Cl.** .............................................. **705/39**; 455/466

(57) **ABSTRACT**

A mobile payment platform and service provides a fast, easy
way to make payments by users of mobile devices. The
platform also interfaces with nonmobile channels and
devices such as e-mail, instant messenger, and Web. In an
implementation, funds are accessed from an account hold-
er's mobile device such as a mobile phone or a personal
digital assistant to make or receive payments. Financial
transactions may be conducted on a person-to-person (P2P)
or person-to-merchant (P2M) basis where each party is
identified by a unique indicator such as a telephone number
or bar code. Transactions may be requested through any
number of means including SMS messaging, Web, e-mail,
instant messenger, a mobile client application, an instant
messaging plug-in application or "widget." The mobile
client application, resident on the mobile device, simplifies
access and performing financial transactions in a fast, secure
manner.



SQUARE - EXHIBIT 1011

US 2007/0255652 A1

Nov. 1, 2007

2

loss of funds and is superior to carrying cash, the system lacks adequate security to protect the account holder from improper use by others.

[0012]    Further, a credit card indicates that the holder has been granted a line of credit from a bank or other issuer and it enables the holder to make purchases or withdraw cash up to a prearranged amount. Interest is charged based on the terms of the credit card agreement and the holder is sometimes charged an annual fee. Traditionally, a plastic card bearing an account number is assigned to the holder.

[0013]    Credit card transactions utilize proprietary networks that are paid for by the merchants to settle transactions. Because of the proprietary nature of the payment system, such systems costs are high. Also, because multiple parties are involved in a credit card transaction such systems are often referred to as "open loop" financial systems.

[0014]    FIG. 34 shows an example of a proprietary network includes a point-of-sale (POS) terminal 3401 to initiate transactions at a merchant's location and a payment processor 3402 connected with the POS terminal 3401 by a proprietary network 3403. In some instances, the proprietary network is nothing more than a connection to the Internet. Payment processor 3402 is, in turn, connected by a proprietary network 3404 to a credit card interchange 3408.

[0015]    To initiate the transaction, a consumer would present a credit card 3406, or alternatively an RFID key fob 3407, at the POS terminal. A key fob is a type of security token: a small hardware device with built-in storage mechanism. Both the credit card 3406 and key fob 3407 include encoded information that the POS terminal detects and forwards to transaction processor 3402 over the proprietary network 3403. Unfortunately, both the credit card and key fob are unable to work without access to the POS terminal either by proximity or over the telephone.

[0016]    The transaction processor 3402 submits the transaction to the credit card interchange (a network of financial entities that communicate to manage the processing, clearing, and settlement of credit card transactions) via private network 3404. The credit card interchange routes the transaction to the customer's credit card issuer 3409. The issuer identifies the consumer based on the detected account number and determines the available credit limit before either approving or declining the transaction. If the transaction is approved, the amount is forwarded to the merchant's bank processor 3405 over the credit card interchange with the amount being added to the credit account maintained by the bank for the merchant.

[0017]    Since information for the transaction is carried on proprietary networks, merchants pay a steep monthly service charge for the privilege accepting credit cards and for accessing these proprietary networks. Merchants further pay a substantial per-transaction charge for each transaction. For example, to handle a simple transaction to purchase a bottle of water at a convenience store for a $1.00, the merchant may incur a per-transaction charge of about $0.25 and 3 percent of the transaction amount although much higher charges are typical if the merchant incurs a lot of charge backs. After accounting for their overhead expenses, the per-transaction charge can be a substantial part of the overall expenses and, in some cases, can be more than the profit margin on a particular item. Unfortunately, for many small merchants, the combination of the monthly service charge and the per-transaction interchange charge may exceed their total profit on credit card sales for the month. For larger merchants, the interchange fee is less of a significant drag on profitability but still an unwelcome erosion of their profit margins.

[0018]    Not only are credit cards a "high cost" expense item for most merchants, they are also subject to substantial fraud and abuse. For example, if a credit card is stolen, it may be used at a POS terminal by anyone, even if they are not the holder. To prevent such use, many POS terminals now include a request that the consumer enter in the postal zip code where the credit card bill is sent, to authenticate the consumer as the holder. Unfortunately, postal information is readily available on the Internet so the enterprising thief is not deterred by the additional information request to complete the transaction. The holder, however, is annoyed by having to enter such superfluous information.

[0019]    Finally, the open loop credit card system is simply not adaptable to person-to-person transactions where one party is not a merchant. For example, if two students want to share the expenses for a pair of movie tickets, one student may wish to electronically transfer funds to the other student. However, the interchange fee alone would make the transaction sufficiently expensive to discourage use. Further, it is unlikely, that either student would agree to pay the monthly fee and other charges associated with a merchant's account in order to access the credit card interchange. Accordingly, the closed-loop system deployed and operated by the credit card issuers is wholly ill suited for person-to-person financial transactions.

[0020]    Therefore, what is needed is a cost-effective mobile payment system that enables an account holder the flexibility to conduct their financial transactions any time anywhere. What is also needed is a "mobile wallet," that people can carry as a cash source that is accessible from a mobile phone. Further, what is needed is a software application and managed service for consumer mobile payments that operates as a mobile wallet on a mobile phone platform. This mobile wallet should be secure, easy to use, and easy to acquire so that the ability to make mobile payments is available to any mobile account holder. Moreover, what is needed is a closed-loop financial transaction system that facilitates payments without the substantial payment charges associated with closed-loop financial systems and has a high level of security for the holder, the merchant and others involved in the financial transactions. Accordingly, the following embodiments and exemplary descriptions of inventions and exemplary descriptions of inventions are disclosed.

## SUMMARY OF THE INVENTION

[0021]    A mobile payment platform and service provides a fast, easy way to make payments by users of mobile devices. The platform also interfaces with nonmobile channels and devices such as e-mail, instant messenger, and Web. In an implementation, funds are accessed from an account holder's mobile device such as a mobile phone or a personal digital assistant to make or receive payments. Financial transactions may be conducted on a person-to-person (P2P) or person-to-merchant (P2M) basis where each party is identified by a unique indicator such as a telephone number or bar code. Transactions may be requested through any

number of means including SMS messaging, Web, e-mail, instant messenger, a mobile client application, an instant messaging plug-in application or "widget." The mobile client application, resident on the mobile device, simplifies access and performing financial transactions in a fast, secure manner.

[0022]    The invention provides a mobile payment system (MPS) or mobile person-to-person payment system that allows fast and easy money transactions. The mobile phone is becoming more and more ubiquitous around the world. Many people carry a mobile phone or similar portable communications device, even if they do not carry a wallet around with them as they go about their daily lives. Through the mobile payment system and their phones, users will be able to do what they can with a normal wallet and much, much more. Users will be able send and receive money, pay for services, pay for bills, pay for movie tickets, pay for groceries, pay a babysitter, pay for coffee and a newspaper, instantly pay back a friend, split a dinner bill, send money to children, get money from parents, get quick or emergency cash, send emergency cash, pay up or collect on a friendly wager, pay for fantasy football, pay for gardening services, pay for association dues, track purchases, check the balance, and more. As can be appreciated, the system of the invention provides many benefits.

[0023]    The problems and needs that the invention addresses includes: Cash can be stolen and cash transactions are not traceable. Need to encourage cash to reside in banks rather than consumer's pockets. Need for low-cost or small-deposit cash storage. Need for low cost electronic payments. Need for electronic payments to be available to everyone, any-place, any-time and in near-real-time. Need for electronic payments to result in an instantly usable form (companion prepaid debit card for example, or through a real-time link into a user's demand deposit account (DDA) at a bank). Need for electronic payments to be accessible to banked and unbanked consumers. Need for electronic payments to be able to be linked to existing financial instruments such as credit, debit, prepaid, payroll, and others. Need to be able to load to and unload from existing financial instruments in real time or near-real-time. Need for electronic payments to work across banks. Need for electronic payments to be accessible via mobile devices. Need for electronic payments to be accessible via consumer media devices such as PCs, POS payment terminals, TV cable boxes, digital video recorders (DVRs), satellite boxes, and others. Need for electronic payments to be accessible via person-to-machine devices such as vending machines, parking meters, kiosks, and others. Need for electronic payments to work across electronic networks such as mobile carriers, cable carriers, satellite carriers, and others.

[0024]    Some of the benefits of the invention include MPS electronic payments encourage cash to stay in the bank (instead of consumer's pockets). MPS electronic payments are safe and traceable. MPS electronic payments occur in near-real-time. MPS electronic payments are accessible to any-one, any-time and any-place. MPS can provide an optional or not required companion prepaid debit card (e.g., MasterCard, Visa, or other) for instant funds accessibility. MPS electronic payments can be leveraged for person-2-person (P2P) as well as person-2-merchant (P2M) transactions. MPS funds are stored within distributed pooled partner bank accounts. "T" records for MPS consumer funds are

managed within the MPS payment system of record (for low cost P2P and P2M transfer). MPS facilitates manual or automated load functionality from existing financial instruments (e.g., credit, debit, other). MPS facilitates manual or automated unload functionality to existing financial instruments (e.g., credit, debit, other). MPS can optimize load or unload processing (i.e., performing load or unload within bank when possible). MPS facilitates electronic payments in a cross-bank manner. MPS facilitates electronic payments in a cross carrier or cross network manner. MPS facilitates electronic payments in a cross device or cross channel manner (i.e., mobile, e-mail, Web, instant messenger). MPS funds are electronic, PIN protected, and "live" in the bank.

[0025]    Further, a closed-loop financial transaction system based, in part, on the use of a cell phone or a PDA to make or receive payments. Financial transactions may be conducted on a person-to-person basis where each party is identified by a unique indicator such as a telephone number, e-mail address, instant messaging identifier, or bar code or on a consumer-to-merchant basis. Fee structures are disclosed to facilitate wide spread adoption and to free people from having to carry cash.

[0026]    In an embodiment, the invention is a financial transactions system including a consumer interface, connected to a network, including: a Web interface to handle transaction requests from a Web browser client; a mobile Internet browser interface to handle transaction requests from a mobile Internet browser on a mobile phone client; an SMS interface to handle transaction requests using SMS text messaging; and a mobile client application interface to handle requests from a mobile client application executing on mobile phone client.

[0027]    The consumer interface may include an interactive voice response interface to handle requests from a telephone voice channel. The system may include a pooled account for newly registered users, where newly registered users may conduct transactions from registered users immediately after registration. The mobile client application interface may permit a send money transaction, loading account transaction, unload account transaction, and balance inquiry transaction. The consumer interface may further include an instant messenger interface to handle requests from an instant messenger client.

[0028]    The system may include: a financial partner interface; a merchant interface, where users through the consumer interface can access their money at a bank connected to the system through the financial partner interface and transfer money to merchants connected to the merchant interface. The system may include a system of record managed by the financial transaction system, recording transaction executed through the consumer interface. The system may include a pooled account managed by the financial transaction system, where a number of the clients accessing the system through the consumer interface have an account in the pooled account. A number of the clients may not have an account in the pooled account but instead have an account at a financial institution, which has access to the system.

[0029]    In an embodiment, the invention is a method including: providing an application program interface to conduct transactions with a first financial partner; providing an SMS messaging interface to receive requests to conduct

[0423] The value propositions for the participating account holder include:

[0424] (1) Safety—the account holder's money is safely locked in mobile device instead of having to carry cash in a pocket or purse;

[0425] (2) Security—timely verification to see how much money is available in the account;

[0426] (3) Information—easy to obtain account activity and balance information;

[0427] (4) Convenient—the account holder may move money in seconds around the world or across a room.

[0428] The value propositions for the merchants include:

[0429] (1) Safety—no cash;

[0430] (2) Less handling cost—no counting cash receipts, no deposit slips, no adding machine tapes;

[0431] (3) Less transaction costs—lower fees than credit cards; and

[0432] (4) Guaranteed funds—no returned checks.

[0433] Merchant partners have a unique opportunity to earn revenue for handling transactions directed to depositing funds to a prepaid debit account or for providing cash to an account holder. Commissions may be earned by the merchants when funds are added to an account.

[0434] The stand-alone closed loop payment system of the present invention is designed to integrate with a companion bank account. This account can be a preexisting account or, for unbanked users, accounts can be created or held in a pooled account with the partner bank.

[0435] The closed loop system maintains a user profile database that includes the account holder's name and demographic data, information used for underwriting the risk for each specific account holder and linked bank account information for accounts that will be used to load or unload funds from the account. The user profile database also requires a consumer facing and customer service facing website for collection of the enrollment data when accounts are opened.

[0436] The payment server maintains a "T" account record for each account holder. This account is a ledger that keeps track of each account holder's transactions and balances. In conjunction with the T account database, the payment server provides history and balance data through the mobile device as well as a consumer and customer service facing web site.

[0437] In order to get money into and out of the closed loop payment system, the present invention provides for three types of functions for different account holders.

[0438] Some account holders will already have a bank account with a bank that is not a partner. The system allows account holders to move funds to and from this bank account through the ACH system or through a direct integration with the account holder's DDA or through an integration through the ATM network. Due to the risk involved, the user will be subjected to risk controls that may include deferred availability of transferred funds (for example a transfer from your bank account on Monday may not be used until Thursday). This deferral time could be reduced with additional underwriting (running credit reports or obtaining financial statements). A reduction in deferral time may also occur due to

the user having a good credit record with a partner carrier or guaranteeing payments with a credit card that is held in reserve. In general, this approach is not our first choice due to the risk involved unless there is a carrier involved that can deliver some underwriting data and enough customers to justify the additional underwriting.

[0439] Where the account holder enrolled as a result of a relationship with a partner bank, a real time connection to the Demand Deposit Accounting (checking account) system enables the account holder to obtain balances and post transactions to their account in real time.

[0440] In other instances, the account holder maintains an account with a bank (e.g., Bancorp Bank or First Premier Bank) that operates the bank but web sites, checks, and customer statements will carry an affinity branding. This approach will allow us to provide the affinity branding with a companion bank account (the account will be free to the user) in a tightly integrated environment.

[0441] The present invention relates to a closed-loop financial transaction service having low or no transaction fees and improved security. An embodiment of the present invention encompasses a method for fast, easy transfer of payments between any peer or between a consumer and merchant. An implementation of the method includes a mobile telephony device, cellular telephone (cell phone), or similar device as the mechanism to access an account such as a prefunded debit account and authorize transfer of funds from that account to another party. Additional embodiments of the present invention encompass a variety of partners that include mobile phone operators, nationally branded merchants, and financial service providers together with a payment platform that provides a fast, easy way to make payments by individuals using their cell phones or other telecommunication device.

[0442] Refer now to FIG. 36, which shows a closed-loop financial transaction system in accordance with an embodiment of the present invention. In this transaction system, consumers and merchants, a group of two or more consumers or a group of two or more merchants may readily complete financial transactions quickly, securely for little or no transaction cost.

[0443] This closed-loop financial transaction system utilizes prefunded debit account and for this reason may comprise a point of sale (POS) terminal 3612 where traditional debit cards 3606 may be used as in the prior art system—by swiping the card at the magnetic reader 3613 associated with POS terminal 3612. Card 3606 provides a second view into the account holder's accounts.

[0444] In some embodiments, the POS terminal 3612 further includes a near field (F) antenna and circuitry 3614. NF antenna and circuitry 3614 detect passive devices such as a NF enabled cell phone, a Bluetooth enabled cell phone or other short range transmission device, such as RFID or bar codes, associated with cell phone 3618. Thus, when cell phone 3618 is in proximity to the POS terminal, account information is automatically to POS terminal. In yet other embodiments, the POS terminal 3612 includes a cell phone connection that establishes a connection with transaction processor 3630 which is also variously referred to as payment server or server, upon initiation of a transaction. It is to be understood that transaction processor 3630 includes

one or more server farms or data centers capable of handling large volumes of simultaneous transactions. As is well understood in the art, such server farms are typically geographically dispersed and linked with the appropriate technology to maintain an accurate view of the real time status of all of the accounts. The POS terminal transfers the transaction amount directly from the POS terminal to the payment server for authorization by a cell phone connection **3615**. The payment server **3630** calls the account holder's cell phone **3619** to confirm the transaction details. One skilled in the art will appreciate that POS terminal may include only one or two of the magnetic reader **3613**, NF antenna and circuit **3614**, and cell phone **3615**. It will also be appreciated that POS terminal **3612** is usually associated with a merchant.

[0445]   One considerable advantage of an embodiment of the present invention is that both cell phone **3618** or **3619** and the card **3606** share a common PIN. Thus, the account holder is not inconvenienced by having to recall multiple PINs.

[0446]   In addition to consumer-to-merchant transactions, the present invention is flexible enough to implement true person-to-person financial transaction capabilities. Person-to-person devices **3620** each comprise a cell phone that is linked to an account and an account holder. When one of the peers **3620** desires to initiate a transaction request, such as to send a payment to another peer, the request, authorization and confirmation of the transaction are all sent between payment server **3630** and the peers **3620** over a public network. Advantageously, since one or more public networks are utilized, there is no interchange fee so cost to the participants can be either free or so cheap as to comprise a negligible percentage of the overall transactions conducted on the system, especially compared to the typical interchange fee.

[0447]   As noted above, transaction requests are routed to a payment server **3630** over a public network. In one embodiment, the public network **3625** is the Internet. In another embodiment, the public network **3625** is the cellular telephone network. In yet another embodiment, the public network **3625** is a radio network and in yet another embodiment, it is the public switched telephone network or PSTN. The public network **3625** transfers the account holder transaction requests to the payment server **3630**.

[0448]   In an implementation, the connection over the public network **3625** is a secure link that relies on authenticated participants and encryption. Thus, for connections over the Internet, the connection protocol may be HTTPS and the link may be a virtual private network or VPN. Payment server **3630** is also connected to linked deposit accounts **3635** either over the public network **3625** (not illustrated) or over a proprietary ACH banking or financial network.

[0449]   FIG. 37 is a block diagram of a closed-loop financial system in accordance with an embodiment of the invention. More specifically, the simplicity of the present invention provides the ability to be ubiquitous and to provide great value to the account holders and merchants. As previously discussed, the present invention provides an inexpensive electronic financial transaction service for consumer-to-merchant transactions and for person-to-person transactions. This flexibility is provided in part by interfac-

ing a consumer's cell phone **3702** to a POS terminal **3612**. In one embodiment, the consumer may enter their telephone number on a keypad associated with the POS terminal and when the transaction total is available, the merchant can send a PAY REQUEST to cell phone **3702** by way of an Internet connection **3706** and payment server **3704**. Payment server **3704** would call cell phone **3702** and request the consumer to authorize the transfer of funds. The consumer would then enter their PIN or other biometric identification and confirm the amount to authorize the payment. Payment server **3704** would transfer the funds from the consumer's prefunded debit account (plus any transaction fees) to the merchants account (less any transaction fees).

[0450]   In alternative embodiments, cell phone **3702** includes a near-field communication (NFC) circuit, Bluetooth circuit or RFID circuit (not shown) that enables POS terminal **3712** to query and recover account information, such as the cell phone telephone number. In this embodiment, the merchant would automatically detect the account information and send the request to payment server **3704**. The payment server **3704** would again call the cell phone **3702** to request the PIN or other biometric identification and payment authorization.

[0451]   Person-to-person transactions eliminate the POS terminal from the process with each peer **3707** and **3708** contacting payment server **3704** directly to conclude the financial transaction.

[0452]   FIG. 38 is a block diagram of the mobile client application (MCA) in accordance with an embodiment of the invention. The MCA resides on the cell phone **3802** and comprises user interface APIs **3802** and **3803** and a Payment API **3805**. API **3802** provides the user screen images that guide an account holder through various financial transactions such as identifying the other party, the amount of the transaction, if any and the type of transactions that are available. API **3803** provides service providers or other value added partners (such as accounting or record keeping services) with a mechanism for accessing the payment API **3805** to acquire information to provide the value added services. The payment API **3805** provides, in one embodiment, the logic for implementing the present invention and for interfacing with the communication layer **3810** of the cell phone.

[0453]   One method for operating a payment transfer infrastructure in accordance with an embodiment of the present invention is as a closed-loop payment system. A closed-loop payment system occurs where all of the components of the value transfer process take place under the control of the entity who owns the payment system. Because the owner controls the system, the underlying pricing is also under the control of the owner.

[0454]   FIG. 39 shows the transaction flow in the closed-loop payment system shown in FIG. 36. Specifically, for a person-to-person transaction, when a payment is made from a mobile device **3901** to another mobile device **3901**, the request for the transfer is passed to the payment server **3903**. The request is indicated by reference arrow **3904**. Server **3903** accesses the T-ledger for the account holder associated with mobile device **3901** (as indicated by reference arrow **3905**) and transfers the specified amount to a payee T-ledger (as indicated by reference arrow **3907**) if certain velocity rules are met as indicated at **3906**. Once funds have been

embodiments and implementations of individual components and elements, variations and modifications of these, and combinations of these. A system of the invention may include any of the variations or specific implementations discussed, singly or in any combination. In this application, an example of a specific implementation of a mobile payment system is provided, and this specific implementation is the Obopay system. The Obopay system is merely one implementation of a mobile payment system and is discussed to describe more easily various aspects of the invention. The invention encompasses many mobile payment system implementations and is not limited to the specific implementations described.

[0691]    Mobile Application Processes Mobile Client Application (MCA)

[0692]    The mobile client application allows people to pay friends, shop, and transfer funds by their mobile device. An account holder can access the mobile client application to send money or request money from anyone with a mobile device that supports text messaging or mobile Internet capabilities. They can also see the balance and history of their account in real-time.

[0693]    The mobile client application supports the following features: Pay, Balance, History, Request Pay, Refer or Invite, Add Money (i.e., Load), Settings, Help. MCA can be used to send money from an account holder's account to any mobile subscriber whose device supports text messaging. The account holder sending the money needs to be an account holder; however the person or merchant to whom they are sending the money does not.

[0694]    The financial transaction may be initiated by either the payer or the payee. If the payer initiates the transaction, the MCA is used to initiate the transaction. To use MCA to send money from a prepaid debit account the account holder will go through a sequence of steps:

[0695]    (1) Open MCA on the account holder's mobile device. This will take the account holder to a splash screen which displays a logo and tag line. The account holder then presses "enter" to continue. This will bring the account holder to the main menu screen which displays a menu of the features of MCA including Pay, Balance, History, Request Pay, Refer or Invite, Add Money (i.e., Load), Settings, and Help.

[0696]    (2) The account holder then selects the Pay option to send a payment. This will take the account holder to the Pay screen where the account holder will enter the telephone number to which they want to send their payment.

[0697]    (3) To select a phone number in the account holder's phone book, the account holder will select options (from the lower left soft key on the mobile device), and then find (from the options menu) which will bring up the account holder's existing phone address book and allow them to select a name in it. Optionally, the account holder may enter the phone number directly from the keypad. In another embodiment, the account holder enters a short code to identify a desired merchant payee. Once the account holder has entered the mobile number they will select OK.

[0698]    (4) This will bring them to the amount screen where the account holder will enter the amount that they want to pay. Depending on the payee's profile, at tip screen

may appear that offers the account holder the opportunity to add a gratuity to the amount they want to pay.

[0699]    (5) When the account holder selects OK they will be brought to the message screen where they can add a message to their transaction. This message may be a text, audio or video attachment. If the account holder does not want to add a message they can simply click OK before writing a message and no message will be added to their transaction. If the transmission network has limited bandwidth, the account holder may be restricted in the type and duration of the message. If the receiving party to the transaction does not have a mobile device capable of handling video or audio messages, the message may be stored on the server for a short period to allow subsequent retrieval via the Internet.

[0700]    (6) Once the account holder selects OK they will be brought to the PIN screen where they will enter their PIN and select OK. When entering the PIN, the alphanumeric characters do not appear on the screen but rather a pseudo-character is displayed instead. Also, the PIN cannot be found in a message log or other logs on the mobile device. If another person were to have access to the mobile device, they would not be able to determine the PIN.

[0701]    This will bring the account holder to the confirmation screen which will show them the following information:

[0702]    Pay To: (Target Phone Number)

[0703]    Amount:

[0704]    Any relevant Transaction Fees:

[0705]    Message (if they have left one)

[0706]    Once the account holder selects OK they will be taken to a screen with the following information:

[0707]    Payer

[0708]    If the target payee has an existing Account holder

[0709]    Message

[0710]    Paid To: (Target phone number)

[0711]    Amount

[0712]    Date: mm/dd/yyyy hh:mm

[0713]    Trans: xxxx

[0714]    If the target payee does not have an existing account, then a message such as: Note: The recipient you paid is not a registered account holder. The recipient has been sent a message with instructions on how to receive the payment.

[0715]    Message

[0716]    Paid To: (Target phone number)

[0717]    Amount

[0718]    Date: mm/dd/yyyy hh:mm

[0719]    Trans: xxxx

[0720]    Payee:

[0721]    If the target payee is an existing account holder, the payee will receive a message that they have a new item added to their account. When they open the item they will see a transaction receipt with the following information:

[0722]  Date: mm/dd/yyyy hh:mm

[0723]  Amount:

[0724]  From: (payer phone number)

[0725]  If the target payee does not yet have an existing account, the payee will receive a text message that says "you've got cash," and that instructs them to go to a web site, such as www.obopay.com to become an account holder and receive their cash. The process for new account holder registration is detailed later in this document.

[0726]  If the financial transaction is initiated by the payee, the MCA is used to initiate the transaction by requesting payment from the payer. An example of a payee initiated transaction is where a pizza delivery service dials the number of the person who ordered the pizza just prior to when the pizza is delivered. When the mobile device is answered, the account holder is given the opportunity to make the payment via the mobile payment infrastructure of the present invention.

[0727]  To use MCA to request money from an account the account holder goes through a similar sequence of steps:

[0728]  (1) Open MCA on the account holder's mobile device. This will take the account holder to a splash screen which displays a logo and tag line. The account holder then presses "enter" to continue. This will bring the account holder to the main menu screen which displays a menu of the features of MCA including Pay, Balance, History, Request Pay, Refer or Invite, Add Money, Settings and Help.

[0729]  (2) The account holder then selects the Request option to request a payment and will enter the telephone number to which they want to send their request.

[0730]  (3) To select a phone number in the account holder's phone book, the account holder will select options (from the lower left soft key on the mobile device), and then find (from the options menu) which will bring up the account holder's existing phone address book and allow them to select a name in it. This address book may correspond, by way of illustration, to a list of telephone numbers for account holders who have requested a pizza delivery. As part of the request, the delivery person may append a tip screen that offers the account holder the opportunity to add a gratuity to the amount they want to pay.

[0731]  (4) When the payee selects OK they will be brought to the message screen where they can add a message to their transaction. In one embodiment, this message can be a text, audio or video attachment. If the payee does not want to add a message they can simply click OK before writing a message and no message will be added to their transaction.

[0732]  (5) Once the account holder selects OK they will be brought to the PIN screen where they will enter their PIN, optionally entering a tip and selecting OK. The request will be sent to the payer who has the option to approve the transaction by entering their PIN and pressing OK. As noted above, the PIN is maintained in a confidential and safe so unauthorized people cannot determine the PIN merely by gaining unauthorized access to the mobile device.

[0733]  The payment will be initially processed and the payee will receive notification of the payment. If there are no problems with the transaction, the account holder will not receive any further notifications. If any problems do arise with the payment (i.e., insufficient funds) both the account holder and the target payee will be notified. Notification regarding any problems with the payment will promptly occur after the payment is sent so that the parties can confirm the transaction.

[0734]  The MCA can also be used to by an Account holder to check the current balance of their prepaid debit account from their mobile device. To use MCA to check their balance the account holder will go through the following steps:

[0735]  (1) Open MCA on the account holder's phone;

[0736]  (2) This will take the account holder to the splash screen which displays the logo and tag line. The account holder will press enter to continue.

[0737]  This will bring the account holder to the main menu screen which displays a menu of the features of MCA including Pay, Balance, History, Request Pay, Settings, and Help. The account holder will select Balance to check their balance.

[0738]  This will bring the account holder to the PIN screen where they will enter their PIN and select OK.

[0739]  This will bring the account holder to the balance screen which will provide them with the following information:

[0740]  Date: MM/DD/YYYY HH:MM

[0741]  Balance:

[0742]  When the account holder selects OK they will be brought back to the main menu screen.

[0743]  The MCA can be used to by an account holder to view the history of their last n, where n is an integer number (such as, 3 or 5, by way of example), transactions and the current balance of their prepaid debit account from their mobile device. To use MCA to check their history the account holder will go through the following steps:

[0744]  (1) Open MCA on the account holder's mobile device. This will take the account holder to the splash screen which displays the logo and tag line. The account holder then presses enter to continue.

[0745]  (2) This will bring the account holder to the main menu screen which displays a menu of the features of MCA including Pay, Balance, History, Request Pay, Settings, and Help. The account holder will select History to view their history.

[0746]  (3) This will bring the account holder to the PIN screen where they will enter their PIN and select OK.

[0747]  (4) This will bring the account holder the history screen which will provide them with the following information:

[0748]  Data of transaction and amount of transaction: MM/DD (+/−)$.$$

[0749]  The account holder will be able to select any one of the transactions listed to get more information on that specific transaction. To do this, they scroll over the specific transaction that they want to view and select it. This will bring them to a screen with the following information:

1  MICHAEL ASCHENBRENER (SBN 277114)
   mja@aschenbrenerlaw.com
2  BRIAN NOACK (*pro hac vice application pending*)
   btn@aschenbrenerlaw.com
3  ASCHENBRENER LAW, P.C.
   795 Folsom Street, First Floor
4  San Francisco, CA 94107
   Telephone: (415) 813-6245
5  Fax: (415) 813-6246
6  *ATTORNEYS FOR PLAINTIFF*

7

8

9                **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11

12  THINK COMPUTER CORPORATION, a      )  Case No.
    Delaware Corporation,              )
13                                     )  **COMPLAINT FOR PATENT**
                         Plaintiff,    )  **INFRINGEMENT**
14                                     )
              v.                       )  **DEMAND FOR JURY TRIAL**
15                                     )
    SQUARE, INC., a Delaware Corporation, )
16                                     )
                         Defendant.    )
17                                     )
18  _____ )

19

20

21

22

23

24

25

26

27

28

SQUARE - EXHIBIT 1014

Filed on behalf of Think Computer Corporation
By:    Robert B. Paladino (rbp@aschenbrenerlaw.com)
       Brian T. Noack (btn@aschenbrenerlaw.com)
       Michael Aschenbrener (mja@aschenbrenerlaw.com) (*pro hac vice*
         application to be filed)
       Aschenbrener Law, P.C.
       815 West Van Buren Street, Suite 415
       Chicago, IL 60607
       Tel: (312) 462-4922
       Fax: (312) 462-4923

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SQUARE, INC.
Petitioner

v.

THINK COMPUTER CORPORATION
Patent Owner

_____

Case No.: CBM2014-00159
Patent 8,396,808

_____

THINK COMPUTER CORPORATION'S
PRELIMINARY RESPONSE

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... I

I. INTRODUCTION ...................................................................................... 1

II. STATEMENT OF RELIEF REQUESTED .................................................. 3

III. PATENT OWNER'S LIST OF EXHIBITS .................................................. 3

IV. PRIOR ART RELIED UPON ...................................................................... 5

V. THE ASSERTED GROUNDS OF UNPATENTABILITY .............................. 6

VI. THE BOARD SHOULD NOT GRANT REVIEW OF THE '808 PATENT

BECAUSE IT IS A TECHNOLOGICAL INVENTION. .................................. 7

    A. The claimed subject matter as a whole recites a technical feature that is novel and

       unobvious over the prior art because no human alone could perform the functions of

       the '808 Patent at all or in real-time, and Petitioner fails to argue otherwise. ................. 9

       *1. Petitioner fails to analyze the '808 Patent as a whole for a technical feature, and*

          *instead improperly analyzes it on a limitation-by-limitation basis.* .......................... 9

       *2. The claimed subject matter as a whole recites a technical feature that is novel and*

          *unobvious over the prior art.* .................................................................. 11

    B. The claimed subject matter solves at least one technical problem with a technical

       solution. .................................................................................................... 12

VII. PETITIONER'S ARGUMENTS AND REFERENCES ARE THE SAME AS, OR

SIMILAR TO, ARGUMENTS THAT WERE PREVIOUSLY BEFORE THE

OFFICE. ...................................................................................................... 16

    A. Petitioner's grounds 1-6 use similar prior art to that of the Examiner. .......................... 17

    B. Petitioner's grounds 7-12 use similar prior art to that of the Examiner. ........................ 19

C.   Petitioner's grounds 1-6 also use similar arguments and combinations to that of the Examiner. ................................................................................................................... 22

D.   Petitioner's grounds 7-12 also use similar arguments and combinations to that of the Examiner. ................................................................................................................... 23

VIII.   **THE ONDRUS REFERENCE SHOULD NOT BE CONSIDERED PRIOR ART BECAUSE IT WAS NOT ACCEPTED BY OR PRESENTED AT THE BLED CONFERENCE IN 2004.** ............................................................................................. 26

IX.   **PETITIONER'S GROUNDS ARE REDUNDANT BECAUSE PETITIONER HAS NOT EXPLAINED WHY ITS ALTERNATIVE GROUNDS ARE MEANINGFULLY DISTINCT.** ....................................................................................... 29

A.   Petitioner's alternative grounds are redundant because Petitioner fails to identify the strengths and weaknesses of the two alternatives, as required. ...................................... 32

B.   The Petitioner's approaches are not meaningfully distinct. ............................................ 33

X.   **PATENT OWNER'S CLAIM CONSTRUCTION** ............................................................. 34

XI.   **THE CLAIMS OF THE PATENT ARE NOVEL AND NON-OBVIOUS.** .................... 39

A.   Petitioner fails to make a prima facie case of obviousness. ............................................ 39

B.   Petitioner fails to include at least one material limitation present in all of the claims, thus the Petition should be denied. .............................................................................. 42

C.   Petitioner fails to analyze the differences between the prior art and the claimed invention, as required, for its obviousness argument. ...................................................... 44

D.   Petitioner fails to articulate a proper reason to combine the references of Ground 1. ..... 47

   *1. Petitioner improperly relies on an unsupported expert opinion to support its combination in Ground 1.* ............................................................................................ 47

*2. Petitioner improperly relies on the mere premise of combination in Ground 1.*...... 49

*3. Petitioner improperly relies on a combination of references in Ground 1 that teach away from the combination.*...................................................................................... 51

E.    Petitioner fails to articulate a proper reason to combine the references of Ground 2..... 53

F.    Petitioner fails to articulate a proper reason to combine the references of Ground 7..... 56

*1. Petitioner improperly relies on the mere premise of combination in Ground 7.*......... 58

*2. Petitioner improperly relies on a combination in Ground 7 that frustrates the purpose of the references.* ........................................................................................ 60

*3. Petitioner improperly relies on a combination of references in Ground 7 that teach away from the combination.*...................................................................................... 62

**XII.    CONCLUSION** ......................................................................................... **67**

## VI.    THE BOARD SHOULD NOT GRANT REVIEW OF THE '808 PATENT BECAUSE IT IS A TECHNOLOGICAL INVENTION.

The '808 Patent is a technological invention because, as a whole, it recites a technical feature that is novel and unobvious over the prior art, and because it solves a technical problem with a technical solution.

To determine whether a patent is a technological invention, it is necessary to consider two factors: "whether the claimed subject matter as a whole recites a technological feature that is novel and unobvious over the prior art; and solves a technical problem using a technical solution." 37 C.F.R. § 42.301(b). A patent is eligible for covered business method patent review only if Petitioner shows both factors of this test are not present. *Travelocity.com L.P. et al., v. Cronos Technology, LLC,* CBM2014-00082, slip op. at 12 (PTAB September 15, 2014) (Paper 10); 37 C.F.R. § 42.301(b).

First, the claimed subject matter as a whole recites at least one technological feature that is novel and unobvious over the prior art because none of the prior art integrates a digital product catalog with the payments infrastructure necessary to facilitate a mobile payment system secured by internet-based biometric verification, let alone such a system where account roles are flexible.

Second, the '808 Patent solves multiple technical problems with technical solutions. For example, one technical problem that the '808 Patent solves is that in the prior art consumers could not track, retrieve, or analyze line-item transaction

data from merchants' point-of-sale ("POS") systems at all. The patent solves this technical problem in real-time with a technical solution by routing line-item data derived from the merchant's digital product catalog to the transaction record of the mobile payment system utilized by the merchant, making that data available immediately through mobile device and web-based portals.

Another technical problem the '808 Patent addresses is the issue of POS payment security, a technical problem that has long frustrated financial institutions to the point where hacks of POS software at major retailers including TJX, Target, Home Depot, and many others have made front-page news on a regular basis. The '808 Patent solves this problem by authenticating purchasers via internet-based multi-factor verification, including biometric verification, without requiring merchants to deploy any additional hardware.

The '808 Patent also solves the technical problem of the lack of role flexibility in traditional payment systems, which for decades has complicated data retrieval tasks for countless businesses by forcing them to maintain multiple accounts and/or identities for transaction counterparts due to legacy technical design flaws. The '808 Patent solves the problem by flexibly assigning roles linked to a centralized legal entity database to create bi-directional account functionality, as opposed to using fixed roles with no bi-directionality and with no uniform entity identifiers, as in the prior art.

combine references from the different approaches. (*See* Pet. 11, 12.)

In ground 8, Petitioner adds Dalzell, a base reference of grounds 1-6's "different approach," as an additional reference to the base grounds of 7-12, a purportedly different approach. (Pet. 11.) Petitioner argues out of both sides of its mouth, by stating on one hand that the two sets of grounds are different enough to avoid redundancy and cumulativeness (Pet. 50), but on the other hand that they are similar enough that they can share references when needed (Pet. 11, 12). This is impossible, for the two sets of grounds cannot "represent different . . . strands of iterative design," and both use the same primary reference, Dalzell. (Pet. 50.) Petitioner's use of Dalzell in both sets of grounds proves the lack of Petitioner's claimed differences and accordingly, the grounds are redundant and cumulative.

In conclusion, because the two sets of grounds are redundant and cumulative, Petitioner should have to elect which set of grounds to proceed upon for this CBM.

## X.    PATENT OWNER'S CLAIM CONSTRUCTION

Patent Owner construes the claims of the '808 Patent in the broadest reasonable construction in light of the stated and inherent limitations of the

specification and prosecution history.[8] Petitioner, on the other hand, incorrectly construes the claims of the '808 Patent because it ignores the stated and inherent limitations of the specification and prosecution history.

The standard for claim construction in a covered business method review for an unexpired patent requires that claim terms be interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

"Under the broadest reasonable construction standard, claim terms are presumed to be given their ordinary and customary meaning as would be understood by one of ordinary skill in the art at the time of the invention." *Oracle Corp. v. Clouding IP, LLC*, IPR2013-00073, slip op. at 6 (PTAB April 24, 2013) (Paper 8) *citing Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en

---

[8] Although Patent Owner disagrees with virtually all of Petitioner's claim construction, Patent Owner has only construed the necessary claims' elements, and only to the extent necessary, to rebut Petitioner's position that the claims are obvious. Patent Owner reserves the right to respond more fully to Petitioner's proposed claim constructions in the Patent Owner's Response, should this review be instituted.

banc). The ordinary and customary meaning of a term may be evidenced by a variety of sources, including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence." *Phillips*, 415 F.3d at 1314. Under this standard, "the words of the claim will be given their plain meaning unless the plain meaning is inconsistent with the specification." *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989).

"It is well established that 'claims are not to be read in a vacuum, and limitations therein are to be interpreted in light of the specification in giving them their broadest *reasonable* interpretation.'" *In re Marosi*, 710 F.2d 799, 802 (Fed. Cir. 1983) (quoting *In re Okuzawa*, 537 F.2d 545, 548 (CCPA 1976) (internal quotations omitted) (emphasis in original)). The specification is the single best guide to the meaning of a claim term. *Phillips*, 415 F.3d at 1317; *Oracle*, IPR2013-00073, slip op. at 6. "Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1334-35 (Fed. Cir. 2004).

Petitioner incorrectly construes many claim terms of the '808 Patent because Petitioner fails to account for the specification and prosecution history of the '808

Patent. Specifically, Petitioner omits the material limitation for "line item data"[9]

when construing and applying many claim terms, including "purchase list,"

"product catalog," and "transaction record."[10]

Patent Owner, though, construes these claim terms in light of the

specification and prosecution history, which define the "line item data" material

limitation. The specification and prosecution history of the '808 Patent show that

the "line item data" is derived from the "product catalog," and located in the

"purchase list" and "transaction record."

The specification in multiple places states that the "purchase list" contains

itemized information, also known as "line item data." (Ex. 2005 2:26-3:18.) The

Declaration of Aaron Greenspan, which is part of the prosecution history, further

---

[9] Although Petitioner mentions "line item transaction data" is present in the

"transaction record," Petitioner's claim construction does not specifically include

"line item data." (Pet. 15.)

[10] (Pet. 12-17, 27 (purchase list, product catalog), 29 (transaction record), 40-41

(product catalog), 41 (purchase list), 42 (transaction record), 60 (purchase list,

product catalog), 62 (purchase list), 66 (purchase list, product catalog), 67

(purchase list, transaction record), 68-69 (product catalog), 71 (product catalog),

and 72 (purchase list).)

clarifies this point by stating that "line item data" is located in the "purchase list."
(Ex. 2005 2:26-3:18.)

The recording and tracking of "line item data" is made possible by the
"product catalog." The specification of the '808 Patent further states that the
"purchase list," which contains "line item data," is comprised of items from the
"product catalog." (Ex. 1001 4:13-16.) The "line item data" points to specific
portions of the "product catalog" and is derived from the "product catalog."

The specification further supports the premise that "line item data" is
derived from the "product catalog" when it explains the functionality and benefits
of the integrated "product catalog" and "payment system." As the '808 Patent
states, the "integration of the payment system and product catalog functions to
enable recording and tracking transactions with itemized detail," (Ex. 1001 2:15-
17) and "one of the main benefits of having merchant product catalogs integrated
into the payment system [is that] line item transaction data can be communicated."
(Ex. 1001 8:5-8; Ex. 2012.) Therefore, the "product catalog" plays a key role in
facilitating the recording and tracking of the "line item data."

The "line item data" is also present in the "transaction record." The
specification states "[t]he line item data is additionally stored as part of the
transaction record of the accounts." (Ex. 1001 8:8-10.)

The prosecution history of the '808 Patent also clarifies what the "line item

data" encompasses. The "line item data" of the '808 Patent includes information such as product description, SKU, quantity, price, tax and total. (Ex. 2005 2:26-3:18.) "Line item data" also includes additional information, not found in prior art systems, such as product versions, price per quantity, uniform legal entity identifiers, and timestamps. (*Id.*)

Accordingly, under its broadest reasonable construction in light of the specification, "line item data" is "itemized data pertaining to products and services that is derived from the 'product catalog' and stored in the 'purchase list' and 'transaction record.'"

## XI.    THE CLAIMS OF THE PATENT ARE NOVEL AND NON-OBVIOUS.

### A.    Petitioner fails to make a prima facie case of obviousness.

In the interest of efficiency, Patent Owner is only responding to the grounds attacking the independent claims.[11] Patent Owner reserves the right to respond to the grounds dedicated to the dependent claims should this Petition be instituted.

Recognizing that nothing like the claimed system existed in the prior art, Petitioner relies only on obviousness arguments, and does not challenge novelty. (Pet. 11, 12.) The Petitioner has failed to make a *prima facie* showing of

---

[11] If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious. *In re Fine*, 837 F.2d 1071, 1076 (Fed. Cir. 1988).

**B.     Petitioner fails to include at least one material limitation present in all of the claims, thus the Petition should be denied.**

The Petition should be denied because Petitioner omits a material limitation in various claim terms in its claim construction. This claim construction omission carries through to Petitioner's obviousness analysis, which fails to address the missing limitation of "line item data," as required. Petitioner's failure to include a material limitation in its obviousness analysis is present in each of Petitioner's grounds.

When evaluating claims for obviousness under 35 U.S.C. § 103, all limitations of the claims must be considered and given weight. *Ex parte Grasselli*, 231 USPQ 393 (Bd. App. 1983) *aff'd mem*. 738 F.2d 453 (Fed. Cir. 1984). Establishing a prima facie case of "obviousness requires a suggestion of all limitations in a claim." *CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) *(citing In re Royka*, 490 F.2d 981, 985 (CCPA 1974)). The failure of an asserted combination to address each and every feature of a claim remains fatal to an obviousness argument under 35 U.S.C. § 103. *See In re Royka*, 490 F.2d 981, 180 USPQ 580 (CCPA 1974).

As shown above, "line item data" is present in all claims of the '808 Patent because it is a limitation of the "purchase list," "product catalog," and "transaction record." Again, the "line item data" consists of much more information than was available in the prior art, such as simply price and what type of payment card is

used. (*See generally* Ex. 1001 8:5-10; Ex. 2005 9:26.) The "line item data" includes additional information such as product description, SKU, quantity, price, product version, and other custom pieces of information. (*Id*.)

However, Petitioner fails to acknowledge this material limitation of "line item data" from various claim terms, including "purchase list" and "product catalog."[12] As a result, Petitioner omits any analysis of whether this limitation has ever been combined with mobile payments systems of the prior art. (*See* Pet. 18-80.) Nevertheless, Petitioner ultimately urges the Board to find that it would have been obvious to add this unacknowledged limitation to prior art payment systems.

Furthermore, the reason Petitioner failed to assert that "line item data" was in the prior art is because "line item data" simply does not exist in the prior art. Credit and debit card payments still do not have the capability to track and store line-item details. Payment card statements do not store itemized details about each transaction—only total amounts are listed. Also, Petitioner's prior art does not contain any disclosure on line-item details. All of the payment system references on which Petitioner relies are limited to tracking information in the same manner

---

[12] (Pet. 27 (purchase list, product catalog), 40-41 (product catalog), 41 (purchase list), 60 (purchase list, product catalog), 62 (purchase list), 66 (purchase list, product catalog), 67 (purchase list), 68-69 (product catalog), 71 (product catalog), and 72 (purchase list).)

as credit and debit card payments, which only involves tracking the date of purchase and the total amount spent in conjunction with an arbitrary string representing a merchant. (*See generally* Ex. 1001 8:5-10; Ex. 2005 9:26.)

Consequently, the Petition should be denied because Petitioner fails to address a limitation that is part of all of the claims of the '808 Patent.

### C.     Petitioner fails to analyze the differences between the prior art and the claimed invention, as required, for its obviousness argument.

The Petition should be denied because Petitioner fails to analyze the differences between the prior art and the claimed invention as required for its obviousness argument. Like Petitioner's omission of a material limitation, Petitioner's failure to analyze the differences between the prior art and claimed invention is present in each of Petitioner's grounds.

"An obviousness inquiry is based on factual inquiries including the differences between the claimed invention and the prior art." *Travelocity.com L.P. et al., v. Cronos Technology, LLC,* CBM2014-00082, slip op. at 19, 20 (PTAB September 15, 2014) (Paper 10) (*citing Graham,* 383 U.S. at 17–18). A Petitioner must specifically identify "the differences between the recited invention and the prior art." *Travelocity.com,* CBM2014-00082, slip op. at 20. This inquiry also includes identifying the differences between the prior art references themselves. *Id.*

In *Travelocity.com L.P. et al., v. Cronos Technology, LLC*, CBM2014-

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | | |
|---|---|---|---|
| 79613 | 7590 | 01/31/2013 | |

Think Computer Corporation
884 College Avenue
Palo Alto, CA 94306-1303

| EXAMINER |
|---|
| LUDWIG, PETER L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3687 | |

DATE MAILED: 01/31/2013

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/641,071 | 12/17/2009 | Aaron J. Greenspan | FACECASH | 9904 |

TITLE OF INVENTION: METHOD AND SYSTEM FOR TRANSFERRING AN ELECTRONIC PAYMENT

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $885 | $300 | $0 | $1185 | 04/30/2013 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85 (Rev. 02/11)

Application/Control Number: 12/641,071                                      Page 2
Art Unit: 3687

*Notice of Allowability*

1.      This Notice of Allowability is in response to Applicant's response filed on
01/07/2013.  In that response, Applicant argued that the claim limitations are neither,
disclosed, taught, nor suggested by the cited prior art.  The examiner respectfully agrees
with Applicant on this issue for the reasons stated below.  Claims 1-22 are currently
allowed.

---

*Examiner's Reasons for Allowance*

2.      The examiner notes that the Declaration under 37 C.F.R. § 1.131 did not have to
be taken into consideration, and therefore was not taken into consideration, for this
application to be allowed.

3.      The most remarkable piece of prior art U.S. Pat. Pub. No. 2010/0138344 to Wong
et al. ("Wong").  In general, Wong is directed to a system for one user to conduct a
transaction with another user, wherein one user's mobile device receives a barcode from
a payment system, wherein the barcode is used to pay for a product/service with the
second user.  *See abstract.*  Relevant Figures are copied below:

Application/Control Number: 12/641,071                                    Page 3

Art Unit: 3687



FIG. 3A                          FIG. 3B



FIG. 4

As noted by the examiner, Wong fails to disclose the following limitations of claim 1:

3            assigning a role of a merchant account to a first account and a role of a

4            purchaser account to a second account within a payment system wherein the first

5            account and the second account are adapted to selectively function as either a

6            merchant account or a purchaser account during any particular transaction;

7                  adding an item offered for sale by the merchant from a product catalog stored

8            in the payment system to a purchase list;

As noted by Applicant, neither U.S. Pat. Pub. No. 2008/0120155 to Pliha ("Pliha") nor

Zhang, J. (2006).  The roles of players and reputations: Evidence from eBay online

auctions.  *Decision Support Systems 42*, 1800-1818 (hereinafter "eBay") remedy the

deficiencies of Wong with respect to the claimed invention.  To be clear, there is nothing

in this particular art (e.g., e-commerce transaction payment and e-commerce transaction

authorization art) that describes the limitation of: "adding an item offered for sale by the

merchant from a product catalog stored in the payment system to a purchase list" that

can be properly combined with Wong to read on this claim.

        As correctly noted by Applicant:

        Wong et al. is directed toward completing purchase transactions using a mobile device.
    According to an embodiment of Wong et al., an application on a mobile device having a screen,
    such as a cell phone, enables the user to generate a bar code on the screen, which can be scanned
    for payment.  The bar code is valid for a limited period of time (e.g., one minute).  Once
    scanned, payment is transferred from the user's account to the merchant's account.  According to
    Wong et al., this allows users to easily and safely pay for purchases using a cell phone at any
    location having a suitable scanning device.  See Wong et al. at paras. [0002]-[0011].

        Pliha is not directed toward completing purchase transactions at all.  Rather, Pliha is
    directed toward distributing targeted incentives to customers of financial institutions based on
    each customer's financial or demographic data, or both.  Specifically, Pliha's Abstract describes
    its invention as follows:

            An incentive distribution system is used in distributing, tracking and redeeming
        product incentives offered by manufacturers and distributors of consumer goods
        through a financial institution.  A financial institution distributes an incentives list
        to each of its customers, based on information relating to the customers,
        containing the incentives relating to the category for which the customer qualifies.

Qualifying criteria includes transactional activity within the account held with the financial institution distributing the incentives, demographic data relating to the customer, and various account data. The system tracks purchases made by a customer at a participating retailer or dealership and updates the customer's qualifications based on these purchases. Further, the financial institution acts as a redemption warehouse by debiting the accounts of the manufacturers and distributors offering the incentives and crediting the accounts held by the retailers and dealerships honoring the incentives.

Therefore, Wong et al. and Pliha are directed toward solving fundamentally different problems which are encountered fundamentally different contexts. Specifically, Wong et al. is directed toward facilitating payments for purchases using a cell phone and a scanning device, whereas, Pliha is directed toward distributing consumer product incentives in a targeted fashion by analyzing records held at a financial institution where the records reflect past transactions of a consumer. Therefore, a significant difference is that Wong et al. is directed toward completing real-time processing of purchase transactions whereas Pliha is directed toward analyzing records of past transactions after the transactions have occurred. And, the purpose of Wong et al. is to facilitate such purchase transactions, whereas, the purpose of Pliha is to distribute incentives to make product purchases.

In view of these significant differences, the Applicant respectfully submits that there would not have been a reason to combine Wong et al. and Pliha references in the manner suggested in the office action. Each claim rejection contained in the office action mailed on October 24, 2012, depends upon this combination. Therefore, for at least this reason, Applicant's claimed invention is allowable over Wong et al. and Pliha.

Regarding Pliha, the office action mailed on October 24, 2012, states as follows:

In particular, the financial institution maintains a product catalog of offers to various merchants, and when, the user takes an action with the financial institution (but indirectly with the merchant) the financial institution records the activity, and then places one of its "products" from its "product catalog" with the consumer, wherein the "product" provided to the consumer is "purchased" by the consumer acting as he/she did in the course of the one or more transaction completed by the merchant.

This characterization of Pliha is incorrect for a number of reasons. First, Pliha cannot reasonably be considered as disclosing the "product catalog" recited in Applicant's claims. Taking claim 1 as an example, it recites adding an item from a product catalog to a purchase list and then transferring funds for a purchase price total from the purchaser account to the merchant

10

account. Therefore, the product catalog of Applicant's claim 1 is clearly a catalog of products offered for sale by the merchant. In contrast, Pliha does not use the term "product catalog" or anything equivalent.[1] The incentives discussed in Pliha cannot reasonably be considered "products" nor can the collection of such incentives be reasonably considered a "product catalog" as those terms are used in the Applicant's claim 1. This is at least because, when Applicant's claim 1 is considered as a whole, as it must according to 35 U.S.C. § 103, these terms clearly refer to items being purchased by a purchaser and do not refer to "incentives" to make purchases, as in Pliha. In contrast, the incentives distributed by Pliha are simply informational since they inform the consumer of incentives offered to that particular consumer (see para. [0076] of Pliha). While the Applicant does not consider it necessary, to further clarify this point, Applicant previously amended the independent claims to recite that the items added to the "purchase list" from the "product catalog" are offered for sale by the merchant.

The office action mailed on October 24, 2012, further alleges that paragraph 26 of Pliha discloses a product catalog that includes "items for sale by the merchant," and wherein the items purchased by the user are added to a "purchase list." The Applicant respectfully disagrees. The quoted terms or their equivalents do not appear in paragraph 26 of Pliha. Rather, paragraph 26 of Pliha is discussing a redemption process which involves debiting and crediting bank accounts of retailers, dealerships, manufacturers, and distributors. This redemption of incentives is unrelated to the items for sale by the merchant and the purchase list that are recited in Applicant's claims. This is at least because the redemptions are transacted among the financial institution, retailers, dealerships, manufacturers, and distributors separate from any purchase transactions made by a customer. This is clear from paragraph 25 of Pliha because it explains that the redemptions are performed after a log of any purchase transactions is compiled and communicated to the financial institution.

Moreover, it would not make any sense to substitute the items being purchased in the context of Wong et al. with the incentives to make purchases as in Pliha. Regarding Pliha, the office action states that "the financial institution records the activity, and then places one of its

---

[1] The office action mailed on October 25, 2012, argues that the references do not need to recite the claim limitations word-for-word. This misapprehends the Applicant's argument. The Applicant submits that Pliha does not disclose the recited product catalog or anything equivalent, regardless of terminology. This office action, as well as prior office actions, uses quotations around claim terminology when discussing the cited art. See e.g., the paragraph spanning pages 4-5 of the office action mailed on October 25, 2012. This gives the impression that the cited art also

11

'products' from its 'product catalog' with the consumer, wherein the 'product' provided to the consumer is 'purchased' by the consumer." However, even if the "incentives" of Pliha could reasonably be considered "products," this is not how Pliha actually operates. Rather, as Pliha shows in Figure 10 and discusses at paras. [0097]-[0098], the financial institution only records consumer activity and it does this in "end-of-day" batches, not in real-time. Additionally, Pliha shows in Figure 11 and discusses at paras. [0099]-[0100] that its incentives are also not distributed in real-time. Rather, as discussed by Pliha, a customer is informed of incentives as part of the financial institution's monthly statement after it has completed end-of-month processing. Because of these differences, the distribution of incentives as taught by Pliha would be incompatible with the system of Wong et al.

The office action additionally alleges that Pliha discloses "having the financial institution maintain a product catalog to distribute purchased products to the consumer." See office action mailed on October 24, 2012, at page 5. The Applicant respectfully disagrees. Pliha states throughout its specification that it is intended to match consumers with financial products, e.g. incentives such as coupons, offered by the financial institution based on demographics and other metrics. Pliha does not suggest that the financial institution would in any way "maintain a product catalog" or "distribute purchased products to the consumer."

Moreover, the incentives disclosed by Pliha relate to financial services[2] offered by financial institutions. Pliha explains that the incentives are based upon the level, amount and type of transactions made by each customer regarding the accounts held by the customers with the financial institution, such as a number of ATM transactions made by the customer. See Pliha at paras. [0053], [0067], and [0069]. The incentives offered to a particular customer are not listed in a "product catalog" but are instead predicated on the analysis of each customer's purchase history. And, according to Pliha, consumers are informed of incentives on a paper statement aggregating transactions for a month. As such, there is no "product catalog" of items offered for sale by Pliha from which any prospective customer might selectively add an item to a purchase list.

_____

uses that terminology when, in fact, it does not. For this reason, the Applicant pointed out that Pliha does not actually use the term "product catalog."
[2] The emphasistic phrase "financial product" that appears in Pliha is misleading insofar as many financial products are not actually products at all, but complex, structured financial services, frequently involving investments.

12

Additionally regarding Pliha, the office action alleges that it would have been obvious to combine Pliha with Wong et al. "because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog." This also incorrectly characterizes Pliha at least because Pliha does not disclose distribution of a product catalog. Instead, Pliha discloses distributing incentives to make future purchases. Moreover, the distribution of these incentives is not contemporaneous with a purchase but is instead performed periodically via end-of-month statements of the financial institution. In contrast, Wong et al. is directed toward completing real-time processing of purchase transactions. Therefore, to make the combination as suggested in the office action would materially alter the manner in which the systems described in the cited references function. As such, this reasoning to make the alleged combination does not appear to be based on what the cited references fairly teach, but appears instead to be based on improper hindsight reconstruction using the applicant's claims as a template. As explained in the Manual of Patent Examining Procedure at Section 2143.01, if a proposed modification or combination of cited art would change the principle of operation of the cited art invention being modified, then the teachings of the references are not sufficient to render the claims *prima facie* obvious.

In view of the above, the Applicant respectfully submits that Applicant's claimed invention is allowable over the cited art. Specifically, the Applicant's independent claims all require that a product catalog is stored in a payment system that is at a location that is different from the merchant's location. Neither Wong et al. nor Pliha, whether considered individually or in combination, discloses such a product catalog.

The examiner notes that the arguments focused on by the examiner relate to the arguments surrounding the issue of combining Wong with Pliha, and how one of ordinary skill in the art at the time of the invention would not have been motivated to make such a combination. The claimed language recites a combination of features that could have only been taught by the combination of Wong with Pliha through the use of improper hindsight. As exhibited in the prior art, such a combination had not been contemplated.

Application/Control Number: 12/641,071                                    Page 9
Art Unit: 3687

## Conclusion

Any inquiry concerning this communication or earlier communications from the examiner should be directed to PETER L. LUDWIG whose telephone number is (571)270-5599.  The examiner can normally be reached on Mon-Fri, 9:00am - 5:00pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Matthew Gart can be reached on 571-272-3955.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/Elaine  Gort/

Primary Examiner, Art Unit 3687/Elaine  Gort/

Primary Examiner, Art Unit 3687


/PETER L. LUDWIG/

Examiner, Art Unit 3687

Atty Dkt. No.  <u>THNK-00100</u>

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:  Aaron J. Greenspan          Confirmation No. 9904

Serial No.:  12/641,071                 Group Art Unit:  3687

Filed:  December 17, 2009               Examiner:  Peter L. Ludwig

Title:       Method and System for Transferring an Electronic Payment

\* \* \*

**RESPONSE TO OFFICE ACTION MAILED ON October 24, 2012**

**Certificate of Electronic (EFS-WEB) Transmission under 37 CFR 1.8(a)**
I hereby certify that this correspondence is being submitted via the U.S. Patent and Trademark Office Electronic Filing System in accordance with 37 CFR 1.6(a)(4) on the date indicated below:

Date of Submission:  January 7, 2013

Typed Name:  Derek J. Westberg

Signature:  /Derek J. Westberg/ (Reg. No. 40,872)

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Examiner:

The following is in response to the official action mailed on October 24, 2012:

13. (Previously Presented)  The method of claim 9, wherein augmenting the transaction includes charging a portion of the purchase price total to at least a third account.

14. (Previously Presented)  The method of claim 13, wherein a percentage of the purchase price total is charged to the purchaser account and a remaining percentage of the purchase price total is charged to the third account.

15. (Previously Presented)  The method of claim 13, wherein the portion of the purchase price total charged to at least a third account is calculated from items from the product list that are selected to be charged to the third account.

16. (Previously Presented)  The method of claim 9, wherein augmenting the transaction includes applying a budgeting rule that transfers money based in part on the purchase.

17. (Original)  The method of claim 2, further comprising communicating a notification of purchase-related effects at the time of purchase.

18. (Original)  The method of claim 2, further comprising receiving purchaser acknowledgment of account-related warnings at the time of purchase and obtaining purchaser consent to ameliorative actions at the time of purchase.

19. (Previously Presented)  A method for transferring an electronic payment between a purchaser and a merchant comprising:

    assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;

Additionally regarding Pliha, the office action alleges that it would have been obvious to combine Pliha with Wong et al. "because when the financial institution, which is at a different location than the merchant, also collects data on consumer activity, the financial institution can now distribute relevant information to the user through its product catalog." This also incorrectly characterizes Pliha at least because Pliha does not disclose distribution of a product catalog. Instead, Pliha discloses distributing incentives to make future purchases. Moreover, the distribution of these incentives is not contemporaneous with a purchase but is instead performed periodically via end-of-month statements of the financial institution. In contrast, Wong et al. is directed toward completing real-time processing of purchase transactions. Therefore, to make the combination as suggested in the office action would materially alter the manner in which the systems described in the cited references function. As such, this reasoning to make the alleged combination does not appear to be based on what the cited references fairly teach, but appears instead to be based on improper hindsight reconstruction using the applicant's claims as a template. As explained in the Manual of Patent Examining Procedure at Section 2143.01, if a proposed modification or combination of cited art would change the principle of operation of the cited art invention being modified, then the teachings of the references are not sufficient to render the claims *prima facie* obvious.

In view of the above, the Applicant respectfully submits that Applicant's claimed invention is allowable over the cited art. Specifically, the Applicant's independent claims all require that a product catalog is stored in a payment system that is at a location that is different from the merchant's location. Neither Wong et al. nor Pliha, whether considered individually or in combination, discloses such a product catalog.

Additionally, independent claims 1, 19, 20, 21 and 22 recite essentially that the accounts within the payment system are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction. The office action alleges that Wong et al. inherently or implicitly discloses this limitation because "the user *could*, after the registration phase, sign up as a merchant, and then the account assigned to the user *could be* associated with a merchant account, and then the merchant *could* register as a user and the merchant's first account *could be* transformed into a user account." See office action mailed on October 24, 2012, at page 6 (emphasis added). The Applicant respectfully disagrees with this reasoning. That Wong et al. *could be* made to operate in a particular fashion, does not imply that Wong et

al. inherently or implicitly discloses doing so.  The fact that a certain result or characteristic may occur or may be present in the prior art is not sufficient to establish the inherency of that result or characteristic.  MPEP 2112, *citing, In re Rijckaert*, 9 F.3d 1531, 1534, 28 USPQ2d 1955, 1957 (Fed. Cir. 1993) (reversed rejection because inherency was based on what would result due to optimization of conditions, not what was necessarily present in the prior art); *In re Oelrich*, 666 F.2d 578, 581-82, 212 USPQ 323, 326 (CCPA 1981) (Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.); *In re Robertson*, 169 F.3d 743, 745, 49 USPQ2d 1949, 1950-51 (Fed. Cir. 1999) (To establish inherency, the extrinsic evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill.).  Therefore, the examiner must provide a basis in fact and/or technical reasoning to reasonably support the determination that the allegedly inherent characteristic necessarily flows from the teachings of the applied prior art.  Here, the examiner would need to provide a basis in fact and/or technical reasoning to support a conclusion that the accounts of Wong et al. are necessarily adapted to selectively function as either a merchant account or a purchaser account during any particular transaction.  This would not be possible based on the teachings of Wong et al.

The office action additionally alleges that Zhang discloses "that an account can at times be selectively designated as a buying account and at other times selectively designated as a selling account (see e.g. Table 4)."  The Applicant respectfully submits that Zhang merely shows in Table 4 that a "seller" can receive both selling and buying feedback.  At page 1801, Zhang further discusses that "[a] user can take the role as a buyer at some times, and as a seller at other times."  At most, this discloses that a *person* can assume these different roles, however, this does not teach that an *account within a payment system* is adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, as in Applicant's claim 1.

Therefore, because Zhang does not disclose this feature missing from Wong et al. and Pliha, this is another reason why Applicants' claim 1 is allowable over the cited references taken singly or in combination.  Moreover, because Wong et al. lacks such flexibility, it would not have been obvious to modify Wong et al. as suggested in the office action in order to achieve the Applicant's claimed invention.  Therefore, this is an additional reason why claim 1 is allowable.

Trials@uspto.gov                                    Paper No. 9
571-272-7822                              Entered: December 29, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
—————————

SQUARE, INC.,
Petitioner,

v.

THINK COMPUTER CORPORATION,
Patent Owner.
—————————

CBM2014-00159
Patent No. 8,396,808 B2
—————————

Before TONI R. SCHEINER, SCOTT E. KAMHOLZ, and
BART A. GERSTENBLITH, *Administrative Patent Judges.*


KAMHOLZ, *Administrative Patent Judge.*


DECISION
Institution of Covered Business Method Patent Review
*37 C.F.R. § 42.208*

CBM2014-00159
Patent 8,396,808 B2

document filed as Exhibit 1007 actually was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it." Prelim. Resp. 26-27 (quoting *In re Wyer*, 655 F.2d 221 (CCPA 1981) (internal quotations omitted).

## III.    CONCLUSION

Petitioner has demonstrated that it is more likely than not, on the present record, that claims 1–7, 9–11, 13–17, and 20–22 are unpatentable. Petitioner has not demonstrated that it is more likely than not that claims 8 and 19 are unpatentable.  The Board has not made a final determination on the patentability of the challenged claims.

## IV.    ORDER

Accordingly, it is

ORDERED that a covered business method patent review is hereby instituted as to claims 1–7, 9–11, 13–17, and 20–22 U.S. Patent No. 8,396,808 B2 on the following grounds of unpatentability:

    A. Obviousness of claims 1–3, 5–7, 17, and 20–22 over Bemmel and Dalzell;

    B. Obviousness of claim 4 over Bemmel, Dalzell, and Carlson;

    C. Obviousness of claims 9, 10, and 13–15 over Bemmel, Dalzell, and Tripp;

    D. Obviousness of claim 11 over Bemmel, Dalzell, and Elston; and

    E. Obviousness of claim 16 over Bemmel, Dalzell, and Deschryver;

FURTHER ORDERED that pursuant to 35 U.S.C. § 324(d) and

CBM2014-00159
Patent 8,396,808 B2

37 C.F.R. § 42.4, notice is hereby given of the institution of a trial, the trial commencing on the entry date of this decision; and

FURTHER ORDERED that the trial is limited to the grounds identified above, and no other grounds are authorized.

Filed on behalf of Think Computer Corporation
By:     Sean G. Goodwin (sgg@aschenbrenerlaw.com)
        Michael Aschenbrener (mja@aschenbrenerlaw.com)
        Aschenbrener Law, P.C.
        815 West Van Buren Street, Suite 415
        Chicago, IL 60607
        Tel: (312) 462-4922
        Fax: (312) 462-4923

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SQUARE, INC.
Petitioner

v.

THINK COMPUTER CORPORATION
Patent Owner
_____

Case No.: CBM2014-00159
Patent 8,396,808

_____

**PATENT OWNER'S MOTION TO AMEND UNDER 37 C.F.R. § 42.221**

## I.    INTRODUCTION

Patent owners in a CBM may file a motion to amend the claims subject to certain conditions. 37 C.F.R. § 42.221. A motion to amend may be denied, without prejudice, if it is determined that patent owner's original claims are patentable. 77 Fed. Reg. 48,767 (to be codified at 37 C.F.R. pt. 42). If the instituted claims are determined to be unpatentable, Patent Owner requests cancellation of claims 1-18 and 20-22, and substituted with proposed claims 23-43 found in this amendment.

## II.    CLAIM LISTING [37 C.F.R. § 42.221(B)]

Claims 1-18 (canceled).

Claim 19 (original): A method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account and a role of a purchaser account to a second account within a payment system wherein the first account and the second account are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction;

adding at least one item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;

providing a user ID token in the form of a barcode that is displayable on a purchaser terminal;

obtaining a user ID token of the purchaser from a merchant terminal by scanning a purchaser terminal display of the barcode user ID, the merchant terminal being at a merchant location and the merchant location being different from the payment system;

communicating identity confirmation information associated with the user ID token to the merchant terminal, wherein the identity confirmation information is an image of an owner of the purchaser account;

receiving confirmation from the merchant terminal that the image matches the owner of the purchaser account;

transferring funds for a purchase price total from the purchaser account to the merchant account; and

recording purchase list information as a transaction record for the merchant account and the purchaser account.

Claims 20-22 (canceled).

Claim 23 (proposed substitute for original claim 1): A method for transferring an electronic payment between a purchaser and a merchant comprising:

assigning a role of a merchant account to a first account and a role of a purchaser account to a second account with a payment system wherein the first account and the second account are adapted to selectively function as either a

merchant account or a purchaser account during any particular transaction, said payment system storing and communicating line item transaction data;

adding an item offered for sale by the merchant from a product catalog stored in the payment system to a purchase list;

obtaining a user ID token of the purchaser from a merchant terminal, the merchant terminal being at a merchant location and the merchant location being different from the payment system;

communicating identity confirmation information associated with the user ID token to the merchant terminal; and

transferring funds for a purchase price total from the purchaser account to the merchant account.

Claim 24 (proposed substitute for original claim 2): The method of claim [1] 23, further comprising storing purchase list information as a transaction record for the merchant account and the purchaser account.

Claim 25 (proposed substitute for original claim 3): The method of claim [2] 24, further comprising serving the product catalog to a purchaser terminal, wherein an item is added to the product catalog from the purchaser terminal.

Claim 26 (proposed substitute for original claim 4): The method of claim [3] 25, further comprising navigating the purchaser terminal to the product catalog of a merchant based on the location of the purchaser terminal.

Claim 27 (proposed substitute for original claim 5): The method of claim [2] 24, further comprising serving the product catalog to the merchant terminal, wherein an item is added to the product catalog from the merchant terminal.

Claim 28 (proposed substitute for original claim 6): The method of claim [2] 24, wherein the step of obtaining a user ID token of a purchaser includes scanning a barcode provided by the purchaser.

Claim 29 (proposed substitute for original claim 7): The method of claim [6] 28, further comprising providing a barcode displayable on a purchaser terminal.

Claim 30 (proposed substitute for original claim 8): The method of claim [2] 24, wherein the step of communicating identity confirmation information includes sending an image associated with an account ID, wherein the image comprises a photograph of an owner of the purchaser account, and receiving confirmation from the merchant terminal that the image associated with the account ID matches that of the purchaser.

Claim 31 (proposed substitute for original claim 9): The method of claim [2] 24, further comprising augmenting a transaction associated with the transfer of funds.

Claim 32 (proposed substitute for original claim 10): The method of claim [9] 31, wherein augmenting the transaction includes adding a purchaser-variable value to the purchase price total.

Claim 33 (proposed substitute for original claim 11): The method of claim [10] 32, wherein adding a purchaser-variable value to the purchase price total includes allowing the purchaser to set the purchaser-variable value after the purchase with the merchant is complete.

Claim 34 (proposed substitute for original claim 12): The method of claim [11] 33, wherein adding a purchaser-variable value to a purchase price includes setting a default value greater than zero, and using the default value as the purchaser-variable value if the purchaser-variable value is not set by an expiration time.

Claim 35 (proposed substitute for original claim 13): The method of claim [9] 31, wherein augmenting the transaction includes charging a portion of the purchase price total to at least a third account.

Claim 36 (proposed substitute for original claim 14): The method of claim [13] 35, wherein a percentage of the purchase price total is charged to the purchaser account and a remaining percentage of the purchase price total is charged to the third account.

Claim 37 (proposed substitute for original claim 15): The method of claim [13] 35, wherein the portion of the purchase price total charged to at least a third account is calculated from items from the product list that are selected to be charged to the third account.

Claim 38 (proposed substitute for original claim 16): The method of claim [9] 31, wherein augmenting the transaction includes applying a budgeting rule that transfers money based in part on the purchase.

Claim 39 (proposed substitute for original claim 17): The method of claim [2] 24, further comprising communicating a notification of purchase-related effects at the time of purchase.

Claim 40 (proposed substitute for original claim 18): The method of claim [2] 24, further comprising receiving purchaser acknowledgement of account-related warnings at the time of purchase and obtaining purchaser consent to ameliorative actions at the time of purchase.

Claim 41 (proposed substitute for original claim 20): A system for transferring an electronic payment between a purchaser and a merchant comprising:

a payment system that manages transactions between the purchaser and the merchant and includes a payment system account database, wherein the account database includes a plurality of accounts that are adapted to selectively function as either a merchant account or a purchaser account during any particular transaction and wherein the merchant is at a merchant location and the merchant location is different from the payment system, said payment system storing and communicating line item transaction data;

a product catalog with categorized items offered for sale by the merchant that is hosted within the payment system;

an account portal that connects an electronic terminal to the payment system through a network connection, and includes transaction interface tools and product catalog management tool; and

wherein the account portal connects the purchaser to the payment system with a transaction interface for a purchaser and connects a merchant to the payment system with a merchant interface.

Claim 42 (proposed substitute for original claim 21): A method performed over a payment network for transferring an electronic payment between a purchaser and a merchant, the payment network comprising a plurality of merchant terminals connected to a plurality of payment servers, an accounts database that includes a plurality of accounts adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, and a product catalog database of items offered for sale by the merchant, wherein each merchant terminal has an ID token reader, a display, and network capabilities, the method comprising the steps of:

assigning the role of a merchant account to a first account from the accounts database and the role of a purchaser account to a second account from the accounts database;

creating a purchase list with at least one item from the product catalog

database;

reading, with the ID token reader of a merchant terminal, the user ID token

of a purchaser and sending the user ID token to a payment server, the merchant

terminal being at a merchant location and the merchant location being different

from the product catalog database, said payment server storing and communicating

line item transaction data;

transmitting, from the payment server to the merchant terminal, identity

confirmation information associated with the user ID token;

transmitting, from the merchant terminal to the payment server, a payment

approval communication;

transferring, with the payment server, payment from the purchaser account

to the merchant account.

Claim 43 (proposed substitute for original claim 22): A method performed

over a payment network for transferring an electronic payment between a

purchaser and a merchant, the payment network comprising a plurality of merchant

terminals and purchaser terminals connected to a plurality of payment servers, an

accounts database that includes a plurality of accounts adapted to selectively

function as either a merchant account or a purchaser account during any particular

transaction, and a product catalog database of items offered for sale by the

merchant, wherein each merchant terminal has an ID token reader, a display, and network capabilities, the method comprising the steps of:

assigning the role of a merchant account to a first account from the accounts database and the role of a purchaser account to a second account from the accounts database:

creating a purchase list with at least one item form the product catalog database;

transmitting, from a purchaser terminal to a merchant terminal, the user ID token of a purchaser and sending the user ID token to a payment server, the merchant terminal being at a merchant location and the merchant location being different from the product catalog database, said payment server storing and communicating line item transaction data;

transmitting, from the payment server to the merchant terminal, identity confirmation information associated with the user ID token;

transmitting, form the merchant terminal to the payment server, a payment approval communication;

transferring, with the payment server, payment from the purchaser account to the merchant account.

## III.   PROPOSED CLAIM CONSTRUCTION

Patent Owner provides proposed claim construction for the terms "line item transaction data" under the standard applicable for CBM Reviews. Patent Owner requests that the Board construe the phrase "line item transaction data" as that of a person having ordinary skill in the art ("POSITA"), who would understand it to mean the information given on each line of an invoice used to communicate the quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping, or any other fees that arrive at the total sum for the transaction. (Greenspan Supplemental Declaration, Ex. 2021, ¶ 6.) Additional support for this claim construction is found in the attached declaration by the patent inventor, Aaron Greenspan.

## IV.   SCOPE OF SUBSTITUTE CLAIMS [37 C.F.R. § 42.221(A)(2)]

Proposed substitute claims may not enlarge the scope of original patent claims. 37 C.F.R. § 42.221(a)(2)(ii). Patent Owner notes that proposed independent claims 23 and 41 include all of the limitations found in their respective original independent claims, as well as an additional limitation in which the payment system be able to store and communicate line item transaction data. Likewise, proposed independent claims 42 and 43 include all of the limitations found in their respective original independent claims, as well as an additional limitation in which the payment server is able to store and communicate line item transaction data.

Therefore, proposed independent claims 23, 41, 42, and 43 only add features to the claims they would substitute, and do not remove any limitation therefrom. Proposed dependent claims 24-40 correspond to the original dependent claims 2-18. Due to the nature of multiple dependent claims, only the dependency of these substituted claims have changed to ultimately depend from proposed substitute independent claim 23.

## V.    SUPPORT FOR CLAIMS [37 C.F.R. § 42.221(B)(1) AND (2)]

Support for the added limitation in amended independent claims 23, 41, 42, and 43 is found in paragraph 26 of U.S. Application Serial Number 12/641,071 (Ex. 1004, "File History 2 of 2"), as well as column 8, lines 6-15 of U.S. Patent Number 8,396,808 B2 (Ex. 1001, the "'808 Patent"). Furthermore, Figures 3, 4, and 5 show line item transaction data breakdowns. In Figures 3 and 4, line item data for a hamburger, soda, and tax add up to the total amount of the transaction. Figure 5 shows a purchase list with a breakdown for item cost as well as a tax amount.

Otherwise, original claim one and amended claim 23 find support in paragraphs 16 through 21, and 31 of the application. (Ex. 1004.) Original claim 20 and amended claim 41 find support in paragraphs 16 through 18, 20, 30, and 31. (Ex. 1004.) Original claim 21 and amended claim 42 find support in paragraphs 16

through 21, and 31. (Ex. 1004.) Original claim 22 and amended claim 43 find

support in paragraphs 16 through 21, and 31. (Ex. 1004.)

## VI. ALLOWABILITY OF PROPOSED SUBSTITUTE CLAIMS OVER PRIOR ART [37 C.F.R. § 42.221(A)(2)(I), *IDLE FREE V. BERGSTROM* AT 6]

In the case of a motion to amend, the patent owner bears the burden of proof

to demonstrate patentability of the proposed claims over the prior art in general,

and thus entitlement to the proposed claims. *Idle Free Sys., Inc. v. Bergstrom, Inc.,*

IPR2012-00027, slip op. at 33 (PTAB January 7, 2014 (Paper 66)). As set forth in

*Idle Free*, that does not mean that the patent owner is "assumed to be aware of

every item of prior art presumed to be known to a hypothetical person of ordinary

skill in the art." *Id.* Rather, the patent owner should discuss, as well as present

evidence, if appropriate, as to the level of ordinary skill in the art, and what was

known regarding the features being relied upon to demonstrate patentability of the

proposed claims. *Id.* At the present time, Patent Owner is unaware that the new

limitation is otherwise known in combination with any of the other elements of the

claims in any prior art, even that which is discussed below.

### A. Person of Ordinary Skill in the Art

At the time of the invention, a POSITA would be a computer programmer

with 3-4 years of backend development experience in the context of enterprise

software familiar with relational databases and computer security who, through at

least routine involvement in financial transactions, has also come into contact with receipts, basic accounting principles, and banking technology (e.g. ACH, retail, and on-line plastic payment card processing, etc.). (Ex. 2021, ¶ 28.)

A POSITA would know that "line item transaction data" would comprise such information as the item description, item quantity, unit-of-measure, price, discount, and tax information. The total line item charges for a transaction would equal the total sum paid for the transaction. (*See* Ex. 2021, ¶¶ 6, 14-19.) "Line item data" is essentially a detailed receipt for the transaction. However, a POSITA would not have found it obvious to combine line item data with a novel payment system that included a product catalog and used authentication protocols to increase transaction security. (Ex. 2021, ¶ 30.)

Petitioner's expert, Dr. Sadeh-Koniecpol, was deposed on March 26, 2015. (Ex. 2019, 1:10-11.) He admitted that he only wrote approximately 10% of his expert report "to provide further color, to add additional details," and that opposing counsel drafted the remaining 90%. (*Id.*, 24:4-13.) In that report, Dr. Sadeh testified that a POSITA would have the equivalent of a bachelor's degree in business or finance or computer science or electrical engineering and at least two years of experience designing and implementing mobile commerce or e-commerce systems. (Ex. 1002, ¶ 19.) In Dr. Sadeh's deposition, he admitted that he was guided as to how that paragraph was to be phrased. (Ex. 2019, 40:17 – 41:2.) In the

expert report, Dr. Sadeh stated that it was his opinion that a POSITA would have been motivated to combine the various documents described as prior art. (*See*, e.g., Ex. 1002, ¶ 136.) Yet in his deposition, Dr. Sadeh testified that software developers are not known for being good at performing prior art research and he had "no idea" as to how a POSITA would be expected to find specific prior art. (Ex. 2019, 48:3 – 49:12.) The entire expert report is drafted through the lens of a hypothetical POSITA and what that POSITA would find to be obvious at the relevant point in time. Dr. Sadeh admitted that the petitioner's counsel guided him as to how a POSITA should be defined and drafted at least 90% of the report, which presumably includes what a POSITA would find to be obvious. Dr. Sadeh's expert report should be excluded from this CBM Review, and the allegations of obviousness should be overcome.

### B.  Indicia of Nonobviousness

The Court of Appeals for the Federal Circuit stated in *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed. Cir. 1983) that "evidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." Such evidence might give light to circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or unobviousness, such evidence may have relevancy. *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459

(1966). Affidavits or declarations, when timely presented, containing evidence of criticality or unexpected results, commercial success, long-felt but unsolved needs, failure of others, skepticism of experts, etc., must be considered by the examiner in determining the issue of obviousness of claims for patentability under 35 U.S.C. 103.

The inventor, Aaron Greenspan, solved a nagging problem in July 2009 that resulted in U.S. patent number 8,396,808. Mr. Greenspan wanted to capture line item data from the point-of-sale and transfer it through a payment system intact so that he did not have to enter it manually for accounting and tax purposes. (Ex. 2021, ¶¶ 5-8.) In this way, he would not have to keep receipts and manually reenter line item amounts. He knew the data existed at the merchant level as line item data typically found in a detailed receipt. (*See Id.*, ¶ 6.) He knew that "Level III transactional data" only included a very limited amount of line item characters, and that payment providers (such as credit cards and banks) routinely excised any information other than that minimally required due to the antiquated system's limited capabilities of data transfer. (*Id.*, ¶ 19.) There was no incentive for payment providers to pass along Level III data. (*See* Ex. 2026.) First, it costs more money to transmit that much information on antiquated communication systems and report it to the consumer. Second, it is a potential threat to privacy. Third, there is no need to provide more than the limited amount of data necessary to ensure that someone

spent X amount of money at the Y institution, and that is all that is reported on credit card and bank account reports. In general, credit card processing terminals do not have the capability to capture and transmit Level III data due to memory limitations. (Ex. 2028.) For example, the standard for transmitting data from a merchant's bank to a card issuer's bank allows only 23 characters for the name of the business. (*See* Ex. 2026.)

Mr. Greenspan's attached declaration presents objective evidence of nonobviousness. The financial burden of updating all of the legacy systems around the world prevented the entire payment system industry from ever innovating to simply increase the number of characters required to include the requisite room for all line item data per transaction. (*See* Ex. 2026.) Even though there has been a long-felt but unsolved need by the consumer to receive Level III data, the credit card payment systems were designed decades ago to send the minimum amount of information required to verify a transaction. (*Id.*) It was, and still is, to the economic advantage of the credit card payment systems to provide the minimal amount of data required to verify a transaction, which typically only includes the date, amount, and merchant name.

## C.    Referenced Prior Art in the Decision to Institute CBM Review

This covered business method patent review has been instituted on the grounds of obviousness due to various combinations of Bemmel, Dalzell, Carlson,

Tripp, Elston, and Deschryver. (Paper 9, at 15.) Patent Owner contends that

independent claims 23, 41, 42, and 43 are patentable over the references. Patent

Owner contends that none of the references cited in the Decision to Institute CBM

review, disclose, or suggest that line item transaction data is integrated into the

payment system or stored in the transaction record to include such itemized details

that tax forms could be "automatically completed by aggregating each category of

line item transaction data as appropriate." (Ex. 1004, Col. 26.)

Bemmel discloses a system and method for authorizing a payment for a

point of sale transaction by authenticating the user of a mobile device. (Ex. 1005,

Abstract.) Bemmel discusses how a User ID can be associated with demographic

data, financial account information, loyalty account information, and healthcare

information in an electronic wallet. (*Id*. at [0030].) Bemmel does not disclose

anything related to line item transaction data.

Dalzell discloses an online marketplace system that provides features that

assist users to list products for sale, locate product listings, and make purchases.

(Ex. 1006, Abstract.) According to Figure 5A, the product information database,

backend payment processing system, and purchase histories are all separate. Figure

4A states that it only captures four purchase history data points: item name, order

number, date, and buyer. This is essentially the exact same data provided by

current ACH and credit card payment systems. Dalzell does not disclose the level of detail that a POSITA would understand "line item transaction data" to mean.

Carlson discloses a method, apparatus, and computer program code for creating an electronic catalog. (Ex. 1008, Abstract.) Consumers are able to purchase items from the electronic catalog based on their physical location in relation to the product location. Figures 8-11 discloses line item detail within the online catalog that consists of quantity, item identification, item description, and price. Figure 12 includes "import duty" based on location of buyer. It is essentially a product-listing database for travelers on a fixed itinerary that can calculate an import duty. There is no mention of a payment system, purchase history, receipt, or aggregation of taxable items.

Tripp discloses a computing device operated by a restaurant customer to order food items, essentially relegating the waiter to that of an expediter. (Ex. 1009, Abstract.) Food item information includes category, name, detailed description, pictures, item ingredients, nutritional information, and cost. (*Id*. at [0020], [0029].) Bills and tips can be split, and credit cards can be used for payment. (*Id*. at [0016].) Receipts can be printed or emailed, and are not part of the payment system. *Id*. Record keeping duties are clearly placed in the hands of the customer, and it does not appear to be saved in the electronic system. (*Id.*) Although limited line item data is present detailing restaurant menu items, the

entire point of the '808 patent is frustrated by the lack of record keeping passing through the payment system so that tax and accounting functions can be automated by the consumer.

Elston discloses a remote ordering system suited for mobile customers who choose to pick up their purchases from a merchant location. (Ex. 1013, Abstract.) Menu items are stored in an electronic store information directory by product groups and sub-groups. (*Id*. at [0019].) This directory includes item price, service fees, tips, taxes, time, date, order fulfillment time, UPC, SKU, and item coding. (*Id*. at [0130], [0132], [0136], [0144], [0293].) Transaction receipts are printed, and both merchant and customer keep one copy. (*Id*. at [0143].) All transaction data is stored in a data warehouse for the merchant's auditing purposes. (*Id*. at [0344].) Figure 1 reveals that the payment processors are external to the invention. Notably, the customer only receives a paper copy of the transaction receipt, and the payment system does not allow line item transaction data to be transferred to the customer for personal tax or auditing services.

Deschryver discloses a system and method for directing the transfer of funds to a customer account, ostensibly a retirement or savings account. (Ex. 1010, Abstract, [0043].) Transfers made to a customer designated account are itemized on a customer's receipt or made available online. (*Id*. at [0089].) However, merchandise is never actually purchased using this system or method; it is only

useful for transferring money to an account. Therefore, there is no line item data to be captured or transferred to the end-user.

### D.    Other Prior Art Cited by the Petitioner

Tumminaro discloses a mobile payment platform and service to provide a fast and easy method for users. (Ex. 1011, Abstract.) Financial transactions can take place person-to-person or person-to-merchant. (*Id*. at [0021].) A transaction summary is captured, but includes only amount value, balance, and time stamp data. (*Id*. at [0950].) This is essentially the same data transmitted in a typical credit card payment system.

Ogilvy discloses a financial transaction processing system that can be utilized by mobile phones in which an authorization is required by the payer device. (Ex. 2003, Abstract.) Financial transactions may be made over the internet or by utilizing a credit card payment system. (*Id.* at [0012].) The payer authorization can include product information, such as a product listing or identifier. (*Id.* at [0015].) A receipt of the transaction can be produced, but it is only transmitted from the merchant's server to the payer's device. (*Id.* at [0104].) Line item transaction data is not transmitted through the payment system to the consumer so that it may be automatically aggregated for tax or audit purposes.

Wong discloses a mobile device application that can generate limited-use bar codes for point-of-sale purchases. (Ex. 2001, Abstract.) Receipts can be stored

on the mobile device, and are searchable by date, recent activity, store, or dollar amount. (*Id*. at [0008] and [0030].) This does not amount to anything more than the typical information found in a credit card payment system transaction, and would not allow the consumer to automatically aggregate line item transaction data for tax or audit purposes.

Pliha discloses an incentive distribution system used to distribute, track, and redeem product incentives. (Ex. 2002, Abstract.) The system tracks purchases made by a customer at participating merchants and updates the customer's qualifications for increased incentives. (*Id.*) Line item transaction data is not transmitted through a payment system to track the consumer's activities.

Zhang discloses information regarding the impact of a consumer's behavior in a reputation-based website auction system based on evidence from eBay. (Ex. 2004, Abstract.) An intelligent web agent program was used to collect transaction and feedback data for analysis. (*Id*. at [1804].) The data collected included the trading item, seller's ID, buyer's ID, start time, end time, bid prices, number of participants, description of item auctioned, and seller's feedback history. (*Id*. at [1804]-[1805].) This scientific paper does not discuss line item transaction data or payment system data communications.

Ondrus discloses a proposed novel architecture for a mobile payment system that includes a membership scheme. (Ex. 1007, Abstract.) The objective of the

proposed architecture was to adapt legacy systems used in the retail industry with mobile technologies. (*Id.* at 2.) Merchants would be able to aggregate consumer purchase history to provide benefits via a loyalty program and personalized coupons. (*Id.* at 12.) However, a traditional credit/debit card payment system is used for all transactions. (*Id*.) Line item data transactions are not discussed at all, merely an aggregation of consumer purchasing history. Regardless, the traditional credit card payment system does not allow for line item transaction data to be transmitted directly to the consumer for tax and auditing purposes.

### E.    PRIOR ART PER THE CANADIAN PATENT OFFICE

Gangi discloses a system to provide a customized set of identification data to facilitate a transaction and related methods. (Ex. 2029, Abstract.) The system allows for additional consumer information to be stored and transferred on the magnetic stripe of a credit or debit card. (*Id.* at 1:26-34.) In this way, multiple sets of information for multiple credit cards can be encoded onto one card. (*Id*. at 2:33-39.) This information can include data to correspond with the user's profile, such as an image of the user or other form of identification. (*Id.* at 11:41-51.) However, the additional data on the single credit card does not allow for transmittal of line item transaction data from the point of sale to flow through the traditional payment system to the consumer for aggregation purposes.

Giordano discloses a secure electronic payment system and methods for

monitoring consumer behavior. (Ex. 2030, Abstract). The secure payment system involves wirelessly communicating payment information to a merchant transceiver coupled to a point-of-sale device. (*Id.* at [0011].) The customer ID, merchant ID and transaction data is then transmitted as an authorization request to a secure processing system. (*Id.* at [0011].) The customer's credit or debit card numbers are never transmitted across an unsecure link, and a payment processing center transmits authorization codes to verify transactions. (*Id.* at [0011].) This system also allows merchants to track the purchase history of every customer who uses the transaction processing system to authorize payments. (*Id.* at [0012].) Importantly, "the transaction processing system identifies the selected payment method and transmits the authorization request to the appropriate payment processing center." (*Id.* at [0013].) This application does not mention "line item data" and is not directed towards passing along detailed purchase history data to the consumer through a payment system like the patent at issue.

Borenstein discloses a method for providing catalog information for presentation to a user of an electronic store in an electronic commerce system, which includes storing catalog information for multiple merchants in one location. (Ex. 2031, Abstract.) The server used to host the product catalog can help facilitate a purchase by accepting a credit card number and contacting the card vendor to complete the transaction. (*Id.* at [0027].) The traditional credit card payment

system is required, and line item transaction data would be limited by the number of characters associated with traditional Level-III data.

Krikorian discloses a system and method to enable a third party service provider to initiate authorization and settlement of card payments with invoice line item data on behalf of the merchant or consumer. (Ex. 2032, Abstract.) Payment initiation is based on submission of either a pre-approved invoice or order confirmation validated against a purchase order. (*Id*., Abstract.) This system requires both the merchant and the consumer to provide identical line item data to a third party processor, which matches the line item data before authorizing payment. This is, in effect, an electronic version of an Accounts Payable department that matches a purchase order with an invoice before cutting a check. This application does not disclose a viable solution for consumers who make spur of the moment purchases because it requires submittal of a purchase order to the payment provider before authorization and payment can take place.

## F.    CONCLUSION AND RELIEF REQUESTED

For at least the foregoing reasons, the Patent Owner respectfully requests that the Board grant this Motion to Amend.

Dated: May 8, 2015                    Respectfully Submitted,

s/ Sean G. Goodwin/
Sean G. Goodwin, Lead Counsel
Reg. No. 66,760

Filed on behalf of Think Computer Corporation
By:    Sean G. Goodwin (sgg@aschenbrenerlaw.com)
       Michael Aschenbrener (mja@aschenbrenerlaw.com)
       Aschenbrener Law, P.C.
       815 West Van Buren Street, Suite 415
       Chicago, IL 60607
       Tel: (312) 462-4922
       Fax: (312) 462-4923

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SQUARE, INC.
Petitioner

v.

THINK COMPUTER CORPORATION
Patent Owner
_____

Case No.: CBM2014-00159
Patent 8,396,808

_____

**PATENT OWNER THINK COMPUTER CORPORATION'S
RESPONSE**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................I

I.  INTRODUCTION ................................................................. 1

II. THE INSTITUTED GROUNDS OF UNPATENTABILITY ...................... 3

III. STATEMENT OF RELATED PROCEEDINGS .......................................... 4

IV. PATENT OWNER'S CLAIM CONSTRUCTION ........................................ 4

    A.  A POSITA would have understood what "line item data" is both from

        pre-2009 publications and from looking at the '808 Patent specification. ... 5

    B.  Patent Owner has filed a motion to amend to add the limitation "line item

        transaction data" to claims 1, 20-22. ........................................................... 9

V.  THE CLAIMS OF THE PATENT ARE NON-OBVIOUS. ....................... 10

    A.  Petitioner fails to include at least one material limitation present in all of

        the claims, thus the Petition should be denied. .......................................... 11

    B.  Petitioner fails to articulate a proper reason to combine the references of

        Ground 1. ................................................................................................... 14

        *1. Petitioner improperly relies on an unsupported expert opinion to*

            *support its combination in Ground 1 ................................................... 14*

        *2. Petitioner improperly relies on the mere premise of combination in*

            *Ground 1 .............................................................................................. 18*

VI. PETITIONER'S ARGUMENTS AND REFERENCES ARE THE SAME AS, OR SIMILAR TO, ARGUMENTS THAT WERE PREVIOUSLY BEFORE THE OFFICE. ............................................................... 20

A. Petitioner's grounds 1-6 use similar prior art to that of the Examiner. ...... 21

B. Petitioner's grounds 1-6 also use similar arguments and combinations to that of the Examiner. .................................................................. 22

VII.    PATENT OWNER'S LIST OF EXHIBITS ........................................... 24

VIII.   CONCLUSION ...................................................................... 25

## I.    INTRODUCTION

Patent Owner Think Computer Corporation ("Patent Owner" or "Think") submits this Response to Petitioner Square, Inc.'s ("Petitioner" or "Square") petition for Covered Business Method ("CBM") patent review filed July 21, 2014 (Paper 3), and the Patent Trial and Appeal Board's ("PTAB" or the "Board") Institution Decision entered December 29, 2014 (Paper 9), to institute the CBM Review. Think respectfully requests that the Board deny Square's requests for relief on all grounds instituted from the petition, namely that all claims of U.S. Patent No. 8,396,808 (the '808 Patent) are unpatentable under 35 U.S.C. § 103(a) as obvious over certain prior art references.

The '808 Patent is assigned to Think, and was invented by Think owner Aaron Greenspan. Greenspan conceived of the invention claimed in the '808 Patent while operating Think when he became frustrated at the inability to automate accounting tasks due to the complete lack of line item transaction data offered by financial institutions. (Ex. 2021, Greenspan Supp. Decl., ¶ 5.)

Concurrent with the filing of this Response, Think has filed a motion to amend. (Paper 20.) In the motion to amend, Think seeks to add the limitation "line item transaction data" to several claims. Thus, the Board's decision in this matter basically boils down to a couple major issues:

- Claim construction—namely, whether the Board allows Patent
  Owner to add the "line item transaction data" limitation to the

| 6 | Bemmel, Dalzell, and Deschryver | § 103 | 16 |

## III.    STATEMENT OF RELATED PROCEEDINGS

The '808 Patent is involved in the following current proceedings:

- *Think Computer Corp. v. Square, Inc.*, No. 5:14-cv-1374-PSG (N.D. Cal.);

- *Square, Inc. v. Think Computer Corp.*, CBM2015-00067.

## IV.    PATENT OWNER'S CLAIM CONSTRUCTION

Patent Owner construes the claims of the '808 Patent in the broadest reasonable construction in light of the stated and inherent limitations of the specification and prosecution history. Petitioner, on the other hand, incorrectly construes the claims of the '808 Patent because it ignores the stated and inherent limitations of the specification and prosecution history, specifically the term "line item data." As will be shown below in the additional evidence Patent Owner now offers, as well as Patent Owner's motion to amend, the Board should adopt Patent Owner's claim construction and reject Petitioner's claim construction.

The standard for claim construction in a covered business method review for an unexpired patent requires that claim terms be interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.300(b). Claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in

the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

The ordinary and customary meaning of a term may be evidenced by a variety of sources, including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). Under this standard, "the words of the claim will be given their plain meaning unless the plain meaning is inconsistent with the specification." *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989).

The specification is the single best guide to the meaning of a claim term. *Phillips*, 415 F.3d at 1317. "Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1334-35 (Fed. Cir. 2004).

### A. A POSITA would have understood what "line item data" is both from pre-2009 publications and from looking at the '808 Patent specification.

Petitioner incorrectly construes at least one claim term of the '808 Patent because Petitioner fails to account for the specification and prosecution history of the '808 Patent. Specifically, Petitioner omits the material limitation for "line item data" when construing and applying many claim terms, including "purchase list,"

"product catalog," and "transaction record."

Patent Owner, though, construes these claim terms in light of the specification and prosecution history, which define the "line item data" material limitation. The specification and prosecution history of the '808 Patent show that the "line item data" is derived from the "product catalog," and located in the "purchase list" and "transaction record."

In its Institution Decision, the Board held that Patent Owner did not show on the record in its preliminary response that a POSITA "would have understood that a 'purchase list,' 'product catalog,' or a 'transaction record' necessarily would include 'line item data.'" (Paper 9 at 10.)

But a POSITA certainly would have understood that a purchase list, product catalog, and transaction record necessarily would include line item data because the term "line item data" had been in use in the field for years, if not decades. For example, the phrase "line item data" appears in the 2005 book *QuickBooks 2006: The Official Guide for Premier Edition Users* published by McGraw-Hill/Osborne, ISBN 978-0-07226-274-2. (Ex. 2021, ¶ 14.)

The phrase "line item data" also appears in the book *The Career Programmer: Guerilla Tactics for an Imperfect World* by Christopher Duncan, ISBN 978-1-59059-624-1, on page 105.  This book was published in 2006 and distributed by Springer-Verlag New York, Inc. (*Id*. at ¶ 15.) The phrase also

appears in the book *Access 2007 Bible* by Michael R. Groh, Joseph C. Stockman, Gavin Powell, Cary N. Prague, Michael R. Irwin, and Jennifer Reardon, ISBN 978-0-47004-673-9, on page 16. The book was published in 2007 by Wiley Publishing, Inc. (*Id.*, ¶ 16; Ex. 2022.)

The phrase "line item data" also appears in the November 2008 Oracle[®] Retail Invoice Matching User Guide Addendum Release 12.0.8IN on page 15, and is discussed generally throughout as "invoice data" and "line level." (Ex. 2021, ¶ 17; Ex. 2023.)

The publications, targeted at programmers and bookkeepers, are of the type that persons of ordinary skill in the art would consult and generally be familiar with. (Ex. 2021 at ¶ 18.) Therefore, a POSITA in July 2009 would have understood that a purchase list, product catalog, or transaction record necessarily would have included "line item data." (Ex. 2021 at ¶ 20.) As these publications demonstrate, the term "line item data" was well known for years prior to July 2009, and a POSITA would have understood the term without even looking to the '808 Patent specification.

Additionally, the specification states in multiple places that the "purchase list" contains itemized information, also known as "line item data." (Ex. 2005, 2:26-3:18.) The Declaration of Aaron Greenspan, which is part of the prosecution history, further clarifies this point by stating that "line item data" is located in the

"purchase list." (Ex. 2005 2:26-3:18.) And Figure 5 of the '808 Patent explicitly

shows a "Purchase List" with a breakdown for "Item A" and "Item C." (Ex. 1001,

Figure 5.)

The recording and tracking of "line item data" is made possible by the

"product catalog." The specification of the '808 Patent further states that the

"purchase list," which contains "line item data," is comprised of items from the

"product catalog." (Ex. 1001, 4:13-16.) The "line item data" points to specific

portions of the "product catalog" and is derived from the "product catalog."

The specification further supports the premise that "line item data" is

derived from the "product catalog" when it explains the functionality and benefits

of the integrated "product catalog" and "payment system." As the '808 Patent

states, the "integration of the payment system and product catalog functions to

enable recording and tracking transactions with itemized detail," (Ex. 1001, 2:15-

17) and "one of the main benefits of having merchant product catalogs integrated

into the payment system [is that] line item transaction data can be communicated."

(Ex. 1001, 8:5-8; Ex. 2012.) Therefore, the "product catalog" plays a key role in

facilitating the recording and tracking of the "line item data."

The "line item data" is also present in the "transaction record." The

specification states "[t]he line item data is additionally stored as part of the

transaction record of the accounts." (Ex. 1001, 8:8-10.)

The prosecution history of the '808 Patent also clarifies what the "line item data" encompasses. The "line item data" of the '808 Patent includes information such as product description, SKU, quantity, price, tax and total. (Ex. 2005 2:26-3:18.) "Line item data" also includes additional information, not found in prior art systems, such as product versions, price per quantity, uniform legal entity identifiers, and timestamps. (*Id.*)

Accordingly, under its broadest reasonable construction in light of the specification, "line item data" is "itemized data pertaining to products and services that is derived from the 'product catalog' and stored in the 'purchase list' and 'transaction record.'"

**B.    Patent Owner has filed a motion to amend to add the limitation "line item transaction data" to claims 1, 20-22.**

In order to clarify that the limitation "line item data" or "line item transaction data" "necessarily forms part of elements recited in the claims" (Paper 9 at 10-11), Patent Owner has filed a motion to amend the '808 Patent specifically to add the limitation "line item transaction data" to current claims 1 and 20-22 (Paper 20).

In addition to the reasons articulated above as to why a POSITA would know that "line item transaction data" necessarily forms part of elements recited in the claims, the amended claims now make it crystal clear that "line item transaction data" is necessarily a part of the claims.

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *See KSR*, 550 U.S. at 418.

The Petition should be denied because Petitioner's obviousness argument is deficient in at least two ways. First, Petitioner omits from its obviousness analysis a material limitation, "line item data," that is present in all of the claims. Second, the Petition also fails to make a *prima facie* case of obviousness because Petitioner's combinations are improper, as they lack a proper reason to combine.

### A.    Petitioner fails to include at least one material limitation present in all of the claims, thus the Petition should be denied.

The Petition should be denied because Petitioner omits a material limitation in various claim terms in its claim construction. This claim construction omission carries through to Petitioner's obviousness analysis, which fails to address the missing limitation of "line item data," as required. Petitioner's failure to include a material limitation in its obviousness analysis is present in each of Petitioner's grounds.

When evaluating claims for obviousness under 35 U.S.C. § 103, all limitations of the claims must be considered and given weight. *Ex parte Grasselli*, 231 USPQ 393 (Bd. App. 1983) *aff'd mem.* 738 F.2d 453 (Fed. Cir. 1984). Establishing a prima facie case of "obviousness requires a suggestion of all limitations in a claim." *CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1342

(Fed. Cir. 2003) *(citing In re Royka*, 490 F.2d 981, 985 (CCPA 1974)). The failure of an asserted combination to address each and every feature of a claim remains fatal to an obviousness argument under 35 U.S.C. § 103. *See In re Royka*, 490 F.2d 981, 180 USPQ 580 (CCPA 1974).

As shown above, "line item data" is present in all claims of the '808 Patent because it is a limitation of the "purchase list," "product catalog," and "transaction record." Again, the "line item data" consists of much more information than was available in the prior art, such as simply price and the payment card account number used. (*See generally* Ex. 1001, 8:5-10; Ex. 2005, 2:26 – 3:18.) The "line item data" includes additional information such as product description, SKU, quantity, price, product version, and other custom pieces of information. (*Id*.)

However, Petitioner fails to acknowledge this material limitation of "line item data" from various claim terms, including "purchase list" and "product catalog."[2] As a result, Petitioner omits any analysis of whether this limitation has ever been combined with mobile payments systems of the prior art. (*See* Paper 3, 18-80.) Nevertheless, Petitioner ultimately urges the Board to find that it would

---

[2] (Pet. 27 (purchase list, product catalog), 40-41 (product catalog), 41 (purchase list), 60 (purchase list, product catalog), 62 (purchase list), 66 (purchase list, product catalog), 67 (purchase list), 68-69 (product catalog), 71 (product catalog), and 72 (purchase list).)

have been obvious to add this unacknowledged limitation to prior art payment systems.

A POSITA would have understood from the "passing references" in the '808 Patent specification what "line item data" is for the reasons addressed above in the claim construction section. Namely, "line item data" or "line item transaction data" would have been a well-known and readily understood term to any POSITA because it was and remains a term of art within the payments and enterprise software worlds, as shown in multiple publications. (Ex. 2021, ¶¶ 14-18, 20.) Thus, Mr. Greenspan's understanding of "line item data" can be easily "gleaned from the specification" by any POSITA. (Paper 9 at 11.)

Also, as discussed above, Patent Owner has filed a motion to amend to add the term "line item transaction data" to current claims 1 and 20-22. (Paper 20.)

Furthermore, the reason Petitioner has failed to assert that "line item data" is present in the prior art is because "line item data" simply does not exist in the prior art. Even today, credit and debit card payments still do not have the capability to track and store line-item details. Payment card statements do not present itemized details about each transaction—only total amounts are listed. Also, Petitioner's prior art does not contain any disclosure on line-item details. All of the payment system references on which Petitioner relies are limited to tracking information in the same manner as credit and debit card payments, which only involves tracking

the date of purchase and the total amount spent in conjunction with an arbitrary string representing a merchant. (*See generally* Ex. 1001, 8:5-10; Ex. 2005, 2:26 – 3:18.)

Consequently, the Petition should be denied because Petitioner fails to address a limitation that is part of all of the claims of the '808 Patent.

## B.  Petitioner fails to articulate a proper reason to combine the references of Ground 1.

All of Petitioner's reasons for combining Bemmel and Dalzell are deficient in one way or another. As a result, Petitioner fails to articulate a valid reason to combine Bemmel and Dalzell that would support obviousness arguments for claims 1-3, 5-7, 17 and 20-22.

### 1.  *Petitioner improperly relies on an unsupported expert opinion to support its combination in Ground 1.*

One of petitioner's reasons for combining Bemmel and Dalzell is based on Dr. Sadeh-Koniecpol's ("the Expert") unsupported opinion of industry custom. Thus, Petitioner's reason for combining Bemmel and Dalzell is not valid.

It was not industry custom to integrate product catalogs into payment systems. Generally, credit and debit card providers focused their innovative efforts on ways to prevent ever-increasing payment card fraud, not on ways to increase data transparency. Online marketplaces and mobile payments have been around since roughly the late 1990s. Yet, the '808 Patent was the first to integrate these

or similar prior art in the same way the Examiner did. Petitioner attempts to combine the same types of systems that the Examiner did, which the Applicant overcame.

Petitioner's grounds 1-6 use substantially the same arguments that were previously before the Office. Applicant overcame the Examiner's rejection based on a mobile payment system, Wong, and an online marketplace, Zhang. (Ex. 2006 at 3.) Petitioner also tries to combine a mobile payment system and an online marketplace together (Pet. 19, 20); Petitioner uses the same premise that an online marketplace provides the accounts with selective functionality limitation (Pet. 21).

Just like the Examiner, the Petitioner could not find all of the elements of the '808 Patent's claims in one reference. (*See* Pet. 11, 12.) The Petitioner also relies on a payment system, Bemmel, which is missing claimed elements. (Pet. 18.) The Petitioner tries to rectify these missing elements of the mobile payment system, Bemmel, by combining it with an online marketplace, Dalzell. (Pet. 18.)

The Examiner found a combination of an online marketplace and mobile payment system insufficient to render the '808 Patent obvious. (*See* Ex. 2006 at 8.) The Examiner found that the online marketplace art only teaches the limited concept that users could assume the role of seller or buyer. (*Id*.) The Examiner found that online marketplaces, like eBay, did not teach or suggest an account within a payment system that is adapted to selectively function as either a merchant

account or a purchaser account during any particular transaction. (*Id*.) Petitioner's

replacement of eBay, an online re-seller, with Dalzell, and its disclosure of a re-

selling feature of Amazon.com, is the same argument as the Examiner, which fails

to disclose selective functionality.

Additionally, the Examiner found the references lacked a product catalog

integrated into the payment system for the step of "adding an item . . . purchase

list." (*Id*.) Petitioner's references Bemmel and Dalzell also do not disclose a

product catalog integrated into the payment system. (*See* Ex. 1005; Ex. 1006.)

Petitioner's combination of Bemmel and Dalzell adds nothing new that the

Examiner did not have before him on original prosecution. Thus, Petitioner's

arguments for grounds 1-6 are substantially the same as the arguments that were

previously before the Office.

## VII.   PATENT OWNER'S LIST OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| Exhibit 2001 | US. Pat. Pub. No. 2010/0138344 to Wong *et al*. ("Wong") |
| Exhibit 2004 | Zhang, J. (2006), *The roles of players and reputations: Evidence from eBay online auctions* ("Zhang") |
| Exhibit 2005 | Declaration of Aaron Greenspan |
| Exhibit 2006 | Notice of Allowance |
| Exhibit 2007 | Signed Information Disclosure Statement |
| Exhibit 2012 | March 9, 2012 Response To Office Action Mailed On October 24, 2012 |

24

Filed on behalf of Think Computer Corporation
By:    Sean G. Goodwin (sgg@aschenbrenerlaw.com)
       Michael Aschenbrener (mja@aschenbrenerlaw.com)
       Aschenbrener Law, P.C.
       815 West Van Buren Street, Suite 415
       Chicago, IL 60607
       Tel: (312) 462-4922
       Fax: (312) 462-4923

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SQUARE, INC.
Petitioner

v.

THINK COMPUTER CORPORATION
Patent Owner

_____

Case No.: CBM2014-00159
Patent 8,396,808 B2

_____

DECLARATION OF AARON GREENSPAN
ON BEHALF OF THINK COMPUTER CORPORATION

routinely handled Think's accounting matters, such as accounts receivable and payable work, as well as tax preparation.

5.    Throughout the many years I have spent running Think—and to this very day—I have found routine accounting tasks to be supremely tedious and challenging, primarily due to the lack of accepted standards around accounting-related data.  Despite automating a number of tasks through software, the primary challenge I encountered when balancing Think's books and preparing tax returns was the inability to automate tasks due to the complete lack of line item data offered by financial institutions.

6.    Line item data is a familiar concept to anyone who has ever spent money with a plastic card, whether credit or debit, and the phrase "line item data" is well known.  For any given transaction, a receipt or invoice document produced by the merchant will list a breakdown of charges for each item purchased, typically one item per line—hence the term "line item."  By adding the charges for each line item, which may include quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping or other fees, one can arrive at the total sum for the transaction.  Unfortunately, while many receipt and invoice documents are produced by a computer or some other digital means, financial institutions that process debit and credit card payments generally do not provide a mechanism for the transmission of line item data.  Instead, with extremely rare exceptions, United

in the ACH format is position dependent and long strings of data are therefore truncated.  Transactions are categorized by three-letter Standard Entry Class (SEC) codes to indicate their nature.  Though there is a "WEB" code for internet transactions, there is no field—and no room for a field—to store IP address information that might be useful in combating fraud.  Accordingly, there is also no room in the format for line item data, and it would not be obvious how one might combine or otherwise integrate product catalogs into the extremely inflexible ACH network, which is essentially the underpinning of the payments infrastructure in the United States.  Nor do card networks provide this functionality in their various formats.

11.    In addition to lacking room for IP address information, the ACH format lacks room for any authentication data that might uniquely identify a customer, whether biometric or otherwise.  It is not at all obvious how a person of ordinary skill in the art would combine or otherwise integrate biometric authentication into the extremely inflexible ACH network.

12.    Ultimately, based on my experience with numerous NACHA meetings and countless hours of research, I decided that it would not be possible to automate line item acquisition and categorization without building a new and more modern payment system, which also provided an opportunity for updating anti-

fraud protections.  The '808 patent was and is based on my insights in these domains.

13.    As consumers have been reviewing (and submitting reimbursement forms for) line item receipts for decades, if not centuries, line item data is mentioned in the specification of the '808 patent, as well as the diagrams.  Figure 3 shows a mobile purchaser device (e.g. and iPhone or Android smartphone) with line item breakdowns for a Hamburger and Diet Cola purchase.  Figure 4 shows an electronic receipt on a smartphone with line items.[3]  Figure 5 explicitly shows a "Purchase List" with a breakdown for "Item A" and "Item C."  Even the rare individual unfamiliar with "line item data" would be able to therefore see multiple examples in the figures.  The Board has already acknowledged that line item data is mentioned repeatedly in the specification.

14.    The phrase "line item data" appears on page 183 in the book *QuickBooks 2006: The Official Guide for Premier Edition Users* published by McGraw-Hill/Osborne in 2005, ISBN 978-0-07226-274-2.

---

[3] In contrast, the prior art submitted by Square and the examples in Dr. Sadeh-Koniecpol's 2002 book do *not* involve line items.  *See*, for example, Exhibit 1011, Figure 66, which references only *amounts* in the user interface.  Dr. Sadeh-Koniecpol's book does not use the phrase "line item" once, which does not suggest that a person of average skill in the art did not know what a line item was in 2002—the 2001 book *Using Microsoft Excel 2002* by Patrick Blattner, ISBN 978-0-78972-511-0 uses "line-item data" on page 435—but rather that few people had considered the non-obvious possibility that line item data could be combined with the outdated payment system infrastructure which had been static for so long.

Paper No. _____
Filed:  August 3, 2015

Filed on behalf of:  Square, Inc.
By:   Michael T. Rosato
      Robin L. Brewer
      WILSON SONSINI GOODRICH & ROSATI
      Professional Corporation
      701 Fifth Avenue, Suite 5100
      Seattle, Washington  98104-7036
      Telephone:  (206) 883-2529
      Facsimile:  (206) 883-2699
      Email:      mrosato@wsgr.com
      Email:      rbrewer@wsgr.com


UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____


SQUARE, INC.,
Petitioner

v.

THINK COMPUTER CORPORATION,
Patent Owner

_____

CBM2014-00159
Patent No. 8,396,808

_____


**PETITIONER'S OPPOSITION TO PATENT OWNER'S
MOTION TO AMEND UNDER 37 C.F.R. § 42.221**

# **TABLE OF CONTENTS**

**Page**

I.    STATEMENT OF PRECISE RELIEF AND OVERVIEW OF
WHY THINK COMPUTER'S MOTION SHOULD BE
DENIED......................................................................................... 1

II.   PATENT OWNER'S MOTION LACKS EVIDENCE
SUPPORTING ITS ASSERTIONS ................................................ 2

III.  PATENT OWNER FAILED TO ADEQUATELY DEFINE
THE SCOPE OF OR REASONABLY CONSTRUE THE
CLAIMS ........................................................................................ 4

IV.   PATENT OWNER HAS FAILED TO DEMONSTRATE THE
AMENDED CLAIMS ARE PATENTABLY DISTINCT
OVER THE PRIOR ART ............................................................... 9

       A.    The Added "Line Item Transaction Data" Limitation is
Rendered Obvious by the Prior Art of Record................... 12

           1.    Dalzell Discloses the "Line Item Transaction
Data" Limitation. .................................................... 12

           2.    Carlson, in Combination with Bemmel and
Dalzell, Discloses the "Line Item Transaction
Data" Limitation. .................................................... 16

           3.    Tripp, in Combination with Bemmel and Dalzell,
Discloses the "Line Item Transaction Data"
Limitation................................................................ 17

           4.    Elston, in Combination with Bemmel and Dalzell,
Discloses the "Line Item Transaction Data"
Limitation................................................................ 18

       B.    The Added "Line Item Transaction Data" Limitation is
Rendered Obvious by Additional Prior Art. ...................... 18

           1.    Dohse, in Combination with Bemmel and Dalzell,
Discloses the "Line Item Transaction Data"
Limitation................................................................ 18

2.    Jagatic, in Combination with Bemmel and Dalzell, Discloses the "Line Item Transaction Data" Limitation.................................................................... 21

C.    Patent Owner's "Indicia of Nonobviousness" Is Unavailing. ........................................................................ 23

V.    CONCLUSION................................................................................ 25

## I.    STATEMENT OF PRECISE RELIEF AND OVERVIEW OF WHY THINK COMPUTER'S MOTION SHOULD BE DENIED

Petitioner Square, Inc. ("Square") asks the Board to deny Patent Owner Think Computer Corporation's ("Patent Owner" or "PO") Motion to Amend, PN 20 ("Motion").  PO fails to meet its burden to show it is entitled to amended claims (*see* 37 C.F.R. § 42.20(e)).

First, PO's motion consists largely of unsupported attorney argument.  The corresponding declaration of Mr. Greenspan (PO's expert witness, the sole listed inventor on the '808 patent, and President & CEO of Think Computer), even where it does track the argument advanced in the Motion, lacks supporting objective evidence and should be accorded little, if any, weight.

Second, PO fails to clearly or adequately construe the terminology of the proposed claims such that the public can reasonably be apprised as to the scope of the proposed claims.  PO has offered several different vague and inconsistent constructions throughout this proceeding that are neither particularly meaningful nor particularly clear.

Third, when considering prior art unpatentability (addressed further below), PO fails to credibly explain why including basic transaction data (i.e., "line item transaction data") such as item identification or price in a payment system would possibly have been considered novel or unobvious.  PO's Motion in this regard consists solely of attorney argument amounting to little more than conclusory statements regarding certain prior art references (e.g., Bemmel, Dalzell, Carlson, Tripp, Elston and Deschryver).  PO's conclusions are (1) wholly unsupported by

any expert testimony (Mr. Greenspan or otherwise); (2) terse and unexplained; and (3) often are factually incorrect or fail to address the issue of obviousness. In contrast, Dr. Sadeh explains that a person of ordinary skill at the time would not reasonably have considered "line item transaction data" as recited in the proposed claims as being novel or nonobvious in view of the prior art.

Accordingly, PO's Motion should be *denied*.

## II.    PATENT OWNER'S MOTION LACKS EVIDENCE SUPPORTING ITS ASSERTIONS

PO's arguments lack support from expert testimony or any other objective evidence. For example, there is no expert testimony providing a clear construction of the key term being added—line item transaction data. As a further example, PO cites to no evidence in support of its prior art analysis, which consists exclusively of attorney argument. It is well-established that attorney argument should be afforded little, if any, weight before the Board. *See, e.g.*, *Ex parte Intel Corp.*, Appeal No. 2009-010070, Decision on Appeal at 7 (BPAI Jan. 21, 2011) (citing *Estee Lauder Inc. v. L'Oreal, S.A.*, 12 F.3d 588, 595 (Fed. Cir. 1997)).

To the extent PO cites to evidence, such as in support of its proposed construction, the understanding of a person of ordinary skill in the art, and irrelevant arguments relating to purported indicia of nonobviousness, PO cites to the declaration of Mr. Greenspan. Motion at 10, 12-14 (citing to Ex. 2021, ¶¶ 5-8, 14-19, 28, 30). Mr. Greenspan is the PO's CEO and the named inventor of the '808 patent and, as such, has an interest in the outcome of the proceedings. *See Ex parte SPC Corp.*, Reexamination Control No. 90/006,272 (BPAI March 14, 2007)

(explaining that the "interest of a witness is a factor to be considered in evaluating the credibility of testimony").

Much of Mr. Greenspan's cited testimony lacks supporting evidence. To the extent evidence is cited, it does not aide in resolution of the issues. *See, e.g.*, Ex. 2021, ¶¶ 14-17. For example, Mr. Greenspan cites to books in which the phrase line item data appears, but the books provide no apparent definition for this central term. *Id.* Moreover, Mr. Greenspan cites to evidence that tends to undermine PO's arguments. For example, in footnote 2 Mr. Greenspan cites a book that allegedly supports Mr. Greenspan's statement that the lack of line item data from financial institutions purportedly represents a significant problem. Ex. 2021, ¶ 6, n. 2. Mr. Greenspan then concludes that "[t]o the extent that the authors describe a solution to this problem, they also note that it works with only four banks, and disclose few other details, suggesting a rather limited fix to a systemic flaw." Mr. Greenspan, therefore, admits that based upon the cited evidence there is a solution to the problem and the flaw has been fixed. Mr. Greenspan's qualifying language that the solution works on only four banks and the fix is limited is irrelevant. Mr. Greenspan's testimony demonstrates that the proposed limitation was already known in the art and cannot render the claims patentable.

The cited paragraphs also do not include corroborating evidence. *See, e.g.* Res. at 15 (citing Ex. 2021, ¶¶ 9-12). For example, there is nothing to indicate that Mr. Greenspan in fact attended the NACHA Internet Council meetings in 2010, let alone the topics discussed at those meeting. Ex. 2021, ¶¶ 9-10. Without corroborating evidence, "the opinion testimony of an interested party is of little or

no probative value." *Ex parte BASF AG*, Reexamination Control No. 90/006,554 (BPAI Dec. 12, 2006).

As such, Mr. Greenspan's testimony should be accorded little, if any, weight. If anything, Mr. Greenspan's testimony confirms the unpatentability of the proposed claims.

## III.  PATENT OWNER FAILED TO ADEQUATELY DEFINE THE SCOPE OF OR REASONABLY CONSTRUE THE CLAIMS

In a motion to amend, a Patent Owner must include construction of new claim terms such that the metes and bounds of the proposed claims are clearly set forth. *Idle Free Sys., Inc. v. Bergstrom, Inc.*, Case IPR2012-00027, slip op. at 7 (PTAB June 11, 2013) (Paper 26, "Idle Free"); *see also Toyota Motor Corp. v. American Vehicular Scis. LLC*, Case IPR2013-00419, slip. op. at 5 (PTAB Mar. 7, 2014) (Paper 32, "Toyota"). Consistent with the statute and legislative history of the Leahy-Smith America Invents Act, the Board interprets claims using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Tech.*, LLC, 778 F.3d 1271, 1279–83 (Fed. Cir. 2015).

PO proposes that "line item transaction data" should be construed as "information given on each line of an invoice used to communicate the quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping, or any other fees that arrive at the total sum for the transaction." Motion at 10. This construction differs from the construction offered in Patent Owner's

Response, PN 19.  In the Response, PO took the position that "line item data" [1] should be construed as "itemized data pertaining to products and services that is derived from the 'product catalog' and stored in the 'purchase list' and 'transaction record.'"  Resp. at 9.  Not only has PO offered two constructions of the same term, the only support cited is the supplemental declaration of inventor and Think Computer President and CEO Aaron Greenspan, Ex. 2021.  *Id.*

Mr. Greenspan's testimony in this regard lacks the requisite clarity and is actually inconsistent with his previous testimony submitted during *ex parte* prosecution.  With regard to Mr. Greenspan's current testimony, he asserts that the term "line item transaction data" would have been clear to a person of ordinary skill in the art but fails to define the term himself.  *See, e.g.*, Ex. 2021, ¶¶ 13-17.  Paragraphs 13-17 provide examples of line item data, but do not provide a clear definition.  For example, in paragraph 13, Mr. Greenspan testifies the '808 patent mentions line item data and specifically calls out Figures 3, 4, and 5.  *See id.*, ¶ 13.  Figures 3, 4, and 5, are exemplary screenshots of a purchase list, each of which contains different information.  For example, Figure 3 is a shopping cart that includes two items, the quantity for each item, description and additional descriptive details for each item, the price for each item, the subtotal, the tax, and the pre-tip total.  Figure 4 removes quantity and adds the tip and total.  Figure 5

---

[1] During his deposition, Aaron Greenspan testified that "line item data and line item transaction data are equivalent and interchangeable terms."  Ex. 1020 at 37:6-8.

shows purchases lists including one or more items, a description for the item, the price for the item, the tax, and the total.



Mr. Greenspan concludes that "[e]ven the rare individual unfamiliar with 'line item data' would be able to therefore see multiple *examples* in the figures." *Id.* (emphasis added). Paragraphs 14-17 reference books in which "[t]he phrase 'line item data' appears." *Id.*, ¶¶ 14-17. As such, the evidence cited by Mr. Greenspan provides further examples of line item data, but does not define or provide a clear delineation of the scope of the term.

During his deposition, Mr. Greenspan confirmed a broad, ambiguous definition for line item transaction data. Ex. 1020 at 35:9-22 ("Q. Are there any particular attributes that must be present in order for data to be considered line item data? A. I think that you need at least one of the attributes that I've described in Paragraph 6. I can imagine a receipt that just has a quantity and a description and that's it. I would consider those pairings to be line item data. Obviously it's more helpful if you also list a price, shipping information, perhaps, but I think you do need at least -- at least one attribute because *if the only attribute you have is a description that's still enough to constitute line item data.* And that's just one attribute.") (emphasis added). Mr. Greenspan further testified that the list of attributes in paragraph 6 of his declaration was neither exhaustive nor exclusive. Ex. 1020 at 32:9-23.

Mr. Greenspan's current testimony also contradicts previous testimony of record. In his declaration, Mr. Greenspan claims that "Level III [data] is a poor facsimile of line item data." Ex. 2021 at ¶ 19. Mr. Greenspan further testified during his deposition that he did not consider Level III data to be line item data. Ex. 1020 at 49:24-52:9. Mr. Greenspan gave the example that, if you buy a ticket, Level III data could include the information "SFO to LGA." *Id.* at 50:24-51:3. Mr. Greenspan further stated that "I don't think that the SFO/LGA example would qualify as line item data . . . there's no price, there's no quantity, there's no tax information." *Id.* at 51:15-20. This testimony not only contradicts his testimony that a description is enough to constitute line item data, it also contradicts his previous declaration submitted to the Patent Office submitted under 37 C.F.R. §

1.131 on January 2, 2013, during original prosecution of the '808 patent.  Ex. 2005.  In the declaration, Mr. Greenspan identified one of the problems of the payment processing industry "as the inability for most payment processing terminals to transmit line-item (also called 'Level 3') data concerning purchases." Ex. 2005 at ¶ 11.  Mr. Greenspan, therefore, directly correlated line item data with "Level 3" data.

In sum, it is unclear from the proposed construction whether each of the attributes listed is required to qualify as line item data, whether only one of the attributes listed is required to qualify as line item data, or whether a subset of the attributes listed is required to qualify as line item data.  PO has the burden on a motion to amend to clearly define the metes and bounds of the proposed claim. *See Idle Free*, at 7.  PO's failure to offer a clear construction of the term "line item transaction data" and identify the scope of the claims is fatal to its argument and the Motion should be rejected on these grounds alone.

In order to analyze the prior art, however, Square has undertaken an analysis of the '808 patent so as to offer a reasonable construction of the term "line item transaction data."  As a starting point, the '808 patent references "line item" three times: "Additionally, as one of the main benefits of having merchant product catalogs integrated into the payment system, line item transaction data can be communicated.  The line item data is additionally stored as part of the transaction record of the accounts.  This itemized information can be very useful, such as in one application where tax forms are automatically completed by aggregating each category of line item transaction data as appropriate."  Ex. 1001 at 8:6-13.  This

describes certain uses for line item data, but does not define line item transaction data. Rather, the specification generally describes a product catalog providing line item transaction data that is stored as part of the transaction record. *Id.*

The product catalog is described in the '808 patent as follows: "The product catalog preferably includes a listing of product descriptions and prices for each product contained within the product catalog. Additional information may be included for a product, such as categories for tax purposes and other purposes, product-related IDs for each distributor of the product (e.g., Stock Keeping Unit or 'SKU'), images or media files related to the product, inventory related information (the number of items on hand, on order, etc. at each warehouse location), or any other suitable product-related data." Ex. 1001 4:4-13. The specification uses permissive language, indicating that the product catalog may contain any one or any combination of the listed attributes.

Accordingly, under the broadest reasonable construction standard in light of the specification, a reasonable construction of "line item transaction data" for purposes of the prior art analysis is "one or more attributes used in relation to individual products involved in a purchase or sale."

## IV. PATENT OWNER HAS FAILED TO DEMONSTRATE THE AMENDED CLAIMS ARE PATENTABLY DISTINCT OVER THE PRIOR ART

PO bears the burden of showing patentability over the prior art in general. *See Bloomberg Inc. v. Markets-Alert Pty Ltd.,* CBM2013-00005, PN 71 at 22 n.9 (PTAB Mar. 26, 2014); *see also Blackberry Corp. v. Mobilemedia Ideas LLC,* IPR2013-00016, PN 32 at 23 (P.T.A.B. Feb. 25, 2014) (explaining that discussing

only references cited in the petition is inadequate to show patentability of substitute claims over the prior art in general). This requires PO to "discuss, as well as present evidence, if appropriate, as to the level or ordinary skill in the art, and what was known regarding the features being relied upon to demonstrate patentability of the proposed claims." *Blackberry Corp.*, IPR2013-00016, PN 32 at 22-23.

PO fails to meet this burden. In analyzing the prior art, PO relies exclusively on attorney arguments that are unsupported by any expert testimony. For example, PO provides no expert testimony that including basic transaction data (i.e., "line item transaction data") such as a product description or price in a payment system would have been considered novel or unobvious. In fact, as discussed by Dr. Sadeh the additional limitation of "the payment system storing and communicating line item transaction data" was well-known in the prior art in general and something as basic as "line item transaction data" does not create a point of novelty. *See* Declaration of Dr. Norman Sadeh in support of Petitioner's Opposition to PO's Motion (Ex. 1021), ¶¶ 21, 76.

Moreover, PO fails to perform a complete analysis of the prior art in view of the proposed amendment. PO's unsupported attorney arguments are conclusory at best and, at times, factually incorrect. Further, despite being instituted on grounds of obviousness, PO presents only an individualized analysis of various prior art references and fails to address the prior art references in combination, rendering the analysis incomplete and unhelpful. *See* Motion at 14-24; *see also Blackberry Corp.*, IPR2013-00016, PN 32 at 22-23 ("[A]nalysis merely discuss[ing] how each

cited prior art reference individually does not disclose the features added in the substitute claim . . . [i]s insufficient to demonstrate non-obviousness."); *see also In re Keller*, 642 F.2d 413 (CCPA 1981); *In re Merck & Co., Inc.*, 800 F.2d 1091 (Fed. Cir. 1986). In a number of instances, PO argues that the reference fails to disclose aspects of the claims that are disclosed by the instituted combination. PO's showing is deficient at least for failing to address the combined teachings of the identified references.

PO further relies upon limitations not found in the proposed amendment in order to allegedly distinguish the prior art. PO admits that a number of the references disclose line item transaction data, but argues the claims are patentably distinct because the references do not disclose that the payment system allows the line item transaction data to be transferred to the customer for tax or auditing services. *Id.*; *see also* Motion at 17 ("Patent Owner contends that none of the references cited in the Decision to Institute CBM review, disclose, or suggest that line item transaction data is integrated into the payment system or stored in the transaction record to include such itemized details that tax forms could be 'automatically completed by aggregating each category of line item transaction data as appropriate'"). This is not a limitation in the amended claims and cannot be used as a basis for finding the amended claims patentable.

Finally, a quick search of the prior art identified additional references disclosing the line item transaction data limitation that, for the reasons explained below, would have been obvious to combine with the prior art references of record. *See* Ex. 1021, ¶¶ 58-74.

PO fails to sustain its burden of demonstrating that the amended claims are patentably distinct and PO's Motion should, therefore, be denied.

## A.    The Added "Line Item Transaction Data" Limitation is Rendered Obvious by the Prior Art of Record.

The Board has made clear that "[t]he burden is not on the petitioner to show unpatentability, but on the patent owner to show patentable distinction over the prior art." *Idle Free* at 7.   Nevertheless, as demonstrated below and as further supported by the Declaration of Dr. Norman Sadeh in support of Petitioner's Opposition to PO's Motion (Ex. 1021), the amended claims are unpatentable in view of the prior art of record.

### 1.    Dalzell Discloses the "Line Item Transaction Data" Limitation.

Dalzell discloses a payment system that stores and communicates "line item transaction data." Ex. 1006.  PO's attempt to distinguish the disclosures of Dalzell from the additional "line item transaction data" limitation based upon unsupported attorney argument is unavailing.  PO's argument that Dalzell is distinguishable because, in Dalzell, "the product information database, backend payment processing system, and purchase histories are all separate" (Motion at 17) finds no support in the claims or the specification of the '808 patent.  In other words, nothing in the instituted claims or the '808 patent in general requires that these databases be unified.

PO further argues that "Figure 4A states that it only captures four purchase history data points: item name, order number, date, and buyer.  This is essentially the exact same data provided by current ACH and credit card payment systems." Motion at 17-18.  The data provided by *current* ACH and credit card payment

systems is not pertinent.  Nor is there any reason to compare the prior art to ACH or credit card payment systems as the '808 patent does not mention either.  This last sentence is also factually incorrect.  For example, to the extent an entity is identified by ACH or credit card payment systems, it is the seller, not the recipient, who is identified.1021  This statement is also inconsistent with PO's position that ACH and credit card systems purportedly do not provide information down to the item level.  *See, e.g.*, PO Response at 15.  Further, PO's argument that Dalzell discloses only four instances of line item data is irrelevant, as Mr. Greenspan testified that a single attribute was sufficient to qualify as line item data.  Ex. 1020 at 35:9-22.

PO's argument ignores the disclosures in Dalzell that indicate that purchase histories may include a hyperlink to the product's detail page, relevant product IDs, purchase prices, product conditions, or shipping recipient.  *See* Ex. 1006 at [0020], [0103], [0132].  Specifically, Dalzell discloses a "user database" that stores "purchase histories," which "may include information about the purchases made by and for a respective user, including the relevant product IDs, purchase prices, product conditions, and purchase dates."  Ex. 1006 at [0132]; Ex. 1021, ¶ 32.  The purchase history page includes listings of previously purchased products.  Ex. 1006 at [0103].  The listings include a product description or title and hyperlink to the product's detail page.  *Id.*  "In addition, each listing 405 may include one or more of the following types of information (or links to such information): an order

number, the price paid, the condition of the item when purchased, an order date, and the shipping recipient." *Id.* Dalzell further discloses that the purchase history includes individualized product listings that are "associated with a particular product ID or product record within a product database." Ex. 1006 at [0020]; Ex. 1021, ¶ 32. FIG. 4A shows a "purchase history" user interface that is very similar to the "purchase list" in Figure 5 of the '808 patent, which PO cites as support for the added limitation. *See* Motion at 11; *see also* Ex. 1006 at [0103].



FIG. 4A

Further, similar to the '808 patent, Dalzell discloses that line item data in the purchase histories is derived from product information in the product catalog. Ex. 1006 at [0086], [0102]; *see also* PO Response at 8 ("The recording and tracking of 'line item data' [in the '808 patent] is made possible by the 'product catalog.'"). Dalzell discloses a product catalog consisting of product detail pages. Ex. 1006 at [0055]; Ex. 1021, ¶ 30. Dalzell further discloses that "each detail page may include, for example, a product name, a unique product ID, a specification or other description of the product (including manufacturer, brand, author, artist, etc., as applicable), a picture or multimedia presentation of the product, reviews of the product (e.g., from customers and/or professional reviews) average customer ratings, a listing of similar or related products, pricing and availability information, shipping information, and/or sales rank data maintained by the system." Ex. 1006

at [0055]; Ex. 1021, ¶ 30.  FIGS. 1A and 1B show exemplary product detail pages. *Id.*



FIG. 1A                    FIG. 1B

Products may be added to a purchase list by clicking the "Add to shopping cart" button.  Ex. 1006 at [0086], FIG. 1A; Ex. 1021, ¶ 31.  Purchases made in the marketplace are then stored in purchase histories.  Ex. 1006 at [0102]; Ex. 1021, ¶ 31.  Storage of purchase histories as part of the marketplace system is further disclosed in FIG. 5A, showing a block diagram of the marketplace system, and FIG. 11, illustrating a flow chart for the marketplace system.  *See id.* at FIGS. 5A, 11; *see also id.* at [0102]-[0103] (describing the purchase history as "a listing of products"), [0062], [0132]; Ex. 1021, ¶ 33.  This information is then communicated by displaying it to the user.  Ex. 1006 at FIG. 4A; Ex. 1021, ¶ 33.  Accordingly, Dalzell discloses the payment system storing and communicating line item transaction data.

Finally, for the reasons set forth in the Petition and as explained by Dr. Sadeh, it would have been obvious to one of ordinary skill at the relevant time to combine the teachings of Bemmel with those of Dalzell.  Pet. at 24-25; Ex. 1002 at

¶¶ 137-142.  In addition to the reason set forth in the Petition and declaration of Dr. Sadeh, Dalzell's disclosure of line item transaction data as being stored as part of the purchase history and as being communicated via the user interface is complementary to the authentication system and mobile aspects of Bemmel.  Ex. 1021 at ¶ 35.

Accordingly, Dalzell, in combination with Bemmel as suggested in the Petition discloses a payment system that stores and communicates line item transaction data, thereby rendering the amended claims obvious.

2.    Carlson, in Combination with Bemmel and Dalzell, Discloses the "Line Item Transaction Data" Limitation.

Carlson also discloses a payment system that stores and communicates "line item transaction data."  Ex. 1008.  PO admits that "Figures 8-11 discloses [sic] line item detail within the online catalog that consists of quantity, item identification, item description, and price."  Motion at 18; *see also* Ex. 1021, ¶¶ 39-42.  PO, however, argues that Carlson should be distinguished because "[t]here is no mention of a payment system, purchase history, receipt, or aggregation of taxable items."  Motion at 18.  This unsupported attorney argument is based upon nonexistent limitations and ignores the combination proposed by Square in the Petition, which includes Carlson combined with Dalzell and Bemmel.  Pet. at 42-43.  As an initial matter, neither "receipts" nor "aggregation of taxable items" are claimed or inherent in the instituted claims and PO's reference to them is irrelevant.  Moreover, the combination of Dalzell and Bemmel discloses a payment system and purchase history.  Ex. 1021, ¶ 35In addition, it is clear that Carlson discloses a system that allows users to pick items from a product catalog and

"check out" at their preferred location. *See, e.g.*, Ex. 1008 at [0012] ("The checkout of the online shopping basket is completed if at least one item is determined to be available for checkout at the current location."); Ex. 1021, ¶ 39. Finally, for the reasons set forth in the Petition and as explained by Dr. Sadeh, it would have been obvious to one of ordinary skill at the relevant time to combine the teachings of Carlson with those of Bemmel and Dalzell. Pet. at 42-43; Ex. 1002 at ¶¶ 288-293. Accordingly, Carlson, in combination with Bemmel and Dalzell as suggested in the Petition, renders the amended claims obvious.

### 3. Tripp, in Combination with Bemmel and Dalzell, Discloses the "Line Item Transaction Data" Limitation.

As with Carlson, PO admits that Tripp discloses line item transaction data. Motion at 18; *see also* Ex. 1021, ¶¶ 47-50. In distinguishing Tripp, PO argues that "the entire point of the '808 patent is frustrated by the lack of record keeping passing through the payment system so that tax and accounting functions can be automated by the consumer." Motion at 18-19. As discussed above, automated accounting and tax functionality is not a claim limitation and not relevant to the analysis of whether the amended claim limitation that the payment system store and communicate line item transaction data is obvious in view of the prior art. PO's attorney argument absent any support from an expert should be rejected.

Further, Tripp discloses that its system can "take orders and communicate them wirelessly over a network 27 to a central-order computer CC, which in turn, can provide billing information to a billing computer." Ex. 1009 at [0012]; Ex. 1021, ¶ 50. Tripp, therefore, discloses that the line item transaction data is stored and communicated by the payment system. Ex. 1021, ¶ 50. Moreover, for the

reasons set forth in the Petition and as explained by Dr. Sadeh, it would have been obvious to one of ordinary skill at the relevant time to combine the teachings of Tripp with those of Bemmel and Dalzell.  Pet. at 44-45; Ex. 1002 at ¶¶ 298-304.

Accordingly, Tripp, in combination with Bemmel and Dalzell as suggested in the Petition, renders the amended claims obvious.

4.    Elston, in Combination with Bemmel and Dalzell, Discloses the "Line Item Transaction Data" Limitation.

As with Carlson and Tripp, PO admits that Elston discloses line item transaction data.  Motion at 19; *see also* Ex. 1021, ¶¶ 55-56.  PO attempts to distinguish Elston on the grounds that "the payment system does not allow line item transaction data to be transferred to the customer for personal tax or auditing services."  Motion at 19.  As discussed above, this distinction is unavailing. Further, Elston discloses storing and communicating line item transaction data. Ex. 1021, ¶ 56.  Finally, for the reasons set forth in the Petition and as explained by Dr. Sadeh, it would have been obvious to one of ordinary skill at the relevant time to combine the teachings of Elston with those of Bemmel and Dalzell.  Pet. at 47; Ex. 1002 at ¶¶ 318-323.  Accordingly, Elston, in combination with Bemmel and Dalzell as suggested in the Petition, renders the amended claims obvious.

**B.    The Added "Line Item Transaction Data" Limitation is Rendered Obvious by Additional Prior Art.**

A quick prior art search by Square revealed multiple additional prior art references that render obvious the "line item transaction data" limitation.

1.    Dohse, in Combination with Bemmel and Dalzell, Discloses the "Line Item Transaction Data" Limitation.

Dohse (attached as Ex. 1022), entitled Receipt Card Systems, was filed on August 30, 2006, and published on March 1, 2007, and therefore constitutes prior art under 35 U.S.C. § 102(b). Dohse discloses "a system and method for accumulating and storing transaction line-item detail on behalf of consumers. The system permits consumers to view stored transaction line-item detail in a variety of ways using a web browser interface." Ex. 1022 at [Abstract]; *see also* Ex. 1021, ¶ 60. FIG. 2 shows a functional diagram of the primary processes of the preferred embodiment. Ex. 1022 at [0045]. FIG. 10 shows an example of a report for a consumer created by the system in accordance with the preferred embodiment. *Id.* at [0053]; *see also* Ex. 1021, ¶ 62. Dohse further discloses that mobile devices may be used to access the stored line-item detail. Ex. 1022 at [0056]; *see also* Ex. 1021, ¶ 63. The consumer can "periodically transfer line-item detail to a personal computer, or similar computer system where a selected a [sic] personal financial manager, such as Intuit Quicken or Microsoft Money, or a small business accounting system, such as QuickBooks from Intuit, Inc. is installed." Ex. 1022 at [0084]; *see also* Ex. 1021, ¶ 64.



**FIG. 2**



**FIG. 10**

Dohse therefore teaches the added aspects of the amended claims, which requires the "payment [system/server] storing and communicating line item transaction data." Ex. 1021, ¶¶ 65-66.

It would have been obvious for one of ordinary skill in the art to combine this feature of Dohse with Bemmel and Dalzell, as adding the personal financial

management features of Dohse to the electronic marketplace and bidirectional account features of Dalzell together with the authentication features disclosed by Bemmel would offer an additional benefit to customers.  Ex. 1005 at [Abstract]; Ex. 1006 at [Abstract]; *see also* Ex. 1021, ¶ 67.  Moreover, it was common practice for individuals designing electronic payment systems to research and combine the features of other similar systems already in existence at the time, especially where those features were complementary.  Ex. 1021, ¶ 67.  In this case, adding the storage, communication, and management of line item detail from purchases to the payment systems of Bemmel and Dalzell would have been a predictable and desirable result of the combination of Bemmel, Dalzell, and Dohse.  *Id.*

<div style="text-align:center">

2.    <u>Jagatic, in Combination with Bemmel and Dalzell, Discloses the "Line Item Transaction Data" Limitation</u>.

</div>

Jagatic (attached as Ex. 1023), entitled Transmission and Capture of Line-Item-Detail to Assist in Transaction Substantiation and Matching, was filed on February 15, 2007, and published on August 21, 2008, and therefore constitutes prior art under 35 U.S.C. § 102(b).  Jagatic discloses "leverag[ing] existing data feeds to capture LID [line-item-detail] at a point of sale (POS) terminal.  The POS terminal sends the encrypted LID to a central database."  Ex. 1023 at [0008].  The line item data is used to determine whether the captured line item data qualifies for tax advantaged accounts, such as FSA, HRA, or HSA.  *Id.* at [0005], [0018]; *see also* Ex. 1021, ¶ 71.  "FIG. 1 illustrates a sample receipt containing line-item-details for a purchase made by a card holder."  Ex. 1023 at [0012].  "FIG. 3 is a flowchart illustrating a process of capture and transmission of line-item-detail to

provide tax advantaged account benefits for eligible items to card holders." *Id.* at [0014]. The data is then stored. *Id.* at [0039]; *see also* Ex. 1021, ¶ 71.



**FIG. 1**

FIG. 3

Jagatic therefore teaches the added aspects of the amended claims, which requires the "payment [system/server] storing and communicating line item transaction data." Ex. 1021, ¶¶ 72-73.

It would have been obvious for one of ordinary skill in the art to combine this feature of Jagatic with Bemmel and Dalzell because by combining the features disclosed by Jagatic for the transmission and capture of line item details together with the electronic payment features of Dalzell and Bemmel, one would be able to offer customers the benefits of being able to automatically import and process purchase information details. Ex. 1021, ¶ 74. Bemmel and Jagatic also both disclose use of a POS terminal connected to payment processing services in a financial transaction. Ex. 1005 at [0047]; Ex. 1023 at [0024]; *see also* Ex. 1016, ¶

74.    Moreover, it was common practice for individuals designing electronic payment systems to research and combine the features of other similar systems already in existence at the time, especially where those features were complementary. Ex. 1021, ¶ 74. In this case, adding the transmission of line item detail through the POS and payment processing system to the payment systems of Bemmel and Dalzell would have been a predictable and desirable result of the combination of Bemmel, Dalzell, and Jagatic. *Id.*

### C.    Patent Owner's "Indicia of Nonobviousness" Is Unavailing.

PO's discussion of so-called "indicia of nonobviousness" at pp. 14-16 of its Motion is uncorroborated, misplaced argument, or both. PO claims that the '808 patent addressed a long-felt but unsolved need and cites to the declaration of Mr. Greenspan.

Mr. Greenspan discusses two NACHA conferences that he attended, but attaches no corroborating evidence. Ex. 2021 at ¶¶ 9-12. Both conferences occurred after the filing of the provisional application that resulted in the '808 patent the content of any discussions as well as their relevancy here is unclear. Further, Mr. Greenspan testifies that he was the only at one of the meetings to suggest modifying the traditional payment system to include additional information. Even if true, this would seem to actually demonstrate those in the industry did not believe there was a long-felt but unsolved need to include line item information in the payment system.

PO also cites to an online forum in which two questions relating to line item data on credit card statements were posed. Exs. 2025, 2026. PO offers no

evidence that this online forum represents a credible source of information. Moreover, to the extent such evidence is given any weight, it undermines rather than supports PO's argument.

The post "How long will it be before before [sic] fully itemized credit card/bank statements emerge..." had 34 users who indicated that they wanted answers and 4 answers. Ex. 2025 at *1. The first answer, by a blog by someone named Gus Fuldner on July 29, 2010, indicates that this feature was already available. *Id.* ("This feature is called Level III purchase data. It is readily available today on corporate purchasing cards from most of the major card networks."). During his deposition, Mr. Greenspan asserted Mr. Fuldner was well-known in the Bay Area payment world and he would consider Mr. Fuldner's point of view as worth hearing when asked whether he considered any of the posters to the questions payment system experts. Ex. 1020 at 55:20-56:4; 57:12-17. Thus, this evidence undermines PO's assertions regarding patentability.

The post "Why do itemized credit card statements only show business abbreviations and purchase totals..." had 23 users who indicated they wanted answers and 6 answers. Ex. 2026 at *1. Mr. Fuldner was again the first to respond on October 19, 2011, and stated that "[t]here is some receipt data available from certain merchants that provide 'Level III' data" and incorporated by reference his answer in Ex. 2025. *Id.*

As with the NACHA conferences, these posts occurred after the priority date of the '808 patent. They fail to demonstrate a long-felt but unsolved need, but in fact, seem to demonstrate the availability of the very aspects the PO asserts support

a finding of nonobviousness.  The number of people wanting answers also does not demonstrate that this may generally be considered a long-felt need.  Finally, the evidence from Mr. Fuldner indicates that this is not an unsolved need.  As such, Exhibits 2025 and 2026 undermine rather than support PO's position.

The record lacks any evidence that supports PO's claims of secondary considerations of nonobviousness and, in fact, demonstrates that the proposed amendment of "the payment [system/server] storing and communicating line item transaction data" was known prior to the '808 patent.

## V.    CONCLUSION

For the reasons set forth above, Petitioner asks that PO's Motion be *denied*.

Respectfully submitted,

Dated:  August 3, 2015          /Michael T. Rosato/
Michael T. Rosato, Lead Counsel
Reg. No. 52,182

Paper No. _____
Filed:  August 3, 2015

Filed on behalf of:  Square, Inc.
By:   Michael T. Rosato
      Robin L. Brewer
      WILSON SONSINI GOODRICH & ROSATI
      Professional Corporation
      701 Fifth Avenue, Suite 5100
      Seattle, Washington  98104-7036
      Telephone:  (206) 883-2529
      Facsimile:  (206) 883-2699
      Email:      mrosato@wsgr.com
      Email:      rbrewer@wsgr.com

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————————————

SQUARE, INC.,
Petitioner

v.

THINK COMPUTER CORPORATION,
Patent Owner

————————————————————

CBM2014-00159
Patent No. 8,396,808

————————————————————

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE**

# TABLE OF CONTENTS

<div align="right"><u>Page</u></div>

I.     STATEMENT OF RELIEF REQUESTED AND
PRELIMINARY STATEMENT .................................................... 1

II.    PATENT OWNERS'S UNSUPPORTED CLAIM
CONSTRUCTION ARGUMENT IS UNAVAILING................................... 1

      A.     Patent Owner Fails to Demonstrate that "Line Item Data"
Is Necessarily Required by the Terms of the Claims............................ 1

III.   THE INSTITUTED CLAIMS ARE OBVIOUS OVER THE
PRIOR ART PURSUANT TO 35 U.S.C. § 103 ........................... 4

      A.     Patent Owner's Attempt to Distinguish the Prior Art
Based on a Limitation that Does Not Appear in the
Claims Is Unavailing............................................................. 4

      B.     The Cited Prior Art Discloses Product Catalog, Purchase
List, and Transaction Record. ................................................. 5

      C.     A Person of Skill in the Art Would Have Found It
Obvious to Combine the Bemmel and Dalzell
References. ....................................................................... 7

           1.     Patent Owner Disregards Dr. Sadeh's Testimony
Regarding Bemmel's and Dalzell's Explicit
Suggestion to Combine............................................. 8

           2.     Patent Owner Fails to Rebut Square's Showing of
Industry Custom to Combine Complementary
Features. .......................................................... 9

           3.     Dr. Sadeh Demonstrated that the Combination of
Bemmel and Dalzell Would Yield Predictable
Results............................................................. 11

           4.     Patent Owner's Remaining Arguments Are
Unavailing.......................................................... 12

IV.   THE ARGUMENTS UNDER 35 U.S.C. §325(D) ARE
MISPLACED.................................................................. 14

V.     CONCLUSION................................................................. 14

Filed on behalf of Think Computer Corporation
By:    Sean G. Goodwin (sgg@aschenbrenerlaw.com)
       Michael Aschenbrener (mja@aschenbrenerlaw.com)
       Aschenbrener Law, P.C.
       38 Country Lane
       Deer Park, IL 60010
       Tel: (312) 970-9303

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SQUARE, INC.
Petitioner

v.

THINK COMPUTER CORPORATION
Patent Owner

_____

Case No.: CBM2014-00159
Patent 8,396,808

_____

**PATENT OWNER'S REPLY IN SUPPORT OF MOTION TO AMEND
UNDER 37 C.F.R. § 42.221**

## I.  PATENT OWNER'S MOTION PROVIDES AMPLE SUPPORTING EVIDENCE, NOT THAT DOING SO IS NECESSARY.

Petitioner's lead argument in opposition to Patent Owner's ("PO") motion to amend is that the motion is not supported by corroborating evidence. Petitioner's argument, based upon a non-published decision, is demonstrably incorrect. Petitioner's premise is also flawed because the cases on which Petitioner relies state that corroborating evidence is required to invalidate a patent, not to amend.

Petitioner relies on *Ex parte SPX Corp.*, Reexamination Control No. 90/006,272 (BPAI March 14, 2007) (incorrectly cited by Petitioner as "*SPC Corp.*") for the proposition that Aaron Greenspan, as owner of PO, is an interested party, and his testimony should be considered less credible. (Paper 29 at 2-3). But the very first line of *SPX Corp.* is "[t]he opinion in support of the decision being entered today was *not* written for publication and is *not* binding precedent of the Board." (Emphasis in original.) Thus, Petitioner's argument should be afforded little weight. Moreover, the interest of a party is one factor and is not dispositive.

More importantly, the cases on which the *SPX* decision rests do not directly support Petitioner's arguments. For example, *SPX* cities to *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728 (Fed. Cir. 2002), which states that "[g]enerally, oral testimony of prior public use must be corroborated in order to invalidate a patent." *Id*. at 737-38. Thus, Petitioner's argument that PO's expert testimony is uncorroborated is misplaced—it is Petitioner's testimony that must be corroborated.

Additionally, *SPX* relies on *Checkpoint Systems, Inc. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1339 (Fed. Cir. 2005), which states that "[t]he law has long looked with disfavor upon invalidating patents on the basis of mere testimonial evidence absent other evidence that corroborates that testimony." (Quoting *Finnigan Corp. v. United States Int'l, Trade Comm'n*, 180 F.3d 1354, 1366 (Fed. Cir. 1999).) Square is ultimately making the case that Dr. Sadeh's uncorroborated testimony must be sufficiently supported, not that PO's expert testimony is deficient.

In its attack on Mr. Greenspan's expert declaration,[1] Petitioner argues that the Greenspan Declaration should be afforded little or no weight because he fails to include corroborating evidence concerning his attendance at a 2010 NACHA Internet Council meeting. (Paper 29 at 3-4 (citing Paper 2021 at ¶¶ 9-12).) This is the only set of paragraphs that Petitioner argues lack corroborating evidence. Setting aside the fact that the principle favoring corroborating evidence does not apply here, several attached exhibits clearly demonstrate Mr. Greenspan's attendance and participation (Ex. 2037, Email from NACHA to Mr. Greenspan; Ex. 2038, Panel Notes; Ex. 2039, Conference Agenda showing Mr. Greenspan as a panelist for the 1:00 p.m. discussion; and, Ex. 2040, Conference Attendee List.)

Petitioner also argues that Mr. Greenspan's support corroborating ¶ 6 n. 2 of his declaration (Paper 2021) undermines PO's position regarding the point that the

---

[1] Petitioner also generally calls into question Mr. Greenspan's expert qualifications. Attached as Exhibit 2036, please find Mr. Greenspan's CV.

lack of line item data represents a significant problem. (Paper 29 at 3.) Petitioner argues that the book referenced in Mr. Greenspan's declaration undermines Think's position because Mr. Greenspan "admits . . . there is a solution to the problem and the flaw has been fixed." (*Id*.) In so arguing, Petitioner: (1) tacitly admits that the lack of line item data is a significant problem; (2) inadvertently reveals that the referenced book demonstrates that the problem is *not* fixed.

The authors of the book, *Strategic Marketing in Practice*, thought they had found software ("Signifo," now "webexpenses") in 2007 that solves the problem central to the '808 Patent, but they did not, because Signifo does not transfer line item data. The book's Figure 4 (Ex. 2042, loc. 3859 of 6384) shows each line as a different *transaction*; line item data can only be *manually entered* with a separate, offline product shown in Figure 3 (*Id*., loc. 3849 of 6384). Even today, Signifo still does not offer line item data integration. (Ex. 2043 & 2044.) Thus, the referenced software does not actually transmit or receive line item data from *any* bank.

Petitioner's lead arguments fail upon basic inspection, and demonstrate that PO's motion to amend should be granted.

## II. PATENT OWNER ADEQUATELY CONSTRUED "LINE ITEM TRANSACTION DATA" IN ITS MOTION TO AMEND.

Petitioner argues that PO failed to adequately construe the claims, specifically "line item data" (aka "line item transaction data") in its motion. But Petitioner's argument obfuscates and ignores the simple reality that PO satisfied

*Idle Free Sys., Inc. v. Bergstrom, Inc.*, Case IPR2012-00027, at 7 (PTAB June 11, 2013) (Paper 26) in this regard in PO's expert declaration. (Paper 2021 ¶ 6.)

*Idle Free* holds that a patent owner filing a motion to amend must construe new claim terms. *Idle Free* at 7. Patent Owner does so: line item transaction data "may include quantity, description, type, cost, product identifier (e.g., stock keeping unit), tax, duty, shipping or other fees." (Paper 2021 ¶ 6.)

Despite Petitioner's efforts to confuse the issue, it really is this simple.

## III. DALZELL DOES NOT SUPPORT BIDIRECTIONAL ACCOUNTS.

Petitioner incorrectly contends that the '808 Patent is not patentably distinct over Dalzell because Dalzell supports "bidirectional account features." (Paper 29 at 20-21.) Yet the '808 is patentably distinct over Dalzell because Dalzell does not support bidirectional accounts at all, let alone send or receive line item data.

"[0059] As is conventional, users of the marketplace system *can register online as marketplace sellers* and *thereafter* create marketplace listings. As part of seller registration and/or as marketplace listings are created, the system may allow the user/seller to . . . specify a bank account into which proceeds from sales are to be deposited by the system or its operator." (Ex. 1006, (emphasis added).)

This represents two extra steps: registering a new seller account to enable the receipt of funds, and adding a new *external* payment account to hold them. In other words, Dalzell does *not* support bidirectional accounts. A purchaser specifies

a particular payment card to make payments, but Dalzell—which is a marketplace, not a payment system—does not support using the same card to receive payments. The reverse is also true: entering ACH bank information for a seller account does not permit use of the same bank account to transmit funds from a purchaser account. Either way, Dalzell requires two extra steps versus the '808 Patent.

To get around this, Dr. Sadeh makes an unsupported logical leap. (Ex. 1002 at ¶ 151). "As illustrated in the citation listed above, according to Dalzell, a user account stores both payment information and bank account information (in particular for sellers). For each account, the system stores the information necessary for that account to be both a buyer and seller. *See also* Ex. 1006 at [0061]." (*Id*.) The first sentence is true, but the second sentence is not because, as [0059] points out, the system must create a new and separate account for sellers that also uses separate payment data, and therefore the system does *not* "store[] the information necessary for that account to be both a buyer and seller." (*Id.*) Accordingly, Dalzell fails to satisfy the first step of proposed claim 23 (original claim 1), and the '808 Patent is patentably distinct over Dalzell.

## IV.    CONCLUSION AND RELIEF REQUESTED

For at least the foregoing reasons, the Patent Owner respectfully requests that the Board grant this Motion to Amend in the event that the Board cancels the instituted claims.

Trials@uspto.gov                                    Paper 34
Tel: 571-272-7822                          Entered: August 14, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SQUARE, INC.,
Petitioner,

v.

THINK COMPUTER CORPORATION,
Patent Owner.

————————

Case CBM2014-00159
Patent 8,396,808 B2

————————

Before TONI R. SCHEINER and MICHAEL W. KIM, *Administrative Patent Judges*.

KIM, *Administrative Patent Judge*.

ORDER
Conduct of Proceeding
*37 C.F.R. § 42.5*

On August 13, 2015, a conference call was held between counsel for Petitioner and Patent Owner, as well as Judges Scheiner and Kim. During the call, two issues were discussed.

CBM2014-00159
Patent 8,396,808 B2

*Motion to Withdraw as Counsel*

On August 12, 2015, Patent Owner filed a Motion to Withdraw as Counsel for Patent Owner Under 37 C.F.R. § 11.116(b).  Paper 33; "Motion."  Specifically, the Motion requested withdrawal of Mr. Sean Goodwin from the proceeding as counsel for Patent Owner.  The Motion was filed without prior Board authorization.  Moreover, the Motion did not address the impact of the requested withdrawal on Patent Owner in light of the requirements of 37 C.F.R. § 42.10.

During the call, Mr. Goodwin requested authorization to file a motion to withdraw based on several financial, personal, and strategic hardships imposed by his current representation of Patent Owner.  Neither party objected to this request.  On these representations, the Board informed Mr. Goodwin that while the Motion would be expunged, Mr. Goodwin was authorized to file another motion for withdrawal.  In the motion, Mr. Goodwin must show why his current situation constitutes good cause sufficient for the Board to exercise its discretion under 37 C.F.R. § 42.5 to waive Patent Owner's compliance with several requirements of 37 C.F.R. § 42.10, in particular subparts (a) and (c).

*Patent Owner's Reply Brief Outside the Proper Scope*

During the call, Petitioner expressed a concern that certain sections of Patent Owner's Reply in Support of Motion to Amend (Paper 32; "Reply") were outside the proper scope of the subject matter of Patent Owner's Motion to Amend (Paper 20; "Motion to Amend") and Petitioner's Opposition to Patent Owner's Motion to Amend (Paper 29; "Opposition").  Also, Petitioner indicated that in a motion to exclude it is authorized to file by Due Date 4, it may seek to exclude portions of Patent Owner's Reply.

2

CBM2014-00159
Patent 8,396,808 B2

Patent Owner asserted that this was the first indication of such a concern, and further asserted the belief that the contents of the Reply were within the scope of the Motion to Amend and the Opposition.

IT IS ORDERED that Paper 33 is expunged;

IT IS FURTHER ORDERED that Mr. Goodwin is authorized to file a motion to withdraw as counsel, limited to three pages, by August 18, 2015;

IT IS FURTHER ORDERED that as a discrete section of any motion to exclude filed by Due Date 4, Petitioner may, but is not required to, identify arguments and evidence in the Reply and in Patent Owner's Exhibits, filed contemporaneously therewith, that Petitioner contends exceed the proper scope of a Reply. The identification shall be in the form of a sequentially numbered, itemized list, containing no more information than the paper/exhibit number and page/paragraph range, as appropriate, of the material that Petitioner alleges exceeds the proper scope of a Reply. Other than a brief introductory sentence immediately after a heading identifying that this section of the motion to exclude is responsive to this Order, no explanation, elaboration, or discussion should be included in this portion of the motion to exclude; and

IT IS FURTHER ORDERED that as a discrete section of any opposition to Petitioner's motion to exclude to be filed by Due Date 5, Patent Owner may respond to Petitioner's identifications. This section of the response shall be in the form of an itemized list with sequential numbering in one-to-one correspondence with the numbering of Petitioner's list (to maintain sequential correspondence, state "none" for any items for which Patent Owner lacks a corresponding citation to the Record). Other than a brief, introductory sentence immediately after a heading identifying

CBM2014-00159
Patent 8,396,808 B2

that this section of the opposition is responsive to this Order, Patent Owner's response should not include arguments and explanations. Each listed item in Patent Owner's response may provide up to 2 (two) citations to the Record by paper/exhibit number and page/paragraph range, as appropriate, namely: (1) where, if at all, Patent Owner initially raised the issue in its initial Motion to Amend and accompanying Exhibits; and (2) the specific portions of the Opposition that Patent Owner believes justifies the material in the Reply; and

IT IS FURTHER ORDERED that Petitioner and Patent Owner must confer concerning the issues raised by Petitioner regarding Patent Owner's Reply prior to filing any motion to exclude.

Paper No. _____
Filed: August 18, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SQUARE, INC.,
Petitioner,

v.

THINK COMPUTER CORPORATION,
Patent Owner

_____

CBM2014-00159
Patent No. 8,396,808

_____

**PETITIONER'S MOTION TO EXCLUDE EVIDENCE
PURSUANT TO 37 C.F.R. § 42.64(c)**

## I.    STATEMENT OF PRECISE RELIEF REQUESTED

Petitioner Square, Inc. ("Square") moves to exclude Patent Owner Think Computer Corporation's ("PO") Exhibit 2042, pursuant to 37 C.F.R. § 42.64(c).

Additionally, per the Board's authorization in Order (PN 34) Square herein identifies evidence and/or argument, first presented in PO's reply (PN 32) to Square's opposition to the motion to amend, which are believed untimely under 37 C.F.R. § 42.23(b), should have been included in PO's motion to amend if believed relevant, and/or exceeds the proper scope of a reply

## II.    STATEMENT OF REASONS FOR THE RELIEF REQUESTED

### A.    <u>Ex. 2042 Should be Excluded</u>

Petitioner respectfully requests the Board exclude Exhibit 2042 under F.R.E. 106.  Exhibit 2042 consists of seven excerpted pages from the book *The Official CIM Coursebook: Strategic Marketing in Practice*, Ranchhod, A. and Marandi, E., Elsevier Ltd. (2007).  Ex. 2042, as submitted by Patent Owner, omits parts of the record "that in fairness ought to be considered at the same time."

### B.    <u>Brief Identification of Evidence and/or Argument Untimely under 37 C.F.R. § 42.23(b) and Exceeding the Proper Scope of a Reply</u>

The Board's Order (PN 34) authorized Square to include in this motion to exclude identification of evidence and/or argument believed untimely under 37 C.F.R. § 42.23(b), which should have been included in PO's motion if believed relevant, and/or exceeds the proper scope of a reply.  Accordingly, attention is respectfully directed to the following:

1. Exhibit 2036 – Greenspan CV; corresponding argument at Reply, p. 2, FN1.

2. Exhibit 2037 – Email from NACHA to Mr. Greenspan; corresponding argument at Reply 2:8-17

3. Exhibit 2038 – Panel Notes; corresponding argument at Reply 2:13-17

4. Exhibit 2039 – Conference Agenda; corresponding argument at Reply 2:13-17

5. Exhibit 2040 – Conference Attendee List; corresponding argument at Reply 2:13-17

6. Exhibit 2042 – Excerpts from *Strategic Marketing*; corresponding argument at Reply 3:7-12

7. Exhibit 2043 – Webpage from webexpenses.com; corresponding argument at Reply 3:12-14

8. Ex. 2044 – Administrator's User Guide for webexpenses.com; corresponding argument at Reply 3:12-14

9. Reply at 4:11-5:16 regarding new argument addressing the reference to Dalzell

## III.    CONCLUSION

For the reasons discussed above, the above-identified evidence should be excluded from consideration by the Board in this proceeding.


Date:  August 18, 2015           / Michael T. Rosato /
                                 Michael T. Rosato
                                 WILSON SONSINI GOODRICH & ROSATI
                                 701 Fifth Avenue, Suite 5100
                                 Seattle, WA  98104-7036
                                 Tel.: 206-883-2529
                                 Fax: 206-883-2699
                                 Email: mrosato@wsgr.com

                                 Attorney for Petitioner Square, Inc.

Filed on behalf of Think Computer Corporation
By:    Isaac Rabicoff (isaac@rabilaw.com)
       Rabicoff Law LLC
       100 N Lasalle Suite 2400
       Chicago, IL 60602
       Tel: (773) 669-4590
       Fax: (312) 984-1504
       Michael Aschenbrener (mja@aschenbrenerlaw.com)
       Aschenbrener Law, P.C.


UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SQUARE, INC.
Petitioner

v.

THINK COMPUTER CORPORATION
Patent Owner

————————

Case No.: CBM2014-00159
Patent 8,396,808

————————


**PATENT OWNER THINK COMPUTER CORPORATION'S
REQUEST FOR REHEARING PURSUANT TO 37 C.F.R. §42.71**

# TABLE OF CONTENTS

I.    **Relief requested under 37 C.F.R. §42.71**........................................................1

II.   **Introduction** ........................................................................................1

III.  **The Board overlooked or misapprehended the phrase "any particular transaction"**................................................................................2

IV.  **Dalzell fails to meet the claims' requirements**........................................7

V.   **Line Item Data**........................................................................................10

VI.  **Conclusion**........................................................................................15

## I.    Relief requested under 37 C.F.R. §42.71

Patent Owner Think Computer Corporation ("Patent Owner" or "Think") respectfully requests that the Board reconsider and reverse its decision (Paper 47, the "Decision") ordering that claims 1-7, 9-11, 13-17, and 20-22 of U.S. Patent No. 8,396,808 ("the '808 patent") are held unpatentable. In the alternative, Patent Owner respectfully requests that the Board grant Patent Owner's motion to amend.

## II.    Introduction

When considering a request for rehearing of a decision on a petition, the Board reviews the decision for an abuse of discretion. 37 C.F.R. § 42.71(c). An abuse of discretion may arise if a decision is based on an erroneous interpretation of law, if a factual finding is not supported by substantial evidence, or if an unreasonable judgment is made in weighing relevant factors. *Star Fruits S.N.C. v. U.S.*, 393 F.3d 1277, 1281 (Fed. Cir. 2005); *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004); *In re Gartside*, 203 F.3d 1305, 1315-16 (Fed. Cir. 2000). The party requesting rehearing has the burden of showing that the decision should be modified, and "[t]he request must specifically identify all matters the party believes the Board misapprehended or overlooked." 37 C.F.R. § 42.71(d).

Patent Owner respectfully requests that the Board reconsider its decision to invalidate claims 1-7, 9-11, 13-17, and 20-22 of the '808 Patent ("Invalidated Claims"). The discussion below will demonstrate that the Board has inadvertently

overlooked and/or misapprehended key points already in the record, including but not limited to a crucial phrase in the independent claims of the '808 Patent.

## III. The Board overlooked or misapprehended the phrase "any particular transaction"

The Board overlooked or misapprehended the proper construction of the Invalidated Claims, all of which include the clear limitation (or depend on a claim that does) that financial account role assignments "are adapted to selectively function as either a merchant account or a purchaser account *during any particular transaction,*" Ex. 1001 at 9:62-64, 11:6-8, 12:1-2, 12:29-31 (emphasis added). Fundamentally, this phrase means that all of these claims *require* that one account can simultaneously assume the role of a merchant account in Transaction A while assuming the role of a purchaser account in a different Transaction B.

Patent Owner's arguments are consistent with and have been previously argued by Patent Owner. For example, Patent Owner has always held that the bi-directional payment system functionality is a necessary limitation to all of the claims. *See, e.g.* Paper 7 at 8, 17. Even Petitioner concedes that a bi-directional account "is shorthand for referring to an entire claim element that embodies this concept of assigning a role of a purchaser or a merchant." Paper 46, 38:5-7.

In its Decision, the Board relies *exclusively* on the meaning of the word "selectively" when construing the phrase "wherein the first account and the second account are adapted to selectively function as either a merchant or a purchaser

account during any particular transaction," interpreting it to involve selection of the account roles by a human being, rather than the payment system[1]. Decision at 11, 13-14. Nowhere does the Board consider the additional limitation created by the phrase "during any particular transaction."

Regardless of whether the payment system or a human directly selects the roles, all of the claims require that any particular financial account in the payment system *must* have the capability to *simultaneously* function as both a merchant account *and* a purchaser account within the broad scope of "*any particular transaction*," or in other words, all transactions. The invocation of the word "any" necessarily means that this functionality must work over a plurality of transactions.

In its Decision, the Board disagreed that this phrase necessarily means simultaneous account roles: "We discern that the ordinary and customary usage of this word ["selectively"] denotes expressly that a particular account need *not* function *simultaneously* as both a merchant account and a purchaser account; a user is permitted expressly to select which account mode is desired at the

---

[1]     The human user presumably exists, but is never alluded to directly in either the claims or the Specification as making the choice; the Specification describes the payment system making the selection. Ex. 1001 at 3:32 ("As part of the step of assigning a purchaser account and a merchant account, the payment system…").

appropriate point in time." *Id*. at 13-14. This interpretation, which was not advanced or shared by Petitioner at oral argument,[2] overlooks and/or misconstrues the proper construction of "any particular transaction," a limitation required by all claims. Each transaction requires two accounts: a "first" and a "second". *See*, *e.g.* Ex. 1001 at 9:59-60. Most importantly, independent Claims 1, 19 and 20 all specifically recite "any particular transaction," which means that this simultaneous merchant/purchaser account functionality must work over multiple transactions, because even if transactions are considered one at a time, any particular transaction might be the one chosen to evaluate, with account roles unpredictable in advance.[3] *Id.* at 9:62-64, 11:6-8, 12:1-2, 12:29-31.

This very issue of construction of the above phrase arose during the prosecution of the '808 Patent, just before the Notice of Allowance was issued. The USPTO Examiner misinterpreted this claim language in a manner similar to the Board's present misinterpretation. Ex. 1004 at 58. For this reason, Patent

---

[2]    *See* Paper 46, 39:1-14. Petitioner simply deferred to questions.

[3]    The Board may be interpreting the '808 Patent's scope as "*within each particular transaction.*" But as the Decision states, "every word in a claim limitation is usually presumed to have meaning," and here the words "*during any*" clearly indicate that a plurality of transactions must be evaluated.

Owner submitted a declaration containing the statement, "At that point it became clear to me that there was a need for an accounting and payment system that could *simultaneously* treat the same legal entity as both a client and a vendor without duplicating data, as described in claim 1 of the above referenced application…" (emphasis added). *Id*. at 60:26-61:2. The Examiner, therefore, ultimately agreed that claim 1 requires simultaneous differing account roles across the scope of all transactions. *Id*. at 10, 58. Patent Owner also clarified that:

> At most, [Wong] discloses that a *person* can assume these different roles, however, this does not teach that an *account within a payment system* is adapted to selectively function as either a merchant account or a purchaser account during any particular transaction, as in Applicant's claim 1" (emphasis in original).

Patent Owner further noted at that time that, "Wong et al. lacks such flexibility." *Id*. at 58. The Notice of Allowance was forthcoming after this exchange. *Id*. at 5[4].

The Specification underscores the disclosed invention's core functionality of simultaneous versatile account roles when reciting step S110: "the versatility of an entity account in the payment system enables simplified bookkeeping (e.g., elimination of duplicate database records)." Ex. 1001 at 3:29-32. Contrary to the Board's understanding, Patent Owner has never admitted that "essentially that after implementation of the 'extra' steps in Dalzell, the result is that an account which

---

[4]     Petitioner submitted the prosecution history in reverse chronological order.

originally had only buyer capabilities now also has seller capabilities." Decision at 28. Patent Owner's position has always been that Dalzell has no such accounts that "also" have the opposite functionality; in Dalzell, buyer accounts and seller accounts are separate and independent of one another, even if they happen to share the same e-mail address as a username.[5]  Rather, the Board's cited passage in the transcript, 29:1-30:8, is notable for the Board's expressions of confusion such as, "Okay. You lost me there," and, "I guess I'm confused…" Paper 46 at 29:9, 30:5.

The Board quotes Ex. 1001, Specification 3:15–22, in support of its assertion that "a particular account need not function simultaneously as both a merchant account and a purchaser account." Decision at 13-14.  But the language, "within the scope of all transactions, accounts of the payment system can function as bi-directional transaction accounts," belies the Board's position for three reasons. First, the Board focuses on the functionality of a single account (merchant or purchaser) instead of the functionality of a single transaction. For *every* transaction, the payment system "has a first account and...second account" that are "adapted to

---

[5]    Rather than indicating that Dalzell renders obvious the '808 Patent, this fact actually validates the need for Patent Owner's invention, as the redundant e-mail address is exactly the kind of data duplication the '808 Patent's Specification discusses eliminating, thanks to versatile account roles, in column 3:29-32.

selectively function as either a merchant account or a purchaser account during any particular transaction." *See, e.g. id.* at 9:61-64. So every transaction *requires* the available functionality of those two accounts. Second, the Board appears to confuse *user* accounts that can, in theory—but *not* in Dalzell—be tied to multiple payment systems, with *financial* accounts, which can only belong to one payment system. *See*, *e.g.* Ex. 1001 at claim 1. Third, the quoted passage of the specification makes clear that the payment system's functionality of bi-directional transaction accounts is "***within the scope of all transactions***." Ex. 1001, 3:20–22 (emphasis added). The Board must have overlooked or misapprehended this; otherwise it could not assert that bi-directional account functionality is *not* a material limitation.

Accordingly, the Board should reconsider its interpretation of the above phrase, and hold that (1) bi-directional account functionality is a *required* limitation of all claims, and (2) accounts in the payment system *must* have the capability to *simultaneously* function as both a merchant account *and* a purchaser account for all transactions.

## IV.    Dalzell fails to meet the claims' requirements

With the construction of the phrase in the above section properly understood, Dalzell does not and cannot satisfy the requirements of any claim in the '808 Patent. All of the arguments in this section have been previously raised by Patent Owner. *See* Paper 7 at 17-19; *see also* Paper 21 at 18-20.

The '808 Patent demands that for a hypothetical new financial transaction, the payment system—which Dalzell is not, since it is merely a marketplace—appropriately assign the proper roles to two payment system accounts: one purchaser role to a first account, and one merchant role to a second. *See, e.g.* Ex. 1001 at claim 1. Already, Dalzell cannot reliably honor the assignment request for two reasons: A) a "second" account, whether user or financial, may not and most likely does not yet exist in the marketplace[6]; and B) even if it does exist in the marketplace due to a user's explicit request to optionally sign up as a seller, that account's role is fixed and does not accept assignment requests. That seller account can never "adapt[] to selectively function as either a merchant account or a purchaser account during any particular transaction," *id.* at 9:62-64, which is another way of saying that it cannot be "selected" on any basis at all. If the second account even exists—which all claims of the '808 Patent demand that it must for

---

[6]     *See* discussion of Dalzell paragraph [0059], involving the terms "can register" and "thereafter." Paper 32 at 4. *See also* paragraph [0061]: "Once registered with the marketplace system, a marketplace seller…" These steps are not merely extra; they are both extra and path-*determining*, such that the Board's "walk 100 meters west" (which should really involve two separate people) may ultimately involve one person running 300 meters south instead. Decision at 13.

every single transaction—it can only ever function as a seller account.

This same fixed-role logic applies both to Dalzell's uni-directional user accounts and to its uni-directional payment accounts. Dalzell clearly does not disclose or teach a bi-directional payment system. For example, the specification in Dalzell recites: "If the user has not yet registered as a seller, the user may be prompted to do so." Ex. 1006 at [0070]. Another passage demonstrates that a person skilled in the art would glean no teaching of a consistently and pervasively bi-directional-account-based system from Dalzell:

> The user may also be prompted to sign-in, and if applicable, to register as a seller (block 630). In one embodiment, an unregistered seller may finish creating the marketplace listing before registering, although buyers may be prevented from buying the listed item until registration is complete. As part of seller registration, the seller may be required, or given the option, to specify a bank account into which sales proceeds are to be automatically deposited by ACH transfer.

*Id.* at [0144].

Although the Board is correct that, "the claim limitation does not require that the payment type be the same for both the purchaser mode and the merchant mode of the account," Decision at 14, this point overlooks that Dalzell specifies that seller accounts only work with ACH *to send money from the marketplace to the seller*, and that purchaser accounts only with credit cards *to send money from the purchaser to the marketplace*. Ex. 1006 at [0167], [0088]. The problem is not that the payment methods are simply not identical, but rather that they are not each

adaptable, as defined by Dalzell, and even as observed by Dr. Sadeh, to function *in both directions*. Ex. 2019 at 75:15-17.

The Board misapprehends a required feature of all the claims when it states, "the claim only requires that the account have a purchaser mode and a merchant mode," Decision at 14. The claims require more, and Dalzell does not render any claim of the '808 Patent obvious by adding extra steps. The bi-directional account functionality is *required* in all claims, during *every* transaction. A POSITA would therefore lack the understanding or motivation to modify the Dalzell marketplace to incorporate bi-directional account functionality as required by these claims.

## V.    Line Item Data

The Board misconstrues the interchangeable terms "line item data" and "line item transaction data" as "itemized information from a larger group of information, related to individual products involved in a purchase or sale, that is capable of categorization." Decision at 11. This definition overlooks that services and/or miscellaneous, uncategorizable items might be involved. Ultimately, the Board construes "line item data" well beyond its broadest reasonable interpretation. Patent Owner has raised these arguments throughout the proceedings. *See* Paper 7 at 37-39; *see also* Paper 46 at pp. 19-20.

In its Decision, the Board likens "line item data" to "fruit," as both can potentially involve many varieties of material. Yet if line item data is fruit, then the

purchase list is a fruit orchard—nothing more than an array of line item data. The Board suggests that a purchase list could potentially be something more that is not defined in the Specification or claims because "the Specification does not indicate that those embodiments are limiting," Decision at 7, but provides no basis for its unreasonably broad interpretation—and the Board's view is therefore not the broadest *reasonable* interpretation. Decision at 7. The Specification, claims, and diagrams are consistent and clear that the purchase list is derived directly from the product catalog; the Specification further likens the purchase list to a "shopping cart." *See* Ex. 1001 at 4:16; *see also id.* at 9:44. Furthermore, there is no alternative construction posited as was true in *In re Van Geuns*, and "line item data" is not a familiar natural principle, in the way that a magnetic field is. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993). For the above reasons, one of ordinary skill in the art would appreciate that a purchase list is nothing more than an itemized list of what is being purchased, i.e. line item data, per the Board's own definition.

The Board expresses distrust of the declaration of Aaron Greenspan, the inventor of the '808 Patent, because it argues that paragraphs 9 and 10 of the declaration, Exhibit 2021, lack citations. Decision at 23. Paragraph 9 references a private conference meeting that was not recorded, so no additional citation to written evidence is available beyond the "Industry Roundtables" agenda item on page 3 of Exhibit 2039. Paragraph 10, however, is supported by evidence on the

record, and discusses the ACH standard, a well-known matter of public record, utilized by numerous federal agencies. Paragraph 10 is also supported by Ex. 2024, which demonstrates that as of 2012—three years after the '808 Patent was applied for—a major credit card processor, Authorize.Net, still did not support Level 3 data, let alone full line item data; as well as Ex. 2025, where Gus Fuldner discusses payment cards, independently echoing Mr. Greenspan's testimony:

> The description of the merchant and its location is just a text field with only 23 characters for the name of the business. There are large barriers to fundamentally changing these standards because there are tens of thousands of banks around the world...

> Regardless, such concepts should be well-known to the Board in the context

of a Covered Business Method proceeding. To the extent this is not already true, the Board misapprehends the functionality of the ACH system when it states:

> [B]ecause line item data can be as little as a few characters, and the ACH system can, at a minimum, transfer a few characters, we are unclear as to why the ACH system cannot already accommodate line item data.

Decision at 25-26. If doorframes were constructed to accommodate only the shortest children, all people, including adult basketball players, could not simply fit through. Basketball players cannot compress themselves into half their height, and doorframes tend to be constructed of inflexible materials. Nor can doorframes sense the presence of a Manute Bol (7'7" tall) and reconstruct themselves accordingly. Similarly, although line item data could in theory be as short as "a

few characters," it could also be gigabytes (billions of bytes) of data, as in the case of a large transaction involving Wal-Mart or a major retailer. The ACH specification is limited to 94 characters per record, where a record comprises all data regarding one financial transaction. There exists no algorithm capable of compressing billions, or even thousands, of pseudo-random bytes into one field—perhaps 12 characters—of the 94 characters available. Even if there were, all of the fields in each record are assigned to purposes aside from line item data, which is not contemplated in the specification, as Mr. Greenspan accurately described.

Nor is it possible to merely "increas[e] the transmission capacity of the ACH system," given that the ACH system is the nation's banking backbone based on a committee-run standard and is maintained by the Federal Reserve. The Board's assertion that "We are unpersuaded that one of ordinary skill at the time of the invention would have been unfamiliar with ways in which to increase transmission capacity [of the ACH network]" is therefore misplaced. As discussed above, it would not be obvious to a person skilled in the art, given the 94-character per record limitation of the ACH specification, to use line item data for financial transfers in the United States, which relies upon the ACH system for interbank payment transfers. This inherent technical limitation of the ACH system would, moreover, *discourage* a person skilled in the art from using line item data in conjunction with ACH or similar payment transfers.

The Board seems to conflate the *existence* of line item data in a merchant's point of sale system with the subsequent *transmission* of that data to a payment system capable of debiting and crediting financial accounts. As long as there have been itemized receipts, line item data has *always* existed on the merchant side. What is novel in the '808 Patent is the ability to transmit that line item data such that it is stored *in the payment system*, "the merchant location being different from the payment system." This is what claims 1 and 2 recite, since the "purchase list" is merely a multiplicity of data elements concerning itemized purchases, or line item data. *See* Ex. 1001 at claim 1; *see also id.* at claim 2. The prior art does not disclose or teach this step, i.e. transmitting a purchase list to a payment system. Dalzell is just a single-merchant (e.g. Amazon.com), single-location POS system.

The Board notes Signifo, which "'works with only four banks,'" Decision at 35, but then ignores or misapprehends Patent Owner's statement in Paper 32 that "the referenced book demonstrates that the problem is *not* fixed" because:

> The authors of the book, *Strategic Marketing in Practice*, thought they had found software ('Signifo,' now 'webexpenses') in 2007 that solves the problem central to the '808 Patent, but they did not, because Signifo does not transfer line item data. The book's Figure 4 (Ex. 2042, loc. 3859 of 6384) shows each line as a different transaction; line item data can only be manually entered with a separate, offline product shown in Figure 3 (Id., loc. 3849 of 6384). Even today, Signifo still does not offer line item data integration. (Ex. 2043 & 2044.)   Thus, the referenced software does not actually transmit or receive line item data from *any* bank.

Paper 32 at 3. For the sake of legibility, Figure 4 of Ex. 2042 is reproduced in the

attached Exhibit A. In other words, the book authors were mistaken. While their excitement at their "discovery" clearly demonstrates long-felt need, the fact that they misinterpreted the user interface of the software in question—Figure 4 does not show any received line item data at all[7], nor does Figure 3, which requires entry of data by hand—does not mean that "a solution was known as of 2007–2008." None was, and the prior art does not show a solution to that long-felt need.

Accordingly, the claim terms "purchase list," product catalog," and "transaction record" require line item data as a *necessary* limitation to all claims.

## VI.    CONCLUSION

The Board has misinterpreted the Invalidated Claims. Petitioner's view on the matter of Dalzell's lack of bi-directionality is far more in line with Patent Owner's than the Board's. Petitioner has also failed to make the required showing that it is more likely than not that any of the reviewed claims of the '808 Patent are obvious. Consequently, the Board should reconsider rendering claims 1-7, 9-11, 13-17, and 20-22 unpatentable, and deem all of these claims patentable. Or, in the alternative, Patent Owner's motion to amend should be granted.

---

[7]    The "Category" column reflects a merchant-level category, not line item data. One could purchase only 50 chocolate bars at a "Petrol" station, and still have the entire transaction confusingly labeled as "Petrol."

Dated: December 27, 2015          Respectfully Submitted,

                                   /s/ /Isaac Rabicoff/
                                   Isaac Rabicoff

**EXHIBIT A**
**Transcribed from Exhibit 2042 at Figure 4**

## CREDIT CARD IMPORT / [?]

[home] [log out] [add] [delete]

| Select All | Description: | Category: | Date: | Currency: | Amount: |
|---|---|---|---|---|---|
| [Check Box] | SHELL SUSSEX 342 EAST GRINSTEA | Petrol | 07-12-2002 | GBP | 53.8000 |
| [Check Box] | ESSO-BELLFIELDS S/STN GUILDFORD | Petrol | 03-12-2002 | GBP | -33.3800 |
| [Check Box] | ESSO-BELLFIELDS S/STN GUILDFORD | Petrol | 03-12-2002 | GBP | 10.0000 |
| [Check Box] | LE CAPRICE PARIS | Meals | 27-11-2002 | EUR | 125.0000 |
| [Check Box] | ESSO-BELLFIELDS S/STN GUILDFORD | Petrol | 21-11-2002 | GBP | 61.6600 |
| [Check Box] | ESSO-BELLFIELDS S/STN GUILDFORD | Petrol | 17-11-2002 | GBP | 37.8400 |
| [Check Box] | MANGO TREE LONDON | Meals | 14-11-2002 | GBP | 130.0000 |
| [Check Box] | ESSO-BELLFIELDS S/STN GUILDFORD | Petrol | 11-11-2002 | GBP | 59.4000 |

Select item(s) and then press add to add to a claim or delete to remove from the system

Tim Geddon / SIGNIFO EXPENSES / Michelin Services Limited

## **CERTIFICATE OF SERVICE**

Pursuant to 37 C.F.R. § 42.6(e)(4), it is hereby certified that on this 28th day of December 2015, a copy of the foregoing document and exhibits was served via Electronic Mail upon the following:

Michael T. Rosato, mrosato@wsgr.com
Robin L. Brewer, rbrewer@wsgr.com

Wilson Sonsini Goodrich & Rosati
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036

/s/ /Isaac Rabicoff/
Isaac Rabicoff, Reg. No. 74,147
Counsel for Think Computer Corporation

Filed on behalf of Think Computer Corporation
By:    Isaac Rabicoff (isaac@rabilaw.com)
        Rabicoff Law LLC
        73 W Monroe St
        Chicago, IL 60603
        Tel: (773) 669-4590

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SQUARE, INC.
Petitioner

v.

THINK COMPUTER CORPORATION
Patent Owner

_____

Case No.: CBM2014-00159
Patent 8,396,808

_____

**PATENT OWNER THINK COMPUTER CORPORATION'S
NOTICE OF APPEAL**

# CERTIFICATE OF SERVICE

I certify that counsel for the parties have been served with a true and correct copy of the foregoing document via the Court's CM/ECF system on January 17, 2017.

*/s/ Isaac P. Rabicoff*
Isaac P. Rabicoff

Attorney for Appellant
THINK COMPUTER CORPORATION